IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

BRAIDWOOD MANAGEMENT, INCORPORATED; JOHN
SCOTT KELLEY; KELLEY ORTHODONTICS; ASHLEY
MAXWELL; ZACH MAXWELL; JOEL STARNES,

Plaintiff-Appellees/Cross-Appellants,

v.

XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES, in his official
capacity as Secretary of Health and Human
Services; UNITED STATES OF AMERICA; JANET
YELLEN, SECRETARY, U.S. DEPARTMENT OF
TREASURY, in her official capacity as Secretary of
the Treasury; JULIE A. SU, ACTING SECRETARY,
U.S. DEPARTMENT OF LABOR, in her official
capacity as Secretary of Labor,

Defendants-Appellants/Cross-
Appellees.

No. 23-10326

---

**REPLY IN SUPPORT OF MOTION FOR A PARTIAL STAY OF
FINAL JUDGMENT PENDING APPEAL**

The district court's judgment extinguished the rights of 150 million
Americans—not parties to this case—who are otherwise protected by the
statutory requirement that insurance plans generally cover without extra
cost preventive services with an "A" or "B" rating in the current
recommendations of the United States Preventive Services Task Force.  42
U.S.C. § 300gg-13(a)(1).  That requirement has been in place for 13 years.

Unsurprisingly, the leading public health organizations and nearly 70 public health deans and scholars have urged this Court to stay the district court's universal remedies pending appeal.  As amici explain, the final judgment encompasses dozens of vital services, including statins to prevent heart attacks and strokes; screenings for breast cancer, colon cancer, and lung cancer; aspirin to prevent preeclampsia deaths in pregnant women and pre-term births; and physical therapy for older adults to prevent falls, which are the leading cause of injury-related death among the elderly.  *See, e.g.*, American Public Health Association and Public Health Deans and Scholars Amicus Br. 7-13 (Doc. 56).

Plaintiffs concede (Resp. 2) that the plaintiff-specific injunction fully redressed the injuries of Braidwood Management, which has a self-insured plan.  They argue (Resp. 3) that the individual plaintiffs needed a broader remedy that would "liberate" Texas insurers to sell them the plans they want.  But the declarations of those plaintiffs failed even to establish standing; they certainly did not support universal remedies.  Plaintiffs' assertion that the Administrative Procedure Act (APA) gave the district court no choice but to extinguish the rights of 150 million people is groundless and contradicts the conclusions reached by their counsel in the article on which they rely.

The district court has not ruled on our partial stay motion and indicated that its "very crowded docket" may prevent it from ruling expeditiously. ROA.2218. The district court also faulted the government for taking two weeks to determine the legal effect of its order vacating unspecified agency actions dating back to 2010, assess the harms that flow from that vacatur, document those harms with supporting declarations, and file a stay motion. ROA.2218. But in the context of this case, that two-week period is negligible. Plaintiffs' claims arose in 2010, ROA.234 ¶ 77, yet they did not bring this suit for another decade. This case was not expedited and took three years to resolve. The exigencies have arisen only because the district court has refused to stay—even administratively—its universal remedies. We thus renew our request that this Court act by May 18 and issue an administrative stay as necessary to consider our motion for a partial stay of the judgment.

## I. The District Court's Universal Remedies Are Likely To Be Reversed On Appeal

**A.** Plaintiffs' response confirms that the district court's universal remedies should be reversed. They concede that the plaintiff-specific relief "fully redressed" the injuries asserted by plaintiff Braidwood Management. Resp. 2. "That is because Braidwood's injuries arose from its inability to determine the coverage in its self-insured plan"—"an injury that was fully

redressed by declaratory and injunctive relief that restrains the defendants from enforcing the unlawful preventive-care coverage mandates *against Braidwood.*" *Id.* (emphasis added).

Plaintiffs argue that the individual plaintiffs—a handful of uninsured Texas residents who alleged that, for religious reasons, they will not buy a plan that covers preexposure prophylaxis (PrEP) drugs, *see* ROA.220 ¶¶ 3-4, 6-7; ROA.226 ¶ 36; ROA.229 ¶ 55—needed "a broader remedy that would liberate private insurers to offer health insurance that excludes the objectionable coverage." Resp. 3. That argument might, at most, have been reason to seek an injunction tailored to preventing defendants from taking enforcement action against a Texas insurer that furnished coverage that did not include the services to which these plaintiffs object. But they did not seek such an injunction, presumably because all qualified health plans in Texas were already covering PrEP drugs as of 2019, *see* ROA.1544-1545, before the Task Force's "A" rating took effect in 2021, *see* ROA.40-41 ¶ 25.

Thus, like the plaintiffs in *Leal v. Becerra*, No. 21-10302, 2022 WL 2981427 (5th Cir. July 27, 2022)—Texas residents who objected to buying a plan that covered contraceptives—the individual plaintiffs here failed to show that their asserted injuries would be redressed by a ruling in their favor. *See id.* at *1-3 (remanding for further consideration of the plaintiffs'

4

standing after the government explained that Texas insurers were covering contraceptives for reasons independent of the federal requirement). Standing is "'substantially more difficult' to establish" when the plaintiff "is not himself the object of the government action or inaction he challenges." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992).  And at the final judgment stage, the plaintiff must substantiate standing allegations with evidence, *id.*, which plaintiffs here failed to do.

Furthermore, plaintiffs' declarations showed that it is speculative whether they would buy insurance even if plans without the objected-to coverage were offered.  Mr. Starnes and Mr. Kelley stopped buying insurance in 2016 in part "because the premiums had become too expensive," and they stated only that they would "seriously consider" buying insurance if plans without objectionable coverage were offered. ROA.2066-2067 ¶¶ 5-7; ROA.2068-2069 ¶¶ 5, 7-8.  Mr. Kelley stopped buying insurance for Kelley Orthodontics in part because "the premiums had become too expensive" and "several of [his] employees asked [him] to drop coverage because they were unable to enroll in their husbands' much better plans as long as [he] was offering coverage to them as part of their job."  ROA.2068-2069 ¶ 6.  Mr. Maxwell and his wife have not had insurance since he left a job in 2021 and "cannot guarantee that [he] would

once again purchase health insurance in the absence of the preventive-care coverage mandates." ROA.2070-2071 ¶¶ 5-7.

These declarations could not support an injunction of any kind. They certainly provide no basis to uphold the district court's nationwide injunction and vacatur of all relevant agency actions since 2010. Indeed, nothing in plaintiffs' declarations evinced a desire to deny themselves or millions of other Americans coverage of the many services to which they expressed no religious objection—including services that prevent cancer, heart attacks, birth defects, and strokes. At the very least, then, the district court should have confined any injunction to barring defendants from enforcing § 300gg-13(a)(1) against Texas insurers that provide insurance without the objected-to coverage *to the individual plaintiffs*. Such an injunction would have remedied their asserted injuries without jeopardizing coverage of all other preventive services for all other Americans. This Court should therefore stay the district court's universal vacatur and injunction to the extent it goes beyond that targeted relief, which would fully redress plaintiffs' asserted injuries.

**B.** Plaintiffs' assertion (Resp. 1) that the "set aside" language in § 706 of the APA gave the district court no choice but to enter universal remedies is groundless.

First, the operative complaint challenged only a statutory requirement. *See* ROA.231 ¶ 66 (alleging that 42 U.S.C. § 300gg-13(a)(1) violates the Appointments Clause). In the article on which plaintiffs rely (Resp. 5), their counsel recognized that when the constitutionality of a statute is challenged, "[a]ll that a court can do is announce its opinion that the statute violates the Constitution, decline to enforce the statute in cases before the court, and instruct executive officers not to initiate enforcement proceedings." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 941 (2018) (footnotes omitted). To the extent a plaintiff seeks to prevent a defendant from relying on agency actions implementing a purportedly unconstitutional statute, any ancillary relief applicable to those actions must likewise be limited to preventing enforcement with respect to the relevant plaintiffs. A litigant cannot circumvent those constraints—or the APA's procedural strictures and applicable statutes of limitations— simply by invoking the APA at the remedial stage.

Plaintiffs acknowledge that "district courts have been far too careless in issuing universal remedies such as nationwide injunctions," which they regard as "appropriate only when authorized or required by statute, or when a remedy of that scope is needed to fully redress the injuries to the named litigants or a certified class represented by those litigants."

Resp. 10.  This case is not a certified class action, and universal remedies were not needed to redress the injuries to the litigants.

Universal relief is particularly unwarranted in the context of an Appointments Clause claim.  The Supreme Court has been loath to uphold relief that would "affect the validity" of "past acts" of improperly appointed officers.  *Buckley v. Valeo*, 424 U.S. 1, 142 (1976).  Courts of appeals have thus recognized that such precedent "caution[s] against any approach that would invalidate swaths of administrative decisions."  *Integrity Advance, LLC v. CFPB*, 48 F.4th 1161, 1170 n.12 (10th Cir. 2022); *accord Decker Coal Co. v. Pehringer*, 8 F.4th 1123, 1137 n.8 (9th Cir. 2021).

**C.**  Even if plaintiffs had challenged a specific final agency action, there would be no merit to their assertion that the "set aside" language in § 706 would compel the district court to vacate universally that action if it were determined to be unlawful.  Where, as here, there is no "special statutory review proceeding," the "form of proceeding" for an APA action is a traditional "legal action" for declaratory or injunctive relief, which is subject to the exercise of the district court's equitable discretion.  5 U.S.C. § 703.  The APA makes explicit that its authorization of judicial review does not affect "the power or duty of the court to * * * deny relief on any * * * equitable ground."  *Id.* § 702(1).  Indeed, confining any equitable relief to

no more than what is necessary to remedy the plaintiff's actual or imminently threatened injury is required by both equitable principles and Article III. Accordingly, plaintiffs' counsel has acknowledged that "[t]he authority to 'set aside' an agency's action * * * does not resolve whether courts should extend relief beyond the named litigants." Mitchell, *supra*, at 1014.

This Court's precedent simply describes vacatur as the "default rule"—not a mandatory command. *Data Market Partnership, LP v. Department of Labor*, 45 F.4th 846, 859 (5th Cir. 2022). Plaintiffs make no attempt to reconcile their contrary position with *Central & South West Services, Inc. v. EPA*, 220 F.3d 683 (5th Cir. 2000), where this Court found it appropriate to "remand, without vacatur," a final rule when "vacating would be 'disruptive.'" *Id.* at 692 (quoting *Radio–Television News Directors Ass'n v. FCC*, 184 F.3d 872, 888 (D.C. Cir. 1999) (quoting *Allied–Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 151 (D.C. Cir. 1993))). Plaintiffs' observation (Resp. 7 & n.6) that Judge Randolph criticized the D.C. Circuit cases on which this Court relied is not license to disregard this Court's precedent.

As Chief Judge Sutton has explained, there is no sound reason to conclude that Congress "meant to upset the bedrock practice of case-by-

case judgments with respect to the parties in each case" by including the
"unremarkable" "set aside" language in the APA. *Arizona v. Biden*, 40
F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring). The Supreme
Court has cautioned that when interpreting a statute vesting authority in an
Executive Branch agency, "both separation of powers principles and a
practical understanding of legislative intent make [the Court] 'reluctant to
read into ambiguous statutory text'" an extravagant delegation of power.
*West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). Such caution is equally
appropriate when interpreting a statute that vests authority to review
agency action in district courts, which by constitutional design are insulated
from political accountability. The litany of extraordinary consequences that
flow from universal remedies is well catalogued. *See* Mot. 16-18. The
language in § 706 authorizing a district court to set aside agency action is "a
wafer-thin reed on which to rest such sweeping power." *Alabama Ass'n of
Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021).[1]

---

[1] The article that plaintiffs cite explained that "the APA's embrace of
the appellate model reflected the contemporaneous fact that agencies
overwhelmingly operated through adjudication, not rulemaking," and
found "nothing to the argument that the APA, by its terms, strips courts of
the authority to leave procedurally defective agency rules intact." Nicholas
Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L. Rev. 253,
258, 309 (2017). Other statutes that plaintiffs cite (to the extent either
provides a relevant analogy) were special statutory review provisions that
authorized but did not compel courts to "set aside" agency orders and did

*Continued on next page.*

## II.    The Balance Of Equities And Public Interest Overwhelmingly Favor A Partial Stay Of The Final Judgment Pending Appeal

The balance of equities and public interest overwhelmingly favor the requested partial stay.  Even with respect to their own coverage, plaintiffs voiced no concern over the vast majority of services with an "A" or "B" Task Force rating.  These services include nutritional supplements to support healthy pregnancies, ointments to prevent blindness in newborns, smoking cessation treatments, screenings to reduce the harms caused by diabetes, and a variety of services to detect different types of cancer early.  *See, e.g.*, American Lung Association et al. Amicus Br. 10 (Doc. 55); American Cancer Society et al. Amicus Br. 6-10 (Doc. 78); American Hospital Association et al. Amicus Br. 4-5 (Doc. 79).

Plaintiffs invite this Court to conclude that preventive services do not save lives and that cost is not a barrier to access, based on their own speculation and inapt sources such as a study involving a colonoscopy "public-education campaign" in Europe.  Resp. 14, 16.  But Congress reached the opposite judgment, and "a court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'"  *United*

---

not speak to the scope of relief.  *See* Hepburn Act of Jun. 29, 1906, ch. 3591, § 4, 34 Stat. 584, 589; Federal Trade Commission Act of Sep. 26, 1914, ch. 311, § 5, 38 Stat. 717, 720.

*States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001).  In any event, Congress's judgment had ample support when the statute was enacted and has been validated over the ensuing 13 years.  *See, e.g.*, American Public Health Association and Public Health Deans and Scholars Amicus Br. 14-17 (Doc. 56).

Plaintiffs deem it "implausible" that insurers and plans will reduce coverage pending appeal, Resp. 12, but the declaration they quote simply explained that group health plans and issuers rarely make changes in the middle of a plan year.  ROA.2170-2171 ¶ 6 (Wu).  The government's other declarant explained that more than 20% of group health plans—which, in 2020, covered approximately 6.3 million participants—may start a new plan year before July 1, 2023, and more than a third of group health plans— which, in 2020, covered approximately 14 million participants—may start new plan years before January 1, 2024.  ROA.2179 ¶ 5 (Gomez).

As amici explain, 41% of all American workers were by 2012 covered by group health plans that expanded their list of covered preventive services due to the Affordable Care Act.  American Medical Association et al. Amicus Br. 10 (Doc. 57).  "If even ten percent of those workers' plans reverted to excluding preventive care or requiring cost-sharing, more than *six million Americans* could, at some point, lose access to no-cost

preventive services." *Id.*; *see* Service Employees International Union Amicus Br. 10-11 (Doc. 80). Accordingly, to protect the public interest and prevent irreparable harms to third parties, this Court should enter a partial stay of the final judgment pending appeal.

## CONCLUSION

The Court should partially stay the district court's judgment, specifically the first paragraph of item 3 in the judgment, ROA.2131-2132, until this Court issues its mandate in this appeal.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney
  General*
LEIGHA SIMONTON
  *United States Attorney*
MICHAEL S. RAAB
  */s/ Alisa B. Klein*
ALISA B. KLEIN
DANIEL AGUILAR
(202) 514-5432
  Attorneys, Appellate Staff
  Civil Division
  U.S. Department of Justice
  950 Pennsylvania Avenue, NW
  Washington, DC  20530

MAY 2023

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2023, I electronically filed the foregoing reply with the Clerk of the Court by using the appellate CM/ECF system.  Participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ Alisa B. Klein*
Alisa B. Klein

## CERTIFICATION OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify this reply complies with the requirements of Fed. R. App. P. 27(d)(1)(E) because it has been prepared in 14-point Georgia, a proportionally spaced font, and that it complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A), because it contains 2589 words, according to the count of Microsoft Word.

*/s/ Alisa B. Klein*
Alisa B. Klein