No. 23-10326

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

BRAIDWOOD MANAGEMENT, INCORPORATED; JOHN SCOTT KELLEY; KELLEY ORTHODONTICS; ASHLEY MAXWELL; ZACH MAXWELL; JOEL STARNES,

Plaintiffs-Appellees/Cross-Appellants,

JOEL MILLER; GREGORY SCHEIDEMAN,

Plaintiffs–Cross-Appellants

v.

XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, in his official capacity as Secretary of Health and Human Services; UNITED STATES OF AMERICA; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF TREASURY, in her official capacity as Secretary of the Treasury; JULIE A. SU, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR, in her official capacity as Secretary of Labor,

Defendants-Appellants/Cross-Appellees.

On Appeal from the United States District Court
for the Northern District of Texas, No. 20-cv-283, Hon. Reed O'Connor

## OPENING BRIEF FOR THE FEDERAL DEFENDANTS

BRIAN M. BOYNTON
  *Principal Deputy Assistant Attorney General*
LEIGHA SIMONTON
  *United States Attorney*
MICHAEL S. RAAB
ALISA B. KLEIN
DANIEL AGUILAR
(202) 514-5432
  Attorneys, Appellate Staff
  Civil Division
  U.S. Department of Justice
  950 Pennsylvania Avenue, NW
  Washington, DC  20530

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as appellants are the United States and federal officials sued in their official capacities. Fifth Cir. R. 28.2.1.

*/s/ Daniel Aguilar*
Daniel Aguilar

## STATEMENT REGARDING ORAL ARGUMENT

The district court's judgment—which this Court partially stayed pursuant to the parties' stipulation, *see* Order, Dkt. 153-2 (5th Cir. June 13, 2023)—eliminated for 150 million Americans a statutory right to receive scores of critical preventive services, many life-saving, without additional cost.  Oral argument is warranted in light of the importance of the issues presented.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ v

STATEMENT OF JURISDICTION.............................................................1

INTRODUCTION ....................................................................................1

STATEMENT OF THE ISSUES ...................................................................3

STATEMENT OF THE CASE ......................................................................3

    A.    Statutory And Regulatory Framework ......................................3

    B.    Plaintiffs ................................................................................6

    C.    District Court's Decision........................................................8

          1.    Standing ......................................................................8

          2.    Appointments Clause ....................................................9

          3.    Removal .................................................................... 10

          4.    Nondelegation .............................................................11

          5.    Remedy ...................................................................... 12

SUMMARY OF ARGUMENT .....................................................................14

STANDARD OF REVIEW ........................................................................17

ARGUMENT..........................................................................................17

I.    TASK FORCE MEMBERS ARE INFERIOR OFFICERS WHOSE RECOMMENDATIONS WERE VALIDLY RATIFIED BY THE SECRETARY OF HEALTH AND HUMAN SERVICES.........................................17

    A.    Task Force Members Are Inferior Officers Who Are Supervised By The HHS Secretary ........................................ 19

B.    The HHS Secretary Properly Ratified The Task Force's Recommendations..................................................................27

C.    The HHS Secretary Has Statutory Authority To Prospectively Appoint Task Force Members ...........................30

II.    IF THE SECRETARY CANNOT ADEQUATELY SUPERVISE TASK FORCE MEMBERS, THE STATUTORY RESTRICTIONS ON SECRETARIAL SUPERVISION SHOULD BE SEVERED TO THE EXTENT NECESSARY UNDER THE CONSTITUTION ................................................. 35

III.    AT A MINIMUM, THIS COURT SHOULD REVERSE THE NATIONWIDE INJUNCTION AND UNIVERSAL VACATUR OF AGENCY ACTIONS .................41

A.    The District Court Failed To Consider Whether The Balance Of Equities And The Public Interest Justified Its Universal Remedies ................................................................. 41

B.    The Balance Of Equities And Public Interest Precluded The District Court's Universal Remedies ................................46

CONCLUSION...........................................................................................50

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Arizona v. Biden*,
 40 F.4th 375 (6th Cir. 2022) .................................................... 45

*Aurelius Inv., LLC v. Puerto Rico*,
 915 F.3d 838 (1st Cir. 2019) ..................................................... 46
 *reversed on other grounds*, 140 S. Ct. 1649 (2020) ................................. 46

*Ayotte v. Planned Parenthood of Northern New England*,
 546 U.S. 320 (2006) ................................................................. 35

*Big Time Vapes, Inc. v. FDA*,
 963 F.3d 436 (5th Cir. 2020) .................................................... 11

*Buckley v. Valeo*,
 424 U.S. 1 (1976) .................................................................. 46

*Cargill v. Garland*,
 57 F.4th 447 (5th Cir. 2023) (en banc) .................................................... 44

*Central & South West Services, Inc. v. EPA*,
 220 F.3d 683 (5th Cir. 2000) ................................................... 44

*CFPB v. Gordon*,
 819 F.3d 1179 (9th Cir. 2016) ................................................... 29

*Data Marketing Partnership, LP v. United States Dep't of Labor*,
 45 F.4th 846 (5th Cir. 2022) ..................................................... 45

*Edmond v. United States*,
 520 U.S. 651 (1997) ........................................ 19, 20, 21, 28, 29, 34, 38, 39

*Exela Enterprise Solutions, Inc. v. NLRB*,
 32 F.4th 436 (5th Cir. 2022) ........................................................... 20, 21

*Franciscan Alliance, Inc. v. Becerra*,
 47 F.4th 368 (5th Cir. 2022) ..................................................... 45

v

*Freytag v. Commissioner*,
  501 U.S. 868 (1991) ................................................................ 28

*Georgia v. President of the United States*,
  46 F.4th 1283 (11th Cir. 2022) ............................................ 42

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018) .......................................................... 44

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  920 F.3d 1 (D.C. Cir. 2019) (per curiam) ............................ 28

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
  561 U.S. 477 (2010) ....................................................... 21, 22, 40

*In re Grand Jury Investigation*,
  916 F.3d 1047 (D.C. Cir. 2019) ....................................... 22, 23

*Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*,
  684 F.3d 1332 (D.C. Cir. 2012) ...................................... 22, 40

*Johanns v. Livestock Marketing Ass'n*,
  544 U.S. 550 (2005) .............................................................. 28

*Kajmowicz v. Whitaker*,
  42 F.4th 138 (3d Cir. 2022) ................................................. 29

*Kennedy v. United States*,
  146 F.2d 26 (5th Cir. 1944) .................................... 15, 31, 32

*Kentucky v. Yellen*,
  54 F.4th 325 (6th Cir. 2022) ................................................ 42

*Louisiana v. Becerra*,
  20 F.4th 260 (5th Cir. 2021) .......................................... 43, 44

*Lucia v. SEC*,
  138 S. Ct. 2044 (2018) ......................................................... 19

*Maryland v. King*,
  567 U.S. 1301 (2012) ............................................................ 47

*Metro-North Commuter Railroad Co. v. Buckley*,
    521 U.S. 424 (1997) ................................................................... 17

*Moose Jooce v. FDA*,
    981 F.3d 26 (D.C. Cir. 2020) ....................................... 27-28, 29

*Morrison v. Olson*,
    487 U.S. 654 (1988) ................................................................ 23

*National Federation of the Blind of Texas, Inc. v. Abbott*,
    647 F.3d 202 (5th Cir. 2011) .................................................. 17

*NLRB v. Newark Electric Corp.*,
    14 F.4th 152 (2d Cir. 2021) .................................................... 29

*Public Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989) ................................................................ 26

*Texas Medical Providers Performing Abortion Services v. Lakey*,
    667 F.3d 570 (5th Cir. 2012) .................................................. 26

*Texas v. Yellen*,
    597 F. Supp. 3d 1005 (N.D. Tex. 2022) ............................ 41, 42

*United States v. Arthrex*,
    141 S. Ct. 1970 (2021) ............................................ 2, 16, 36, 38

*United States v. Davis*,
    139 S. Ct. 2319 (2019) ........................................................... 25

*United States v. Hartwell*,
    73 U.S. 385 (1867) ................................................................. 31

*United States v. Scott*,
    61 F.4th 855 (11th Cir. 2023) ................................................ 17

*Vote.Org v. Callanen*,
    39 F.4th 297 (5th Cir. 2022) .................................................. 47

*Williams v. Thrasher*,
    62 F.2d 944 (5th Cir. 1933) ................................................... 28

*Willy v. Administrative Review Board,*
  423 F.3d 483 (5th Cir. 2005) ..................................................... 15, 33, 34

*Winter v. Natural Resources Defense Council, Inc.,*
  555 U.S. 7 (2008) ................................................................... 43

*Zadvydas v. Davis,*
  533 U.S. 678 (2001) ................................................................ 25

## U.S. Constitution and Statutes:

U.S. Const. art. II, § 2, cl. 2 .................................................. 19, 30

Act of July 23, 1866, c. 208,
  14 Stat. 191 ........................................................................ 31

Healthcare Research and Quality Act of 1999,
  Pub. L. 106-129, 113 Stat. 1653 ................................................. 5

Military Appropriation Act, 1943, ch. 477,
  56 Stat. 611 (1942) ................................................................ 32

Military Appropriation Act, 1944, ch. 185,
  57 Stat. 347 (1943) ................................................................ 32

Patient Protection and Affordable Care Act,
  Pub. L. 111-148, 124 Stat. 119 (2010) ...................................... 5, 18

Reorganization Plan No. 3 of 1966,
  80 Stat. 1610 .................................................................. 15, 32, 33

Reorganization Plan No. 6 of 1950,
  64 Stat. 1263 ...................................................................... 34

5 U.S.C. § 301 ....................................................................... 33

5 U.S.C. § 702(1) .................................................................... 44

5 U.S.C. § 704 ....................................................................... 46

5 U.S.C. § 706 ................................................................... 44

5 U.S.C. § 7513 ................................................................. 36

8 U.S.C. § 1103(g)(1) ....................................................... 38

10 U.S.C. § 866 ................................................................ 34

28 U.S.C. § 1291 ................................................................. 1

28 U.S.C. § 2401(a) .......................................................... 46

28 U.S.C. §§ 1331, 1343 ..................................................... 1

35 U.S.C. § 6(c) .......................................................... 36, 37

42 U.S.C. § 202 ................................... 9, 20, 24, 27, 37, 39

42 U.S.C. § 299(a) ............................................ 31, 32, 33, 34

42 U.S.C. §§ 299(a), 299b-4(a) .................................... 20

42 U.S.C. §§ 299(a), 299b-4(a)(1) ............................... 15

42 U.S.C. § 299b-4 .................................................. 18, 20

42 U.S.C. § 299b-4(a) ........................................... 5, 14, 19

42 U.S.C. § 299b-4(a)(1) ...................... 5, 26, 31, 32, 34, 37

42 U.S.C. § 299b-4(a)(6) .......... 5, 10, 12, 14-15, 15, 25, 27, 29, 35, 37, 39 50

42 U.S.C. § 300gg-13 ..................... 3-4, 6, 8, 14, 18, 19, 30, 35, 37, 39, 40

42 U.S.C. § 300gg-13(a) ............................................ 14, 42

42 U.S.C. § 300gg-13(a)(1) ................... 4, 6, 16, 20, 25, 26, 48, 50

42 U.S.C. § 300gg-13(a)(2)-(4) ...................................... 4

42 U.S.C. § 300gg-13(a)-(b) .................................... 14, 50

42 U.S.C. § 300gg-13(b) ............................................... 4

42 U.S.C. § 300gg-13(b)(1)-(2) ................................................... 24

**Filings on Appeal:**

American Public Health Association and Public Health Deans and Scholars
   Amicus Br.,
   Dkt. 56 (5th Cir. May 1, 2023) ............................................... 48

Order,
   Dkt. 99-2 (5th Cir. May 15, 2023) ......................................... 13

Order,
   Dkt. 153-2 (5th Cir. June 13, 2023) ................................... ii, 13

Pls.' Resp. to Mot. for a Partial Stay of Final Judgment Pending Appeal,
   Dkt. 66 (5th Cir. May 5, 2023) .............................................. 49


**Other:**

*Appointment and Removal of Federal Reserve Bank Members of the
   Federal Open Market Committee,*
   43 Op. O.L.C. ___, 2019 WL 11594453 (2019) ................................... 23-24

KFF, *FAQs: Health Insurance Marketplace and the ACA:
   Marketplace Eligibility,*
   https://perma.cc/3UYB-K95G ............................................. 50

*Proclamation by the President: National Breast Cancer Awareness
   Month, 2003,*
   3 C.F.R., 2003 Comp., pp. 115-16 (Oct. 3, 2003) ..................................... 17

U.S. Preventive Services Task Force, *A & B Recommendations,*
   https://perma.cc/FC9Y-Y3DN ............................................... 6

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1343.  ROA.220.  The district court issued its final judgment on March 30, 2023.  ROA.2131-2132.  The defendants filed a notice of appeal the next day, ROA.2133, and plaintiffs filed a cross-appeal on April 6, 2023, ROA.2141.  This Court has jurisdiction under 28 U.S.C. § 1291.

## INTRODUCTION

For the past 13 years, federal law has generally required group health plans and insurers that offer group or individual health plans to cover, without cost sharing, preventive services and items that receive an "A" or "B" rating from the U.S. Preventive Services Task Force.  This statutory requirement gives 150 million Americans access (at no extra cost) to more than 50 services—many life-saving—including statins to prevent heart attacks and strokes, and procedures that detect various forms of cancer early when survival rates are far higher.

The district court declared that Task Force members are officers of the United States whose appointment did not comport with the Constitution's Appointments Clause.  Although the Secretary of Health and Human Services (HHS) had ratified the Task Force's recommendations, the district court declared that ratification to be ineffectual.  As a remedy, the

district court not only entered relief tailored to the six prevailing plaintiffs but also entered a nationwide injunction and universal vacatur of agency actions taken since March 2010 to implement the statutory coverage requirement.

The district court's judgment should be reversed. The government does not challenge the district court's conclusion that members of the Task Force are officers of the United States who were not appointed consistent with the Constitution's Appointments Clause. But the HHS Secretary can properly appoint Task Force members as inferior officers prospectively and has already ratified the Task Force's recommendations and accepted them as his own. That ratification remedies any Appointments Clause violation. And, if more were needed, the Court could narrowly construe or sever the statutory provision that limits the Secretary's supervision over the Task Force, as the Supreme Court recently did to eliminate an Appointments Clause violation in *United States v. Arthrex*, 141 S. Ct. 1970 (2021).

The district court compounded its legal errors by entering not only plaintiff-specific relief but also a nationwide injunction and universal vacatur of past agency actions. There was no basis for that sweeping relief, which undermines access to vital preventive services for 150 million people. The prevailing plaintiffs are two Texas companies and four uninsured

individuals who live in Texas.  They have no interest in the terms of health insurance offered to other people or in other States, nor do they have any interest in the terms of the millions of group health plans offered by other employers.

## STATEMENT OF THE ISSUES

1.  Whether the HHS Secretary properly ratified recommendations made by Task Force members, who are inferior officers subject to supervision by the Secretary.

2.  If statutory limitations on the Secretary's supervision of the Task Force do not comport with the Constitution, whether those limitations should be severed.

3.  Whether the district court erred by entering a nationwide injunction and universal vacatur of agency actions.

## STATEMENT OF THE CASE

### A.    Statutory and Regulatory Framework

As part of the Patient Protection and Affordable Care Act (ACA), Congress generally required group health plans and insurers offering coverage in the individual or group markets to cover certain preventive services without cost sharing—*i.e.*, without requiring the insured person to pay deductibles, copayments, or other out-of-pocket payments.  42 U.S.C.

§ 300gg-13. Congress did not create a fixed list of covered preventive services, but rather provided for coverage of categories of services according to the up-to-date recommendations of medical experts. The Act requires coverage for "evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force." *Id.* § 300gg-13(a)(1). And it also requires coverage for "immunizations" recommended by the Centers for Disease Control and Prevention (CDC) Advisory Committee on Immunization Practices, as well as "preventive care and screenings" for women, infants, children, and adolescents recommended by the Health Resources and Services Administration (HRSA). *Id.* § 300gg-13(a)(2)-(4).

The recommendations made by these medical experts do not take effect under the ACA on their own. Congress directed the HHS Secretary to determine when such recommendations will take effect under the ACA and required a minimum interval of at least one year between the date on which a recommendation is made and when the service must be covered without cost sharing as part of a new plan year. 42 U.S.C. § 300gg-13(b).

The Task Force recommendations are at issue in this appeal. HHS first convened the Task Force in 1984, and Congress codified its role in 1999 by authorizing the Director of the Agency for Healthcare Research and

Quality, an agency within HHS, to "periodically convene" the Task Force. Healthcare Research and Quality Act of 1999, Pub. L. 106-129, § 915(a), 113 Stat. 1653, 1659.  Congress later amended the relevant statute to set out the Task Force's role in greater detail.  Patient Protection and Affordable Care Act, Pub. L. 111-148, § 4003, 124 Stat. 119, 541-43 (2010).

The Task Force is currently composed of 16 members (selected by the HHS official who convenes the Task Force), and members serve 4-year terms, ROA.1159, but there is no statutory restriction on a member's removal before the expiration of that term, 42 U.S.C. § 299b-4(a). Composed of volunteers "with appropriate expertise," the Task Force "reviews the scientific evidence related to the effectiveness, appropriateness, and cost-effectiveness of clinical preventive services for the purpose of developing recommendations for the health care community, and updating previous clinical preventive recommendations." *Id.* § 299b-4(a)(1).  It publishes its recommendations "in the Guide to Clinical Preventive Services," a resource for medical professionals, Congress, and other policy makers.  *Id.*  Congress indicated that Task Force members "and any recommendations made by such members, shall be independent and, to the extent practicable, not subject to political pressure." *Id.* § 299b-4(a)(6).

The Task Force's current recommendations give "A" or "B" ratings to more than 50 preventive services, which are accordingly covered under 42 U.S.C. § 300gg-13(a)(1). These services include, for example, screenings to detect lung cancer, breast cancer, cervical cancer, and colorectal cancer early, when the survival rates are significantly higher; statin medications proven to reduce the risk of heart disease and strokes; and physical therapy for older adults to prevent falls, which are the leading cause of injury-related death among the elderly. U.S. Preventive Services Task Force, *A & B Recommendations*, https://perma.cc/FC9Y-Y3DN.

In January 2022, the HHS Secretary ratified the Task Force's list of recommended services with "A" and "B" ratings. ROA.1094.

### B. Plaintiffs

The prevailing plaintiffs are two companies and four individuals who challenged the legality of Congress's directive that health insurance issuers and group health plans subject to 42 U.S.C. § 300gg-13 must cover preventive services at no extra cost to the insured. All plaintiffs reside in Texas. ROA.220.

Braidwood Management "self-insures its seventy employees and must therefore provide ACA-compliant health insurance." ROA.1788. As relevant here, its owner Steven Hotze wishes to have the plan exclude

coverage of preexposure prophylaxis drugs—which received an "A" rating from the Task Force in 2019 based on their effectiveness in preventing the spread of HIV—because he "objects to coverage of those services on religious grounds." ROA.2108.

The other five plaintiffs also object to coverage for preexposure prophylaxis drugs on religious grounds, but they "do not currently participate in the health care market," ROA.2113, and they left the market for reasons independent of the objected-to coverage. For example, Mr. Starnes and Mr. Kelley stopped buying insurance in 2016 in part "because the premiums had become too expensive," and they stated only that they would "seriously consider" buying insurance if plans without objectionable coverage were offered. ROA.2066-2067, ¶¶ 5-7; ROA.2068-2069, ¶¶ 5, 7-8. Similarly, Mr. Kelley stopped buying insurance for employees of his company, Kelley Orthodontics, in part because "the premiums had become too expensive" and "several of [his] employees asked [him] to drop coverage because they were unable to enroll in their husbands' much better plans as long as [he] was offering coverage to them as part of their job." ROA.2068-2069, ¶ 6.

### C.    District Court's Decision

In the operative complaint, plaintiffs challenged the constitutionality of the statute's preventive-services coverage requirements under the Appointments Clause, nondelegation doctrine, and Executive Vesting Clause, and also asserted claims under the Religious Freedom Restoration Act (RFRA).  ROA.231-243.  The district court granted summary judgment to plaintiffs on one of their Appointments Clause claims and on their RFRA claims.  In addition to entering plaintiff-specific relief, the court vacated all agency actions taken to implement or enforce preventive-services coverage requirements in response to an "A" or "B" recommendation by the Task Force on or after the ACA was enacted on March 23, 2010, and enjoined the government from implementing or enforcing coverage requirements in response to an "A" or "B" recommendation in the future.

**1. *Standing.*** The district court concluded that six plaintiffs had standing.  ROA.1787-1793; ROA.2109-2118.  It reasoned that Braidwood presents "the easiest case for standing" because Braidwood's group health plan is "the object of the challenged government action."  ROA.1788.  The court explained that "[t]he ACA requires Braidwood to cover the preventive services mandated under § 300gg-13," and "Braidwood cannot exclude coverage for those services without violating the law."  ROA.1788-1789.

The district court determined that four of the individual plaintiffs and the other plaintiff company (Kelley Orthodontics) had standing because they "ha[d] been denied the opportunity to purchase a desired product—namely, health insurance coverage that excludes services [that the plaintiffs] find religiously objectionable." ROA.2111. The court deemed it immaterial that those plaintiffs "do not currently participate in the health care market," had "opted out of the insurance market" in part because of "the cost of coverage," and had not "prove[d] that they would, in fact, purchase conventional health insurance if the preventive care mandates were lifted." ROA.2113-2114 (emphasis omitted).

**2.** ***Appointments Clause.*** The district court rejected the Appointments Clause claims arising out of the recommendations of the CDC and HRSA. ROA.1793-1796. The court explained that the CDC and HRSA are "under the supervision and direction of the [HHS] Secretary," 42 U.S.C. § 202, who had ratified their recommendations. ROA.1794-1796; *see also* ROA.1094 (Secretary's ratification). That ratification, the court concluded, would remedy any potential "appointment defects." ROA.1795.

By contrast, the court accepted the Appointments Clause claim arising out of the Task Force's recommendations. The court reasoned that Task Force members are officers for purposes of the Appointments Clause

because they "occupy a continuing position established by law," ROA.1797,
and "exercise significant authority pursuant to" federal law, ROA.1800,
specifically, "authority to determine what preventive-care services private
insurers must cover," ROA.1801.  Because Task Force members had not
received an appointment by the President or the HHS Secretary, the court
continued, they had not received a constitutional appointment.  ROA.1805.
The court also ruled that the Secretary could not ratify Task Force
recommendations because the statute provides that Task Force members
and their recommendations "shall be independent and, to the extent
practicable, not subject to political pressure."  ROA.1797 (quoting 42 U.S.C.
§ 299b-4(a)(6)).

   **3.  *Removal.*** The district court rejected plaintiffs' argument that
the Task Force is "not subject to Presidential direction, removal, or
control."  ROA.238.  The court explained that "no statute forbids the
President, Secretary, or [the HHS subagency] Director from firing any
member of" the Task Force, and so there is no unconstitutional restriction
on removing the Task Force members.   ROA.1808.  The court rejected
plaintiffs' invitation to interpret 42 U.S.C. § 299b-4(a)(6) as implicitly
prohibiting the removal of Task Force members.  The court noted that this
provision states that Task Force members shall "not [be] subject to political

pressure," but only "to the extent practicable."  ROA.1807.  Particularly given that qualifying language, the court found "no persuasive argument as to why the provision should be construed in the direction of a constitutional violation."  ROA.1807 (citing the canon of constitutional avoidance).

**4.  *Nondelegation.***  The district court rejected plaintiffs' claim that each category of the preventive-services coverage requirement violates the nondelegation doctrine.  ROA.1810-1815.  Applying this Court's decision in *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 444-45 (5th Cir. 2020), which "[p]laintiffs d[id] not address," ROA.1814, the court explained that "Congress has delineated its general policy with respect to the preventive-care mandates, the public agencies applying the preventive-care mandates, and the boundaries of the delegated authority," ROA.1812.  Thus, the statute's coverage requirement falls "within the constitutional parameters outlined by the Supreme Court and the Fifth Circuit."  ROA.1815.[1]

**5.  *Remedy.***  After additional briefing, the district court issued a remedial order, ROA.2103-2130, and final judgment, ROA.2131-2132.

---

[1] The district court also granted summary judgment for plaintiffs on their RFRA claims, ROA.1815-1820, and issued a plaintiff-specific remedy on those claims.  ROA.2120-2121, ROA.2132.  Although the government does not concede that the plaintiffs other than Braidwood established standing, it is not challenging the plaintiff-specific remedy on the RFRA claims in this appeal.

The government urged that the statutory provision stating that Task Force members "and any recommendations made by such members, shall be independent and, to the extent practicable, not subject to political pressure," 42 U.S.C. § 299b-4(a)(6), should be severed to allow the HHS Secretary to review the Task Force's "A" and "B" recommendations before they take effect under the ACA—thus putting those recommendations on the same footing as HRSA and CDC recommendations.  ROA.1867-1869. The district court declined to do so, reasoning that severance is generally inappropriate for "an Appointments Clause violation" as opposed to "a Removal Clause violation." ROA.2129.

The district court entered two distinct forms of relief:  plaintiff-specific relief and universal remedies.  As plaintiff-specific relief on the Appointments Clause claim, the court declared that "Braidwood Management Inc. and Kelley Orthodontics, and to the extent applicable, individual Plaintiffs need not comply with the preventive care coverage recommendations" of the Task Force "issued on or after March 23, 2010," and "ENJOIN[ED] Defendants" from "implementing or enforcing the same *against these Plaintiffs*."  ROA.2132 (emphasis added).  Similarly, on the RFRA claim, the court enjoined defendants from enforcing "against these

Plaintiffs" the requirement to cover preexposure prophylaxis drugs. ROA.2132.

The district court did not conclude that any additional relief was necessary to redress plaintiffs' asserted injuries.  ROA.2121-2130. Nonetheless, its final judgment provided that "any and all agency actions taken to implement or enforce the preventive care coverage requirements in response to an 'A' or 'B' recommendation" by the Task Force "on or after March 23, 2010 are VACATED" and that defendants are "ENJOINED from implementing or enforcing" the statute's preventive-services coverage requirement "in response to an 'A' or 'B' rating from the Task Force in the future."  ROA.2129; *see also* ROA.2131-2132 (final judgment).

The government moved to stay that nationwide injunction and universal vacatur pending appeal, and this Court entered an administrative stay of those remedies.  Order, Dkt. 99-2 (5th Cir. May 15, 2023).  After this Court heard oral argument on the government's stay motion, the parties stipulated to a stay of those universal remedies, and this Court entered a corresponding stay pending the issuance of the mandate.  Order, Dkt. 153-2 (5th Cir. June 13, 2023).

## SUMMARY OF ARGUMENT

**I.**     The U.S. Preventive Services Task Force recommends to the medical community numerous preventive services like cancer screening and medications that improve the health of millions of Americans.  The HHS Secretary properly ratified the Task Force's recommendations insofar as they would require coverage under 42 U.S.C. § 300gg-13(a), just as he properly ratified other healthcare recommendations from his subordinates at the CDC and HRSA.  Task Force members are inferior officers, subject to the supervision of the Secretary.  Task Force members occupy continuing positions established by federal law, 42 U.S.C. § 299b-4(a), and they exercise significant authority on behalf of the United States under federal law, since Task Force recommendations for healthcare items and services with an "A" or "B" rating qualify for coverage without cost sharing after the interval required by the Secretary's regulations has been satisfied, *id.* § 300gg-13(a)-(b).  The Secretary may supervise the Task Force through at-will removal of its members, and the statute is properly understood to give the Secretary supervisory authority to review or reject Task Force recommendations for coverage under § 300gg-13 as may be constitutionally necessary.  Task Force recommendations are "independent" and they are "not subject to political pressure" "to the extent practicable," *id.* § 299b-

4(a)(6), which is properly construed to permit constitutionally required supervision while preserving the Task Force's responsibility to exercise independent judgment in evaluating evidence and practices in developing their recommendations for preventive care.

Because the Task Force is constitutionally subordinate to the Secretary, the Secretary properly ratified its recommendations as his own. ROA.1094.  As the district court recognized, a ratification by a properly appointed officer cures any Appointments Clause defect.  ROA.1795.

And going forward, the Secretary can appoint Task Force members pursuant to his statutory authority under 42 U.S.C. §§ 299(a), 299b-4(a)(1), and HHS's Reorganization Plan, 80 Stat. 1610 (1966).  As this Court has explained, comparable statutory authority allows for the appointment of inferior officers.  *Kennedy v. United States*, 146 F.2d 26, 28 (5th Cir. 1944); *Willy v. Administrative Review Board*, 423 F.3d 483, 491-92 (5th Cir. 2005).

**II.**  If the Court were to conclude that the Secretary's ratification was ineffective because he cannot adequately supervise Task Force recommendations, the Court should sever the statutory limitations on the Secretary's oversight in 42 U.S.C. § 299b-4(a)(6), insofar as they would otherwise apply to the Secretary's authority to give effect to Task Force

recommendations under § 300gg-13.  The Supreme Court has explained that by severing statutory limitations on a principal officer's supervision of subordinates, those subordinates are rendered *inferior* officers who can serve in conformity with the Appointments Clause.  *United States v. Arthrex*, 141 S. Ct. 1970, 1987-88 (2021).  That reasoning applies here to eliminate any Appointments Clause defect.

**III.**  The district court vacated more than a decade's worth of federal actions that were taken to guarantee that covered individuals can receive Task Force recommended preventive services without cost-sharing, and the court enjoined the federal government from taking any action across the country to execute that congressional mandate.  ROA.2131-2132.  That relief is unwarranted and gratuitous.  The court had already issued separate relief ensuring that plaintiffs need not comply with the preventive services requirements of 42 U.S.C. § 300gg-13(a)(1).  The court made no judgment that its sweeping relief was appropriate as a matter of equity—instead, the court apparently thought it was compelled to issue universal relief under the Administrative Procedure Act (APA).  But plaintiffs brought no claim under that statute and thus have no right to relief under it.  And in all events, even if the APA permits universal vacatur of agency actions, there is no basis for it here.

## STANDARD OF REVIEW

The district court's judgment rests on errors of law that are subject to de novo review. *National Federation of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202, 208 (5th Cir. 2011).

## ARGUMENT

### I.    Task Force Members Are Inferior Officers Whose Recommendations Were Validly Ratified By The Secretary Of Health And Human Services

The U.S. Preventive Services Task Force is a "panel of national experts" who "make[] evidence-based recommendations about clinical preventive tests" and services. *United States v. Scott*, 61 F.4th 855, 861 (11th Cir. 2023). The Task Force was first convened in 1984 by the U.S. Public Health Service—a subagency of HHS—and for almost four decades the Task Force has "worked to fulfill its mission of improving the health of all Americans" by evaluating the evidence for various treatments and services to promote public health. ROA.1158. The Supreme Court has cited a Task Force report in identifying the difficult medical judgments that must be made concerning "which tests are most usefully administered and when." *Metro-North Commuter Railroad Co. v. Buckley*, 521 U.S. 424, 441 (1997). *See also Proclamation by the President: National Breast Cancer Awareness Month, 2003*, 3 C.F.R., 2003 Comp., pp. 115-16 (Oct. 3, 2003) (President Bush's proclamation "encourag[ing] all women to consult with

17

their physicians to obtain appropriate screenings," citing the Task Force's mammogram recommendations).

In light of the Task Force's expertise and as part of the ACA, Congress elaborated on the status and role of the Task Force, 124 Stat. 541-43 (amending 42 U.S.C. § 299b-4), and further provided that items and services receiving an "A" or "B" rating and recommendation from the Task Force should be covered without cost sharing, 124 Stat. 131-32 (amending 42 U.S.C. § 300gg-13). The district court did not cast any doubt on the merit or substance of the Task Force's recommendations, but rather held that Task Force members are officers of the United States for constitutional purposes and that they had not been properly appointed. As explained below, the government does not challenge that conclusion by the district court. The Act can be reasonably construed to render Task Force members officers of the United States. But, contrary to the district court's view, Task Force members can be appointed and supervised by the HHS Secretary and may therefore properly serve as inferior officers. And the Secretary's ratification of Task Force recommendations—approving those actions and accepting them as his own—remedies any defect in the initial promulgation of those recommendations.

18

## A.    Task Force Members Are Inferior Officers Who Are Supervised By The HHS Secretary

Officers of the United States are persons who hold a continuing position established by federal law, and who exercise significant authority on behalf of the United States pursuant to federal law.  *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018).  Principal officers must be appointed by the President by and with the advice and consent of the Senate.  U.S. Const. art. II, § 2, cl. 2.  Inferior officers may also be appointed in this manner, or alternatively "Congress may by law vest" their appointment "in the President alone, in the Courts of Law, or in the Heads of Departments."  *Id.*  Inferior officers are those "officers whose work is directed and supervised at some level by others who were appointed by" the President with Senate confirmation.  *Edmond v. United States*, 520 U.S. 651, 663 (1997).

Under this framework, Task Force members are inferior officers. They are officers of the United States because they hold positions established by federal law, 42 U.S.C. § 299b-4(a), which are continuing for a period of years.  And Task Force recommendations of preventive health care items and services with an "A" or "B" rating must be covered without cost-sharing under 42 U.S.C. § 300gg-13, once the Secretary's regulation governing when a Task Force recommendation becomes effective for those purposes is satisfied.  Task Force members thus "exercis[e] significant

authority on behalf of the United States," *Edmond*, 520 U.S. at 662, to the extent that their recommendations are given binding legal effects under § 300gg-13(a)(1).[2]

Task Force members are *inferior* officers because they are subject to supervision by the HHS Secretary.  Most significantly, they can be removed by the Secretary at will.  ROA.1809.  That supervision through at-will removal ensures that Task Force members are subordinate to a superior. *Edmond*, 520 U.S. at 663.  And if additional supervision were necessary, the relevant statutes, 42 U.S.C. §§ 202 and 299b-4, can be construed to allow the Secretary to review and reject recommendations with an "A" or "B" rating in order to prevent them from binding issuers under § 300gg-13.

**1.**  Task Force members are removable at will.  As the district court correctly explained, plaintiffs "do not identify any removal restrictions on [Task Force] members."  ROA.1807.  Removal limitations must be established by "very clear and explicit language in the statute," *Exela Enterprise Solutions, Inc. v. NLRB*, 32 F.4th 436, 441 (5th Cir. 2022)

---

[2] In the district court, the government took the position that the Task Force was a volunteer body whose members are private actors and not officers for purposes of the Appointments Clause.  ROA.1064-1065.  Upon further consideration and after reviewing the district court's opinion, the government does not challenge that Task Force members should be regarded as inferior officers in these circumstances.

(quotation marks omitted), and without such limitations, removal is at will, *id.* at 445.  The authority to remove at will is "a powerful tool for control" and grants the principal officer "administrative oversight over" inferior officers.  *Edmond*, 520 U.S. at 664.

Relying on the removal power, the Supreme Court in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), rejected the claim that members of the Public Company Accounting Oversight Board could not serve as inferior officers, *id.* at 510.  Earlier in its decision, the Court had severed the Board members' removal restrictions, so they were removable at will by the Securities and Exchange Commission.  *Id.* at 508-10.  Given that removal authority, the Court had "no hesitation in concluding that under *Edmond* the Board members are inferior officers."  *Id.* at 510.  The ability to remove the Board members was critical, because although the Commission had "other oversight authority," it was not "plenary."  *Id.* at 504, 510.  The Board could "take significant enforcement actions * * * largely independently of the Commission," and the Commission lacked authority "to start, stop, or alter individual Board investigations, executive activities typically carried out by officials within the Executive Branch."  *Id.* at 504.  These inferior officers thus had "significant independence in determining [their] priorities and intervening

in the affairs of regulated firms (and the lives of their associated persons) without Commission preapproval or direction." *Id.* at 505.  But because Board members could be removed at will by the Commission, they properly served as inferior officers.  *Id.* at 510.

Applying those principles, the D.C. Circuit has repeatedly emphasized that at-will removal power renders officers subordinate to their superiors. Thus, the court explained that Copyright Royalty Board judges are inferior officers, even though they may issue decisions not "directly reversible" by anyone else.  *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332, 1340-41 (D.C. Cir. 2012).  Those judges serve at the pleasure of the Librarian of Congress, who has "unfettered removal power," and thus "the direct ability to 'direct,' 'supervise,' and exert some 'control' over the Judges' decisions."  *Id.*  Likewise, the court held that a special counsel appointed by the Attorney General validly served as an inferior officer.  *In re Grand Jury Investigation*, 916 F.3d 1047 (D.C. Cir. 2019).  Although there were some regulatory restrictions on the special counsel's removal, *id.* at 1050, the Attorney General could "rescind the regulations" at any time, *id.* at 1052.  Because the special counsel "effectively serve[d] at the pleasure of" a principal officer, he was an

"inferior officer." *Id.* Here, too, Task Force members are inferior officers because they can be removed at will by the Secretary.

That conclusion is reinforced by *Morrison v. Olson*, 487 U.S. 654 (1988), including Justice Scalia's dissenting opinion. The *Morrison* majority held that the independent counsel was an inferior officer because she was subject to removal for good cause by the Attorney General and could perform "only certain, limited duties," because her office was "limited in jurisdiction" and "limited in tenure." *Id.* at 671-72. Task Force members can be removed without cause, perform limited duties with respect to the coverage of preventive services under the ACA, and serve for a term of years.

In his *Morrison* dissenting opinion, Justice Scalia emphasized that if the independent counsel "were removable at will by the Attorney General, then she would be subordinate to him and thus properly designated as inferior." 487 U.S. at 716 (Scalia, J., dissenting). Based on the same reasoning, the Office of Legal Counsel concluded that members of the Federal Open Market Committee—which sets the overnight interest rate for bank lending—are inferior officers because they can be removed at will by the Federal Reserve Board. *See Appointment and Removal of Federal Reserve Bank Members of the Federal Open Market Committee*, 43 Op.

O.L.C. ___, 2019 WL 11594453, at *6-8 (2019).  Here, Task Force members also are removable at will and are therefore inferior officers.

**2.**  To the extent additional supervision by the HHS Secretary were required to render Task Force members inferior officers, the statutes permit such supervision.  As the district court recognized, ROA.1794-1795, 42 U.S.C. § 202 provides that the Public Health Service and its subagencies (like the CDC and HRSA) are "under the supervision and direction of the Secretary."  Because the CDC and HRSA are "answerable to the Secretary," their recommendations are necessarily subject to secretarial supervision, and thus can be properly ratified.  ROA.1795.

The Task Force is convened by an HHS subagency "within the Public Health Service."  42 U.S.C. §§ 299(a), 299b-4(a).  That subagency, like the CDC and HRSA, is answerable to the Secretary.  *Id.* § 202.  And the Task Force, by virtue of this hierarchy, is thus "under the supervision and direction of the Secretary" pursuant to § 202 to the extent consistent with inferior officer status.  Moreover, Task Force "A" and "B" recommendations do not bind issuers by themselves, but instead become binding following an appropriate minimum interval, not less than a year, established by the Secretary.  *Id.* § 300gg-13(b)(1)-(2).

The district court nonetheless ruled that the Secretary, as "a political actor, * * * does not have authority to direct what services are covered" by Task Force recommendations under 42 U.S.C. § 300gg-13(a)(1).  ROA.1797. The court rested that conclusion on the language in 42 U.S.C. § 299b-4(a)(6) that the Task Force and its recommendations "shall be independent and, to the extent practicable, not subject to political pressure."  ROA.1797.

But the statutory language "to the extent practicable" contemplates flexibility within the statutory framework, particularly to the extent necessary to ensure conformity with constitutional requirements.  Thus, to the extent it is constitutionally necessary for the Secretary to possess authority to review individual Task Force "A" and "B" recommendations and decide whether those recommendations should take binding effect under § 300gg-13(a)(1), the statute can permit that level of review.  It is a "'cardinal principle' of statutory interpretation" that a court must construe a statute as consistent with the Constitution if it is "fairly possible" to do so. *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001).  *See also United States v. Davis*, 139 S. Ct. 2319, 2332 n.6 (2019) (explaining the "long lineage" of the rule that "courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional").  That rule applies to statutes "concern[ing] the relative powers of coordinate branches of government,"

as courts are "loath to conclude that Congress intended to press ahead into dangerous constitutional thickets in the absence of firm evidence that it courted those perils." *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 465-66 (1989). Thus, as this Court has explained, it is an "elementary rule that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Texas Medical Providers Performing Abortion Services v. Lakey*, 667 F.3d 570, 581 (5th Cir. 2012).

The district court declined to construe the statute to allow "the Secretary to decree recommendations unilaterally." ROA.1797. But there is no need for the Secretary to have *complete* control over *all* Task Force recommendations, many of which do not have "A" or "B" ratings and therefore are not eligible for required coverage under § 300gg-13(a)(1). *See* ROA.1205 (describing Task Force recommendations receiving a "C," "D," or "I" rating). Even for "A" or "B" recommendations, any secretarial review authority would need only to extend to deciding whether those recommendations should take binding effect on issuers under § 300gg-13(a)(1)—not to their effect as "recommendations for the health care community" more broadly, 42 U.S.C. § 299b-4(a)(1). The mere act of recommendation, without any additional legal effect, does not implicate

any exercise of significant federal power by the Task Force on behalf of the United States.

Nor is there any need to construe the relevant statutes, including 42 U.S.C. § 299b-4(a)(6), to require that the Secretary have day-to-day control over the Task Force's activities and meetings, or to in any way limit the Task Force's ability to conduct an independent evaluation of medical evidence. Rather, to the extent it is constitutionally necessary for the Secretary to have supervisory authority over the Task Force's exercise of significant authority under federal law—the ability to make "A" and "B" rated recommendations for preventive services, which in turn may lead to required coverage of those services under the ACA without cost-sharing—the Secretary has that authority in 42 U.S.C. § 202. Nothing compels the Court to read § 299b-4(a)(6)—which limits political oversight only "to the extent practicable"—in a way that would impede that secretarial oversight to the extent necessary to satisfy constitutional requirements.

### B.  The HHS Secretary Properly Ratified The Task Force's Recommendations

The Secretary ratified the recommendations of the Task Force, the CDC, and HRSA based on his "independent and considered review of [those] actions and decisions." ROA.1094. "Ratification occurs when a principal sanctions the prior actions of its purported agent," *Moose Jooce v.*

27

*FDA*, 981 F.3d 26, 28 (D.C. Cir. 2020), and in doing so "adopts" those actions "as his own," *Williams v. Thrasher*, 62 F.2d 944, 946 (5th Cir. 1933). Ratification furthers the underlying purpose of the Appointments Clause, which is "designed to preserve political accountability," *Edmond*, 520 U.S. at 663, by ensuring that "the Secretary of [HHS], a politically accountable official," *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 563 (2005), is subject to blame or praise for those ratified decisions. *Accord Freytag v. Commissioner*, 501 U.S. 868, 884 (1991) (the Appointments Clause "ensure[s] that those who wield[]" appointment authority are "accountable to political force and the will of the people").

The district court correctly upheld the Secretary's ratification of the recommendations of the CDC and HRSA. ROA.1793-1797. As the district court explained, ratification "of an allegedly improper official's prior action * * * resolves the [Appointments Clause] claim on the merits by 'remedying the defect' (if any) from the initial appointment." ROA.1793-1794 (quoting *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 13 (D.C. Cir. 2019) (per curiam)).

Courts of appeals have consistently recognized that properly appointed officers may validly ratify the acts of their subordinates or their predecessors. Thus, a properly appointed FDA Commissioner may ratify an

agency rule signed by a person whose appointment was contested. *Jooce*, 981 F.3d at 28. So too, a Senate-confirmed Attorney General may ratify a rule promulgated by an acting Attorney General whose appointment was challenged. *Kajmowicz v. Whitaker*, 42 F.4th 138, 147-48 (3d Cir. 2022). Other courts of appeals have reached similar conclusions. The Second Circuit, for example, accepted a ratification by an agency's Senate-confirmed General Counsel, *NLRB v. Newark Electric Corp.*, 14 F.4th 152, 160-63 (2d Cir. 2021), and the Ninth Circuit approved the ratification by an agency head of his own past actions, *CFPB v. Gordon*, 819 F.3d 1179, 1190-92 (9th Cir. 2016). And the Supreme Court held that military judges had been properly appointed when the Department Head "adopt[ed]" his subordinate's appointments of those judges "as judicial appointments of my own." *Edmond*, 520 U.S. at 654. So too, the Secretary may ratify the actions of his subordinates.

The district court held that the Secretary could not ratify the Task Force's recommendations because of the statutory limitations in 42 U.S.C. § 299b-4(a)(6). But as discussed above, *supra* pp. 25-27, that provision—which ensures independence from political pressure only "to the extent practicable"—does not prohibit the Secretary from reviewing Task Force "A" and "B" recommendations as necessary before they become effective

under 42 U.S.C. § 300gg-13.  The district court later expressed concern that if the Secretary had the power to "authorize or reject [Task Force] recommendations *post hoc*," nothing would "*compel* him to take such action."  ROA.2128.  But the Secretary's power to take action—not any compulsion to do so—is all that is required for ratification.  *Kajmowicz*, 42 F.4th at 147-48 (ratification requires "the authority to take the action to be ratified").  The Secretary has that authority and validly ratified the Task Force's recommendations with an "A" or "B" rating.

## C.     The HHS Secretary Has Statutory Authority To Appoint Task Force Members

As the district court held, proper ratification by the Secretary cures any Appointments Clause defect.  ROA.1796-1797.  Although the existing Task Force members have not yet received an appointment consistent with the Appointments Clause, the Secretary has authority to appoint Task Force members and is in the process of providing them with a constitutional appointment.  Under the Appointments Clause, Congress "may by Law vest the Appointment of" inferior officers in Department Heads like the Secretary.  U.S. Const. art. II, § 2, cl. 2.  Here, Congress has enacted two separate and overlapping statutory provisions that authorize the Secretary to appoint Task Force members.

*First*, the Task Force is "conven[ed]" by the Director for the Agency for Healthcare Research and Quality, 42 U.S.C. § 299b-4(a)(1), and the Secretary appoints that Director, *id*. § 299(a). Congress further provided that "[t]he Secretary shall carry out this subchapter," which includes convening the Task Force, by "acting through the Director." *Id*. The Supreme Court and this Court have held that similar statutory schemes permit constitutional appointments by the Department Head. *United States v. Hartwell*, 73 U.S. 385 (1867); *Kennedy v. United States*, 146 F.2d 26, 28 (5th Cir. 1944). In short, the statute permits the Director to select Task Force members, on the necessary constitutional condition that they may be appointed only with the Secretary's approbation.

The Supreme Court in *Hartwell* held that a similar statutory scheme complied with the Appointments Clause. There, the question was whether a Treasury clerk had been properly appointed under the Clause when the statute directed the clerk to be appointed by "the assistant treasurer * * * with the approbation of the Secretary." *Hartwell*, 73 U.S. at 393 & n.7 (citing Act of July 23, 1866, c. 208, 14 Stat. 191, 202). That approbation was sufficient, and the Supreme Court held that the clerk "was appointed by the head of a department within the meaning of the constitutional provision." *Id*. at 393-94.

This Court, applying *Hartwell*, similarly held that a "junior instructor of shop mathematics of the Air Corps" was an inferior officer because he "was appointed by a subordinate executive officer" and "his appointment was made with the approval of the Secretary of the War Department." *Kennedy*, 146 F.2d at 27-28.  That was true even though the cited statutes contained no express provision for the Secretary to approve the appointment.  *Id.* at 28 n.2 (citing Military Appropriation Act, 1943, ch. 477, 56 Stat. 611, 619 (1942) and Military Appropriation Act, 1944, ch. 185, 57 Stat. 347, 356 (1943)).  Here, of course, Congress directed the Secretary to "carry out" specified statutory duties through his subordinate Director, 42 U.S.C. § 299(a), including the duty to "convene" the Task Force, *id.* § 299b-4(a)(1).

*Second*, Congress approved HHS's Reorganization Plan No. 3 of 1966, 80 Stat. 1610, which authorizes the Secretary to appoint officers in the Public Health Service, including the subagency that convenes the Task Force.  *See* 42 U.S.C. § 299(a) (explaining that the Agency for Healthcare Research and Quality "is established within the Public Health Service").  The Reorganization Plan authorizes the Secretary to perform "all functions of the Public Health Service * * * and of all other officers and employees of the Public Health Service, and all functions of all agencies of

or in the Public Health Service." 80 Stat. at 1610. And the Plan authorizes the Secretary to "make such provisions as he shall deem appropriate authorizing the performance of any of the functions transferred to him by the provisions of this reorganization plan by any officer, employee, or agency of the Public Health Service." *Id.*

This Court held that similar language in a Reorganization Plan for the Department of Labor authorized the Secretary of Labor to create inferior offices and make constitutional appointments to them. *Willy v. Administrative Review Board*, 423 F.3d 483, 491-92 (5th Cir. 2005). Even though "no specific federal statute creates the" Department of Labor's Administrative Review Board, this Court held that "the Secretary possesses the requisite congressional authority to appoint" the Board's members. *Id.* at 491. Under the general provisions of 5 U.S.C. § 301—applicable to all agencies—and the Department's Reorganization Plan, the Secretary had "ample authority to create the [Board and] appoint its members." *Willy*, 423 F.3d at 491-92. Like HHS's Reorganization Plan, the Plan in *Willy* authorized the Secretary to "make such provisions as he shall deem appropriate authorizing the performance by any other officer, or by any agency or employee, of the Department of Labor of any function of the Secretary." *Id.* at 492 & n.27 (quoting Reorganization Plan No. 6 of 1950,

§ 2, 64 Stat. 1263, 1264).  That language was "broad enough to allow the Secretary to" appoint the Board members as inferior officers under "the Appointments Clause."  *Id.* at 494.

HHS's Reorganization Plan, 42 U.S.C. § 299(a), and 42 U.S.C. § 299b-4(a)(1) are thus properly interpreted as granting the Secretary authority to appoint Task Force members as inferior officers.  That interpretation is reinforced by Supreme Court's decision in *Edmond*, which rejected the argument that a statute required an unconstitutional appointment.  520 U.S. at 656-58.  The *Edmond* petitioners—defendants whose convictions had been upheld by military courts—argued that the judges on those courts could not be constitutionally appointed.  *Id.* at 655-57.  Their argument relied on 10 U.S.C. § 866, under which the Judge Advocate General (who was not the Head of a Department) could "establish" appellate military courts and "assign" military judges to those courts.  If that were the sole method of appointment, there would be no "way to interpret" the statute "that would make it consistent with the Constitution."  *Edmond*, 520 U.S. at 658.  But a court "must of course avoid" interpreting a statute "in a manner that would render it clearly unconstitutional * * * if there is another reasonable interpretation available."  *Id.* (collecting cases).  Since there was a reasonable interpretation that 10 U.S.C. § 866 merely spoke of "assigning"

judges, and a separate statute could be read to vest the judges' appointment in a Department Head, the Supreme Court adopted that interpretation. *Id.* at 658, 666. The same reasoning applies here, where the relevant statutes permit the Secretary to appoint and remove Task Force members.

## II. If The Secretary Cannot Adequately Supervise Task Force Members, The Statutory Restrictions On Secretarial Supervision Should Be Severed To The Extent Necessary Under The Constitution

If the Court were to conclude that the Secretary cannot constitutionally supervise the Task Force because of the Task Force's "independence" provision in 42 U.S.C. § 299b-4(a)(6)—notwithstanding the Secretary's ability to appoint Task Force members and remove them at will, and the fact that Congress sought to avoid political pressure on the Task Force only "to the extent practicable"—then the proper response is severance. The Court could sever the limitations on secretarial oversight in 42 U.S.C. § 299b-4(a)(6), or alternatively sever their application to the Task Force's "A" and "B" recommendations to the extent those recommendations are given effect to require coverage under 42 U.S.C. § 300gg-13. *See Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 328-329 (2006) ("[W]hen confronting a constitutional flaw in a statute, we try to limit the solution to the problem" by disregarding the "problematic portions while leaving the remainder intact").

35

The Supreme Court adopted a substantively similar severance to eliminate an Appointments Clause violation in *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021). *Arthrex* addressed the officer status of judges serving on the Patent Trial and Appeal Board, an adjudicative body within the U.S. Patent and Trademark Office. The Court held that the patent judges exercised powers "incompatible with their appointment by the Secretary to an inferior office." *Id.* at 1985. That incompatibility arose from statutory prohibitions on the relevant principal officer unilaterally reviewing patent judge decisions, *see* 35 U.S.C. § 6(c), and prohibitions on removing those judges at will, *see* 5 U.S.C. § 7513. The problem in *Arthrex* was that the principal officer had been "restrain[ed]" from reviewing adjudicative decisions, which broke the "chain of command" between the Director and his subordinates. *Arthrex*, 141 S. Ct. at 1981, 1988.

The Supreme Court in *Arthrex* concluded that this Appointments Clause violation could be eliminated by "a tailored approach." 141 S. Ct. at 1987. The Court explained that if the principal officer "were to have the 'authority to take control' of" the adjudicative proceedings, then the patent judges "would properly function as inferior officers." *Id.* Thus, the Court severed 35 U.S.C. § 6(c) "to the extent that its requirements prevent the [principal officer] from reviewing final decisions rendered by" the patent

judges. *Id.* The court of appeals had similarly sought to cure the Appointments Clause defect through severance, although it had chosen to sever the inferior officers' removal restrictions. *Id.* The Supreme Court did not question the validity of that approach, but rather concluded that its chosen severance "better reflect[ed] the structure of supervision within the [agency] and the nature of [patent judges'] duties." *Id.*

Here, the limitations in § 299b-4(a)(6) similarly can be severed to the extent of permitting the Secretary to review and reject Task Force "A" and "B" recommendations before they would become effective under § 300gg-13. That severance would mirror how the Supreme Court severed the limitations in 35 U.S.C. § 6(c) to the extent of permitting the principal officer in *Arthrex* to review and reject decisions by patent judges.

The district court declined to adopt this approach to cure any Appointments Clause defect, ROA.2127-2129, but the court's holding rests on three mistaken premises. *First*, the court declared that *Arthrex* was inapplicable because the Task Force is "not part of HHS or any federal agency." ROA.2128. But as explained above, the Task Force is statutorily convened by a subagency of HHS, 42 U.S.C. § 299b-4(a)(1), which is subject to secretarial oversight, *id.* § 202, and Task Force members may be appointed and removed at will by the Secretary. The court gave no reason

why permitting the Secretary to exercise *greater* oversight over the Task Force in its role concerning preventive services under the ACA would not eliminate the Appointments Clause issue by allowing the Task Force members to serve as inferior officers.

*Second*, the district court reasoned that severance would not "*compel*" the Secretary to direct the Task Force to issue certain recommendations. ROA.2128. But compelled supervision is not necessary to constitutionally oversee the work of inferior officers. Inferior officers may not wield "unreviewable authority," *Arthrex*, 141 S. Ct. at 1985, but that does not mean that the Constitution requires principal officers to constantly exercise their review authority over every aspect of their subordinates' decisionmaking, *id.* at 1988 ("To be clear, the [principal officer] need not review every decision of the [inferior officers]."). The Attorney General has statutory authority to review his subordinates' decisions on whether a noncitizen should be removed, 8 U.S.C. § 1103(g)(1), but he need not exercise that authority in every case. Nor is it necessary for a superior to have plenary authority over every aspect of a subordinate's actions. Rather, as the Supreme Court explained in *Edmond*, 520 U.S. at 664-65, adjudicators within the military courts could properly serve as inferior officers even though their supervisors could "not attempt to influence * * *

38

the outcome of individual proceedings" and could "not reevaluate the facts" found by the adjudicators if they were supported by "competent evidence." What mattered was that the inferior officers had "no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers." *Id.* at 665.

The severance approach set forth here would permit the same level of control. The Secretary could review "A" and "B" recommendations to determine if they are warranted for purposes of required coverage under § 300gg-13, because the Task Force (convened as part of the Public Health Service) would be "under the supervision and direction of the Secretary," 42 U.S.C. § 202. And as explained, § 299b-4(a)(6) would not bar any constitutionally required supervision. Moreover, severance in this manner is not inconsistent with the principles of independent and evidence-based decisionmaking entrusted to the Task Force. Rather, this severance approach simply acknowledges that—for constitutional purposes—Task Force members must receive a constitutionally requisite level of supervision by the Secretary. Indeed, the district court acknowledged that even with the statutory restrictions in place, the Task Force was subject to "some level of direction by the Secretary." ROA.1797.

*Third*, the district court concluded that severance could not eliminate an Appointments Clause violation, as opposed to "a Removal Clause violation."  ROA.2129.  But that reasoning disregards the Supreme Court's decision in *Arthrex*, which eliminated an Appointments Clause violation by severing limitations on review by a principal officer.  And in addition to *Arthrex*, other Appointments Clause cases have used severance to permit inferior officers to be subject to a constitutionally requisite level of supervision.  In *Free Enterprise*, for example, the Supreme Court held that the contested Board members properly served as inferior officers because the Court had already severed "the statutory restrictions on the Commission's power to remove Board members."  561 U.S. at 510.  Applying *Free Enterprise*, the D.C. Circuit "likewise conclude[d] [] that invalidating and severing the restrictions on the" principal officer's supervisory authority "eliminates the Appointments Clause violation and minimizes any collateral damage."  *Intercollegiate Broadcasting System*, 684 F.3d at 1340.  The same reasoning applies here.[3]

---

[3] Because the statute, as properly construed, permits the Secretary to appoint and remove Task Force members, the statute allows meaningful supervisory authority by the Secretary with respect to the application of the Task Force's "A" and "B" recommendations under 42 U.S.C. § 300gg-13. The statutory provisions are thus constitutional even if Task Force members are not regarded as officers of the United States and serve in a

*Continued on next page.*

## III. At A Minimum, This Court Should Reverse The Nationwide Injunction And Universal Vacatur Of Agency Actions

### A. The District Court Failed To Consider Whether The Balance Of Equities And The Public Interest Justified Its Universal Remedies

This Court should, at a minimum, reverse the district court's nationwide injunction and universal vacatur of agency actions. In imposing these universal remedies, the district court failed to consider the balance of equities or the public interest. Instead, the court treated its universal remedies as flowing automatically from its finding of an Appointments Clause violation. That reasoning contradicts the controlling precedent of the Supreme Court and this Court and requires that the universal remedies be reversed.

When, as here, the constitutionality of a federal statute is at issue, the usual remedy is to enjoin the enforcement of the statutory provision against the plaintiffs. Recent cases involving constitutional challenges to a provision of the American Rescue Plan Act are illustrative. In *Texas v. Yellen*, 597 F. Supp. 3d 1005 (N.D. Tex. 2022), the district court enjoined

---

purely private capacity. And if the Court were to regard the Task Force members in that manner but conclude that the statute does not afford the Secretary constitutionally adequate supervisory authority over their actions, the severance analysis above would also eliminate any constitutional defect in that event.

the defendant agency officials from enforcing the challenged statutory provision "against Plaintiffs." *Id.* at 1019. Similarly, in *Kentucky v. Yellen*, 54 F.4th 325 (6th Cir. 2022), the Sixth Circuit affirmed a permanent injunction to the extent that it barred the defendant agency officials from enforcing the same provision against one of the plaintiff States. *See id.* at 329, 341-42 n.12 (affirming the permanent injunction as to Tennessee but vacating it as to Kentucky, which failed to demonstrate standing). Those conclusions are consistent with the Eleventh Circuit's directive that when "the courts can offer complete relief to the plaintiffs in federal regulatory challenges without issuing a nationwide injunction," they "must" do so. *Georgia v. President of the United States*, 46 F.4th 1283, 1308 (11th Cir. 2022).

The district court here entered such plaintiff-specific relief on the Appointments Clause claim. In relevant part, the final judgment declared that Braidwood Management and Kelley Orthodontics and, "to the extent applicable, [the] individual plaintiffs,"[4] need not comply with the preventive-services coverage requirement with respect to Task Force recommendations made on or after March 23, 2010, and it enjoined

---

[4] By its terms, 42 U.S.C. § 300gg-13(a) applies to "group health plan[s]" and "health insurance issuer[s] offering group or individual health insurance coverage," not to individuals themselves.

defendants from "implementing or enforcing the same *against these Plaintiffs*." ROA.2132 (emphasis added). The district court did not conclude that any additional relief was necessary to redress plaintiffs' asserted injuries. *See* ROA.2121-2130. Nonetheless, its final judgment provided that any and "[a]ll agency actions taken to implement or enforce the preventive care coverage requirements in response to an 'A' or 'B' recommendation" by the Task Force "on or after March 23, 2010 * * * are VACATED" and that defendants are "ENJOINED from implementing or enforcing" the statute's preventive-services coverage requirement "in response to an 'A' or 'B' rating from the Task Force in the future." ROA.2129.

Although the district court believed that its universal remedies flowed automatically from its finding of a constitutional violation, the Supreme Court has admonished that "the balance of equities and consideration of the public interest" are "pertinent in assessing the propriety of any injunctive relief, preliminary or permanent." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 32 (2008). Likewise, this Court has recognized that nationwide injunctions are not "required or even the norm." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021). "As is true

for all injunctive relief, the scope of the injunction must be justified based on the circumstances." *Id.* (quotation marks omitted).

The district court's reliance on the "set aside" language in section 706 of the APA, ROA.2122 (citing 5 U.S.C. § 706), was wholly misplaced. Even when (unlike here) the target of a lawsuit is final agency action rather than a federal statute, this Court has treated universal vacatur of agency action as a discretionary equitable remedy—not as a remedy that is automatic or compelled. *See, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality op.) (concluding without contradiction from any other member of the Court that the district court could consider on remand "a more limited remedy" than universal vacatur of the final rule, and instructing the district court to "determine what remedy—injunctive, declarative, or otherwise—is appropriate to effectuate" the judgment); *see also id.* (recognizing that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury") (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018)); *Central & South West Services, Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (declining to enter vacatur in favor of remand). That makes sense, given that the APA itself makes explicit that its authorization of judicial review does not affect "the power or duty of the court to * * * deny relief on any * * * equitable ground." 5 U.S.C. § 702(1). The problems

caused by universal remedies are well catalogued and do not depend on whether the universal remedy takes the form of a nationwide injunction or universal vacatur of agency action. *See, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 395-398 (6th Cir. 2022) (Sutton, C.J., concurring).[5]

Here, moreover, the operative complaint challenged only the requirements of the statute—plaintiffs abandoned the sole count for "violations of the Administrative Procedure Act" that they alleged in their original complaint. *Compare* ROA.57 (original complaint, count 5), *with* ROA.231-244 (first amended complaint). Permitting plaintiffs to obtain an asserted APA remedy without raising an APA claim created cascading problems, allowing them to evade the APA's procedural requirement to

---

[5] We do not concede that universal vacatur of agency action is authorized by the APA, but we recognize that this Court's precedent allows vacatur without requiring it. This Court has described vacatur of an agency action as the "default rule" in this Circuit, *Data Marketing Partnership, LP v. United States Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022), but the agency action at issue in the *Data Marketing* case was plaintiff-specific: a Department of Labor advisory opinion that addressed the question whether a particular health plan qualified as an employee welfare benefit plan governed by the Employee Retirement Income Security Act. Similarly, although this Court has stated that "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation," *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374-75 & n.29 (5th Cir. 2022), the Court did not suggest that universal vacatur was *mandatory*, and acknowledged circumstances where courts "do not vacate the action." Indeed, *Franciscan Alliance*'s ultimate holding was that the APA challenge to the final rule was moot. *Id.* at 380.

challenge identified final agency action, *e.g.*, 5 U.S.C. § 704, and the statute of limitations for civil actions against the government, 28 U.S.C. § 2401(a). Moreover, the district court's universal remedies contravene the longstanding principle that courts should avoid mass invalidation of past administrative actions based solely on a defect in appointment. *See, e.g.*, *Buckley v. Valeo*, 424 U.S. 1, 142 (1976) (declining to grant relief that would "affect the validity" of "past acts" of improperly appointed officers); *Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 862 (1st Cir. 2019) (declining to award for an Appointments Clause violation relief that would "have negative consequences for the many, if not thousands, of innocent third parties"), *reversed on other grounds*, 140 S. Ct. 1649 (2020).

### B.    The Balance Of Equities And Public Interest Precluded The District Court's Universal Remedies.

As discussed above, the district court entered a nationwide injunction and universal vacatur of agency actions without even considering the balance of equities or the public interest.  The universal remedies are thus premised on legal error and must be reversed.  Moreover, if the district court had considered the issue, it would have been a clear abuse of discretion to conclude that the balance of equities and public interest justified its universal remedies.

Those sweeping remedies undermine the statutory right of 150 million Americans to coverage without cost sharing for more than 50 vital preventive services. *See* ROA.2170-2176 (declaration of Jeff Wu, Deputy Director for Policy at the Centers for Medicare & Medicaid Services); ROA.2177-2181 (declaration of Lisa M. Gomez, Assistant Secretary in the Department of Labor). "[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *accord Vote.Org v. Callanen*, 39 F.4th 297, 308 (5th Cir. 2022) (citing cases). And here, the whole point of the statutory requirement is to remove barriers to those preventive services that can save peoples' lives.

The district court's universal remedies thus pose a grave threat to the public health. As the leading public health organizations, scholars, and deans emphasized in their amicus briefs supporting a stay of the district court's universal remedies, the final judgment encompasses dozens of critical services, including statins proven to reduce the risk of heart attacks and strokes; screenings to detect breast cancer, colon cancer, and lung cancer early, when the survival rate is far higher; preexposure prophylaxis medications to prevent HIV infection for those at high risk; aspirin to

47

prevent preeclampsia deaths during pregnancy and pre-term births; and physical therapy for older adults to prevent falls, which are the leading cause of injury-related death among the elderly. *See, e.g.*, American Public Health Association and Public Health Deans and Scholars Amicus Br. 7-13, Dkt. 56 (5th Cir. May 1, 2023).

There is no doubt that such preventive services save lives. Early detection of lung cancer, for example, increases the five-year survival rate from 7% to 61%, and it is estimated that the lung cancer screenings encompassed by the final judgment could save 10,000 to 20,000 lives each year. ROA.2174. Increasing costs for statins significantly reduces the likelihood that patients will adhere to a statin regimen designed to prevent heart attacks and strokes. ROA.2175. Preexposure prophylaxis medications can reduce the risk of HIV infection by as much as 99%, ROA.1473, and if the drugs had been used more widely between 2015 and 2020, they "could have prevented an additional 17,000" HIV infections. ROA.1474; *see also* ROA.2173. Through 42 U.S.C. § 300gg-13(a)(1), Congress took steps to ensure that the covered public will benefit from these critical medications and services without any cost sharing. The district court's order prohibits the United States from carrying out that

directive, at significant cost to the public health and with no identifiable benefit to plaintiffs, who already received party-specific relief.

In responding to the government's stay motion, plaintiffs conceded that the district court's plaintiff-specific relief "fully redressed" the injuries asserted by Braidwood Management. Pls.' Resp. to Mot. for a Partial Stay of Final Judgment Pending Appeal 2, Dkt. 66 (5th Cir. May 5, 2023). "That is because Braidwood's injuries arose from its inability to determine the coverage in its self-insured plan"—"an injury that was fully redressed by declaratory and injunctive relief that restrains the defendants from enforcing the unlawful preventive-care coverage mandates *against Braidwood.*" *Id.* (emphasis added).

In opposing a stay, plaintiffs argued that broader relief was necessary to redress the injuries of the other prevailing plaintiffs—four uninsured individuals who live in Texas and one uninsured small business located in Texas, who object to only a small subset of the Task Force's more than 50 "A" and "B" recommendations. The district court said no such thing, however, and it should be obvious that its universal remedies cannot be justified by the claims of a handful of uninsured Texas residents. No plaintiff in this case has an interest in the terms of the plans that insurers offer through the Exchanges in Minnesota, Kentucky, California, Maine, or

any other State apart from Texas.  *See, e.g.*, KFF, *FAQs: Health Insurance Marketplace and the ACA: Marketplace Eligibility*, https://perma.cc/3UYB-K95G (explaining that "[t]o be eligible" to buy a plan "you must live in the state where your Marketplace is").  Likewise, no plaintiff in this case has an interest in the terms of the millions of group health plans that are offered by employers for whom they do not work.  *See* ROA.2177 (Gomez declaration) (explaining that approximately 133 million Americans have health coverage through 2.5 million ERISA-covered plans).

In short, it is difficult to imagine a weaker case for entering universal relief.

## CONCLUSION

The Court should reverse the district court's judgment insofar as it held that the statutory provision concerning preventive services covered under 42 U.S.C. § 300gg-13(a)(1) suffered from an Appointments Clause defect.  If the Court concludes that there was an Appointments Clause defect, then it should sever the restrictions in 42 U.S.C. § 299b-4(a)(6) with respect to the HHS's Secretary's review over Task Force recommendations that may be given binding effect under 42 U.S.C. § 300gg-13(a)(1) and (b).  At a minimum, the Court should reverse the district court's universal remedies.

Respectfully submitted,

BRIAN M. BOYNTON
    *Principal Deputy Assistant*
    *Attorney General*

LEIGHA SIMONTON
    *United States Attorney*

MICHAEL S. RAAB

ALISA B. KLEIN

 */s/ Daniel Aguilar*

DANIEL AGUILAR

(202) 514-5432

Attorneys, Appellate Staff

Civil Division

U.S. Department of Justice

950 Pennsylvania Avenue NW

Washington, DC 20530

(202) 514-5432

June 2023

## CERTIFICATE OF SERVICE

I certify that on June 20, 2023, I filed a copy of this brief with the Clerk of Court for the Fifth Circuit Court of Appeals through the Court's CM/ECF system, which will serve counsel for all parties.

*/s/ Daniel Aguilar*
Daniel Aguilar

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,548 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Georgia 14-point font, a proportionally spaced typeface.

*/s/ Daniel Aguilar*
Daniel Aguilar

**ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

U.S. Const., art. II, § 2, cl. 2....................................................................Add. 1

Reorganization Plan No. 3 of 1966, 80 Stat. 1610 .................................Add. 2

42 U.S.C. § 202 ........................................................................................Add. 4

42 U.S.C. § 299 ........................................................................................Add. 4

42 U.S.C. § 299b-4...................................................................................Add. 6

42 U.S.C. § 300gg-13 ...............................................................................Add. 9

**U.S. Const., art. II, § 2, cl. 2.**

[H]e shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

## Reorganization Plan No. 3 of 1966, 80 Stat. 1610

*Prepared by the President and transmitted to the Senate and the House of Representatives in Congress assembled, April 25, 1966, pursuant to the provisions of the Reorganization Act of 1949, 63 Stat. 203, as amended.*

### PUBLIC HEALTH SERVICE

Section 1. *Transfer of Functions*

(a) Except as otherwise provided in subsection (b) of this section, there are hereby transferred to the Secretary of Health, Education, and Welfare (hereinafter referred to as the Secretary) all functions of the Public Health Service, of the Surgeon General of the Public Health Service, and of all other officers and employees of the Public Health Service, and all functions of all agencies of or in the Public Health Service.

(b) This section shall not apply to the functions vested by law in any advisory council, board, or committee of or in the Public Health Service which is established by law or is required by law to be established.

Sec. 2. *Performance of Transferred Functions*

The Secretary may from time to time make such provisions as he shall deem appropriate authorizing the performance of any of the functions transferred to him by the provisions of this reorganization plan by any officer, employee, or agency of the Public Health Service or of the Department of Health, Education, and Welfare.

Sec. 3. *Abolitions*

(a) The following agencies of the Public Health Service are hereby abolished:

> (1) The Bureau of Medical Services, including the office of Chief of the Bureau of Medical Services.

> (2) The Bureau of State Services, including the office of Chief of the Bureau of State Services.

> (3) The agency designated as the National Institutes of Health (42 U.S.C. 203), including the office of Director of the National Institutes of Health (42 U.S.C. 206(b)) but excluding the several research Institutes in the agency designated as the National Institutes of Health.

> (4) The agency designated as the Office of the Surgeon General (42 U.S.C. 203(1)), together with the office held by the Deputy Surgeon General (42 U.S.C. 206(a)).

(b) The Secretary shall make such provisions as he shall deem necessary respecting the winding up of any outstanding affairs of the agencies abolished by the provisions of this section.

Sec. 4. *Incidental Transfers*

As he may deem necessary in order to carry out the provisions of this reorganization plan, the Secretary may from time to time effect transfers within the Department of Health, Education, and Welfare of any of the records, property, personnel and unexpended balances (available or to be made available) of appropriations, allocations, and other funds of the Department which relate to functions affected by this reorganization plan.

## 42 U.S.C. § 202.  Administration and supervision of Service

The Public Health Service in the Department of Health and Human Services shall be administered by the Assistant Secretary for Health under the supervision and direction of the Secretary.

## 42 U.S.C. § 299.  Mission and duties

### (a) In general

There is established within the Public Health Service an agency to be known as the Agency for Healthcare Research and Quality, which shall be headed by a director appointed by the Secretary. The Secretary shall carry out this subchapter acting through the Director.

### (b) Mission

The purpose of the Agency is to enhance the quality, appropriateness, and effectiveness of health services, and access to such services, through the establishment of a broad base of scientific research and through the promotion of improvements in clinical and health system practices, including the prevention of diseases and other health conditions. The Agency shall promote health care quality improvement by conducting and supporting--

    **(1)** research that develops and presents scientific evidence regarding all aspects of health care, including--

        **(A)** the development and assessment of methods for enhancing patient participation in their own care and for facilitating shared patient-physician decision-making;

        **(B)** the outcomes, effectiveness, and cost-effectiveness of health care practices, including preventive measures and long-term care;

        **(C)** existing and innovative technologies;

        **(D)** the costs and utilization of, and access to health care;

        **(E)** the ways in which health care services are organized, delivered, and financed and the interaction and impact of these factors on the quality of patient care;

        **(F)** methods for measuring quality and strategies for improving quality; and

**(G)** ways in which patients, consumers, purchasers, and practitioners acquire new information about best practices and health benefits, the determinants and impact of their use of this information;

**(2)** the synthesis and dissemination of available scientific evidence for use by patients, consumers, practitioners, providers, purchasers, policy makers, and educators; and

**(3)** initiatives to advance private and public efforts to improve health care quality.

## (c) Requirements with respect to rural and inner-city areas and priority populations

### (1) Research, evaluations and demonstration projects

In carrying out this subchapter, the Director shall conduct and support research and evaluations, and support demonstration projects, with respect to--

**(A)** the delivery of health care in inner-city areas, and in rural areas (including frontier areas); and

**(B)** health care for priority populations, which shall include--

**(i)** low-income groups;

**(ii)** minority groups;

**(iii)** women;

**(iv)** children;

**(v)** the elderly; and

**(vi)** individuals with special health care needs, including individuals with disabilities and individuals who need chronic care or end-of-life health care.

### (2) Process to ensure appropriate research

The Director shall establish a process to ensure that the requirements of paragraph (1) are reflected in the overall portfolio of research conducted and supported by the Agency.

### (3) Office of Priority Populations

The Director shall establish an Office of Priority Populations to assist in carrying out the requirements of paragraph (1).

**42 U.S.C. § 299b-4.  Research supporting primary care and access in underserved areas**

**(a) Preventive Services Task Force**

**(1) Establishment and purpose**

The Director shall convene an independent Preventive Services Task Force (referred to in this subsection as the "Task Force") to be composed of individuals with appropriate expertise. Such Task Force shall review the scientific evidence related to the effectiveness, appropriateness, and cost-effectiveness of clinical preventive services for the purpose of developing recommendations for the health care community, and updating previous clinical preventive recommendations, to be published in the Guide to Clinical Preventive Services (referred to in this section as the "Guide"), for individuals and organizations delivering clinical services, including primary care professionals, health care systems, professional societies, employers, community organizations, non-profit organizations, Congress and other policy-makers, governmental public health agencies, health care quality organizations, and organizations developing national health objectives. Such recommendations shall consider clinical preventive best practice recommendations from the Agency for Healthcare Research and Quality, the National Institutes of Health, the Centers for Disease Control and Prevention, the Institute of Medicine, specialty medical associations, patient groups, and scientific societies.

**(2) Duties**

The duties of the Task Force shall include--

**(A)** the development of additional topic areas for new recommendations and interventions related to those topic areas, including those related to specific sub-populations and age groups;

**(B)** at least once during every 5-year period, review interventions and update recommendations related to existing topic areas, including new or improved techniques to assess the health effects of interventions;

**(C)** improved integration with Federal Government health objectives and related target setting for health improvement;

**(D)** the enhanced dissemination of recommendations;

**(E)** the provision of technical assistance to those health care professionals, agencies and organizations that request help in implementing the Guide recommendations; and

**(F)** the submission of yearly reports to Congress and related agencies identifying gaps in research, such as preventive services that receive an insufficient evidence statement, and recommending priority areas that deserve further examination, including areas related to populations and age groups not adequately addressed by current recommendations.

### (3) Role of Agency

The Agency shall provide ongoing administrative, research, and technical support for the operations of the Task Force, including coordinating and supporting the dissemination of the recommendations of the Task Force, ensuring adequate staff resources, and assistance to those organizations requesting it for implementation of the Guide's recommendations.

### (4) Coordination with Community Preventive Services Task Force

The Task Force shall take appropriate steps to coordinate its work with the Community Preventive Services Task Force and the Advisory Committee on Immunization Practices, including the examination of how each task force's recommendations interact at the nexus of clinic and community.

### (5) Operation

Operation. In carrying out the duties under paragraph (2), the Task Force is not subject to the provisions of chapter 10 of Title 5.

### (6) Independence

All members of the Task Force convened under this subsection, and any recommendations made by such members, shall be independent and, to the extent practicable, not subject to political pressure.

### (7) Authorization of appropriations

There are authorized to be appropriated such sums as may be necessary for each fiscal year to carry out the activities of the Task Force.

**(b) Primary care research**

    **(1) In general**

There is established within the Agency a Center for Primary Care Research (referred to in this subsection as the "Center") that shall serve as the principal source of funding for primary care practice research in the Department of Health and Human Services. For purposes of this paragraph, primary care research focuses on the first contact when illness or health concerns arise, the diagnosis, treatment or referral to specialty care, preventive care, and the relationship between the clinician and the patient in the context of the family and community.

    **(2) Research**

In carrying out this section, the Center shall conduct and support research concerning--

    **(A)** the nature and characteristics of primary care practice;

    **(B)** the management of commonly occurring clinical problems;

    **(C)** the management of undifferentiated clinical problems; and

    **(D)** the continuity and coordination of health services.

## 42 U.S.C. § 300gg-13.  Coverage of preventive health services.

### (a) In general

A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for--

**(1)** evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the United States Preventive Services Task Force;

**(2)** immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved; and

**(3)** with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration.

**(4)** with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.

**(5)** for the purposes of this chapter, and for the purposes of any other provision of law, the current recommendations of the United States Preventive Service Task Force regarding breast cancer screening, mammography, and prevention shall be considered the most current other than those issued in or around November 2009.

Nothing in this subsection shall be construed to prohibit a plan or issuer from providing coverage for services in addition to those recommended by United States Preventive Services Task Force or to deny coverage for services that are not recommended by such Task Force.

### (b) Interval

#### (1) In general

The Secretary shall establish a minimum interval between the date on which a recommendation described in subsection (a)(1) or (a)(2) or a guideline under subsection (a)(3) is issued and the plan year with respect to which the requirement described in subsection (a) is effective

with respect to the service described in such recommendation or guideline.

**(2) Minimum**

The interval described in paragraph (1) shall not be less than 1 year.

## (c) Value-based insurance design

The Secretary may develop guidelines to permit a group health plan and a health insurance issuer offering group or individual health insurance coverage to utilize value-based insurance designs.