# United States Court of Appeals

*for the*

# Fifth Circuit

---

Case No. 23-10326

BRAIDWOOD MANAGEMENT, INCORPORATED; JOHN SCOTT KELLEY; KELLEY ORTHODONTICS; ASHLEY MAXWELL; ZACH MAXWELL; JOEL STARNES,

*Plaintiffs-Appellees / Cross-Appellants,*

JOEL MILLER; GREGORY SCHEIDEMAN,

*Plaintiffs-Cross-Appellants,*

v.

XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, in his official capacity as Secretary of Health and Human Services; UNITED STATES OF AMERICA; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF TREASURY, in her official capacity as Secretary of the Treasury; JULIE A. SU, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR, in her official capacity as Secretary of Labor,

*Defendants-Appellants / Cross-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

**BRIEF FOR *AMICUS CURIAE* BLUE CROSS
BLUE SHIELD ASSOCIATION IN SUPPORT
OF APPELLANTS AND VACATUR**

K. LEE BLALACK II
BRIAN D. BOYLE
JORDAN PETER ASCHER
O'MELVENY & MYERS LLP
*Attorneys for Amicus Curiae*
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5374

## CORPORATE DISCLOSURE STATEMENT AND
## SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed entity, in addition to the persons and entities listed in the parties' briefs, has an interest in the outcome of this case.  This representation is made so that the judges of this Court may evaluate possible disqualification or recusal.

*Amicus curiae* **Blue Cross Blue Shield Association** is a non-profit entity with no parent corporation, and no publicly traded corporation has any ownership interest in it of any kind.

June 27, 2023                                        /s/ K. Lee Blalack II
                                                     K. Lee Blalack II

i

# TABLE OF CONTENTS

**Page**

CORPORATE DISCLOSURE STATEMENT AND SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS ........................................... i

INTEREST OF *AMICUS CURIAE* ............................................................ 1

SUMMARY OF ARGUMENT ................................................................. 2

ARGUMENT .......................................................................................... 4

I.    THE DISTRICT COURT FAILED TO CONSIDER THE PUBLIC INTEREST BEFORE IMPOSING ITS SWEEPING, NATIONWIDE REMEDY. ................................................................ 4

II.   THE PUBLIC INTEREST STRONGLY COUNSELS AGAINST A NATIONWIDE INJUNCTION BARRING ENFORCEMENT OF THE PREVENTIVE SERVICES MANDATE. ................................. 6

    A.    Preventive services without cost-sharing has improved health outcomes. ...................................................... 8

    B.    Preventive services reduce long-term costs for patients and the health care system overall. ............................... 11

III.  THE DISTRICT COURT'S DECISION WOULD BE TREMENDOUSLY DISRUPTIVE TO HEALTHCARE DELIVERY IN THE UNITED STATES AND DETRIMENTAL TO THE PUBLIC INTEREST. ................................................... 13

    A.    Eliminating the Preventive Services Mandate may cause some health plan sponsors to reduce or eliminate coverage for preventive care. ............................................... 14

    B.    Eliminating the Preventive Services Mandate will harm patients. ........................................................ 15

CONCLUSION ..................................................................................... 19

CERTIFICATE OF SERVICE ............................................................... 20

CERTIFICATE OF COMPLIANCE ...................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) .................................................................5

*CASA de Maryland, Inc. v. Trump,*
    971 F.3d 220 (4th Cir. 2020) ..............................................................5

*eBay Inc. v. MercExchange, LLC,*
    547 U.S. 388 (2006) .............................................................................5

*Louisiana v. Becerra,*
    20 F.4th 260 (5th Cir. 2021) ................................................................5

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) .............................................................................6

*Stevens v. St. Tammany Parish Gov't,*
    17 F.4th 563 (5th Cir. 2021) ...........................................................5, 6

**Statutes**

42 U.S.C. § 300gg-13(a) ...........................................................................2

42 U.S.C. § 300gg-13(a)(1) ...................................................................3, 4

5 U.S.C. § 702(1) .......................................................................................4

**Other Authorities**

A & B Recommendations, U.S. Preventive Services Task Force,
    https://perma.cc/V665-7P5G ................................................................7

Cagdas Agirdas & Jordan G. Holding, *Effects of the ACA on Preventive*
    *Care Disparities*, 16 App. Health Econ. & Health Pol. 859 (2018),
    https://tinyurl.com/eu2fcan2 .........................................................11, 18

Employee Benefits Research Inst., *Will Employers Introduce Cost*
    *Sharing for Preventive Services?  Findings from EBRI's First*
    *Employer Pulse Survey* (2022), https://perma.cc/4PPP-4G2S .............14

H. Rep. 111-299, pt. 1 (2009) .....................................................................7

H. Rep. 111-299, pt. 2 (2009) ...............................................................8, 11

Harris Meyer, *Court Ruling May Spur Competitive Health Plans to*
    *Bring Back Copays for Preventive Services*, Kaiser Health News (Sept.
    15, 2022), https://perma.cc/GM8R-JE7W ....................................14, 16

# TABLE OF AUTHORITIES

**Page(s)**

Jared B. Fox & Frederic E. Shaw, *Clinical Preventive Services Coverage and the Affordable Care Act*, 105 Am. J. Pub. Health e7, e7 (2015), https://tinyurl.com/yc4uy7bj .......................................................... 10, 18

Jonathan Gruber & Benjamin D. Sommers, *The Affordable Care Act's Effects on Patients, Providers and the Economy: What We've Learned So Far* 12 (Nat'l Bureau of Econ. Rsch., Working Paper No. 25932, 2019), https://tinyurl.com/2p8dvhkf. ........................................ 9, 10, 18

Jonathan T. Kolstad & Amanda E. Kowalski, *The Impact of Health Care Reform on Hospital and Preventive Care: Evidence From Massachusetts*, 96 J. Pub. Econ. 909 (2012), https://tinyurl.com/mtdwfc74. ............................................................................................ 12

Kara Gavin, *What Happens When Preventive Care Becomes Free to Patients*, Univ. of Mich. Health Lab (June 28, 2021), https://perma.cc/U9CX-CB7T .................................................................................. 10, 18

Kenneth E. Thorpe, *Racial Trends in Clinical Preventive Services Use, Chronic Disease Prevalence, and Lack of Insurance Before and After the Affordable Care Act*, 28 Am. J. of Managed Care (Apr. 2022), https://tinyurl.com/5ywmu966........................................................ 10, 18

Krutika Amin et al., *Preventive Services Use Among People with Private Insurance Coverage*, Kaiser Fam. Found. (Mar. 20, 2023), https://perma.cc/DYj4-EPXC. ......................................................... 8

Laura Skopec & Jessica Banthin, *Free Preventive Services Improve Access to Care*, Urban Institute (July 2022), https://perma.cc/LJX9-ST3T .................................................................................................. 9

Nat'l Ctr. for Chronic Disease Prev. & Health Promotion, Ctrs. for Disease Control & Prevention, *Understanding Value-Based Insurance Design* (2015), https://perma.cc/2XTY-KV6L ...................................... 12

Off. of Assistant Sec'y for Plan. & Evaluation, Dep't of Health & Hum. Servs., *Access to Preventive Services Without Cost-Sharing: Evidence from the Affordable Care Act* (Jan. 11, 2022), https://perma.cc/ZL9S-BTJX................................................................................................... 8

Preventive Services Tracker, Kaiser Fam. Found. (Apr. 26, 2023), https://perma.cc/C2F2-U56T............................................................. 7

# TABLE OF AUTHORITIES

**Page(s)**

Ricky Zipp, *Many Americans Are Likely to Skip Preventive Care if ACA Coverage Falls Through*, Morning Consult (2023), https://perma.cc/W8ND-3TRS ............................................................ 17

Sabrina Corlette, *A World Without the ACA's Preventive Services Protections: The Impact of the* Braidwood *Decision*, Geo. Univ. Health Pol. Inst. Ctr. for Children & Families (Apr. 18, 2023), https://perma.cc/6G45-E8MZ ........................................................ 15, 16

Shameek Rakshit et al., *How Does Cost Affect Access to Healthcare?*, Kaiser Fam. Found. (Jan. 30, 2023), https://perma.cc/689M-DLZL ........................................................................................ 17, 18

Shirley Musich et al., *The Impact of Personalized Preventive Care on Health Care Quality, Utilization, and Expenditures*, 19 Pop. Health Mgmt. 389 (2016), https://tinyurl.com/y6mz546e .............................. 11

Xuesong Han et al., *Has Recommended Preventive Service Use Increased After Elimination of Cost-Sharing as Part of the Affordable Care Act in the United States?*, 78 Prev. Med. 85 (Sept. 2015), https://tinyurl.com/5arrnkv7 ............................................................... 8

Zarek C. Brot-Goldberg et al., *What Does A Deductible Do? The Impact of Cost-Sharing on Health Care Prices, Quantities, and Spending Dynamics*, 132 Q. J. of Econ. 1261 (2017), https://tinyurl.com/36ezs5ub ......................................... 17

Zoe Chopra & A. Mark Fendrick, *Clinical Implications of the* Braidwood *Ruling: Use of Pre-ACA Task Force Recommendations*, Health Affairs (May 2, 2023), http://bit.ly/43PDD4Z .................................................. 13

## INTEREST OF *AMICUS CURIAE*

The Blue Cross Blue Shield Association ("BCBSA") is the non-profit association that promotes the national interests of 34 independent, community-based, and locally operated Blue Cross Blue Shield health insurance companies ("Blue Plans").[1]  Together, the Blue Plans provide health insurance for 115 million people—one in three Americans—in every zip code in all fifty states, the District of Columbia, and Puerto Rico. Blue Plans offer a variety of insurance products to all segments of the population, including federal employees, large employer groups, small businesses, and individuals.  As leaders in the healthcare community for more than ninety years, Blue Plans seek to expand access to quality healthcare for all Americans and have extensive knowledge of and experience with the health insurance marketplace.  BCBSA has an interest in advising the Court regarding the public interest arising from the legal mandate that health insurers and health plans offer beneficiaries preventive health care services without cost sharing, which is the subject of this suit.

---

[1] Counsel for all parties have consented to the filing of this brief.  This brief was not authored in whole or in part by counsel for a party and no one other than *amicus* or its counsel has contributed money for this brief.

1

## SUMMARY OF ARGUMENT

Under the Affordable Care Act ("ACA"), health insurers must cover certain preventive services without any cost-sharing requirement—in other words, at no out-of-pocket cost to policyholders ("the Preventive Services Mandate"). 42 U.S.C. § 300gg-13(a). This requirement—a cornerstone of the ACA—has had immensely positive social and economic effects. Preventive services are now much more widely accessible than they were before the ACA. The Preventive Services Mandate has reduced morbidity and mortality. It has eased longstanding racial and economic inequities in health access and outcomes. And it has incentivized patients to avail themselves of less-costly preventive care, reducing the need for expensive and disruptive interventions that may not produce the same successful health outcomes. In short, the Preventive Services Mandate has confirmed the truth in the old adage: an ounce of prevention is worth a pound of cure.

The district court's decisions in this case threaten to unwind this hard-won progress. The district court concluded, among other things, that the operation of the U.S. Preventive Services Task Force (the "Task Force"), a body charged with identifying certain preventive services that

2

insurers must cover, *see* 42 U.S.C. § 300gg-13(a)(1), violates the Appointments Clause of the U.S. Constitution.  To remedy that violation, the district court vacated all agency action postdating the ACA's enactment that implemented the Task Force's recommendations and prospectively enjoined any agency action to do so.

That was error.  Before ordering permanent equitable relief—especially on a nationwide basis—the district court was obligated to consider whether any such relief would be in the public interest.  It did not do so.  If it had performed that analysis, it would have encountered overwhelming evidence that the Preventive Services Mandate has greatly improved the accessibility of essential coverage, and that rolling it back would have the opposite effect, causing enormous disruption for patients, health plans, and healthcare providers.  Indeed, immense amounts of research, reporting, and analysis confirm that the Preventive Services Mandate has been an enormous policy success, and that the public interest strongly favors maintaining it.  Because the district court erred in failing to consider the public interest, this Court should vacate the district court's remedial order.

## ARGUMENT

I.  **THE DISTRICT COURT FAILED TO CONSIDER THE PUBLIC INTEREST BEFORE IMPOSING ITS SWEEPING, NATIONWIDE REMEDY.**

Eliminating the Preventive Services Mandate would cause a range of disruptive consequences for patients, health plans, and healthcare providers.  Nevertheless, the district court, in fashioning a nationwide remedy, failed to account for these public-interest considerations.

As relevant here, the district court ordered two forms of relief—vacatur under the Administrative Procedure Act ("APA") of *all* agency action "taken to implement or enforce the preventive care coverage requirements in response to an 'A' or 'B' recommendation by the U.S. Preventive Services Task force on or after March 23, 2010 and made compulsory under 42 U.S.C. § 300gg-13(a)(1)[,]" and a permanent, nationwide injunction barring the government from "implementing or enforcing [the Preventive Services Mandate's] compulsory coverage requirements in response to an 'A' or 'B' rating from the Task Force in the future."  Dist. Ct. D.E. 113 at 27.

This sweeping injunctive relief may only be imposed pursuant to the principles of equity.  *See, e.g.*, 5 U.S.C. § 702(1) (relief under the APA

4

may be denied "on any . . . equitable ground"); *Arizona v. Biden*, 40 F.4th 375, 396–97 (6th Cir. 2022) (Sutton, C.J., concurring) (collecting authorities tying relief under the APA to equitable principles); *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (the entry of a permanent injunction is governed by "well-established principles of equity"). Key among these principles is that equitable relief must be in the public interest. *Stevens v. St. Tammany Parish Gov't*, 17 F.4th 563, 576 (5th Cir. 2021) ("A party seeking a permanent injunction must establish . . . that the injunction will not disserve the public interest." (internal quotation marks omitted)); *eBay*, 547 U.S. at 391 (same). Moreover, a district court seeking to "make a binding judgment for the entire country" by issuing a *nationwide* injunction that extends beyond the litigants must justify "the scope of the injunction" "based on the circumstances." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (internal quotation marks omitted); *see also CASA de Maryland, Inc. v. Trump*, 971 F.3d 220, 259 (4th Cir. 2020) ("[T]he attendant practical consequences of this drastic and extraordinary remedy [a nationwide injunction] should restrict its use to the most exceptional circumstances.").

Under these principles, the district court erred in entering nationwide equitable relief. Such relief is far more "burdensome . . . than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). At the same time, an injunction—especially one effective as to *all Americans*—would undermine the public interest. *See Stevens*, 17 F.4th at 576. As explained hereafter, the Preventive Services Mandate has improved the health of millions of Americans and improved the efficiency and effectiveness of the healthcare system. The district court's exercise of its equitable power to enjoin enforcement of the mandate not only as to the few litigants before it, but for all stakeholders across the country, will cause enormous disruption and threaten this demonstrable progress. The district court did not consider whether the public interest favored an injunction—especially one so broad. That was error. This Court should therefore vacate the district court's remedial order.

## II. THE PUBLIC INTEREST STRONGLY COUNSELS AGAINST A NATIONWIDE INJUNCTION BARRING ENFORCEMENT OF THE PREVENTIVE SERVICES MANDATE.

Had the district court undertaken a review of public interest considerations, it would have found strong reasons to exercise restraint

6

in fashioning a remedy for these few plaintiffs' claims. Through the ACA's mandate that plans cover, without cost-sharing, preventive services recommended by the Task Force, Americans have gained access to a wide range of critical preventive services—including a number of cancer screenings, smoking cessation interventions, and mental health treatments.[2] The increased accessibility of preventive services has improved health outcomes, led to greater economic and racial equity in health care, and reduced costs for patients and the healthcare system as a whole.

Indeed, increasing the accessibility and use of preventive services was a key objective for Congress in enacting the ACA. As the House Committee on Energy and Commerce, quoting the then-Secretary of Health and Human Services, put it when considering the bill that eventually became the ACA, "[F]or too long, we've sunk all our resources into cures and short-changed prevention. Preventing disease and controlling its effects over time must be the foundation of our health care system." H. Rep. 111-299, pt. 1, at 326 (2009). And the House Ways and

---

[2] Preventive Services Tracker, Kaiser Fam. Found. (Apr. 26, 2023), https://perma.cc/C2F2-U56T; A & B Recommendations, U.S. Preventive Services Task Force, https://perma.cc/V665-7P5G.

Means Committee explained that the ACA's "reforms are designed to make the nation's health care system more efficient . . . in large part by recognizing the importance of primary and preventive care." H. Rep. 111-299, pt. 2, at 198 (2009).

### A. Preventive services without cost-sharing has improved health outcomes.

As Congress hoped, the ACA's requirement that plans cover preventive services without cost-sharing has dramatically increased the accessibility of preventive services and improved health outcomes. In a typical year, approximately 100 million people obtain at least one preventive service without any out-of-pocket cost.[3] The Preventive Services Mandate has contributed to increases in, among other things, colorectal cancer screenings, blood pressure and cholesterol screenings, and general wellness visits.[4] As one meta-analysis concluded, the ACA's

---

[3] Krutika Amin et al., *Preventive Services Use Among People with Private Insurance Coverage*, Kaiser Fam. Found. (Mar. 20, 2023), https://perma.cc/DYj4-EPXC.

[4] Off. of Assistant Sec'y for Plan. & Evaluation, Dep't of Health & Hum. Servs., *Access to Preventive Services Without Cost-Sharing: Evidence from the Affordable Care Act* (Jan. 11, 2022), https://perma.cc/ZL9S-BTJX; *see also* Xuesong Han et al., *Has Recommended Preventive Service Use Increased After Elimination of Cost-Sharing as Part of the Affordable Care Act in the United States?*, 78 Prev. Med. 85 (Sept. 2015),

goal of increasing the use of preventive services "appears to have been accomplished. Studies using multiple research designs and empirical approaches find reductions in cost-related delays in care and an increased share of the population with a personal physician and regular location of care. Studies have found increased use of preventive services ranging from wellness exams to diabetes screening[.]"[5]

The health benefits of expanded access to preventive services are now indisputable. Preventive services, for instance, help patients avoid the onset of chronic conditions (*e.g.*, diabetes screening can identify pre-diabetes and allow for behavioral interventions to prevent the onset of diabetes), allow for earlier interventions (*e.g.*, screenings that lead to early detection and treatment of cancer), and reduce acute health events (*e.g.*, emergency department visits caused by undetected chronic

---

https://tinyurl.com/5arrnkv7 ("Receipt of recent blood pressure check, cholesterol check and flu vaccination increased significantly from 2009 to 2011/2012[.]"); Laura Skopec & Jessica Banthin, *Free Preventive Services Improve Access to Care*, Urban Institute (July 2022), https://perma.cc/LJX9-ST3T.

[5] Jonathan Gruber & Benjamin D. Sommers, *The Affordable Care Act's Effects on Patients, Providers and the Economy: What We've Learned So Far* 12 (Nat'l Bureau of Econ. Rsch., Working Paper No. 25932, 2019), https://tinyurl.com/2p8dvhkf.

conditions).[6] Ultimately, the evidence is compelling that ready access to preventive services without cost-sharing improves health outcomes and saves lives.[7]

Not only does the provision of preventive services without cost-sharing improve overall population health, it also improves the equity of health outcomes. "[L]ow-socioeconomic status groups, and those who experience the greatest financial barriers to care, appear to benefit the most from cost-sharing elimination" for preventive services.[8] Similarly, the provision of preventive services without cost-sharing has reduced health disparities between minority and non-minority populations.[9]

---

[6] *See, e.g.*, *id.* at 14–17 (documenting studies demonstrating salutary effects of preventive services on population health).

[7] *See, e.g.*, Jared B. Fox & Frederic E. Shaw, *Clinical Preventive Services Coverage and the Affordable Care Act*, 105 Am. J. Pub. Health e7, e7 (2015), https://tinyurl.com/yc4uy7bj.

[8] Kara Gavin, *What Happens When Preventive Care Becomes Free to Patients*, Univ. of Mich. Health Lab (June 28, 2021), https://perma.cc/U9CX-CB7T.

[9] Kenneth E. Thorpe, *Racial Trends in Clinical Preventive Services Use, Chronic Disease Prevalence, and Lack of Insurance Before and After the Affordable Care Act*, 28 Am. J. of Managed Care (Apr. 2022), https://tinyurl.com/5ywmu966 (the Preventive Services Mandate caused "greater growth in the use of mammograms and colonoscopies among minority populations. The results also saw relative reductions in hypertension, coronary heart disease, and fair or poor mental health");

**B.     Preventive services reduce long-term costs for patients and the health care system overall.**

As Congress anticipated, preventive services—in addition to improving health outcomes—promote efficiency and reduce long-term health care costs.  *See* H. Rep. 111-299, pt. 2, at 198 (2009) ("recognizing the importance of primary and preventive services" and remarking that preventive services are a key part of the ACA's goal "to make the nation's health care system more efficient").   The immediate effect of the Preventive Services Mandate is to reduce out-of-pocket costs for patients who access such services, even if those services may raise the short-term costs of health plan sponsors and health insurers.  But, over the longer term, the mandate reduces the costs of health care delivery for all stakeholders.   By encouraging early intervention, the Preventive Services Mandate can reduce the need for costly curative care later.[10]

---

*see also* Cagdas Agirdas & Jordan G. Holding, *Effects of the ACA on Preventive Care Disparities*, 16 App. Health Econ. & Health Pol. 859 (2018), https://tinyurl.com/eu2fcan2.

[10] Shirley Musich et al., *The Impact of Personalized Preventive Care on Health Care Quality, Utilization, and Expenditures*, 19 Pop. Health Mgmt. 389 (2016), https://tinyurl.com/y6mz546e ("[A] model of personalized preventive care focused on wellness and prevention and augmenting the physician-patient relationship can improve health

The Preventive Services Mandate "incentivizes and drives patients and providers toward the most valuable services" such as "wellness programs, diabetes treatment and control education, and tobacco cessation programs, that have been demonstrated to reduce future healthcare costs but are often underutilized by patients, including those at high or elevated risk for future disease or complications."[11]   One study in Massachusetts—whose 2006 health care reform law was a model for the ACA—found that "prevention increased outside of hospitals, resulting in a decline in inpatient admissions for certain preventable conditions[,]" and the study observed "declines in length of stay and admissions from the emergency room following the reform."[12]

---

management and reduce health care utilization and expenditures within populations of employees and their spouses.").

[11] Nat'l Ctr. for Chronic Disease Prev. & Health Promotion, Ctrs. for Disease Control & Prevention, *Understanding Value-Based Insurance Design* (2015), https://perma.cc/2XTY-KV6L.

[12] Jonathan T. Kolstad & Amanda E. Kowalski, *The Impact of Health Care Reform on Hospital and Preventive Care: Evidence From Massachusetts*, 96 J. Pub. Econ. 909 (2012), https://tinyurl.com/mtdwfc74.

## III. THE DISTRICT COURT'S DECISION WOULD BE TREMENDOUSLY DISRUPTIVE TO HEALTHCARE DELIVERY IN THE UNITED STATES AND DETRIMENTAL TO THE PUBLIC INTEREST.

Eliminating the Preventive Services Mandate would prove enormously disruptive for patients, health plans, and healthcare providers. Nearly one-third of preventive services required to be covered by the ACA were recommended by the Task Force after the ACA's enactment.[13] Under the district court's order, coverage of those services without cost-sharing would no longer be required.

Reducing or eliminating coverage for these preventive services could unwind the hard-won public health achievements outlined above. It could steer patients away from high-value preventive care, sow confusion regarding available coverage, and increase health inequity along economic and racial lines. These disruptive consequences illustrate

---

[13] Zoe Chopra & A. Mark Fendrick, *Clinical Implications of the* Braidwood *Ruling: Use of Pre-ACA Task Force Recommendations*, Health Affairs (May 2, 2023), http://bit.ly/43PDD4Z; *see also id.* ("Furthermore, a majority of recommendations receiving an A or B grade prior [to] ACA passage were substantially revised after March 2010, potentially leading to full coverage of services that are insufficient, obsolete, or even harmful.").

why the public interest strongly favors maintaining the Preventive Services Mandate pending curative agency action.

### A. Eliminating the Preventive Services Mandate may cause some health plan sponsors to reduce or eliminate coverage for preventive care.

In an effort to reduce short-term costs, some health plan sponsors may reintroduce cost-sharing for preventive services or eliminate coverage for preventive services. After the district court entered its first merits decision in this matter, the Employee Benefit Research Institute found that 8% of the employers it surveyed would impose cost-sharing for preventive services if the Preventive Services Mandate were lifted.[14] A further 12% equivocated on the point.[15] News reports and other analyses likewise suggest that some employers who sponsor health plans for their employees would reduce coverage absent the Preventive Services Mandate.[16] If even a small percentage of the nation's employers elected

---

[14] Employee Benefits Research Inst., *Will Employers Introduce Cost Sharing for Preventive Services? Findings from EBRI's First Employer Pulse Survey* (2022), https://perma.cc/4PPP-4G2S.

[15] *Id.*

[16] *See, e.g.*, Harris Meyer, *Court Ruling May Spur Competitive Health Plans to Bring Back Copays for Preventive Services*, Kaiser Health News (Sept. 15, 2022), https://perma.cc/GM8R-JE7W (health plan sponsors

to impose cost-sharing for preventive services or cease covering preventive services for their employees, it would detrimentally impact millions of Americans. In addition, once a significant segment of the marketplace reimposes cost-sharing for preventive services or eliminates coverage, it could create perverse competitive incentives for others to follow suit. Indeed, those health insurers and health plans that continue to offer coverage for preventive services without cost-sharing may pay a competitive price for doing so.[17]

## B.    Eliminating the Preventive Services Mandate will harm patients.

The impact of such a retrenchment would be enormous—as reports following the district court's decision are bearing out. The initial impact of a rollback of the Preventive Services Mandate will be patient

---

"would likely react by imposing deductibles and copays for some or all the services recommended by the task force.").

[17] Sabrina Corlette, *A World Without the ACA's Preventive Services Protections: The Impact of the* Braidwood *Decision*, Geo. Univ. Health Pol. Inst. Ctr. for Children & Families (Apr. 18, 2023), https://perma.cc/6G45-E8MZ ("[I]t's important to remember that . . . the ACA included the requirement to cover preventive services without cost-sharing because many health plans did not do so at the time. . . . If some health insurers start rolling back benefits, it could become a competitive disadvantage for other insurers not to do the same.").

confusion. Under the ACA, patients know with certainty that their health insurance policies cover a range of preventive services at no out-of-pocket cost to them. If that guarantee is eliminated, the result "will be a confusing patchwork of insurance benefit designs."[18] Patients are likely to be uncertain whether their health insurer will maintain preventive services coverage in future years. "Patients who have serious medical conditions or are at high risk for such conditions may have a hard time finding a plan that fully covers preventive and screening services."[19]

Over the longer term, a rollback of the Preventive Services Mandate will likely cause patients to forego preventive care. Just as the elimination of cost-sharing caused more patients to seek preventive care, its reimposition would likely have the opposite effect. This point was illustrated by a recent Morning Consult poll—taken after the district court's merits decision—finding that at least 40% of Americans "are not willing to pay for 11 of the 12 preventive services currently covered by

---

[18] *Id.*

[19] Meyer, *supra* note 16.

the ACA[.]"[20] "Furthermore, at least half said they would not pay out of pocket for preventive services such as tobacco cessation or screenings for HIV, depression and unhealthy drug use."[21] Less than half of the respondents polled reported that they would pay for cancer screenings.[22] Research confirms that patients facing out-of-pocket costs will forego or postpone key preventive services.[23]

This decrease in the use of preventive services would likely reverse the recent improvements in population health described *supra* at 8–12. Without the Preventive Services Mandate, Americans will be more likely to develop chronic health conditions, less likely to identify maladies early in their onset, and more likely to require costly curative interventions like emergency room visits. Rolling back the Preventive Services

---

[20] Ricky Zipp, *Many Americans Are Likely to Skip Preventive Care if ACA Coverage Falls Through*, Morning Consult (2023), https://perma.cc/W8ND-3TRS.

[21] *Id.*

[22] *Id.*

[23] Shameek Rakshit et al., *How Does Cost Affect Access to Healthcare?*, Kaiser Fam. Found. (Jan. 30, 2023), https://perma.cc/689M-DLZL; *see also* Zarek C. Brot-Goldberg et al., *What Does A Deductible Do? The Impact of Cost-Sharing on Health Care Prices, Quantities, and Spending Dynamics*, 132 Q. J. of Econ. 1261 (2017), https://tinyurl.com/36ezs5ub.

Mandate will likely increase morbidities and mortality.[24]    And the consequences of these changes would be visited disproportionately on the vulnerable, marginalized, and most price-sensitive populations that the Preventive Services Mandate has most helped.[25]

*    *    *

The ACA's Preventive Services Mandate has produced enormous societal and economic benefits.    It has improved health outcomes for millions of Americans and reduced racial and economic disparities in health care delivery.    The public interest strongly favors maintaining the Preventive Services Mandate.    The district court improperly failed to consider the public interest in ordering nationwide equitable relief.    Its remedial order should therefore be vacated.

---

[24] *See generally* Gruber & Sommers, *supra* note 5; Fox & Shaw, *supra* note 7.

[25] *See generally* Gavin, *supra* note 8; Thorpe, *supra* note 9; Agirdas & Holding, *supra* note 9; Rakshit et al., *supra* note 23.

# CONCLUSION

The judgment of the district court should be vacated.

June 27, 2023                          Respectfully submitted,

                                       /s/ K. Lee Blalack II
                                       K. Lee Blalack II
                                       Brian D. Boyle
                                       Jordan Peter Ascher
                                       O'MELVENY & MYERS LLP
                                       1625 Eye Street, N.W.
                                       Washington, D.C.  20006
                                       Telephone: (202) 383-5374

                                       *Counsel for* Amicus *Blue Cross
                                       Blue Shield Association*

19

## CERTIFICATE OF SERVICE

I certify that on June 27, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. I further certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ K. Lee Blalack II
K. Lee Blalack II

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 3,431 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5)(A) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook font size 14.

/s/ K. Lee Blalack II
K. Lee Blalack II