IN THE

# United States Court of Appeals

## FOR THE FIFTH CIRCUIT

Case No. 23-10326

Braidwood Management, Inc., *et al.*,
Plaintiffs-Appellees,
v.

Xavier Becerra, *et al.*,
Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of Texas,
No. 4:20-CV-283-O, Hon. Reed C. O'Connor

**BRIEF OF 49 BIPARTISAN ECONOMIC AND OTHER SOCIAL
SCIENCE SCHOLARS IN SUPPORT OF
DEFENDANTS-APPELLANTS**

MATTHEW S. HELLMAN
ERICA S. TURRET
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, DC 20016
(202) 639-6000
mhellman@jenner.com

*Counsel for Amici Curiae*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that *amici curiae* are unaware of any persons with any interest in the outcome of this litigation other than the signatories to this brief and their counsel, and those identified in the party and *amicus* briefs filed in this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

*Amici curiae* certify that they have no outstanding shares or debt securities in the hands of the public, and they have no parent companies. No publicly held company has a 10% or greater ownership interest in any of the *amici curiae*.

Dated: June 27, 2023

/s/ Matthew S. Hellman
Matthew S. Hellman

*Counsel for Amici Curiae*

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iii

INTEREST OF *AMICI* AND SUMMARY OF ARGUMENT ..................... 1

ARGUMENT ............................................................................................. 5

I. The Preventive Services Provision Rests on Sound Economic Principles Specific to Preventive Care. ........................................... 5

II. Our Fragmented Health Insurance System Necessitates that All Insurers, Public and Private, Cover Preventive Services Without Cost-Sharing. ........................................................................................... 13

    A. The Preventive Services Provision Counteracts Insurers' and Employers' Incentive to Push Costs to Future Insurers. ................ 13

    B. The Preventive Services Provision Has Not Caused Increased Costs for the Uninsured. ........................................................ 17

III. The Preventive Services Provision Enhances Workforce Productivity and Supports a Strong Economy. ................................................... 20

CONCLUSION ......................................................................................... 28

APPENDIX ........................................................................................... A-1

# TABLE OF AUTHORITIES

STATUTES

42 U.S.C. § 300gg–13(a) ................................................................1, 2

42 U.S.C. § 300gg–13(a)(1) ...............................................................2

42 U.S.C. § 300gg–13(a)(2) ...............................................................2

42 U.S.C. § 300gg–13(a)(3) ..........................................................2, 26

42 U.S.C. § 300gg–13(a)(4) ..........................................................2, 26

OTHER AUTHORITIES

Samantha Artiga, Petry Ubri, & Julia Zur, *The Effects of Premiums and Cost Sharing on Low-Income Populations: Updated Review of Research Findings*, Kaiser Family Found. (June 1, 2017), https://bit.ly/3JNtSfZ .......................................10

Assistant Secretary for Planning and Evaluation, U.S. Dep't of Health & Human Services, *Access to Preventive Services Without Cost-Sharing: Evidence from the Affordable Care Act* (Jan. 11, 2022), https://bit.ly/3Js5bFv ..........12, 24

Ruchita Balasubramanian et al., *Projected Impact of Expanded Long-Acting Injectable PrEP Use Among Men Who Have Sex With Men on Local HIV Epidemics*, 91 J. Acquired Immune Deficiency Syndrome 144 (2022), https://bit.ly/42QAf8L ................................................................26

Sandra E. Black, Paul J. Devereux, & Kjell Salvanes, *From the Cradle to the Labor Market? Effect of Birth Weight on Adult Outcomes*, 122 J. Q. Econ. 409 (2007), https://bit.ly/3qMz5Oc .............................................................27

Bd. of Governors of the Federal Reserve System, *Economic Well-Being of U.S. Households (SHED)*, https://bit.ly/44cvA21 (updated Aug. 22, 2022) .......................................10

Bd. of Governors of the Federal Reserve System, *Report on the Economic Well-Being of U.S. Households in 2022 - May 2023*, https://bit.ly/3CCj1Bv (updated Aug. 22, 2022)..................10

Arielle Bosworth et al., *Price Increases for Prescription Drugs 2016-2022*, ASPE (Sept. 30, 2022), https://bit.ly/3pePKJQ ..........................................................18

Joel V. Brill, *Screening for Cancer: The Economic, Medical, and Psychosocial Issues*, Am. J. Managed Care Supplement (Nov 16, 2020), https://bit.ly/44dPJ7O............................23

Zarek C. Brot-Goldberg et al., *What does a Deductible Do? The Impact of Cost-Sharing on Health Care Prices, Quantities, and Spending Dynamics*, 132 Q. J. Econ. 1261 (2017).........................................................................................7

Suzanne Burlone et al., *Extending Contraceptive Coverage Under the Affordable Care Act Saves Public Funds*, 87 Contraception 143 (2013), https://bit.ly/3PiURU6................24

Centers for Disease Control and Prevention, *Lung Cancer Statistics*, https://bit.ly/3Ni4FuN (last reviewed June 8, 2023)..................................................................................23

Centers for Disease Control and Prevention, *Understanding Value-Based Insurance Design* (June 2015), https://bit.ly/3pfR27y ...................................................8

Michael Chernew, et al., *Effects of Increased Patient Cost Sharing on Socioeconomic Disparities in Health Care*, 23 J. Gen. Internal Med. 1131 (2008), https://bit.ly/3qWT64Z ..................11

Sara R. Collins et al., *Wages, Health Benefits, and Workers' Health*, Commonwealth Fund (Oct. 2004), https://bit.ly/3CGPQx5..........................................................11

Sara R. Collins, Lauren A. Haynes, & Relebohile Masitha, *The State of U.S. Health Insurance in 2022*, Commonwealth Fund (Sept. 2022), https://bit.ly/3qSdTXc ...............................7

iv

Congressional Budget Office, *How CBO Analyzes Approaches to Improve Health Through Disease Prevention* (June 2020), https://bit.ly/44fbLHx ..............................21, 25

Congressional Budget Office, *How CBO Analyzes the Costs of Proposals for Single-Payer Health Care Systems That Are Based on Medicare's Fee-for-Service Program* (Congressional Budget Office, Working Paper No. 2020-08, 2020), https://bit.ly/3NiBt6T .......................................................20

Rohan Deogaonkar et al., *Systematic Review of Studies Evaluating the Broader Economic Impact of Vaccination in Low and Middle Income Countries*, 12 BMC Pub. Health 878 (2012), https://bit.ly/3CE1lVQ .............................................25

Michelle M. Doty et al., *Health and Productivity Among U.S. Workers*, Commonwealth Fund (Aug. 2005), https://bit.ly/3Xg1SXL.................................................................21

Federal Reserve Bank of St. Louis, *Producer Price Index By Industry: Offices of Physicians, Except Mental Health* (updated June 14, 2023), https://bit.ly/43SDIVD....................................19

Federal Reserve Bank of St. Louis, *Producer Price Index by Industry: Pharmaceutical Preparation Manufacturing: Hormones and Oral Contraceptives* (updated June 14, 2023), https://bit.ly/42WCxTM.................................................18

J. Nadine Garcia & Amy Pisani, *Vaccine Infrastructure And Education Is The Best Medical Investment Our Country Can Make*, Health Affairs (2020), https://bit.ly/42VhKzZ ...................24

George Washington University, *Report:* Braidwood Management v Becerra *Could Eliminate 75% of the ACA's Preventive Benefits for Women, Infants, and Children* (June 13, 2023), https://bit.ly/3Xz78Gd ....................................27

Sherry A. Glied, Sara R. Collins, & Saunders Lin, *Did The ACA Lower Americans' Financial Barriers To Health Care?*, 39 Health Affairs 379 (2020), https://bit.ly/3XlLPYz.................................................................12

Xuesong Han et al., *Has Recommended Preventive Service Use Increased After Elimination of Cost-Sharing as Part of the Affordable Care Act in the United States?*, 78 Preventive Med. 85 (2015), https://bit.ly/43Rx0iM.............................12

Amelia Haviland et al., *Skin in the Game: How Consumer-Directed Plans Affect the Cost and Use of Health Care*, RAND Corporation (2012), https://bit.ly/46e82eZ .................................7

Bradley Herring, *Suboptimal Provision of Preventive Healthcare Due to Expected Enrollee Turnover Among Private Insurers*, 19 Health Econ. 438 (2010), https://bit.ly/42TTpuy .................................................................14

Kaiser Family Found., Fact Sheet: *Preventive Services Covered by Private Health Plans Under the ACA*, (Aug. 2015), https://bit.ly/3r2blWk.........................................................11

Zura Kakushadze, Rakesh Raghubanshi, & Willie Yu, *Estimating Cost Savings from Early Cancer Diagnosis*, 3 Data 30 (2017), https://bit.ly/46surWa .......................................22

Josephine S. Lau et al., *Improvement in Preventive Care of Young Adults After the Affordable Care Act: The Affordable Care Act is Helping*, 168 JAMA Pediatr. 1101 (2014), https://bit.ly/42OPdfr.................................................12

Andrew J. Leidner et al., *Cost-Effectiveness of Adult Vaccinations: A Systematic Review*, 37 Vaccine 226 (2019), https://bit.ly/3Pohl5W .................................................................25

Jeffrey Levi, Laura M. Segal, & Chrissie Juliano, *Prevention for a Healthier America: Investments in Disease Prevention Yield Significant Savings, Stronger Communities*, Trust for America's Health (July 2008), https://bit.ly/3NFYcLH .................................................................20

Jeffrey Liebman & Richard Zeckhauser, *Simple Humans, Complex Insurance, Subtle Subsidies* (Nat'l Bureau of Econ. Rsch., Working Paper No. 14330, 2008), https://bit.ly/3JqagOO ...................................................................9

Nicole Lurie et al., *Preventive Care: Do We Practice What We Preach?*, 77 Am. J. Pub. Health 801 (1987), https://bit.ly/3p8dQWV ...............................................................10

J. Michael McWilliams et al., *Medicare Spending for Previously Uninsured Adults*, Annals Internal Med. (Dec. 1, 2009), https://bit.ly/430qZ28 ........................................15

Michael McWilliams et al., *Use of Health Services by Previously Uninsured Medicare Beneficiaries*, 357 New Engl. J. Med. 357 (2007), https://bit.ly/3qT1T7Y ..................15

John A. Nyman, *American Health Policy: Cracks in the Foundation*, 32 J. Health Pol. Pol'y L. 759 (2007), https://bit.ly/3pdaLEX..................................................................7

Office on Women's Health, U.S. Dep't of Health and Human Services, *Prenatal Care*, https://bit.ly/44cqlQ0 (last updated Feb. 22, 2021) ...............................................27

Jamison Pike et al., *Societal Costs of a Measles Outbreak*, 147 Pediatrics e2020027037 (2021), https://bit.ly/3NErGts........................25

Mark V. Pauly & Fredric E. Blavin, *Value Based Cost Sharing Meets the Theory of Moral Hazard: Medical Effectiveness in Insurance Benefits Design* (Nat'l Bureau of Econ. Rsch., Working Paper No. 13044, 2007), https://bit.ly/46aKms5 ..................................................................8

Bruce R. Schackman et al., *The Lifetime Medical Cost Savings from Preventing HIV in the United States*, 53 Med Care 293 (2015), https://bit.ly/43Pwf9V.....................................26

Jeffrey A. Singer & Michael F. Cannon, *Drug Reformation: End Government's Power to Require Prescriptions*, CATO Inst. (Oct. 20, 2022), bit.ly/3mGxvvN ................................17, 18

G. Solanki & H.H. Schauffler, *Cost-Sharing and the Utilization of Clinical Preventive Services*, 17 Am. J. Prev. Med. 127 (1999), https://bit.ly/3NDRLsz..................................10

Benjamin D. Sommers et al., *Insurance Churning Rates For Low-Income Adults under Health Reform: Lower Than Expected But Still Harmful For Many*, 35 Health Affairs 1816 (2016), https://bit.ly/3PqpcjI.............................14

Adam Sonfield et al., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children*, Guttmacher Inst. (2013), https://bit.ly/3Pp6xor.................23

Sarah Sugar et al., *Medicaid Churning and Continuity of Care: Evidence and Policy Considerations Before and After the COVID-19 Pandemic*, ASPE (Apr. 12, 2021), https://bit.ly/3JrWHye ................................16

James Trussell et al., *Cost Effectiveness of Contraceptives in the United States*, 79 Contraception 5 (2009), https://bit.ly/3Pohgza ...............................24

U.S. Government Accountability Office, *Prescription Drug Spending*, https://bit.ly/3PnpOXa (last visited June 21, 2023) ...............................18

U.S. Preventive Services Task Force, *A & B Recommendations*, https://bit.ly/3JnxC7m (last visited June 22, 2023)........................................2, 26

Urban Institute, *Maternal Prenatal and Postnatal Care* (Dec. 28, 2021), https://urbn.is/46dIAq2 ...........................26, 27

viii

Brigitte Vaughn et al., In Brief: *Schools and The Affordable Care Act*, Safe Supportive Learning (June 2013), https://bit.ly/46iHbyg ...................................................................21

Dan Witters & Sangeeta Agrawal, *Unhealthy U.S. Workers' Absenteeism Costs $153 Billion*, Well-Being, Gallup (Oct. 17, 2011), https://bit.ly/43PRZ5C...............................................21

Steven H. Woolf, *A Closer Look at the Economic Argument for Disease Prevention*, 301 JAMA 536 (2009).................................21, 23

Hui Zhang & David W. Cowling, *Association of Participation in a Value-Based Insurance Design Program with Health Care Spending and Utilization*, 6 JAMA Network Open e232666 (2023), https://bit.ly/3qZlgMI .....................................9

Ricky Zipp, *Many Americans Are Likely to Skip Preventive Care if ACA Coverage Falls Through*, Morning Consult (Mar. 8, 2023, 5:00 AM EDT), https://bit.ly/44cMuOc ...........................9

Fangjun Zhou et al., *Economic Evaluation of the Routine Childhood Immunization Program in the United States, 2009*, 133 Pediatrics 577 (2014), https://bit.ly/46suMIq.........................24

Benjamin Zhu & Sherry A. Glied, *More Is More: Expanding Access to Primary Care While Maintaining Quality*, Commonwealth Fund (July 15, 2021), https://bit.ly/3JlLqzt.................................................................20

## INTEREST OF *AMICI* AND SUMMARY OF ARGUMENT[1]

The *amici curiae* Bipartisan Economic and Other Social Science Scholars are 49 distinguished professors and internationally recognized scholars of economics and health policy and law who have taught and researched the economic and social forces operating in the health care and health insurance markets. *Amici* have closely followed the development, adoption, and implementation of the Affordable Care Act ("ACA") and are intimately familiar with its provisions, including the Preventive Services Provision ("Provision"), 42 U.S.C. § 300gg–13(a), at issue in this case. The Economic Scholars include economists who have served in high-ranking positions in multiple administrations of both parties; two Nobel Laureates in Economics; four recipients of the Arrow award for best paper in health economics; two recipients of the American Society of Health Economists Medal, which is awarded biennially to the economist aged 40 or under who has made the most significant contributions to the field of health economics; and one recipient of the Victor R. Fuchs Lifetime Achievement Award from

---

[1] All parties have provided consent to the filing of this brief. No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person other than *amici*, its members, or its counsel contributed money intended to fund preparing or submitting the brief.

the American Society of Health Economists. A complete list of *amici* can be found in the Appendix. *Amici* submit this brief to assist this Court in understanding the economic theory that underlies the mandatory coverage of high-value preventive services without cost-sharing as well as the economic benefits such coverage provides.

The district court struck down, and enjoined the enforcement of, one component of the ACA's Preventive Services Provision ("Provision"), 42 U.S.C. § 300gg–13(a)(1), which requires most private insurers and group health plans (whether offered by insurance companies or self-insured employers) to cover services that have received an "A" or "B" rating from the U.S. Preventive Services Task Force ("USPSTF") without cost-sharing.[2] As economists, *amici* know that the district court's decision will

---

[2] *Braidwood Mgmt. Inc. v. Becerra*, No. 20-CV-00283-O, __ F. Supp. 3d __, 2023 WL 2703229, at *1 (N.D. Tex. Mar. 30, 2023). 42 U.S.C. § 300gg–13(a) also requires coverage without cost-sharing of immunizations recommended by the Centers for Disease Control's ("CDC") Advisory Committee on Immunization Practices ("ACIP"), 42 U.S.C. § 300gg–13(a)(2), and preventive care and screenings provided for by the Health Resource and Services Administration ("HRSA") for infants, children, adolescents, and women. 42 U.S.C. § 300gg–13(a)(3)-(4). Due to appellees' plans to cross appeal, *amici* address the economic impact of services covered via all of these mechanisms. For USPSTF-services, A-grade services are those for which evidence demonstrates a high certainty of substantial net benefit. B-grade services are those for which evidence demonstrates a high certainty of moderate net benefit or a moderate certainty of moderate to substantial net benefit. U.S. Preventive Services Task Force, *A & B Recommendations*, https://bit.ly/3JnxC7m (last visited June 22, 2023).

impose significant costs on individuals, the health care system, and the larger economy. Before this Court, appellees have argued "[t]here is considerable tension between the government's insistence that these preventive-care services are valuable and its simultaneous assumption that people will lose coverage for those services or decline to pay for them if co-pays are added."[3] As we explain, economic principles rebut this assertion — there is no such tension.

Accordingly, *Amici* write to make three points in urging this Court to reverse the district court's decision as to the Provision. *First*, the Provision rests on a strong economic foundation. From an economic perspective, optimal insurance design incentivizes high-value care and deters low-value care. As we explain, preventive services are high value, producing significant health and economic benefits. These services are precisely the ones that society should want individuals to use because they generate better health outcomes over time at low cost. Those benefits would be lost if insurers and employers were allowed to drop high-value services at their discretion or reimpose cost-sharing, particularly given the substantial

---

[3] Response to Motion for a Partial Stay of Final Judgment Pending Appeal at 15, ECF No. 66.

research showing that cost-sharing strongly deters individuals from obtaining services regardless of their value.

*Second*, requiring this coverage solves a market problem. In the U.S. health care system, individuals regularly move in and out of different insurance plans. As a result, no single insurer or group health plan has the full economic incentive to provide coverage for preventive care because the cost-savings generated by that care — for example, the lower cost of treating cancers detected earlier — typically accrue in the future, often to a different insurer or employer-sponsored group health plan. This asymmetry belies appellees' contentions that, if these services are in fact valuable, insurers and employers will continue to provide the current level of coverage or that consumers can and will pay for these services in the Provision's absence.[4]

This problem is particularly acute given the large role Medicare plays in our health insurance system. Medicare guarantees coverage for most U.S. individuals when they turn 65. Private insurers know that their customers are likely to switch to Medicare at that age, which makes insurers less likely to take on the immediate costs of preventive care because the savings are

---

[4] *See id.*

disproportionately realized as the person ages. That in turn leaves Medicare — and ultimately the taxpayer — to bear the increased costs of an aging population in poorer health and with a pent-up demand for services. Requiring private insurers and employer plans to cover preventive care helps correct the skewed incentives created by a fragmented market.

*Third*, and finally, the overall economy benefits from investment in prevention. When preventive measures forestall disease or detect it earlier, individuals live longer, more economically productive lives. Longstanding health economics research has quantified the high economic value of many of the preventive services covered through the Provision, and that set of services satisfies any definition of cost-effectiveness. Without the Provision, utilization of preventive care will decrease as individuals respond to increased cost-sharing, as they predictably and consistently do, by foregoing care. That decline in the usage of proven high-value care would translate into substantial economic loss in the form of lost lives and lost years of work.

## ARGUMENT

### I.    The Preventive Services Provision Rests on Sound Economic Principles Specific to Preventive Care.

The ACA's Preventive Services Provision reflects decades of health economics research regarding the advantages and drawbacks of cost-

sharing. Insurers and employers impose cost-sharing to transfer some of the economic burden posed by the generally high cost of health care services from the insurer or employer to the enrollee. Cost-sharing comes in multiple forms: (1) a co-payment, a set amount charged to the consumer at the point of service; (2) co-insurance, a percentage of the cost of a service for which the consumer is responsible; or (3) a deductible, an annual dollar amount the consumer must pay for health care services prior to insurance paying out claims. The cost-cutting effect of cost-sharing, from the perspective of the insurer or employer, is not only due to the increased dollar amount the insured now contributes, but also the resulting decrease in health care utilization and the corresponding reduction in total claims the insurer or employer must pay. Cost-sharing has this depressive effect on utilization because it raises the price of insured care for consumers.

Studies consistently demonstrate that individuals seek out fewer health care services, across the spectrum of care, in response to cost-sharing. As the landmark RAND Health Insurance Experiment found in the 1970s, enrollees in health plans with higher levels of cost-sharing spent less on

health care because they initiated fewer episodes of care.[5]  A recent survey found that 60 percent of adults in employer plans who either had high out-of-pocket costs or deductibles relative to their income reported not obtaining needed health care due to cost.[6]  A study of a large self-insured employer's shift from a plan that offered free care to a high deductible plan found that enrollees reduced spending for all types of care, including high-value services like preventive care.[7]

Some argue in favor of cost-sharing and its effects on the basis that it deters insured consumers from over-purchasing health care services as a result of insurance covering the cost of the service rather than the consumers themselves.[8]  However, regardless of one's view of this argument when applied to health care services in general, it is an ill-fit for the high-value preventive services covered by the Provision.  The application of cost-sharing to these types of services leads patients, particularly those with

---

[5] Amelia Haviland et al., *Skin in the Game: How Consumer-Directed Plans Affect the Cost and Use of Health Care*, RAND Corporation (2012), https://bit.ly/46e82eZ.

[6] Sara R. Collins, Lauren A. Haynes, & Relebohile Masitha, *The State of U.S. Health Insurance in 2022*, Commonwealth Fund (Sept. 2022), https://bit.ly/3qSdTXc.

[7] Zarek C. Brot-Goldberg et al., *What does a Deductible Do? The Impact of Cost-Sharing on Health Care Prices, Quantities, and Spending Dynamics*, 132 Q. J. Econ. 1261 (2017).

[8] John A. Nyman, *American Health Policy: Cracks in the Foundation*, 32 J. Health Pol. Pol'y L. 759 (2007), https://bit.ly/3pdaLEX.

tight budgets, to behave in ways not in the best interest of their health and ability to lead long, economically productive lives.

Tailored cost-sharing that varies based on the type of service provided reflects value-based insurance design ("V-BID"). V-BID constitutes an approach to health insurance that aims to incentivize patients and providers to seek out more valuable services in terms of their cost-effectiveness, i.e., the relationship between the cost of the service and the medical benefit it provides.[9] Thus, eliminating or reducing cost-sharing for high-value services incentivizes individuals to obtain those services because of the lowered cost of doing so. The strength of this effect varies relative to one's income; the magnitude of the incentive increases as one's income decreases. V-BID has proven effective in shaping consumer behavior. Studies have demonstrated that reducing or eliminating cost-sharing for certain prescription drugs or

---

[9] Centers for Disease Control and Prevention, *Understanding Value-Based Insurance Design* (June 2015), https://bit.ly/3pfR27y; Mark V. Pauly & Fredric E. Blavin, *Value Based Cost Sharing Meets the Theory of Moral Hazard: Medical Effectiveness in Insurance Benefits Design* (Nat'l Bureau of Econ. Rsch., Working Paper No. 13044, 2007), https://bit.ly/46aKms5.

treatments for specific diseases or chronic conditions is associated with desired changes in targeted utilization.[10]

Preventive care provides the quintessential example of a category of health care services that requires economic incentives to influence optimal consumer behavior. For the reasons set forth in this brief, preventive services provide substantial economic benefits. Consumers may fail to fully take these benefits into account because these benefits largely accrue in the future.[11] As the above studies demonstrate, consumers respond to cost-sharing by reducing usage, the opposite of the desired behavior for preventive care. Policymakers thus seek to promote rather than deter utilization.

Individuals from lower income households may be particularly likely to forego preventive services, as compared to services that address acute

---

[10] Hui Zhang & David W. Cowling, *Association of Participation in a Value-Based Insurance Design Program with Health Care Spending and Utilization*, 6 JAMA Network Open e232666 (2023), https://bit.ly/3qZlgMI.

[11] Jeffrey Liebman & Richard Zeckhauser, *Simple Humans, Complex Insurance, Subtle Subsidies*, 7-8 (Nat'l Bureau of Econ. Rsch., Working Paper No. 14330, 2008), https://bit.ly/3JqagOO ("A central finding of behavioral economics is that people tend to underinvest in these sorts of activity, placing excessive weight on current-period costs and underweighting next-period benefits.") A poll conducted after the district court's decision found that "[a]t least 2 in 5 U.S. adults said they are not willing to pay for 11 of the 12 preventive services currently covered by the ACA" on their own. *See* Ricky Zipp, *Many Americans Are Likely to Skip Preventive Care if ACA Coverage Falls Through*, Morning Consult (Mar. 8, 2023, 5:00 AM EDT), https://bit.ly/44cMuOc.

health care needs in the present, because they have limited resources to spend on health care.  Data from the Federal Reserve shows that in 2021, half of adults with less than $25,000 in family income had one or more bills that they could not pay in full that month, or were one $400 financial setback away from being unable to pay their bills.[12]  Numerous studies have shown that "even relatively small levels of cost sharing, in the range of $1 to $5, are associated with reduced use of care, including necessary services."[13]  One study found that increases in copayment rates that apply across the board would most harm lower-income individuals, "not only because they will feel the greatest economic burden but also because worsening adherence may

---

[12] Bd. of Governors of the Federal Reserve System, *Economic Well-Being of U.S. Households (SHED)*, https://bit.ly/44cvA21 (updated Aug. 22, 2022).  *See also* Bd. of Governors of the Federal Reserve System, *Report on the Economic Well-Being of U.S. Households in 2022 - May 2023*, https://bit.ly/3CCj1Bv (updated Aug. 22, 2022) ("The likelihood of skipping medical care because of cost was strongly related to family income. Among those with family income less than $25,000, 38 percent went without some medical care because they could not afford it, compared with 11 percent of adults making $100,000 or more.").

[13] Samantha Artiga, Petry Ubri, & Julia Zur, *The Effects of Premiums and Cost Sharing on Low-Income Populations: Updated Review of Research Findings*, Kaiser Family Found. (June 1, 2017), https://bit.ly/3JNtSfZ. *See also* G. Solanki & H.H. Schauffler, *Cost-Sharing and the Utilization of Clinical Preventive Services*, 17 Am. J. Prev. Med. 127 (1999), https://bit.ly/3NDRLsz; Nicole Lurie et al., *Preventive Care: Do We Practice What We Preach?*, 77 Am. J. Pub. Health 801 (1987), https://bit.ly/3p8dQWV (finding that women are significantly less likely to receive preventive services such as mammograms and pap smears when subject to cost-sharing).

lead to relatively larger adverse clinical effects."[14]  Research conducted prior to the ACA found that workers with lower wages were significantly less likely to receive preventive services than their higher-income counterparts.[15]  Pre-ACA implementation, 20% of all women, 13% of insured women, and 35% of women living in a household earning less than 200% of the federal poverty line (including both insured and uninsured individuals) delayed or did not receive preventive services, during the prior year, due to cost.[16]

These dynamics motivated Congress to pursue a V-BID approach in the ACA to ensure all Americans received greater access to high-value health care services.  The ACA's Preventive Services Provision utilizes a V-BID model that 1) relies on established bodies of health care experts, such as the USPSTF, to identify high-value preventive services and 2)

---

[14] Michael Chernew, et al., *Effects of Increased Patient Cost Sharing on Socioeconomic Disparities in Health Care*, 23 J. Gen. Internal Med. 1131, 1136 (2008), https://bit.ly/3qWT64Z.

[15] Sara R. Collins et al., *Wages, Health Benefits, and Workers' Health*, Commonwealth Fund, 4 (Oct. 2004), https://bit.ly/3CGPQx5 ("Job compensation [was] associated with workers receiving preventive care screens at recommended time intervals, including blood pressure and cholesterol tests, dental exams, pap tests, and mammograms.").

[16] Kaiser Family Found., Fact Sheet: *Preventive Services Covered by Private Health Plans Under the ACA*, (Aug. 2015), https://bit.ly/3r2blWk.

guarantees coverage without cost-sharing to encourage consumers to obtain those identified services.

The Provision has worked as intended. Since its implementation, the Provision has increased cancer screenings, blood pressure and cholesterol tests, and led to earlier diagnoses of chronic health conditions across the U.S.[17] By expanding coverage options and decreasing the likelihood of high out-of-pocket costs, the ACA reduced financial barriers that previously prevented many Americans from obtaining timely health care.[18] If consumers no longer have access to preventive services without cost-sharing, they will predictably use fewer of those services, not only damaging their own health, personal finances, and long-term productivity but also

---

[17] *See, e.g.*, Assistant Sec'y for Plan. and Eval., U.S. Dep't of Health & Human Services, *Access to Preventive Services Without Cost-Sharing: Evidence from the Affordable Care Act* (Jan. 11, 2022), https://bit.ly/3Js5bFv; Xuesong Han et al., *Has Recommended Preventive Service Use Increased After Elimination of Cost-Sharing as Part of the Affordable Care Act in the United States?*, 78 Preventive Med. 85 (2015), https://bit.ly/43Rx0iM (noting that receipt of many preventive services "significantly increased" after the ACA eliminated cost-sharing for preventive services); Josephine S. Lau et al., *Improvement in Preventive Care of Young Adults After the Affordable Care Act: The Affordable Care Act is Helping*, 168 JAMA Pediatr. 1101 (2014), https://bit.ly/42OPdfr (comparing pre-ACA and post-ACA rates of young adults receiving preventive care and finding "significantly higher rates of receiving" several preventive services).

[18] Sherry A. Glied, Sara R. Collins, & Saunders Lin, *Did The ACA Lower Americans' Financial Barriers To Health Care?*, 39 Health Affairs 379 (2020), https://bit.ly/3XlLPYz.

increasing the costs imposed on our national system of health care financing, which substantially relies on government payers.

## II. Our Fragmented Health Insurance System Necessitates that All Insurers, Public and Private, Cover Preventive Services Without Cost-Sharing.

The label "preventive" reveals the core purpose of this type of care: to protect against the emergence or belated discovery of significant health problems later in life which both result in worse health outcomes and become more expensive to treat than if addressed earlier. Due to this forward-looking role, preventive care requires a national strategy that incentivizes uptake across insurance plans, in order to spread risk across public and private insurers. The cost-effectiveness of preventive services must be understood across the health care system, not by looking at the circumstances of individual patients, insurers, or employers in isolation.

### A. The Preventive Services Provision Counteracts Insurers' and Employers' Incentive to Push Costs to Future Insurers.

Virtually all Americans change health coverage over the course of their lives, often several times. A change in insurance coverage is a routine occurrence — a new job comes with a different employer-sponsored insurance plan, starting one's own business may mean purchasing coverage on the individual market, and fluctuations in income lead individuals to churn

13

between Medicaid, the public health insurance program for low-income individuals, and private insurance. One study examining the experience of low-income adults in certain southern states found "nearly one-quarter of respondents in each state reported one or more changes in health insurance status during the previous twelve months."[19] Of course, one of the most common changes in health insurance comes when individuals turn 65, the age at which most Americans become eligible for Medicare, the public health insurance program for seniors and certain individuals with disabilities.

This fragmented system that relies on a combination of public and private insurance, with eligibility rules that make individuals gain and lose eligibility for different programs at different times, means that insurers and employers rarely cover the same individual across the lifespan. Accordingly, insurers and employers lack the incentive to spend money on preventive care when the benefits of that investment will likely accrue to a different insurer or employer later in the person's life.[20] In fact, insurers and

---

[19] Benjamin D. Sommers et al., *Insurance Churning Rates For Low-Income Adults under Health Reform: Lower Than Expected But Still Harmful For Many*, 35 Health Affairs 1816, 1818 (2016), https://bit.ly/3PqpcjI.

[20] Bradley Herring, *Suboptimal Provision of Preventive Healthcare Due to Expected Enrollee Turnover Among Private Insurers*, 19 Health Econ. 438 (2010), https://bit.ly/42TTpuy.

employers have an economic incentive to avoid screenings and early treatments, because they may no longer cover the individual by the time the health condition worsens.  If a screening detects a disease in the present, the insurer and employer must expend resources to treat it — pushing off costs to a future payer may work to their economic self-interest.  This disincentive to pay for preventive care exists even if the service is cost-effective for the individual and would reduce the total resources expended on that individual by various payers over a lifetime.

Our insurance infrastructure, in which the government provides health coverage for seniors through Medicare, exacerbates these incentives. In the absence of the Provision, undiscovered health conditions will worsen, only to be identified once the person has aged into Medicare.  This increases costs for the Medicare program, which are borne by taxpayers.  Research shows significant increases in Medicare expenditures among previously uninsured populations who lacked access to appropriate care prior to becoming eligible for the program.[21]  This is particularly true for services

---

[21] *See* J. Michael McWilliams et al., *Medicare Spending for Previously Uninsured Adults*, Annals Internal Med. (Dec. 1, 2009), https://bit.ly/430qZ28; J. Michael McWilliams et al., *Use of Health Services by Previously Uninsured Medicare Beneficiaries*, 357 New Engl. J. Med. 357 (2007), https://bit.ly/3qT1T7Y.

that are addressed through preventive screenings, such as cardiovascular disease and diabetes. The same logic applies to insured individuals who would go without preventive care in the absence of no cost-sharing coverage. Reintroduced cost-sharing or the elimination of coverage for these services could reduce utilization of preventive care prior to age 65 with a resulting increase in Medicare expenditures for those who did not receive these services.

A similar feedback loop also affects Medicaid. Low-income individuals frequently churn between Medicaid and private insurance (or no insurance at all) as changes in their income affect their eligibility for the program.[22] If individuals forgo preventive services due to cost when not on Medicaid, conditions may worsen by the time they regain eligibility, posing increased costs. In this way, diminished uptake of high-value preventive services for low-income individuals would have significant implications for federal and

---

[22] Sarah Sugar et al., *Medicaid Churning and Continuity of Care: Evidence and Policy Considerations Before and After the COVID-19 Pandemic*, ASPE (Apr. 12, 2021), https://bit.ly/3JrWHye.

state budgets as both levels of government share responsibility for Medicaid expenditures.

## B.   The Preventive Services Provision Has Not Caused Increased Costs for the Uninsured.

In their memorandum opposing a stay pending appeal, appellees erroneously claim that "[m]andatory coverage of preventive-care services without costs-sharing can *reduce* access to those services by increasing prices, making it more difficult for the uninsured (or those with . . . plans exempt from the ACA's coverage mandates) to obtain that care."[23] The only evidence cited in support of this proposition is a paper advocating for the elimination of the necessity of a prescription to access medications, i.e., the right to self-medicate.[24] The section of the paper arguing that contraception should be available over the counter incidentally observes that the ACA requirement that insurers and group health plans cover contraceptives without cost-sharing coincided with an increase in the producer price index for contraceptives.[25] This observation is a far cry from the establishment of

---

[23] Response to Motion for a Partial Stay of Final Judgment Pending Appeal at 15, ECF No. 66.

[24] Jeffrey A. Singer & Michael F. Cannon, *Drug Reformation: End Government's Power to Require Prescriptions*, CATO Inst. (Oct. 20, 2022), bit.ly/3mGxvvN.

[25] *Id.*

a causal relationship between the Provision and an increase in costs the uninsured must pay for preventive services.

First, the cost of prescription drugs overall has increased for many reasons during the post-ACA period and most drugs do not fall within the preventive services provision.[26] In addition, the cost of contraceptives specifically has leveled off dramatically since the period the paper examines.[27] Second, the paper uses changes in the producer price index to track the asserted increase in the cost of contraception. However, the producer price index represents the wholesale price of products, not what consumers actually pay, which is measured by the consumer price index, as the paper itself admits.[28] Moreover, the timing of the changes in the producer price index do not correspond to relevant policy changes. Third, appellees rely on an alleged increase in the price paid for contraception by a very small percentage of the population (those who lack access to

---

[26] *See e.g.*, Arielle Bosworth et al., *Price Increases for Prescription Drugs 2016-2022*, ASPE (Sept. 30, 2022), https://bit.ly/3pePKJQ; U.S. Government Accountability Office, *Prescription Drug Spending*, https://bit.ly/3PnpOXa (last visited June 21, 2023).

[27] *Compare* Federal Reserve Bank of St. Louis, *Producer Price Index by Industry: Pharmaceutical Preparation Manufacturing: Hormones and Oral Contraceptives* (updated June 14, 2023), https://bit.ly/42WCxTM *with* Singer & Cannon, *supra* note 24, Figure 4. (The paper examines the producer price index from 2013 through 2019. Since 2019, the producer price index for contraception has remained relatively stagnant.)

[28] Singer & Cannon, *supra* note 24 at n.162.

contraceptive coverage without cost-sharing) to argue for a result that would dramatically increase the price paid for contraception by the vast majority of the population. Thus, appellees' argument that the contraceptive coverage requirement is net access-reducing defies logic.

Further, appellees rely on this one flawed data point regarding contraception to assert that mandatory coverage of preventive services in general reduces access due to price increases. Appellees cite no authority with respect to the cost of other preventive services since the Provision went into effect. Most of the preventive services recommended by the USPSTF are administered in physicians' offices. The producer price index, the same measure of cost relied on by appellees for contraception, in fact dropped in 2015 for physician services following the implementation of the ACA's coverage requirements and grew slowly thereafter until the onset of the COVID-19 pandemic.[29]  A CBO study concluded that even under large adjustments in demand for physician services — such as those that would occur if all cost-sharing were eliminated under a single payer system — such changes would be mainly absorbed through existing capacity, implying no

---

[29] Federal Reserve Bank of St. Louis, *Producer Price Index By Industry: Offices of Physicians, Except Mental Health* (updated June 14, 2023), https://bit.ly/43SDIVD.

observable effect on prices.[30]  Similarly, research on the supply response to the ACA's coverage expansions, which generated a much greater increase in demand than the Provision, found that providers easily adapted to them.[31]

## III. The Preventive Services Provision Enhances Workforce Productivity and Supports a Strong Economy.

Coverage of preventive services, by promoting population health, produces population-level benefits.  Preventive services often prevent or mitigate costs for third parties who are not direct consumers or payers for the services.  The uptake of preventive care generates substantial cost savings in terms of direct costs and societal savings, and enables health care systems, especially hospitals, to better manage admissions and allocate resources.

First, access to preventive care supports economic security.[32] Productivity losses stemming from the illnesses of workers and their

---

[30] Cong. Budget Office, *How CBO Analyzes the Costs of Proposals for Single-Payer Health Care Systems That Are Based on Medicare's Fee-for-Service Program*, 74 (Cong. Budget Office, Working Paper No. 2020-08, 2020), https://bit.ly/3NiBt6T.

[31] *See*, *e.g.*, Benjamin Zhu & Sherry A. Glied, *More Is More: Expanding Access to Primary Care While Maintaining Quality*, Commonwealth Fund (July 15, 2021), https://bit.ly/3JlLqzt.

[32] Jeffrey Levi, Laura M. Segal, & Chrissie Juliano, *Prevention for a Healthier America: Investments in Disease Prevention Yield Significant Savings, Stronger Communities*, Trust for America's Health (July 2008), https://bit.ly/3NFYcLH.

families cost the economy as much as $150 billion per year.[33]  For school-age children, student health and well-being affects attendance, grades, test scores, and graduation rates.[34]  Preventive services play an important economic role because they "potentially reduce the time that family members spend caring for relatives who are sick."[35]  In addition, preventive services can reduce the likelihood of early death or disability, and therefore improve worker, and thus economic, productivity.[36]

Second, as explained in Section II.A, because individuals change insurers and employers often, it is typically not in the interest of any particular insurer or employer to bear the cost of preventive services.  Just as a present insurer is not likely to reap the benefits of reduced health care costs in the future, a present employer will not likely bear the costs of future losses to workforce productivity when a particular employee's disease is

---

[33] Dan Witters & Sangeeta Agrawal, *Unhealthy U.S. Workers' Absenteeism Costs $153 Billion*, Gallup (Oct. 17, 2011), https://bit.ly/43PRZ5C; Michelle M. Doty et al., *Health and Productivity Among U.S. Workers*, Commonwealth Fund (Aug. 2005), https://bit.ly/3Xg1SXL.

[34] Brigitte Vaughn et al., In Brief: *Schools and The Affordable Care Act*, Safe Supportive Learning (June 2013), https://bit.ly/46iHbyg.

[35] Congressional Budget Office, *How CBO Analyzes Approaches to Improve Health Through Disease Prevention* (June 2020), https://bit.ly/44fbLHx.

[36] Steven H. Woolf, *A Closer Look at the Economic Argument for Disease Prevention*, 301 JAMA 536 (2009).

detected at a later stage. The future cost of a preventable early death or disability is a societal cost that a current employer or insurer can easily ignore. Similarly, no private insurer or employer has an economic incentive to invest in preventive services for children. The economic costs of poor health's negative impact on academic performance and future income will not fully emerge until later in the child's life. Accordingly, economics counsels in favor of health insurance design that counteracts what would result from insurers and employers acting in their own self-interest. The Provision performs precisely this role.

The below examples illustrate the broad and long-lasting economic benefits of the preventive services for which the ACA guarantees coverage without cost-sharing.[37]

*Cancer Screenings.* National cost savings associated with early cancer diagnosis is estimated at $26 billion per year.[38] Experts assess the economic benefits of cancer screenings not only in terms of the cost of future

---

[37] These are merely intended as examples and by no means constitute an exclusive list of preventive services that have widespread economic benefits.

[38] Zura Kakushadze, Rakesh Raghubanshi, & Willie Yu, *Estimating Cost Savings from Early Cancer Diagnosis*, 2 Data 13 (2017), https://bit.ly/46surWa.

services but also in the number of productive life years gained.[39]   For example, lung cancer is the third most common cancer and the leading cause of cancer mortality in the United States[40] and is significantly more treatable when detected early.[41]   Earlier diagnosis and treatment can lead to shortened treatment courses, ultimately reducing the financial impact on patients and families and enabling patients to continue participation in the workforce for longer.[42]

*Contraception.*     Family planning, which includes access to contraception, is critical to economic growth and prosperity.  The ability to obtain highly effective contraception increases education levels for young women.[43] Contraception is a key driver in significantly increasing the number of young women who participate in the paid workforce.[44]  Moreover, access to contraception has economic benefits across generations — children

---

[39] Woolf, *supra* note 36.

[40]  Centers for Disease Control and Prevention, *Lung Cancer Statistics*, https://bit.ly/3Ni4FuN (last reviewed June 8, 2023).

[41] Joel V. Brill, *Screening for Cancer: The Economic, Medical, and Psychosocial Issues*, Am. J. Managed Care Supplement (Nov 16, 2020), https://bit.ly/44dPJ7O.

[42] *Id.*

[43]  Adam Sonfield et al., *The Social and Economic Benefits of Women's Ability to Determine Whether and When to Have Children*, Guttmacher Inst. (2013), https://bit.ly/3Pp6xor.

[44] *Id.*

of women who had access to contraception have higher rates of college education and higher incomes than the children of women who did not.[45] An analysis of one state's potential expansion of contraceptive coverage found millions in savings with respect to the amount spent on public funding for medical care.[46] The use of contraceptives saves nearly $19 billion in direct medical costs each year.[47]

*Vaccines.* Vaccination also generates a high return on investment. Routine childhood immunization of just one birth cohort prevents more than 40,000 early deaths and 20 million cases of disease in addition to resulting in net savings of $13.5 billion in direct costs and $68.8 billion in total societal costs.[48] Every dollar spent on childhood immunization translates to $10.90 in savings.[49] Adult vaccinations also have a "favorable cost-effectiveness

---

[45] Access to Preventive Services, *supra*, note 17.

[46] Suzanne Burlone et al., *Extending Contraceptive Coverage Under the Affordable Care Act Saves Public Funds*, 87 Contraception 143 (2013), https://bit.ly/3PiURU6.

[47] James Trussell et al., *Cost Effectiveness of Contraceptives in the United States*, 79 Contraception 5 (2009), https://bit.ly/3Pohgza.

[48] Fangjun Zhou et al., *Economic Evaluation of the Routine Childhood Immunization Program in the United States, 2009*, 133 Pediatrics 577 (2014), https://bit.ly/46suMIq.

[49] J. Nadine Garcia & Amy Pisani, *Vaccine Infrastructure And Education Is The Best Medical Investment Our Country Can Make*, Health Affairs (2020), https://bit.ly/42VhKzZ.

profile."[50]  "In addition to reducing healthcare costs, vaccination can help to strengthen the sustainability of healthcare systems, especially at the hospital level.  For example, vaccines such as influenza and rotavirus vaccines can contribute to a reduction in hospital admissions, thereby enabling a better allocation of resources."[51]  A measles outbreak in just one county resulted in millions of dollars in public health costs, in addition to productivity losses and direct medical costs.[52]  Vaccinations generate additional third-party economic benefits by protecting unvaccinated individuals as well, due to the reduction in the number of people who could contract and spread certain communicable diseases.[53]

*PrEP*.  Utilization of HIV preexposure prophylaxis (PrEP) not only protects the individual using PrEP from contracting HIV, but results in community-wide reductions in HIV prevalence.  One study found that if the number of individuals using PrEP increased by only 25%, a 54% decrease in

---

[50] Andrew J. Leidner et al., *Cost-Effectiveness of Adult Vaccinations: A Systematic Review*, 37 Vaccine 226 (2019), https://bit.ly/3Pohl5W.

[51] Rohan Deogaonkar et al., *Systematic Review of Studies Evaluating the Broader Economic Impact of Vaccination in Low and Middle Income Countries*, 12 BMC Pub. Health 878 (2012), https://bit.ly/3CE1lVQ.

[52] Jamison Pike et al., *Societal Costs of a Measles Outbreak*, 147 Pediatrics e2020027037 (2021), https://bit.ly/3NErGts.

[53] How CBO Analyzes, *supra*, note 35.

new HIV cases would result.[54]   The potential economic impacts are staggering, as one study found that avoiding just one additional HIV infection saves nearly $230,000 in medical costs.[55]

***Prenatal Screenings and Services.***  Prenatal screenings and services promote healthy babies and eventually, productive adults.   USPSTF-recommended prenatal care includes services related to preeclampsia, gestational diabetes, and healthy weight, as well as screening for domestic violence,[56] and USPSTF-recommended post-natal care includes breast feeding services and supports and services related to postpartum depression.[57]   These services benefit not only the pregnant individuals who receive them, but also their children and society at large, by reducing maternal mortality.[58]   Pregnant people who do not receive prenatal care are substantially more likely to have babies born with a low birth weight and

---

[54] Ruchita Balasubramanian et al., *Projected Impact of Expanded Long-Acting Injectable PrEP Use Among Men Who Have Sex With Men on Local HIV Epidemics*, 91 J. Acquired Immune Deficiency Syndrome 144 (2022), https://bit.ly/42QAf8L.

[55] Bruce R. Schackman et al., *The Lifetime Medical Cost Savings from Preventing HIV in the United States*, 53 Med Care 293 (2015), https://bit.ly/43Pwf9V.

[56] U.S. Preventive Services Task Force, *supra* note 2.

[57] *Id.*  Other women's and children's services must be covered under other subsections of the Preventive Services Provision.  *See* 42 U.S.C. § 300gg-13(a)(3)-(4).

[58] Urban Institute, *Maternal Prenatal and Postnatal Care* (Dec. 28, 2021), https://urbn.is/46dIAq2.

experience higher rates of infant mortality.[59]  Thus, a reduction in coverage for these services will lead to more immediate and devastating economic consequences in addition to those that accrue further in the future.[60]  But the future economic impact is stark.  Studies demonstrate that "children with low birth weight are less likely to pass English and math exams at age 16 and less likely to be employed in their 20s and 30s."[61]  Care that "increas[es] a child's birth weight reduces risks of mortality in the first year of life, increases the likelihood of high school completion, and increases adult full-time earnings."[62]

The Provision, by mandating coverage of the above services without cost-sharing, promotes all the described economic gains and more.  Long-standing economic research demonstrates that if consumers must pay more for preventive care, their usage of these high-value services will decline, placing the above economic benefits at risk.

---

[59] Office on Women's Health, U.S. Dep't of Health and Human Services, *Prenatal Care*, https://bit.ly/44cqlQ0 (last updated Feb. 22, 2021).

[60] George Washington University, *Report:* Braidwood Management v Becerra *Could Eliminate 75% of the ACA's Preventive Benefits for Women, Infants, and Children* (June 13, 2023) https://bit.ly/3Xz78Gd.

[61] Urban Institute, *Maternal Prenatal, supra* note 58.

[62] *Id.*; *see also* Sandra E. Black, Paul J. Devereux, & Kjell Salvanes, *From the Cradle to the Labor Market? Effect of Birth Weight on Adult Outcomes*, 122 J. Q. Econ. 409 (2007), https://bit.ly/3qMz5Oc.

## CONCLUSION

For the foregoing reasons, *amici* respectfully request that this Court reverse the judgment of the district court with respect to the Religious Freedom Restoration Act (RFRA) claims and the Appointments Clause claim as it relates to the USPSTF.


June 27, 2023                              Respectfully submitted,

                                          /s/ Matthew S. Hellman

                                          MATTHEW S. HELLMAN
                                          ERICA S. TURRET
                                          JENNER & BLOCK LLP
                                          1099 New York Avenue NW
                                          Suite 900
                                          Washington, DC 20016
                                          (202) 639-6000
                                          mhellman@jenner.com


                                          *Counsel for Amici Curiae*

# APPENDIX

## List of *Amici Curiae*

**Henry Aaron, Ph.D.,** The Bruce and Virginia MacLaury Senior Fellow, Brookings Institution; Vice-chair of the D.C. Health Benefits Exchange; Assistant Secretary for Planning and Evaluation at the Department of Health, Education, and Welfare (1977-78);

**Jessica Banthin, Ph.D.,** Senior Fellow, Urban Institute; Deputy Assistant Director, Congressional Budget Office (2013-19);

**Linda Blumberg, Ph.D.,** Institute Fellow, Urban Institute; Research Professor, McCourt School of Public Policy, Georgetown University; Health Policy Advisor, Office of Management & Budget, The White House (1993-94);

**Thomas Buchmueller, Ph.D.,** Senior Associate Dean for Faculty & Research; Waldo O. Hildebrand Professor of Risk Management and Insurance; Professor of Business Economics and Public Policy, Ross School of Business, University of Michigan;

**Leonard Burman, Ph.D.,** Professor Emeritus, Maxwell School of Citizenship & Public Affairs, Syracuse University; Institute Fellow, Urban Institute;

**Stuart Butler, Ph.D.,** Senior Fellow, Brookings Institution;

**Amitabh Chandra, Ph.D.,** Professor & Director of Health Policy Research, Kennedy School of Government, Harvard University; recipient of the American Society of Health Economists Medal; Member, Congressional Budget Office Panel of Health Advisors (2012-present); recipient of the Arrow Award, for best paper in health economics;

**Sara Collins, Ph.D.,** Senior Scholar, Vice President, Health Care Coverage & Access, Tracking Health System Performance, Commonwealth Fund;

**David Cutler, Ph.D.,** Otto Eckstein Professor of Applied Economics, Department of Economics and Kennedy School of Government, Harvard University; Senior Economist, Council of Economic Advisors (1993); Director, National Economic Council (1993); recipient of the Arrow Award, for best paper in health economics; recipient of the American Society of Health Economists Medal; Fellow, American Academy of Arts and Sciences;

**Karen Davis**, Ph.D., Professor Emerita, Department of Health Policy and Management, John Hopkins University; Deputy Assistant Secretary for Health Policy, U.S. Department of Health and Human Services (1977-1980);

**Peter Diamond, Ph.D.,** Professor Emeritus, Massachusetts Institute of Technology; recipient of Nobel Prize in Economic Sciences; former President, American Economic Association;

**Coleman Drake**, Ph.D., Assistant Professor of Health Policy and Management, University of Pittsburgh School of Public Health;

**Doug Elmendorf, Ph.D.,** Dean and Don K. Price Professor of Public Policy, Harvard Kennedy School; Director, Congressional Budget Office (2009-15); Chief of the Macroeconomic Analysis Section, Federal Reserve Board (2002-06); Deputy Assistant Secretary for Economic Policy, U.S. Department of the Treasury (1999-2001);

**Judith Feder**, Ph.D., Institute Fellow, Urban Institute; Professor and former Dean, Georgetown University McCourt School of Public Policy; Principal Deputy Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services (1993-95);

**Matthew Fiedler, Ph.D.,** Senior Fellow in Economic Studies, USC-Brookings Schaeffer Initiative for Health Policy, Brookings Institution;

**Richard Frank, Ph.D.,** Senior Fellow in Economic Studies and Director, USC-Brookings Schaeffer Initiative on Health Policy, Brookings Institution; Margaret T. Morris Professor of Health Economics, Emeritus, Harvard University; Assistant Secretary for Planning and Evaluation, Department of Health and Human Services (2014-16); Special Advisor to the Office of the Secretary, Department of Health and Human Services (2013-14); Deputy Assistant Secretary for Planning and Evaluation, Department of Health and Human Services (2009-11);

**Sherry Glied, Ph.D.,** Dean and Professor of Public Service, Robert F. Wagner Graduate School of Public Service, New York University; Assistant Secretary for Planning and Evaluation, U.S. Department of Health and Human Services (2010-12); Senior Economist, Council of Economic Advisors (1992-93);

**Claudia Goldin, Ph.D.,** Henry Lee Professor of Economics, Harvard University; President, American Economic Association (2013-14);

**Bradley Herring, Ph.D.,** Forrest D. McKerley Professor of Health Economics, University of New Hampshire; Senior Staff Economist, Council of Economic Advisors (2006-07);

**John Holahan, Ph.D.,** Institute Fellow, Health Policy Center, Urban Institute;

**Jill Horwitz, Ph.D.,** David Sanders Professor in Law and Medicine, UCLA School of Law;

**Tim Jost, J.D.,** Professor Emeritus of Law, Washington and Lee University;

**Genevieve M. Kenney, Ph.D.,** Senior Fellow and Vice President, Health Policy Center, Urban Institute;

**Frank Levy, Ph.D.,** Professor of Urban Economics, Emeritus, Massachusetts Institute of Technology; Faculty Affiliate, Strategy Group, Fuqua School of Business, Duke University;

**Helen Levy, Ph.D.,** Research Professor, Health Management and Policy, Institute for Social Research, and Ford School of Public Policy, University of Michigan;

**Peter H. Lindert, Ph.D.,** Distinguished Professor Emeritus, Department of Economics, University of California Davis;

**Eric Maskin, Ph.D.,** Adams University Professor, Harvard University; recipient of Nobel Prize in Economic Sciences;

**John E. McDonough, DrPH,** Professor of Practice, Harvard T.H. Chan School of Public Health; Senior Advisor on National Health Reform, U.S. Senate Committee on Health, Education, Labor and Pensions, United States Senate (2008-2010);

**Alan Monheit, Ph.D.,** Professor of Health Economics and Public Policy, Rutgers University School of Public Health;

**Joseph Newhouse, Ph.D.,** John D. MacArthur Professor of Health Policy and Management, Harvard University; recipient of the Arrow Award, for best paper in health economics; Victor R. Fuchs Lifetime Achievement Award from the American Society of Health Economists;

**Len M. Nichols, Ph.D.,** Non-Resident Fellow, Urban Institute; Professor Emeritus, George Mason University; Member, Physician Focused Payment Model Technical Advisory Panel, (2015-2019); Innovation Advisor, Center for Medicare and Medicaid Innovation (2012); Senior Advisor for Health Policy, Office of Management & Budget, The White House (1993-94); Visiting Public Health Service Fellow, Agency for Health Care Research and Policy (1991-93);

**Harold Pollack, Ph.D.,** Helen Ross Professor, Crown Family School of Social Work, Policy, and Practice, University of Chicago; Co-Director, University of Chicago Health Lab;

**Daniel Polsky, Ph.D.,** Bloomberg Distinguished Professor of Health Policy and Economics, Johns Hopkins University; Senior Economist on health issues for Council of Economic Advisers (2007-08);

**Jim Rebitzer, Ph.D.,** Peter and Deborah Exler Professor, Boston University's Questrom School of Business; recipient of the Arrow Award, for best paper in health economics;

**Michael Reich, Ph.D.,** Professor, University of California, Berkeley; Chair, Center on Wage and Employment Dynamics; Former Director, Institute for Research on Labor and Employment;

**Robert Reischauer, Ph.D.,** Distinguished Institute Fellow and President Emeritus, The Urban Institute; Public Trustee, Social Security & Medicare Trust Fund (2010-15); Vice-Chair, Medicare Payment Advisory Commission (2001-09); Director, Congressional Budget Office (1989-95);

**Thomas Rice, Ph.D.,** Distinguished Professor, Department of Health Policy and Management, UCLA Fielding School of Public Health;

**Meredith Rosenthal, Ph.D.,** C. Boyden Gray Professor of Health Economics and Policy, Harvard T.H. Chan School of Public Health;

**William Sage, M.D., J.D.,** Professor of Law, Medicine, and (by courtesy) Government, Texas A&M University; Cluster Leader, Health Care Working Group (President's Task Force on Health Care Reform) (1993);

**Isabel Sawhill, Ph.D.,** Senior Fellow, Brookings Institution; Associate Director, Office of Management and Budget (1993-95);

**Louise Sheiner, Ph.D.,** Senior Fellow & Policy Director, The Hutchins Center on Fiscal and Monetary Policy, Brookings Institution;

**Katherine Swartz, Ph.D.,** Professor of Health Policy and Economics, Harvard T.H. Chan School of Public Health;

**Kenneth E. Thorpe, Ph.D.,** Robert W. Woodruff Professor and Chair of Department of Health Policy and Management, Rollins School of Public Health, Emory University; Executive Director and Director of Center for Entitlement Reform, Institute of Advanced Policy Solutions;

**Laura Tyson, Ph.D.,** Distinguished Professor of the Graduate School, Haas School of Business, University of California, Berkeley; Chair of the Council of Economic Advisers (1993-95); Director of the National Economic Council (1995-96);

**Paul N. Van deWater, Ph.D.,** Senior Fellow, Center on Budget and Policy Priorities; Assistant Director, Congressional Budget Office (1994-99); Assistant Deputy Commissioner for Policy, Social Security Administration (2001-05);

**Gail Wilensky, Ph.D.,** Senior Fellow, Project Hope; Co-Chair, President's Task Force to Improve Health Care Delivery for Our Nation's Veterans (2001-03); Chair, Medicare Payment Advisory Commission (1997-2001); Deputy Assistant to the President for Policy Development, The White House (1992-93); Administrator, Health Care Financing Administration (1990-92);

**Justin Wolfers, Ph.D.,** Senior Fellow, The Peterson Institute for International Economics; Professor of Economics and Professor of Public Policy, University of Michigan;

**Naomi Zewde, Ph.D.,** Assistant Professor, Department of Health Policy and Management, Fielding School of Public Health, University of California, Los Angeles;

**Stephen Zuckerman, Ph.D.,** Senior Fellow and Co-Director, Health Policy Center, The Urban Institute.

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(a)(7)(B)(i) because it contains 5,965 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 14-point Century Expanded font.

/s/ Matthew S. Hellman

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2023, a true and correct copy of the foregoing Brief was served via the court's CM/ECF system.


/s/ Matthew S. Hellman