No. 23-10326

# In the United States Court of Appeals for the Fifth Circuit

---

BRAIDWOOD MANAGEMENT, INCORPORATED; JOHN SCOTT KELLEY; KELLEY ORTHODONTICS; ASHLEY MAXWELL; ZACH MAXWELL; JOEL STARNES,

*Plaintiffs–Appellees/Cross-Appellants*,

JOEL MILLER; GREGORY SCHEIDEMAN,

*Plaintiffs–Cross-Appellants*,

v.

XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, IN HIS OFFICIAL CAPACITY AS SECRETARY OF HEALTH AND HUMAN SERVICES; UNITED STATES OF AMERICA; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF TREASURY, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE TREASURY; JULIE A. SU, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR, IN HER OFFICIAL CAPACITY AS SECRETARY OF LABOR,

*Defendants–Appellants/Cross-Appellees.*

---

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division
Case No. 4:20-cv-00283-O

---

## BRIEF OF APPELLEES/CROSS-APPELLANTS BRAIDWOOD MANAGEMENT INC., ET AL.

---

GENE P. HAMILTON
Vice-President and General Counsel
America First Legal Foundation
611 Pennsylvania Ave SE #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

*Counsel for Appellees/Cross-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

Counsel of record certifies that the following persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

| Plaintiffs | Plaintiffs' Counsel |
|---|---|
| • Braidwood Management Inc.<br>• John Scott Kelley<br>• Kelley Orthodontics<br>• Ashley Maxwell<br>• Zach Maxwell<br>• Joel Starnes<br>• Joel Miller<br>• Gregory Scheideman | Jonathan F. Mitchell<br>MITCHELL LAW PLLC<br><br>Gene P. Hamilton<br>AMERICA FIRST LEGAL FOUNDATION<br><br>H. Dustin Fillmore<br>Charles W. Fillmore<br>THE FILLMORE LAW FIRM LLP |

| Defendants | Defendants' Counsel |
|---|---|
| • Xavier Becerra<br>• Janet Yellen<br>• Julie Su<br>• United States of America | Michael S. Raab<br>Alisa B. Klein<br>Daniel Aguilar<br>Christopher M. Lynch<br>Jordan L. Von Bokern<br>Brian W. Stoltz<br><br>UNITED STATES DEPARTMENT OF JUSTICE |

 /s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Appellees/Cross-Appellants*

i

# STATEMENT REGARDING ORAL ARGUMENT

We agree with the appellants that the issues presented in this appeal are sufficiently complex and important to warrant argument time.

# TABLE OF CONTENTS

Certificate of interested persons................................................................ i

Statement regarding oral argument ........................................................ ii

Table of contents .................................................................................... iii

Table of authorities ................................................................................vi

Statement of jurisdiction ........................................................................ 2

Statement of the issues ........................................................................... 2

Statement of the case...............................................................................3

Summary of argument .............................................................................3

Argument .................................................................................................5

    I.    The district court correctly held that the Task Force members are principal officers...........................................................................5

        A.    The Task Force members are not removable at will by the Secretary, and even if they were that would not make them inferior officers ................................................. 8

            1.    The Secretary cannot remove Task Force members at will............................................................. 8

            2.    An officer does not automatically become an "inferior" officer whenever he is subject to at-will removal by a principal officer.........................................12

        B.    42 U.S.C. § 299b-4(a)(6) cannot be interpreted to give the Secretary powers to "direct" or "supervise" the Task Force members or their recommendations..................... 15

    II.    The district court correctly held that the Secretary's attempted "ratification" of the Task Force's recommendations could not cure the unconstitutional appointment of its members ..................... 19

        A.    The Secretary cannot "ratify" the Task Force recommendations because the Secretary has no authority to decide the preventive care that private insurers must cover under 42 U.S.C. § 300gg-13(a)(1) ................................. 20

B.      Secretary Becerra's ratification document failed to go through notice-and-comment procedures and is arbitrary and capricious ........................................................................ 24

III.    The Secretary cannot obviate the Appointments Clause violation by reappointing the Task Force members ..........................26

A.      42 U.S.C. § 299b-4(a)(1), by instructing the Director of AHRQ to "convene" the Task Force, does not alter the presumptive constitutional appointment process ....................26

B.      Even if "convene" includes the power to appoint, neither 42 U.S.C. § 299b-4(a)(1) nor any other law "vests" the appointment power in Secretary Becerra ................................30

IV.    The district court correctly refused to remedy the Appointments Clause violations by "severing" 42 U.S.C. § 299b-4(a)(6) ......................................................................38

A.      The defendants' proposed remedy does not cure the Appointments Clause violations .............................................38

B.      A district court cannot enter a judgment that formally revokes a statutory provision or confers new powers on a cabinet secretary .....................................................................41

C.      The defendants' proposed remedy will not redress the plaintiffs' Article III injuries ....................................................45

V.    The district court correctly vacated the unlawful agency actions under 5 U.S.C. § 706(2)(A) ................................................46

A.      The Declaratory Judgment Act................................................46

B.      The Administrative Procedure Act...........................................47

C.      Injunctive relief.......................................................................48

D.      The defendants' criticisms of the district court's remedy are groundless ..........................................................................49

1.      The plaintiffs are entitled to an APA remedy regardless of whether they specifically requested it in their complaint..........................................................49

2.    5 U.S.C. § 706(2) compels courts to "set aside" (*i.e.*, vacate) unlawful agency action regardless of the balance of equities or the public interest .................. 53

VI.    The Secretary's attempted ratification of the ACIP recommendations and HRSA guidelines do not cure the Appointments Clause violations ........................................ 57

VII.    The plaintiffs are preserving their nondelegation claim .................... 60

Conclusion ............................................................................................... 60

Certificate of service .............................................................................. 61

Certificate of compliance ....................................................................... 62

Certificate of electronic compliance ..................................................... 63

Appendix ...............................................................................................

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Reno*, 31 F. Supp. 2d 473 (E.D. Pa. 1999)....................................................55

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ................................................................36

*Biden v. Texas*, 142 S. Ct. 2528 (2022) ....................................................................52

*Big Time Vapes, Inc. v. FDA*, 963 F.3d 436 (5th Cir. 2020).....................................60

*Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam)........................................ 1, 35, 39, 53

*Butte County v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010) ............................................25

*Camreta v. Greene*, 563 U.S. 692 (2011)....................................................................45

*Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (en banc).....................................54

*Central & South West Services, Inc. v. EPA*, 220 F.3d 683 (5th Cir. 2000) ...............54

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984)........................................................................................29

*Citizens United v. FEC*, 558 U.S. 310 (2010) ..........................................................49

*Cleavinger v. Saxner*, 474 U.S. 193 (1985)................................................................18

*Collins v. Mnuchin*, 938 F.3d 553 (5th Cir. 2019).....................................................45

*Collins v. Yellen*, 141 S. Ct. 1761 (2021)...................................................................10

*Consumer Financial Protection Bureau v. Gordon*,
    819 F.3d 1179 (9th Cir. 2016)........................................................................ 22

*Cooper v. Aaron*, 358 U.S. 1 (1958).....................................................................44, 45

*Data Marketing Partnership, LP v. United States Dep't of Labor*,
    45 F.4th 846 (5th Cir. 2022) .....................................................................passim

*Dep't of Homeland Security v. Regents of the University of California*,
    140 S. Ct. 1891 (2020) ....................................................................................25

*Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022) .................50

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) .........................................................48

*Driggers v. Business Men's Assurance Co. of America*,
    219 F.2d 292 (5th Cir. 1955)..........................................................................50

*Edmond v. United States*, 520 U.S. 651 (1997)......................................passim

*Exela Enterprise Solutions, Inc. v. NLRB*, 32 F.4th 436 (5th Cir. 2022) ...................10

*Federal Election Commission v. NRA Political Victory Fund*,
513 U.S. 88 (1994)...........................................................3, 20, 23

*Federal Election Commission v. Ted Cruz for Senate*,
142 S. Ct. 1638 (2022) ...........................................................43

*Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234 (5th Cir. 2023) ...............................25

*Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368 (5th Cir. 2022) .....................passim

*Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660 (N.D. Tex. 2016)............. 48

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
561 U.S. 477 (2010)...........................................................passim

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
527 U.S. 308 (1999)...........................................................43

*Guedes v. Bureau of Alcohol, Tobacco. Firearms, and Explosives*,
920 F.3d 1 (D.C. Cir. 2019) ...........................................................21

*Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019) ...................58

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ................................. 8, 11

*In re Abbott*, 954 F.3d 772 (5th Cir. 2020)...........................................................55

*Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*,
684 F.3d 1332 (D.C. Cir. 2012) ........................................................ 40, 42

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018)...........................................................59

*Kajmowicz v. Whitaker*, 42 F.4th 138 (3d Cir. 2022) ...................................... 22

*Kennedy v. United States*, 146 F.2d 26 (5th Cir. 1944) ...................................33

*Leavitt v. Jane L.*, 518 U.S. 137 (1996)...........................................................41

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
140 S. Ct. 2367 (2020) ...........................................................58, 60

*Lucia v. SEC*, 138 S. Ct. 2044 (2018) ........................................................ 16, 59

*Moose Jooce v. FDA*, 981 F.3d 26 (D.C. Cir. 2020)...........................................22, 23

*Morrison v. Olson*, 487 U.S. 654 (1988) ............................................. 9, 11, 12

*Mow Sun Wong v. Hampton*, 435 F. Supp. 37 (N.D. Cal. 1977) .................................. 32

*Myers v. United States*, 272 U.S. 52 (1926) ......................................... 14, 36

*National Ass'n of Radiation Survivors v. Walters*,
    589 F. Supp. 1302 (N.D. Cal. 1984) ..................................................... 55

*Natural Resources Defense Council v. EPA*,
    489 F.3d 1250 (D.C. Cir. 2007) ......................................................... 54

*NetChoice, L.L.C. v. Paxton*, 49 F.4th 439 (5th Cir. 2022) ................................. 42, 56

*NLRB v. Newark Electric Corp.*, 14 F.4th 152 (2d Cir. 2021) ................................... 22

*Pool v. City of Houston*, 978 F.3d 307 (5th Cir. 2020) ..................................... 55

*Professional Association of College Educators v. El Paso County
    Community College District*, 730 F.2d 258 (5th Cir. 1984) ................................... 56

*Professionals and Patients for Customized Care v. Shalala*,
    56 F.3d 592 (5th Cir. 1995) ............................................................. 25

*Ryder v. United States*, 515 U.S 177 (1995) .......................................... 16, 52

*Sapp v. Renfroe*, 511 F.2d 172 (5th Cir. 1975) ............................................. 50

*Seila Law LLC v. Consumer Financial Protection Bureau*,
    140 S. Ct. 2183 (2020) ................................................................. 9, 16

*Shell Offshore Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001) ............................... 25

*Shurtleff v. United States*, 189 U.S. 311 (1903) ........................................... 11

*Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998) ........................... 45

*United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021) ............................... passim

*United States v. Hartwell*, 73 U.S. 385 (1867) .......................................... 32, 33

*United States v. Stevens*, 559 U.S. 460 (2010) ............................................ 16

*United States v. Texas*, 143 S. Ct. 1964 (2023) .......................................... 49

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ................................. 50

*Whole Woman's Health v. Jackson*, 142 S. Ct. 522 (2021) ................................. 41, 43

*Wilkes-Barre Hospital Co. v. NLRB*, 857 F.3d 364 (D.C. Cir. 2017) .................. 20, 23

*Willy v. Administrative Review Board*, 423 F.3d 483 (5th Cir. 2005) .........................34

*Wilson v. Taylor*, 658 F.2d 1021 (5th Cir. 1981) .........................................................36

**Statutes**

14 Stat. 202 ...................................................................................................................33

80 Stat. 1610 ...........................................................................................................31, 37

5 U.S.C. § 301 ...............................................................................................................34

5 U.S.C. § 551(4) ....................................................................................................24, 59

5 U.S.C. § 553 ...............................................................................................................25

5 U.S.C. § 553(b)(3)(B) .................................................................................................25

5 U.S.C. § 704 ...............................................................................................................51

5 U.S.C. § 706 ...............................................................................................................53

5 U.S.C. § 706(1) ...........................................................................................................43

5 U.S.C. § 706(2)(A) ...........................................................................................5, 46, 53

10 U.S.C. § 611 ..............................................................................................................28

10 U.S.C. § 612 ..............................................................................................................28

10 U.S.C. § 866(a) ...................................................................................................30, 33

15 U.S.C. § 634c(b)(2)(A) .............................................................................................28

15 U.S.C. § 7211(e)(4)(A) .............................................................................................40

17 U.S.C. § 801(a) .........................................................................................................40

18 U.S.C. § 926(a) .........................................................................................................21

22 U.S.C. § 4831(a)(1) ..................................................................................................28

22 U.S.C. § 4831(a)(2)(A)–(E) .....................................................................................28

26 U.S.C. § 7801(a)(1) ..................................................................................................21

26 U.S.C. § 7801(a)(2)(A) .............................................................................................21

26 U.S.C. § 7805(a) .......................................................................................................21

28 U.S.C. § 1651(a) .......................................................................................................44

35 U.S.C. § 6(a) ..................................................................... 40

42 U.S.C. § 202 ........................................................ 17, 18, 58

42 U.S.C. § 299(a) ................................................................ 6, 31

42 U.S.C. § 299b-4 ..................................................................29

42 U.S.C. § 299b-4(a) ................................................................6

42 U.S.C. § 299b-4(a)(1) ...................................................passim

42 U.S.C. § 299b-4(a)(6) ...................................................passim

42 U.S.C. § 300gg-13 ...............................................................1

42 U.S.C. § 300gg-13(a)(1) .............................................passim

42 U.S.C. § 300gg-13(a)(1)-(4) ......................................58, 60

42 U.S.C. § 300gg-13(a)(2)-(4) ......................................passim

42 U.S.C. § 300gg-13(b) ............................... 17, 18, 24, 58

49 U.S.C. § 323(a) ...................................................................33

## Constitutional Provisions

U.S. Const. art. II, § 2, cl. 2 ....................................................1

## Rules

Fed. R. Civ. P. 54(c) ...............................................................49

## Other Authorities

*Appointment and Removal of Federal Reserve Bank Members of the Federal Open Market Committee*, 43 Op. O.L.C. ____, 2019 WL 11594453 (2019) ....................................................................................12

Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L. Rev. 253 (2017) ...........................................47

*Black's Law Dictionary* (11th ed. 2019)....................................18, 27

*Constitutional Limitations on Federal Government Participation in Binding Arbitration*, 19 Op. O.L.C. 208 (1995) .....................29

David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41 ........................47

Brian D. Feinstein & Daniel J. Hemel, *Outside Advisers Inside Agencies*,
108 Geo. L.J. 1139, 1200 (2020) ..............................................................29

John Harrison, *Section 706 of the Administrative Procedure Act Does Not*
*Call for Universal Injunctions or Other Universal Remedies*,
37 Yale J. On Reg. Bull. 37 (2020) ..........................................................49

Thomas W. Merrill, *Article III, Agency Adjudication, and the Origins of*
*the Appellate Review Model of Administrative Law*,
111 Colum. L. Rev. 939 (2011) ................................................................47

Mila Sohoni, *The Power to Vacate a Rule*,
88 Geo. Wash. L. Rev. 1121 (2020) .................................................. 47, 49

*Removal of Assistant Postmaster of Washington, D.C.*,
17 U.S. Op. Att'ys Gen. 475 (1882) ..........................................................32

The Affordable Care Act empowers the U.S. Preventive Services Task Force (Task Force), the Advisory Committee on Immunization Practices (ACIP), and the Health Resources and Services Administration (HRSA) to unilaterally determine the preventive care that private health insurers must cover. *See* 42 U.S.C. § 300gg-13. Since the ACA's enactment, these entities have issued numerous pronouncements that compel coverage of preventive care without cost-sharing arrangements such as deductibles and co-pays. In 2011, for example, HRSA decided that private insurers must cover FDA-approved contraceptive methods without cost sharing. And in 2021, the Task Force decreed that insurers must cover pre-exposure prophylaxis (PrEP) drugs such as Truvada and Descovy.

The Task Force members, the members of ACIP, and the HRSA Administrator all wield significant authority pursuant to the laws of the United States, and they must be appointed as "officers" under Article II of the Constitution. *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam) ("[A]ny appointee exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States,'"); U.S. Const. art. II, § 2, cl. 2 ("[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States . . . but the Congress may by Law vest the Appointment of such inferior Officers . . . in the President alone, in the Courts of Law, or in the Heads of Departments."). Yet none of these decisionmakers have been constitutionally appointed. The

Court should declare it so and enjoin implementation of their preventive-care coverage edicts until they receive a constitutional appointment.

## STATEMENT OF JURISDICTION

The defendants' statement of jurisdiction is complete and correct.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly held that Task Force members are "principal officers" who must be appointed by the President and Senate.

2. Whether the district court correctly held that Secretary Becerra was powerless to cure the unconstitutional appointment of the Task Force by "ratifying" its recommendations.

3. Whether Secretary Becerra can obviate the Appointments Clause problems by appointing the Task Force himself.

4. Whether the district court correctly rejected the defendants' proposal to "sever" 42 U.S.C. § 299b-4(a)(6), the statutory provision that guarantees the independence of Task Force members and their recommendations.

5. Whether the district court correctly interpreted section 706 of the APA to require vacatur of unlawful agency actions taken to implement and enforce the Task Force's "A" and "B" recommendations under 42 U.S.C. § 300gg-13(a)(1).

6. Whether the district court erred in allowing Secretary Becerra's "ratification" of ACIP's recommendations and HRSA's guidelines to cure the Appointments Clause problems with 42 U.S.C. § 300gg-13(a)(2)-(4).

## STATEMENT OF THE CASE

The defendants' statement of the case is accurate and we do not dispute their description of the facts or the proceedings below. The relevant statutory provisions appear in the appendix to our brief. The plaintiffs are cross-appealing their Appointments Clause challenge to the powers conferred on ACIP and HRSA by 42 U.S.C. § 300gg-13(a)(2)-(4). They are also cross-appealing their non-delegation claims but only to preserve them for the Supreme Court.

## SUMMARY OF ARGUMENT

1.    The district court correctly held that Task Force members are principal officers who must be appointed by the President and Senate. They cannot be "inferior" officers because 42 U.S.C. § 299b-4(a)(6) requires that Task Force members and their recommendations be kept "independent" and "to the extent practicable, not subject to political pressure," which means that Task Force members cannot be subject to the "direction" or "supervision" of Secretary Becerra or any other principal officer.

2.    The district court correctly held that Secretary Becerra cannot cure the unconstitutional appointment of the Task Force by "ratifying" its recommendations, because the Secretary lacks authority to exercise powers of the Task Force or decide the preventive care that private insurers must cover under 42 U.S.C. § 300gg-13(a)(1). *See Federal Election Comm'n v. NRA Political Victory Fund*, 513 U.S. 88, 98 (1994) ("'[I]t is essential that the party ratifying should be able not merely to do the act ratified at the time the act was

done, but also at the time the ratification was made.'" (citation omitted) (emphasis removed)). The Secretary's ratification document is also ineffective because it failed to go through notice-and-comment procedures and is arbitrary and capricious.

3. Secretary Becerra cannot shield future recommendations of the Task Force from constitutional challenge by re-appointing its members, because they are principal officers who must be appointed by the President and Senate. The Secretary would also remain powerless to appoint the Task Force even if its members were "inferior" officers because no congressional enactment "vests" him with this appointment power.

4. The district court correctly held that it could not remedy the Appointments Clause violations by "severing" (*i.e.*, nullifying) 42 U.S.C. § 299b-4(a)(6) and empowering the Secretary to veto or cancel the Task Force's "A" or "B" recommendations. This remedy will not cure the Appointments Clause violations because Task Force members would still wield "significant authority pursuant to the laws of the United States," yet they would not be constitutionally appointed as "officers." More importantly, a district-court judgment cannot revoke a statutory provision or confer new powers upon a cabinet secretary that Congress has withheld. This remedy also will not redress the plaintiffs' Article III injuries, as the plaintiffs would remain subject to the unwanted coverage mandates.

5. The district court correctly vacated the agency actions taken to implement the Task Force's "A" or "B" recommendations under section

300gg-13(a)(1) and enjoined their future enforcement. 5 U.S.C. § 706(2)(A) requires courts to "set aside" (*i.e.*, formally vacate) unlawful agency actions, and vacatur under the APA is a universal remedy akin to an executive veto. *See Data Marketing Partnership, LP v. United States Dep't of Labor*, 45 F.4th 846, 859-60 (5th Cir. 2022); *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022).

6.   The district court should have upheld the Appointments Clause challenge to the ACIP recommendations and HRSA guidelines. The Secretary's attempted "ratification" is ineffective because he lacks authority to compel preventive-care coverage under 42 U.S.C. § 300gg-13(a)(2)-(4), or exercise decision-making powers that the statute vests exclusively in ACIP and HRSA. The ratification document also failed to go through notice-and-comment procedures and is arbitrary and capricious.

## ARGUMENT

### I.   THE DISTRICT COURT CORRECTLY HELD THAT THE TASK FORCE MEMBERS ARE PRINCIPAL OFFICERS

The defendants acknowledge that the Task Force members are "officers of the United States" who must be appointed in conformity with Article II. *See* Appellants' Br. at 19. But the defendants insist that the Task Force members are "inferior officers," and that Congress may vest their appointment in the Heads of Department. *Id.* at 19-27. The district court rejected this argument, ROA.1804-1805, and this Court should reject it as well.

We note at the outset that the Task Force was unconstitutionally appointed regardless of whether its members are "principal" or "inferior" officers. The Task Force was appointed by the Director of the Agency for Healthcare Research and Quality (AHRQ),[1] who is not a "Head of Department" and is powerless to appoint even "inferior" officers. *See Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 510 (2010) (defining "Department" as a "freestanding component of the Executive Branch"); Appellants' Br. at 30 (acknowledging that Task Force members "have not yet received an appointment consistent with the Appointments Clause"). But the Court should resolve this issue because the defendants believe they can fix the constitutional violation by having Secretary Becerra re-appoint the Task Force. *See* Appellants' Br. at 30. This is allowed only if the Task Force members are inferior officers, and only if Congress has "vested" their appointment in the Secretary.

An "inferior" officer is an officer whose work is "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 662-63 (1997); *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1980 (2021) (same). That direction and supervision is absent here. 42 U.S.C. § 300gg-13(a)(1) empowers the Task Force—and the Task Force alone—to determine the preventive care that private insurers must cover. Neither the

---

1.    Appellants' Br. at 4-5; 42 U.S.C. § 299(a); 42 U.S.C. § 299b-4(a).

Secretary of Health and Human Services, nor any other officer of the United States, has statutory authority to countermand any preventive-care edict issued by the Task Force. Indeed, no other officer can even *influence* the Task Force's decisions, as 42 U.S.C. § 299b-4(a)(6) provides that Task Force members and their recommendations "shall be independent and, to the extent practicable, not subject to political pressure." *See also* 42 U.S.C. § 299b-4(a)(1) (requiring the Director of AHRQ to "convene an *independent* Preventive Services Task Force" (emphasis added)). These statutory guarantees of independence preclude *any* officer of the United States from reviewing or reversing the Task Force's recommendations, and the absence of "statutory authority" to review Task Force decisions makes its members principal officers. *See Arthrex*, 141 S. Ct. at 1981 ("statutory authority to review" decisions is needed to make one an inferior officer); *id.* at 1983 ("[A]dequate supervision entails review of decisions issued by inferior officers.").

The defendants nonetheless contend that the Task Force is "directed and supervised" by Secretary Becerra despite the guarantees of independence in sections 299b-4(a)(1) and (a)(6). First, the defendants insist that Task Force members are removable at will by the Secretary, which gives the Secretary all the powers of "direction" and "supervision" needed to satisfy *Edmond*'s test for inferior-officer status. *See* Appellants' Br. at 20-24. Second, the defendants claim that the constitutional-avoidance canon requires courts to interpret 42 U.S.C. § 299b-4(a)(6) in a manner that gives the Secretary whatever

supervisory powers he needs to make the Task Force members into "inferior" officers. Neither argument works.

### A. The Task Force Members Are Not Removable At Will By The Secretary, And Even If They Were That Would Not Make Them Inferior Officers

The defendants' removal-power argument adopts the following syllogism:

> Major premise: Every officer removable at will by a principal officer is an "inferior" officer.
>
> Minor premise: Task Force members are removable at will by Secretary Becerra.
>
> Conclusion: Task Force members are therefore inferior officers.

Both the minor premise and the major premise of this argument are wrong.

### 1. The Secretary Cannot Remove Task Force Members At Will

The claim that Secretary Becerra can remove Task Force members at will cannot co-exist with the statutory mandates of independence in 42 U.S.C. § 299b-4(a)(1) and 42 U.S.C. § 299b-4(a)(6), which require Task Force members and their recommendations to be "independent" and "to the extent practicable, not subject to political pressure."

Protection from at-will removal is the very essence of an "independent" officer. *See Humphrey's Executor v. United States*, 295 U.S. 602, 629 (1935) ("[O]ne who holds his office only during the pleasure of another cannot be depended upon to maintain an attitude of independence against the latter's

will."); *Morrison v. Olson*, 487 U.S. 654, 693 (1988) ("[T]he congressional determination to limit the removal power of the Attorney General was essential, in the view of Congress, to establish the necessary independence of the office."); *Free Enterprise Fund*, 561 U.S. at 483 ("Congress can, under certain circumstances, create independent agencies run by principal officers appointed by the President, whom the President may not remove at will but only for good cause."). Any officer who can be removed at will is necessarily dependent upon the one who wields the removal power. When the Supreme Court held that Article II gives the President an at-will removal prerogative over the director of the Consumer Financial Protection Bureau, it described the director and the agency as "dependent" on the President. *Seila Law LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2211 (2020) ("The Constitution requires that such officials remain dependent on the President"); *id.* at 2210 (plurality opinion of Roberts, C.J.) (considering "whether Congress would have preferred a dependent CFPB to no agency at all." (emphasis removed)). At-will removal is the *sine qua non* of a dependent relationship—and the antithesis of an independent one.

If the Secretary could remove Task Force members at will, then the Task Force and its recommendations would no longer be "independent," as required by sections 299b-4(a)(1) and (a)(6), because the Secretary could remove (and threaten to remove) any Task Force member that refuses to do his bidding. *See Edmond*, 520 U.S. at 664 ("The power to remove officers . . . is a powerful tool for control."). The defendants do not explain how Task Force

members and recommendations would remain "independent" of the Secretary in this scenario. At-will removal would also subject Task Force members to "political pressure," in violation of section 299b-4(a)(6)'s requirement that Task Force members and recommendations be insulated from such pressures "to the extent practicable."

The defendants do not (and cannot) identify any statute that gives the Secretary at-will removal power over the Task Force, or that in any way undermines the guarantees of independence and protections from political pressure in sections 299b-4(a)(1) and (a)(6). The only authority cited to support at-will removal is a passage in the district court's opinion noting that the plaintiffs had failed to "identify any removal restrictions on PSTF members,"[2] as well as cases that demand clear statutory language before courts will enforce limits on the *President's* removal powers. *See* Appellants' Br. at 20-21 (quoting *Exela Enterprise Solutions, Inc. v. NLRB*, 32 F.4th 436, 441 (5th Cir. 2022)); *see also Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) ("When a statute does not limit the *President's* power to remove an agency head, we generally presume that the officer serves at the President's pleasure." (emphasis added)); *Exela*, 32 F.4th at 441 (quoting *Collins*). But none of that

---

2. ROA.1807. The district court rejected our claim that 42 U.S.C. § 299b-4(a)(6) protects the Task Force members from at-will removal because any such interpretation of the statute would, in the district court's view, violate Article II by interfering with the President's constitutionally protected removal powers. ROA.1807-1808. This observation does not support a removal power for the Secretary (as opposed to the President). *See* note 3 and accompanying text.

shows that the *Secretary* can remove Task Force members at will in the teeth of 42 U.S.C. § 299b-4(a)(6), and the clear statements needed for statutory limits on the President's removal powers are inapplicable because Article II does not safeguard the *Secretary's* right to remove anyone.[3]

---

3.    The only circumstances in which a clear statutory statement is needed to limit a subordinate executive official's removal prerogatives is when Congress has constitutionally limited the President's removal power over that subordinate executive official, *see Free Enterprise Fund*, 561 U.S. at 484 ("[M]ultilevel protection from removal is contrary to Article II's vesting of the executive power in the President"), or when the subordinate executive official or his predecessors previously appointed the officer that he now seeks to remove, *see Shurtleff v. United States*, 189 U.S. 311, 316 (1903) ("The right of removal . . . inheres in the right to appoint, unless limited by constitution or statute."). Neither situation applies here, as the Secretary of HHS is removable at will by the President and the Secretary did not appoint the Task Force.

Whether 42 U.S.C. § 299b-4(a)(6) allows the *President* to remove Task Force members at will presents a more difficult question that this Court need not resolve, as at-will Presidential removal does not render one an "inferior officer." *See Morrison*, 487 U.S. at 716 (Scalia, J., dissenting) ("[M]ost (if not all) *principal* officers in the Executive Branch may be removed by the President *at will.*"). It is also far from clear that Article II allows the President to remove Task Force members, as the holdings of *Seila Law* and *Collins* are limited to agencies headed by a single member. The Task Force is a multi-member entity, and it exercises quasi-legislative rather than executive functions. *See Humphrey's Executor*, 295 U.S. at 628. The plaintiffs are not appealing the district court's ruling on the Presidential-removal issue. ROA.1808.

### 2. An Officer Does Not Automatically Become An "Inferior" Officer Whenever He Is Subject To At-Will Removal By A Principal Officer

The defendants are also wrong to claim that an at-will removal prerogative would make the Task Force members inferior officers. *See* Appellants' Br. at 24 ("Task Force members . . . are removable at will and are therefore inferior officers."). The Task Force members would still be principal officers even if Secretary Becerra could remove them, because they remain empowered by 42 U.S.C. § 300gg-13(a)(1) and 42 U.S.C. § 299b-4(a)(6) to render final decisions regarding the preventive care that private insurers must cover.

The Supreme Court has never held that an officer is automatically deemed "inferior" whenever he is subject to at-will removal by a principal officer. Instead, removability is merely one factor to consider in deciding whether an officer falls on the "principal" or "inferior" side of the line. *See Edmond*, 520 U.S. at 664-65 (designating military judges inferior officers because they were subject to administrative oversight, were "remov[able] . . . without cause," *and* had "no power to render a final decision"); *Morrison*, 487 U.S. at 671-72 (an officer's removability is one of four factors in the inferior-officer inquiry); *Appointment and Removal of Federal Reserve Bank Members of the Federal Open Market Committee*, 43 Op. O.L.C. ___, 2019 WL 11594453, **9-10 (2019) ("To decide whether an officer has a superior, the Supreme Court has considered whether the officer is subject to the policy direction of another official, whether the officer can take 'final' action without the approval of another officer, and whether an executive officer other than

the President has the 'power to remove [the] officer[].'" (quoting *Edmond*, 520 U.S. at 664-65)).

The Task Force members are principal officers because their preventive-care coverage decisions are not subject to review or reversal by anyone else in the executive branch—and that would remain the case even if the Secretary could remove them at will. *See Edmond*, 520 U.S. at 665 ("What is significant is that the judges of the Court of Criminal Appeals have no power to render a final decision on behalf of the United States unless permitted to do so by other Executive officers."). The touchstone for inferior-officer status is whether the individual is "directed and supervised" by a principal officer, not whether he is subject to at-will removal. *Id.* at 663; *Arthrex*, 141 S. Ct. at 1980 ("An inferior officer must be 'directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" (quoting *Edmond*, 520 U.S. at 663)). The Task Force members—even if removable at will—would *still* have the "'power to render a final decision on behalf of the United States' without . . . review by their nominal superior or any other principal officer in the Executive Branch." *Arthrex*, 141 S. Ct. at 1981 (quoting *Edmond*, 520 U.S. at 665)).

At-will removal would allow the Secretary to fire Task Force members if he is unhappy with their performance, but it would not empower him to overrule their recommendations or direct their decisionmaking given the guarantee of independence in 42 U.S.C. § 299b-4(a)(6). The defendants have already admitted that section 299b-4(a)(6) makes the Secretary powerless to

"direct" the Task Force's recommendations, even if he could remove them at will.[4] They cannot turn around after acknowledging this and insist that an at-will removal prerogative is all that is needed to convert the Task Force members into "inferior" officers subject to the Secretary's "direction" and "supervision." *Myers* also recognizes that the power of at-will removal does not entail the prerogative to overrule or revise the subordinate officer's decisionmaking. *See Myers v. United States*, 272 U.S. 52, 135 (1926) ("[T]here may be duties so peculiarly and specifically committed to the discretion of a particular officer as to raise a question whether the President may overrule or revise the officer's interpretation of his statutory duty in a particular instance. . . . But even in such a case he may consider the decision after its rendition as a reason for removing the officer, on the ground that the discretion regularly entrusted to that officer by statute has not been on the whole intelligently or wisely exercised."). Recognizing an at-will removal prerogative for the Secretary (or the President) would not empower them to "overrule" or "revise" the Task Force's recommendations in the teeth of 42 U.S.C. § 299b-4(a)(6). At-will removal would give the Secretary some influence over the Task Force, but it would not confer the plenary powers of "direction" and "supervision" needed to convert the Task Force members into inferior officers. *See Arthrex*, 141 S. Ct. at 1981-82 (a principal officer's informal

---

4. ROA.1746 ("The Secretary may not, consistent with 42 U.S.C. § 299b-4(a)(6), direct that the PSTF give a specific preventive service an 'A' or 'B' rating, such that it would be covered pursuant to 42 U.S.C. § 300gg-13(a)(1).").

means of influencing an officer's decisionmaking does not render that officer "inferior" in the absence of formal "statutory authority to review" the officer's decisions.); *id.* at 1983 ("[A]dequate supervision entails review of decisions issued by inferior officers.").

### B.    42 U.S.C. § 299b-4(a)(6) Cannot Be Interpreted To Give The Secretary Powers To "Direct" Or "Supervise" The Task Force Members Or Their Recommendations

The defendants also urge the Court to interpret 42 U.S.C. § 299b-4(a)(6) to give the Secretary just enough powers of "direction" and "supervision" over the Task Force so that its members can be squeezed into the "inferior officer" cubbyhole. *See* Appellants' Br. at 24-27. They insist that the constitutional-avoidance canon compels this construction, even though the statutory text requires Task Force members and recommendations to be "independent" and "to the extent practicable, not subject to political pressure." There are two insurmountable problems with the defendants' argument.

First. The constitutional-avoidance canon is inapplicable because the defendants' proposed interpretation will not avoid an Appointments Clause violation. Even if one adopts the defendants' construction of 42 U.S.C. § 299b-4(a)(6) and gives the Secretary all of the powers needed to turn the Task Force members into "inferior officers," the Task Force *still* has not been constitutionally appointed because it members were tapped by the Director of AHRQ, who is not a "Head of Department."[5] The defendants rec-

---

5.    *See* note 1 and accompanying text.

ognize this problem and are trying to fix it by having the Secretary re-appoint the Task Force. *See* Appellants' Br. at 30. But Congress has not "vested" the Secretary with appointment authority over the Task Force, as required by Article II. *See* Part III, *infra*. And even if Congress had "vested" this appointment power in the Secretary, the *past* coverage recommendations of the Task Force still cannot be implemented because its members were unconstitutionally appointed when those recommendations were made. *See Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018); *Ryder v. United States*, 515 U.S 177, 182-83 (1995). The statutes governing the Task Force and its coverage mandates violate the Appointments Clause no matter how 42 U.S.C. § 299b-4(a)(6) is construed—and regardless of whether the Task Force members are principal or inferior officers.

Second. The language of 42 U.S.C. § 299b-4(a)(6) is not "readily susceptible" to the defendants' interpretation. *See United States v. Stevens*, 559 U.S. 460, 481 (2010) ("[T]his Court may impose a limiting construction on a statute only if it is readily susceptible to such a construction. We will not rewrite a . . . law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain" (citations and internal quotation marks omitted)); *Seila Law*, 140 S. Ct. at 2211 ("Constitutional avoidance is not a license to rewrite Congress's work to say whatever the Constitution needs it to say in a given situation.").

Consider the text of 42 U.S.C. § 299b-4(a)(6):

> All members of the Task Force convened under this subsection, and any recommendations made by such members, shall be independent and, to the extent practicable, not subject to political pressure.

42 U.S.C. § 299b-4(a)(6). The idea that the Secretary can "direct" and "supervise" the Task Force members is incompatible with the statutory guarantees of "independence" and immunity from "political pressure." The defendants hang their hat on the phrase "to the extent practicable," which they say can be read to "ensure conformity with constitutional requirements." Appellants Br. at 25. But that qualifier attaches *only* to the requirement that Task Force members be shielded from "political pressure." The command that Task Force members and recommendations "shall be independent" is absolute, and there is no statutory language that gives the Secretary wiggle room to compromise the independence required by 42 U.S.C. § 299b-4(a)(6) and 42 U.S.C. § 299b-4(a)(1). The defendants do not explain how the Task Force members (and recommendations) can simultaneously be "independent" yet subject to the "direction" and "supervision" of the Secretary. Does anyone think the Federal Reserve would remain "independent" if the Secretary of the Treasury could "direct" and "supervise" its decisions?

The defendants also claim that 42 U.S.C. § 202 and 42 U.S.C. § 300gg-13(b) allow the Secretary to "direct" and "supervise" the Task Force. *See* Appellants' Br. at 24. Neither statute does any such thing. 42 U.S.C. § 202 says that:

> The Public Health Service in the Department of Health and Human Services shall be administered by the Assistant Secre-

tary for Health under the supervision and direction of the Secretary.

42 U.S.C. § 202. This places the Assistant Secretary for Health under the Secretary's "supervision" and "direction," but it does not empower the Secretary to supervise or direct the Task Force or any other component of the Public Health Service. The Assistant Secretary for Health, whom the Secretary supervises and directs, is charged only with *administering* the Public Health Service. The responsibility to "administer" does not empower the Assistant Secretary for Health or his commanding officers to direct and supervise a Task Force that the law requires to be "independent" and free from "political pressure." 42 U.S.C. § 299b-4(a)(6); *Cleavinger v. Saxner*, 474 U.S. 193, 203 (1985) ("direct subordinates" whose decisions are subject to review cannot be "'independent'"); *Black's Law Dictionary* (11th ed. 2019) (defining "administer" as "[t]o provide or arrange (something) officially as part of one's job").

And 42 U.S.C. § 300gg-13(b) merely requires the Secretary to establish a "minimum interval" between the issuance of a Task Force recommendation and the plan year in which private insurers must cover the recommended care. This does not empower to Secretary to "direct" or "supervise" the Task Force or its work; it allows him only to decide *when* the Task Force recommendations (which he is powerless to revoke) become binding.

The final problem with the defendants' argument is they never make clear *how much* control the Secretary should have over the Task Force. They

want this Court to bend the language of 42 U.S.C. § 299b-4(a)(6) to give the Secretary just enough control to make the Task Force members into "inferior officers," but not so much control as to render their proposed interpretation of 42 U.S.C. § 299b-4(a)(6) textually implausible. *See* Appellants' Br. at 27. But where exactly is that line to be drawn? And how much "independence" and protection from "political pressure" should 42 U.S.C. § 299b-4(a)(6) preserve? The defendants never provide a clear answer to these questions, which is understandable since the answer ultimately depends on this Court's understanding of the minimum amount of "direction" or "supervision" needed for inferior-officer status. But the Court will need to make clear what exactly the Secretary is and is not permitted to do if it waters down 42 U.S.C. § 299b-4(a)(6)'s commands and allows the Secretary to interfere with the Task Force and its work.

## II. The District Court Correctly Held That The Secretary's Attempted "Ratification" Of The Task Force's Recommendations Could Not Cure The Unconstitutional Appointment Of Its Members

The defendants contend that the Appointments Clause problems have been obviated by Secretary Becerra's memo of January 21, 2022, which purports to ratify the preventive-care coverage mandates previously imposed by the Task Force. *See* Appellants' Br. at 27-30; ROA.1094. The district court correctly rejected this argument.

**A.    The Secretary Cannot "Ratify" The Task Force Recommendations Because The Secretary Has No Authority To Decide The Preventive Care That Private Insurers Must Cover Under 42 U.S.C. § 300gg-13(a)(1)**

The Secretary cannot ratify the Task Force recommendations unless he had authority to issue those recommendations himself. *See NRA Political Victory Fund*, 513 U.S. at 98 ("'[I]t is essential that the party ratifying should be able not merely to do the act ratified at the time the act was done, *but also at the time the ratification was made.*'" (quoting *Cook v. Tullis*, 85 U.S. (18 Wall.) 332, 338 (1874) (emphasis in original))); ROA.1794. The Secretary also cannot ratify the Task Force's preventive-care recommendations unless he "has the power to conduct an independent evaluation of the merits and does so." *Wilkes-Barre Hospital Co. v. NLRB*, 857 F.3d 364, 371 (D.C. Cir. 2017).

Yet Secretary Becerra is powerless to ratify or reject the preventive-care recommendations of the Task Force, or to conduct an "independent evaluation" of those recommendations, because the law does not allow him to decide the "items" or "services" that private insurers must cover under 42 U.S.C. § 300gg-13(a)(1). The statute makes clear that the Secretary must require coverage of items or services that receive "A" or "B" ratings from the Task Force, whether he approves of those decisions or not:

> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for —

(1) evidence-based items or services that have in effect a rating
of "A" or "B" in the current recommendations of the United
States Preventive Services Task Force;

42 U.S.C. § 300gg-13(a)(1). So the Secretary's purported "ratification" is a

meaningless act; it is nothing more than an acknowledgment of the statutory

obligations imposed upon him by 42 U.S.C. § 300gg-13(a)(1), as well as his

impotence to influence or override the Task Force recommendations under

42 U.S.C. § 299b-4(a)(6).[6]

If 42 U.S.C. § 300gg-13(a)(1) (or some other law) authorized the Secre-

tary to override the Task Force's recommendations and decide the preven-

tive care that private insurers must cover, then the defendants could plausibly

argue that the Secretary's ratification cures the Appointments Clause viola-

tion and allows them to enforce the Task Force recommendations as the

handiwork of Secretary Becerra. *See Guedes v. Bureau of Alcohol, Tobacco,

Firearms, and Explosives*, 920 F.3d 1, 11 (D.C. Cir. 2019) (rejecting Appoint-

ments Clause challenge when the disputed agency rule had been "inde-

pendently ratified by Attorney General William Barr, whose valid appoint-

ment *and authority to ratify* is unquestioned." (emphasis added)); 18 U.S.C.

§ 926(a) (empowering the Attorney General to "prescribe" the agency rule at

issue in *Guedes*); 26 U.S.C. §§ 7801(a)(1), 7801(a)(2)(A), 7805(a) (same). But

*Guedes* is no help to the defendants because there is no statute empowering

---

6.    The defendants acknowledge that "[t]he Secretary may not, consistent
with 42 U.S.C. § 299b-4(a)(6), direct that the PSTF give a specific pre-
ventive service an 'A' or 'B' rating, such that it would be covered pursu-
ant to 42 U.S.C. § 300gg-13(a)(1)." ROA.1746.

Secretary Becerra to impose preventive-care coverage mandates, or to ratify or overrule the recommendations of the Task Force. *See Kajmowicz v. Whitaker*, 42 F.4th 138, 147 (3d Cir. 2022) (ratification by a lawfully appointed official must be done "in accordance with the law"). And the other ratification cases that the defendants cite involved situations in which the ratifying officer had unquestioned authority to undertake the disputed action himself.[7] None of that helps the defendants in this case, where the Secretary not only lacks

---

7.  In *Moose Jooce v. FDA*, 981 F.3d 26 (D.C. Cir. 2020), Congress authorized the Secretary of Health and Human Services to regulate the manufacture, sale, and distribution of tobacco products. *Id.* at 27. The Secretary delegated this rulemaking authority to the FDA Commissioner, who re-delegated these powers to FDA's Associate Commissioner for Policy. *Id.* When litigants challenged a rule issued by the Associate Commissioner on the ground that he had been unconstitutionally appointed, the FDA Commissioner ratified the disputed rule and obviated the Appointments Clause challenge. *Id.* at 27-30. But the FDA Commissioner held the undisputed authority to issue this rule, as that power had been explicitly delegated to him by Congress through the Secretary. *Id.* at 27; *Kajmowicz v. Whitaker*, 42 F.4th 138, 151 (3d Cir. 2022) ("[M]ost statutes that confer authority will permit subdelegation"); *see also id.* at 147 (allowing Senate-confirmed Attorney General to ratify a rule issued by an acting predecessor when it was undisputed that the AG had "authority to take the action to be ratified" (citation and internal quotation marks omitted)); *NLRB v. Newark Electric Corporation*, 14 F.4th 152, 162-63 (2d Cir. 2021) (allowing NLRB General Counsel to ratify action taken by his acting predecessor after concluding that the General Counsel "possess[ed] the authority necessary to undertake the ratified act at the time of ratification"); *CFPB v. Gordon*, 819 F.3d 1179, 1191-92 (9th Cir. 2016) (allowing Senate-confirmed agency director to ratify a past action that he took as a recess appointee because the agency "had the authority to bring the action at the time").

authority but is statutorily *forbidden* to tinker with the Task Force recommendations or impose preventive-care coverage mandates of his own accord.

There is another way of describing this problem. The doctrine of ratification applies only when "a principal sanctions the prior actions of its purported agent." *Wilkes-Barre Hospital*, 857 F.3d at 371 (citation and internal quotation marks omitted); *see also Moose Jooce*, 981 F.3d at 28 ("Ratification occurs when a principal sanctions the prior actions of its purported agent."); *NRA Political Victory Fund*, 513 U.S. at 99 (tying the doctrine of ratification to "principles of agency law"); ROA.1794 (same). Yet there cannot be an "agency" relationship between the Secretary and the Task Force when 42 U.S.C. § 299b-4(a)(6) commands that the Task Force and its recommendations be "independent" and (to the extent practicable) "not subject to political pressure."

The defendants never acknowledge that a ratifying officer must have lawfully delegated authority to undertake the act he is seeking to ratify. *See* Appellants' Br. at 27-30. And they do not explain how Secretary Becerra could have wielded powers that 42 U.S.C. § 300gg-13(a)(1) and 42 U.S.C. § 299b-4(a)(6) vest exclusively in the Task Force. Nor do they acknowledge the need to demonstrate a principal-agent relationship between the Secretary and the Task Force, and they obfuscate by suggesting that the Secretary need only show that the Task Force members are his "subordinates" rather than his agents. *See* Appellants' Br. at 28 ("[P]roperly appointed officers may validly

ratify the acts of their *subordinates* or their predecessors." (emphasis added));
*id.* at 29 ("[T]he Secretary may ratify the actions of his subordinates.").

The closest that the defendants come to addressing these problems is a plea to "interpret" 42 U.S.C. § 299b-4(a)(6) in a manner that empowers the Secretary to "review" Task Force recommendations before they take effect. *See* Appellant's Br. at 29-30 ("42 U.S.C. § 299b-4(a)(6) . . . does not prohibit the Secretary from reviewing Task Force 'A' and 'B' recommendations as necessary before they become effective under 42 U.S.C. § 300gg-13."). This is not statutory interpretation but statutory revision. 42 U.S.C. § 300gg-13(b) specifically addresses the Secretary's role vis-à-vis the Task Force recommendations, and it empowers him only to establish a minimum interval of time before the "A" and "B" recommendations become binding on private insurers—not to review or "ratify" the Task Force's work. And a Task Force whose recommendations are subject to review by the Secretary is no longer "independent," as required by 42 U.S.C. § 299b-4(a)(1) and (a)(6).

### B.    Secretary Becerra's Ratification Document Failed To Go Through Notice-And-Comment Procedures And Is Arbitrary And Capricious

Even if one were to imagine that Secretary Becerra has lawful authority to exercise powers that 42 U.S.C. § 300gg-13(a)(1) vests exclusively in the Task Force, his ratification memo would remain ineffective because it failed to go through notice-and-comment procedures. The ratification document is a "rule" under 5 U.S.C. § 551(4), and the APA requires rules to go through no-

tice-and-comment procedures unless a statutory exception applies. *See* 5 U.S.C. § 553. None of the statutory exceptions are applicable. The memo cannot be fobbed off as an "interpretative rule" because it affects individual rights and obligations,[8] and it makes no finding of "good cause" to dispense with the notice-and-comment requirements. *See* 5 U.S.C. § 553(b)(3)(B). So the defendants must explain how this Court can give legal effect to a "rule" that never went through notice and comment, no small task when the "'APA's notice and comment exemptions must be narrowly construed.'" *Professionals and Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) (quoting *United States v. Picciotto*, 875 F.2d 345, 347 (D.C. Cir. 1989)); *Shell Offshore*, 238 F.3d at 628 (rules that fail to use required notice-and-comment procedures are "invalid"). The defendants must also show how the Secretary's ratification memo can survive arbitrary-and-capricious review when it never explains its reasoning and treats the previous decisions as a fait accompli. *See Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1912 (2020); *Butte County v. Hogen*, 613 F.3d 190, 195 (D.C. Cir. 2010).

---

8.  *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 628 (5th Cir. 2001) ("Legislative or substantive rules are those which 'affect individual rights and obligations.'" (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 303 (1979)); *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 240-41 (5th Cir. 2023) (explaining distinction between "legislative" and "interpretive" rules).

### III. The Secretary Cannot Obviate The Appointments Clause Violation By Reappointing The Task Force Members

The defendants are attempting to shield the *future* recommendations of the Task Force from constitutional challenge by having Secretary Becerra reappoint its members. *See* Appellants' Br. at 30. The Court should reject this maneuver because: (1) The Task Force members are principal officers who must be appointed by the President and Senate, *see* Part I, *supra*; and (2) If the Task Force members are inferior officers, there is no congressional enactment that alters the constitutional default rule by "vesting" appointment powers in the Secretary.

It is not enough for the defendants to declare the Task Force members inferior officers and arrange for their reappointment by a Head of Department. They must also identify a "Law" that exempts the Task Force from the presumed appointment process by "vesting" the relevant appointment powers in Secretary Becerra. Otherwise the Task Force members must be appointed by the President and Senate—*even if* they qualify as "inferior officers." *See Edmond*, 520 U.S. at 662-63 ("The prescribed manner of appointment for principal officers is also the default manner of appointment for inferior officers.").

### A. 42 U.S.C. § 299b-4(a)(1), By Instructing The Director Of AHRQ To "Convene" The Task Force, Does Not Alter The Presumptive Constitutional Appointment Process

The defendants appear to believe that 42 U.S.C. § 299b-4(a)(1) exempts the Task Force from the requirement of Presidential appointment with Senate confirmation. But 42 U.S.C. § 299b-4(a)(1) says (in relevant part):

> The Director shall convene an independent Preventive Services
> Task Force . . . to be composed of individuals with appropriate
> expertise.

42 U.S.C. § 299b-4(a)(1). The statute is silent on who appoints the Task Force members. And instructing the Director to "convene" a Task Force does not depart from Article II's presumption that "officers of the United States" will be appointed by the President and Senate.

The prerogative to "convene" does not encompass a power to "appoint" officers of the United States without the Senate's advice and consent. "Convene," when used as a transitive verb, means "[t]o call together, esp. for a formal meeting; to cause to assemble." *Black's Law Dictionary* (11th ed. 2019); *see also* Convene, Merriam-Webster, https://www.merriam-webster.com/dictionary/convene [https://perma.cc/QDS6-899D] (defining the transitive verb "convene" as "1. to summon before a tribunal" and "2. to cause to assemble"). It is always possible that the convening authority might also decide to appoint the individuals that he convenes, as the Director of AHRQ has done with the Task Force. *See* Appellants' Br. 5. But "convening" is not "appointing," and "appointing" is not "convening." The President and the Senate do not "convene" the Supreme Court when they appoint its members, and the President does not "appoint" his cabinet when he convenes it for meetings.

Statutes throughout the U.S. Code require officials to "convene" committees and councils while forbidding those officials to appoint the convened

officials.[9] Other statutes require officials to "convene" entities while separately authorizing or instructing those officials to appoint the members of the convened body.[10] We have provided the text of these (and many other) statutes in Parts II and III of the appendix. All of this shows that the power to "convene" does not encompass the power to unilaterally appoint individuals who qualify as "officers of the United States," and it does not alter the constitutional default rule for appointing those officers. The President can "convene" his cabinet for weekly meetings, but that does not mean he can unilaterally appoint his cabinet without the Senate's advice and consent. Article II governs the appointment of the Task Force, just as it governs the appointment of the President's cabinet, and the Director's duty to "convene" the Task Force does not change the presumptive method of appointment under Article II.

---

9.  *Compare* 22 U.S.C. § 4831(a)(1) ("[T]he Secretary of State shall convene a Security Review Committee" in response to a "serious security incident") *with* 22 U.S.C. § 4831(a)(2)(A)-(E) (designating certain individuals who must serve on the Security Review Committee regardless of the Secretary's wishes); *see also* 15 U.S.C. § 634c(b)(2)(A) (requiring the Small Business Administrator's Chief Counsel for Advocacy to "convene" an Interagency Working Group, for which she cannot appoint members); App. Part II.

10. *Compare* 10 U.S.C. § 611 ("[T]he Secretary of the military department concerned shall convene selection boards.") *with* 10 U.S.C. § 612 ("Members of selection boards shall be appointed by the Secretary of the military department concerned in accordance with this section."); *see also* App. Part III.

There was nothing wrong with the Director of ARHQ assuming the power to appoint the Task Force before the Affordable Care Act. The Task Force served a purely advisory function until the ACA gave binding force to its "A" and "B" recommendations, and the Constitution has nothing to say about the appointment of advisory committees. *See Constitutional Limitations on Federal Government Participation in Binding Arbitration*, 19 Op. O.L.C. 208, 216 (1995) ("[T]he members of a commission that has purely advisory functions 'need not be officers of the United States'" (citation omitted)); Brian D. Feinstein & Daniel J. Hemel, *Outside Advisers Inside Agencies*, 108 Geo. L.J. 1139, 1200 & n.340 (2020). The statutory silence on the appointment prerogative allowed the Director, who is charged with administering 42 U.S.C. § 299b-4, to fill this gap by assigning the appointment power to himself. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984). But once the Task Force members became "officers of the United States," the Appointments Clause took over and imposed a constitutional default rule for their appointment—and only a congressional enactment that "vests" the appointment of the Task Force in the President alone, in the Courts of Law, or in the Heads of Department can alter this presumptive appointment method.

Interpreting the word "convene" to include an appointment prerogative also renders 42 U.S.C. § 299b-4(a)(1) unconstitutional, because it would instruct the Director of ARHQ (who is not a Head of Department) to appoint officers in violation of Article II. *Edmond* requires this Court to reject any

such construction of section 299b-4(a)(1). The petitioners in *Edmond* argued that 10 U.S.C. § 866(a), which requires the Coast Guard Judge Advocate General to "establish" a military court of criminal appeals and "assign" military judges to that court, empowered the Judge Advocate General to appoint those judges. But the Court refused to interpret "establish" and "assign" to encompass an appointment prerogative, because that interpretation would make 10 U.S.C. § 866(a) unconstitutional:

> [W]e see no other way to interpret [10 U.S.C. § 866(a)] that would make it consistent with the Constitution. Under the Appointments Clause, Congress could not give the Judge Advocates General power to "appoint" even inferior officers of the United States; that power can be conferred only upon the President, department heads, and courts of law. Thus, petitioners are asking us to interpret [10 U.S.C. § 866(a)] in a manner that would render it clearly unconstitutional—which we must of course avoid doing if there is another reasonable interpretation available.

*Edmond*, 520 U.S. at 658. *Edmond* controls here, and it compels an interpretation of "convene" that does not include an appointment power over the Task Force.

### B. Even If "Convene" Includes The Power To Appoint, Neither 42 U.S.C. § 299b-4(a)(1) Nor Any Other Law "Vests" The Appointment Power In Secretary Becerra

There is an additional reason why Secretary Becerra cannot escape future Appointments Clause issues by reappointing the Task Force. Even if one interprets the word "convene" in 42 U.S.C. § 299b-4(a)(1) to include an appointment power, that *still* cannot alter the constitutional default rule be-

cause Congress has not "vested" the appointment power in a Head of Department.

The defendants do not (and cannot) claim that 42 U.S.C. § 299b-4(a)(1) "vests" the appointment power in Secretary Becerra. But they try to fix this problem by pointing to other statutes—and insisting that those statutes, together with section 299b-4(a)(1), "authorize" the Secretary to appoint the Task Force. *See* Appellants' Br. at 30-35. The first of these statutes instructs the Secretary to "carry out" the subchapter that establishes the Task Force by "acting through the Director" of AHRQ:

> There is established within the Public Health Service an agency to be known as the Agency for Healthcare Research and Quality, which shall be headed by a director appointed by the Secretary. The Secretary shall carry out this subchapter acting through the Director.

42 U.S.C. § 299(a). The defendants also rely on HHS's Reorganization Plan No. 3 of 1966, which authorizes the Secretary to perform "all functions of the Public Health Service . . . and of all other officers and employees of the Public Health Service." 80 Stat. 1610.[11]

The problem for the defendants is that neither statute "vests" the appointment of Task Force members in the Secretary; they merely allow him to commandeer the Director's powers *if* the Secretary chooses to. So if 42

---

11. This statute does not appear to authorize the Secretary to perform the functions of the Task Force itself. *See* 80 Stat. 1610 ("This section shall not apply to the functions vested by law in any advisory council . . . in the Public Health Service."); 42 U.S.C. § 299b-4(a)(6).

U.S.C. § 299b-4(a)(1) confers an appointment power, that power remains "vested" in the Director, while the Secretary has nothing more than an option to exercise the Director's powers given his supervisory role over the Department. The situation is no different from a statute that confers an appointment power on an executive-branch bureaucrat that the President can direct and control. That the President retains an option to exercise powers that Congress has vested in someone else does not mean that Congress has "vested" an appointment power in the President. If the defendants' argument were accepted, then every statute that vests an appointment power in someone subject to the President's direction is also "vesting" that appointment prerogative in the President himself. *See Removal of Assistant Postmaster of Washington, D.C.*, 17 U.S. Op. Att'ys Gen. 475, 475 (1882) (rejecting this idea); *Mow Sun Wong v. Hampton*, 435 F. Supp. 37, 42 n.6 (N.D. Cal. 1977) (same).

None of the cases cited by the defendants support their claim that Congress has "vested" the appointment of the Task Force in the Secretary. In *United States v. Hartwell*, 73 U.S. 385 (1867), the statute *required* the Secretary of the Treasury to approve any appointment made by the assistant treasurer:

> The assistant treasurer of the United States at Boston is hereby authorized to appoint, *with the approbation of the Secretary of the Treasury*, . . . clerk[s] . . . .

14 Stat. 202 (emphasis added) (cited in *Hartwell*, 73 U.S. at 393). *Hartwell* held that the clerks were constitutionally appointed because Congress compelled the Treasury Secretary to approve his subordinate's appointments, thereby "vesting" the appointment power in a "Head of Department." There is no similar statute requiring Secretary Becerra's "approbation" before a Task Force member is appointed; on the contrary, the statutes are indifferent toward whether the Secretary has any involvement in the appointments. That falls far short of "vesting" the appointment of the Task Force in the Secretary.[12]

*Edmond* held that Congress had "vested" the appointment of civilian Coast Guard judges in the Secretary of Transportation, but only because 49 U.S.C. § 323(a) specifically conferred a broad appointment power on the Secretary of Transportation, allowing him to appoint all "'officers and employees of the Department of Transportation.'" *Edmond*, 520 U.S. at 656 (quoting 49 U.S.C. § 323(a)). Crucial to the holding in *Edmond* was that there were no statutes authorizing anyone else to appoint the Coast Guard judges. *Id.* at 656-57 (rejecting the claim that 10 U.S.C. § 866(a) allowed the Judge Advocate General to appoint the judges). *Edmond* recognizes that Congress "vests" the appointment power in a Head of Department when it explicitly

---

12. In *Kennedy v. United States*, 146 F.2d 26 (5th Cir. 1944), the parties had stipulated that the plaintiff had been appointed "with the approval of the Secretary of the War Department." *Id.* at 28. The parties did not contest whether Congress had "vested" this authority in the Secretary of War, and the Court did not rule on the issue.

authorizes a cabinet secretary to appoint and when no other statute can be construed to vest the appointment power in a different officer. It has no application here, where the defendants cannot identify any statute mentioning appointments or even suggesting a departure from the constitutional default rule.

*Willy v. Administrative Review Board*, 423 F.3d 483 (5th Cir. 2005), is more helpful to the defendants' position because it allowed the Secretary of Labor to create an Administrative Review Board and appoint its members based on vague but sweeping language in a statutory reorganization plan and 5 U.S.C. § 301, neither of which mentioned the appointment power. *See Willy*, 423 F.3d at 491-92. But *Willy* is wrongly decided and its holding should be construed as narrowly as possible. The statutory reorganization plan in *Willy* provided only that:

> [T]he Secretary of Labor may from time to time make such provisions as he shall deem appropriate authorizing the performance by any other officer, or by any agency or employee, of the Department of Labor of any function of the Secretary.

*Id.* at 492 (quoting Reorg. Plan No. 6 of 1950, § 2, 15 Fed. Reg. 3174 (1950), 64 Stat. 1263). And 5 U.S.C. § 301 merely authorized the Labor Secretary to "'prescribe regulations for the government of his department . . . [and] the distribution and performance of its business. . . .'" *Id.* (quoting 5 U.S.C. § 301). None of that alters the constitutional default rule requiring "officers of the United States" to be appointed by the President and the Senate. Even if these statutes authorize the Labor Secretary to *create* an Administrative

Review Board, as the *Willy* Court held, they do not change the constitutional requirement that "officers of the United States" are appointed by the President and the Senate—because neither statute says anything about appointments and does not purport to transfer any of the President and the Senate's appointment powers. If the Labor Secretary wants to create a new entity and imbue its members with "significant authority pursuant to the laws of the United States,"[13] then he must respect the default method of appointment in Article II until Congress enacts statutory language opting out of that default rule and *vesting* the Secretary with an appointment prerogative. Statutes that merely authorize the Secretary to "make . . . provisions" and "prescribe regulations" won't cut it, especially when those statutes say nary a word about appointments and do not even appear to authorize appointments.

*Willy* is also incompatible with the Supreme Court's binding pronouncement in *Myers*, which it never cites, and which holds that exceptions to the default method of appointment in Article II are to be "strictly construed, and not to be extended by implication":

> [A]rticle 2 excludes the exercise of legislative power by Congress to provide for appointments and removals, except only as granted therein to Congress in the matter of inferior offices; that Congress is only given power to provide for appointments and removals of inferior officers after it has vested, and on condition that it does vest, their appointment in other authority than the President with the Senate's consent; that the provisions of the second section of article 2, which blend action by the legislative

---

13.  *Buckley*, 424 U.S. at 126.

branch, or by part of it, in the work of the executive, *are limitations to be strictly construed, and not to be extended by implication*;

*Myers*, 272 U.S. at 165 (emphasis added).

The rule of orderliness prevents this panel from overruling *Willy*. *See Wilson v. Taylor*, 658 F.2d 1021, 1034 (5th Cir. 1981). So we are not asking the panel to overrule *Willy* but to construe it narrowly and distinguish it. And *Willy* can be distinguished from this case on many grounds. First, 42 U.S.C. § 299b-4(a)(1) instructs the Director of AHRQ and not the Secretary to "convene" the Task Force. So to the extent that 42 U.S.C. § 299b-4(a)(1) confers an appointment power over the Task Force, it "vests" those appointing powers in the Director, while leaving the Secretary with nothing more than an option to exercise powers that Congress has vested in someone else. No statute of that sort affected the "vesting" analysis in *Willy*.

There is another difference between this case and *Willy*: The Secretary of Health and Human Services neither appointed the Task Force members nor formally delegated his supposed appointment powers until the plaintiffs sued. This shows that no Secretary until now regarded these statutes as "vesting" him with the power to appoint the Task Force. The executive's longstanding refusal to construe these statutes as "vesting" the appointment power in the Secretary (as opposed to the Director of AHRQ) cuts against its attempt to do so for the first time now. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023) (disapproving an agency interpretation that was inconsistent with "past practice under the statute.").

Finally, Congress enacted HHS's Reorganization Plan No. 3 in 1966, before Congress created the Task Force or placed it within the Public Health Service. So the "functions of the Public Health Service" that Congress "transferred" to the Secretary in 1966 did not include the power to appoint the Task Force, which did not exist at the time.[14] And the section allowing the Secretary to "make . . . provisions" regarding the functions transferred to him[15] does not empower him to do anything regarding the Task Force, because that was not a "function" transferred to him in 1966. So the defendants cannot claim that Congress's enactment of Reorganization Plan No. 3 "vests" the Secretary with powers over the Task Force in any way.[16]

---

14. *See* Reorganization Plan No. 3 of 1966, § 1(a), 80 Stat. 1610 ("Except as otherwise provided in subsection (b) of this section, there are hereby transferred to the Secretary of Health, Education, and Welfare . . . all functions of the Public Health Service . . . and of all other officers and employees of the Public Health Service . . . .")

15. *See* Reorganization Plan No. 3 of 1966, § 2, 80 Stat. 1610 ("The Secretary may from time to time make such provisions as he shall deem appropriate authorizing the performance of any of the functions transferred to him by the provisions of this reorganization plan by any officer, employee, or agency of the Public Health Service or of the Department of Health, Education, and Welfare.").

16. If the Court is unwilling to distinguish *Willy* on these grounds, then we respectfully preserve our arguments against *Willy* for consideration by the en banc court or the Supreme Court.

## IV. The District Court Correctly Refused To Remedy The Appointments Clause Violations By "Severing" 42 U.S.C. § 299b-4(a)(6)

The defendants insist that the district court should have remedied the Appointments Clause violations by "severing" the statutory provision that guarantees the independence of the Task Force and prohibits political interference with its recommendations, thereby "permitting" the Secretary "to review and reject Task Force 'A' and 'B' recommendations before they would become effective under § 300gg-13." Appellants' Br. at 37. This remedy is unlawful for many reasons.

### A. The Defendants' Proposed Remedy Does Not Cure The Appointments Clause Violations

The first problem is that a regime in which the Secretary is "permitted" to countermand the "A" or "B" recommendations of the Task Force still violates the Appointments Clause. The defendants' proposed remedy would allow the Secretary to overrule the Task Force's "A" and "B" recommendations but not their failure to recommend coverage of items or services under 42 U.S.C. § 300gg-13(a)(1). *See* Appellants' Br. at 37 ("[T]he limitations in § 299b-4(a)(6) . . . can be severed to the extent of permitting the Secretary to review and reject Task Force 'A' and 'B' recommendations before they would become effective"). This would create a regime in which *both* the Secretary and the Task Force have gatekeeping functions in deciding which preventive care the private insurers must cover.

But that means the Task Force will still wield "significant authority pursuant to the laws of the United States,"[17] because preventive-care mandates cannot and will not take effect without its recommendation and approval.[18] And it does not make the Task Force members into "inferior officers," because no principal officer has any ability to review or countermand their decisions *not* to adopt an "A" or "B" recommendation. *See Arthrex*, 141 S. Ct. at 1981. Moreover, even if the defendants' proposed remedy converted the Task Force members into "inferior officers," their appointment would *still* violate the Constitution because Congress has not opted out of the default method of appointment in Article II. *See* section III, *supra*.

The situation in *Arthrex* was different because the court-imposed remedy made *every* decision by the Administrative Patent Judges reviewable by the Director of the Patent and Trademark Office—regardless of which direction the decision took. A decision denying the validity of a patent was subject to plenary review by the Senate-confirmed Director in the same manner as a decision upholding the patent's validity. *See Arthrex*, 141 S. Ct. at 1986 ("Decisions by APJs must be subject to review by the Director."). The defendants' proposed remedy, by contrast, allows for principal-officer review only of decisions to recommend preventive-care coverage, and it leaves the Task Force

---

17. *Buckley*, 424 U.S. at 126.

18. *See* notes 4 and 6, *supra*, and accompanying text. The defendants appear to acknowledge that their proposed remedy would not strip Task Force members of their status as "officers." *See* Appellants' Br. at 38 (describing the Task Force members as "inferior officers").

with unreviewable discretion when it declines to recommend new coverage mandates.[19] There was also no dispute in *Arthrex* that Congress had properly "vested" the appointment of the Administrative Patent Judges in the Secretary of Commerce, thereby opting out of the default rule established in Article II. *See* 35 U.S.C. § 6(a) ("The administrative patent judges shall be . . . appointed by the Secretary"); *Arthrex, Inc.*, 141 S. Ct. at 1977 ("The Secretary of Commerce appoints . . . the APJs").[20] In this case, the Task Force members are not properly appointed "inferior officers" because they were appointed by the Director of AHRQ, who is not a Head of Department, and

---

19. The defendants' reliance on *Free Enterprise Fund*, 561 U.S. 477, and *Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332 (D.C. Cir. 2012), is misplaced for the same reason, as there was no dispute that the court-imposed remedies in those cases would completely eliminate the Appointments Clause violations. *Id.* at 1340 ("[I]nvalidating and severing the restrictions on the Librarian's ability to remove the CRJs eliminates the Appointments Clause violation"); *Free Enterprise Fund*, 561 U.S. at 510 ("[Because] the statutory restrictions on the Commission's power to remove Board members are unconstitutional and void . . . we have no hesitation in concluding that under *Edmond* the Board members are inferior officers whose appointment Congress may permissibly vest in a 'Hea[d] of Departmen[t].'").

20. The same was true in *Free Enterprise Fund*, where Congress unambiguously "vested" the appointment of the Public Company Accounting Oversight Board in the SEC (a Head of Department), *see* 15 U.S.C. § 7211(e)(4)(A) ("[T]he Commission . . . shall appoint the chairperson and other initial members of the Board"), and in *Intercollegiate Broadcasting*, where Congress unambiguously "vested" the appointment of Copyright Royalty Judges in the Librarian of Congress, a Head of Department, *see* 17 U.S.C. § 801(a) ("The Librarian of Congress shall appoint . . . Copyright Royalty Judges").

there is no statute vesting their appointment in the President alone, the Courts of Law, or the Heads of Department. *See* section III, *supra*.

### B.    A District Court Cannot Enter A Judgment That Formally Revokes A Statutory Provision Or Confers New Powers On A Cabinet Secretary

There is a more serious problem with the defendants' proposed remedy: A federal district court has no power to cancel the statutory provision in 42 U.S.C. § 299b-4(a)(6) or confer new powers on a cabinet secretary. A district court's remedial tools extend to declaratory judgments, injunctions, APA remedies, and writs—and these remedies are limited by statute and historical practice. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 535 (2021). The defendants do not explain how their proposed remedy fits into any of these categories.

The defendants want a judgment that would "sever"[21] 42 U.S.C. § 299b-4(a)(6) and allow Secretary Becerra to disregard it, thereby "permitting the

---

21.  The defendants are misusing the terms "sever" and "severance." A court "severs" a statute when it separates and preserves its constitutional portions or applications in response to a constitutional problem, rather than declaring the entire statutory enactment unconstitutional across the board. *See Leavitt v. Jane L.*, 518 U.S. 137, 138 (1996). Everyone agrees that 42 U.S.C. § 299b-4(a)(6) is "severable" in that sense of the word, and no one is suggesting that the entire Affordable Care Act should be declared unconstitutional because of the Appointments Clause problems in 42 U.S.C. § 300gg-13(a)(1). The defendants are using the word "sever" to mean something akin to "nullify" or "invalidate." We respectfully urge the Court to avoid the defendants' nomenclature, which is imprecise and misleading.

Secretary to review and reject Task Force 'A' and 'B' recommendations." Appellants' Br. at 37. But it is impossible to see how this proposed remedy could take the form of a declaratory judgment, injunction, APA remedy, or writ. The Declaratory Judgment Act authorizes courts to declare only "the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). It does not empower courts to opine on issues of law in the abstract, and it does not authorize them to veto or erase statutory provisions. *See NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 448 (5th Cir. 2022) ("[T]he judicial power vested in us by Article III does not include the power to veto statutes."); *id.* at 449 ("'[C]ourts have no authority to strike down statutory text'" (citation omitted)).[22] The only "interested part[ies]" seeking a declaration of their "rights and "legal relations" are the plaintiffs, and Secretary Becerra has not counterclaimed for a declaration of *his* "rights" or "legal relations." So a court cannot use the Declaratory Judgment Act to impose the remedy that the defendants suggest.

It is likewise impossible to craft an injunction that imposes the remedy envisioned by the defendants. Injunctions restrain litigants from violating the law or order litigants to comply with the law. Yet the defendants' remedy

---

22. *Intercollegiate Broadcasting* claimed a power to "invalidate" a statutory provision limiting the Librarian of Congress's removal powers. *Intercollegiate Broadcasting*, 684 F.3d at 1342 ("[W]e invalidate and sever the portion of the statute limiting the Librarian's ability to remove the Judges."). That is a textbook example of the writ-of-erasure fallacy; the judiciary has no power to "invalidate" statutes. *NetChoice*, 49 F.4th at 448.

would confer a new and discretionary *power* upon the Secretary—the power to review and veto the Task Force's "A" and "B" recommendations. That regime cannot be imposed through an injunction. Whom would the injunction be directed to, and what would it say? The equitable powers of a federal district court are limited to relief that was "traditionally accorded by courts of equity" when the Constitution was ratified. *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999); *Whole Woman's Health*, 142 S. Ct. at 535. Courts of equity did not create or confer powers for government officials, and the defendants cite no authority to support this idea. Allowing a court judgment to confer new powers on executive-branch officials also violates the separation of powers, as officers must trace their authority to a valid congressional enactment. *See Federal Election Commission v. Ted Cruz for Senate*, 142 S. Ct. 1638, 1649 (2022) ("An agency . . . 'literally has no power to act'—including under its regulations—unless and until Congress authorizes it to do so by statute." (citation omitted)).

The APA allows reviewing courts to "hold unlawful and set aside"[23] agency action, but the defendants are not asking the Court to do that. They are instead asking the Court to *authorize* agency action by conferring powers on the Secretary that Congress has specifically withheld. Nothing in the APA allows courts to award that relief. The APA also permits reviewing courts to "compel agency action unreasonably withheld or unreasonable delayed,"[24]

---

23. 5 U.S.C. § 706(2).
24. 5 U.S.C. § 706(1).

but the defendants are not asking this Court to *compel* the Secretary to do anything. They want the Secretary to be given a *discretionary power* to review and countermand the Task Force's "A" and "B" recommendations. Finally, the defendants do not identify any writ that could be used to impose this remedy under 28 U.S.C. § 1651(a).

The defendants claim their proposed remedy is supported by *Arthrex*. *See* Appellants' Br. at 36-37. But *Arthrex* was an appeal from an agency adjudication, which allowed the Supreme Court to remand to the Acting Director of the PTO to allow him to review decisions of Administrative Patent Judges (APJs). *Arthrex*, 141 S. Ct. at 1987-88 (plurality) ("[A] limited remand to the Director provides an adequate opportunity for review by a principal officer."). This case was initially filed in federal district court, so it cannot be remanded to an agency official—and it certainly cannot be remanded to the Secretary with instructions to review the Task Force recommendations. This Court is reviewing a district court's *judgment*, and it must direct entry of a judgment that awards relief authorized by the Declaratory Judgment Act, the APA, the All Writs Act, or the practice of equity courts.

The Supreme Court also claims a power to announce supreme law in its opinions, which binds all government actors. *See Cooper v. Aaron*, 358 U.S. 1, 18 (1958) ("[T]he interpretation of the [Constitution] enunciated by this Court . . . is the supreme law of the land, and Art. VI of the Constitution makes it of binding effect."). So the Supreme Court may, simply by declaring it so in an opinion that receives five or more votes, purport to render a federal

statutory constraint non-operative and confer new powers on agency officials. *Id*; *Free Enterprise Fund*, 561 U.S. at 509 (purporting to pronounce "removal restrictions . . . invalid"). A federal appellate court has no such power when reviewing a district-court judgment, and the judgment itself has no precedential weight in any forum. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011). An opinion from *this* Court that claims to "sever" (*i.e.*, cancel) 42 U.S.C. § 299b-4(a)(6) is not binding outside the Fifth Circuit, and if the Secretary purports to "override" a Task Force recommendation in reliance on that opinion he could be sued elsewhere and enjoined. So the defendants' proposed remedy will not work unless and until the Supreme Court adopts it.

## C.    The Defendants' Proposed Remedy Will Not Redress The Plaintiffs' Article III Injuries

A final problem with the defendants' remedy is that it will not redress the plaintiffs' Article III injuries, which are caused by the Secretary's *enforcement* of the preventive-care mandates, not by his failure to review or ratify them. ROA.225-231. A remedy that fails to redress the plaintiffs' injuries is incompatible with Article III. *See Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court."); *Collins v. Mnuchin*, 938 F.3d 553, 611 (5th Cir. 2019) (Oldham, J., concurring in part and dissenting in part) ("[O]ur Court does not have the power under Article III to order a remedy that does not redress Plaintiffs' injuries.").

## V. The District Court Correctly Vacated The Unlawful Agency Actions Under 5 U.S.C. § 706(2)(A)

The plaintiffs did not sue as class representatives, so the Court must decide whether they can obtain a universal remedy or whether the judgment must limit relief to the plaintiffs. In considering this question, the Court should distinguish three types of available remedies: (1) Declaratory relief; (2) A remedy that "holds unlawful and sets aside" agency action;[25] and (3) Injunctive relief. Each of these remedies is governed by different sources of law that define their permissible scope.

### A. The Declaratory Judgment Act

A declaratory judgment is a creature of statute, and the scope of a declaratory remedy is described in 28 U.S.C. § 2201(a):

> In a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare *the rights and other legal relations of any interested party seeking such declaration* . . . .

(Emphasis added). Courts rarely consider this statutory text, but it makes clear that a court may declare only: (1) the "rights and other legal relations"; (2) of an "interested party" seeking this declaration. It does not authorize declarations of law in the abstract.

Several implications follow. The first is that declaratory relief must describe the plaintiffs' "rights and other legal relations," rather than abstract pronouncements regarding a statute's constitutionality. An announcement

---

25. 5 U.S.C. § 706(2).

that "42 U.S.C. § 300gg-13(a)(1) violates the Appointments Clause" does not declare the "rights" or "legal relations" of the plaintiffs. The second implication is that courts may declare only the rights and legal relations of a "party" to the lawsuit. *See* David P. Currie, *Misunderstanding Standing*, 1981 Sup. Ct. Rev. 41, 45. Declaratory relief is always litigant-specific, because 28 U.S.C. § 2201 allows a "party" to obtain a declaration of its *own* "rights" and "legal relations" but no one else's.

## B.  The Administrative Procedure Act

The APA authorizes courts to "hold unlawful and set aside" agency action. 5 U.S.C. § 706(2). This veto-like power enables the judiciary to formally revoke an agency's rules, orders, findings, or conclusions—in the same way that an appellate court formally revokes and wipes away an erroneous trial-court judgment. *See Data Marketing Partnership, LP v. United States Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022) ("§ 706 '. . . empowers courts to "set aside"—*i.e.*, formally nullify and revoke—an unlawful agency action.'" (citation omitted)); *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374-75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation.").[26] This remedy is necessarily univer-

---

26. *See* Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L. Rev. 253, 258 (2017); Thomas W. Merrill, *Article III, Agency Adjudication, and the Origins of the Appellate Review Model of Administrative Law*, 111 Colum. L. Rev. 939, 940 (2011); Mila Sohoni, *The Power to Vacate a Rule*, 88 Geo. Wash. L. Rev. 1121, 1126 (2020) ("[T]he APA allows universal vacatur of rules.").

sal because the agency actions themselves are vacated—*i.e.*, "set aside"—which provides relief that benefits non-parties to the lawsuit. *See Data Marketing*, 45 F.4th at 859; *Franciscan Alliance*, 47 F.4th at 374-75; *supra* note 26. The district correctly vacated the "agency actions" taken to implement preventive-care coverage mandates triggered by an "A" or "B" recommendation from the Task Force on after March 23, 2010. ROA.2131.

### C.    Injunctive Relief

The district court also properly enjoined the defendants from implementing the agency actions that it had "set aside." Because this injunction is concomitant to the APA remedy, which formally revoked the contested agency actions, there is no cause for angst over the issuance of a universal injunction. *See Franciscan Alliance, Inc. v. Burwell*, 227 F. Supp. 3d 660, 695 (N.D. Tex. 2016) ("A nationwide injunction is appropriate when a party brings a facial challenge to agency action under the APA." (citing authorities)). The plaintiffs would not be eligible for a universal remedy if they were only challenging the constitutionality of a statute. *See Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931 (1975) ("[N]either declaratory nor injunctive relief can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs"). But a court that "sets aside" agency action is formally revoking and undoing the rule or order, and a universal remedy that restrains implementation of the vacated action is necessary to implement the command of section 706(2).

At least one commentator and three Supreme Court justices deny that the APA's "set aside" language authorizes or requires universal remedies such as vacatur. *See* John Harrison, *Section 706 of the Administrative Procedure Act Does Not Call for Universal Injunctions or Other Universal Remedies*, 37 Yale J. On Reg. Bull. 37, 41 (2020); *United States v. Texas*, 143 S. Ct. 1964, 1981-86 (2023) (Gorsuch, J., concurring in the judgment); *but see* Sohoni, *supra* note 26 (responding to Harrison). But the law of this Court is otherwise,[27] and until this Court repudiates its views it cannot withhold a universal remedy on account of these criticisms.

### D.   The Defendants' Criticisms Of The District Court's Remedy Are Groundless

The defendants' attacks on the district court's remedy are without merit.

#### 1.   The Plaintiffs Are Entitled To An APA Remedy Regardless Of Whether They Specifically Requested It In Their Complaint

The defendants say that the plaintiffs did not "rais[e] an APA claim" in their complaint. *See* Appellants' Br. at 45. But it does not matter whether the pleadings invoked the APA or requested an APA remedy. The court's final judgment "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c); *see also Citizens United v. FEC*, 558 U.S. 310, 333 (2010) (considering the "facial validity" of a statute, even though a facial challenge was never brought);

---

27. *Data Marketing*, 45 F.4th at 859; *Franciscan Alliance*, 47 F.4th at 374-75.

*Driggers v. Business Men's Assurance Co. of America*, 219 F.2d 292, 299 (5th Cir. 1955) ("[T]he final judgment should grant the relief to which plaintiff may prove himself entitled, even if he has not demanded such relief in his pleadings."). And a catch-all request for "other and further relief as the Court may deem just, proper, and equitable" preserves claims or remedies that go unmentioned in the pleadings. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2307 (2016), overruled on other grounds by *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022); *Sapp v. Renfroe*, 511 F.2d 172, 176, n.3 (5th Cir. 1975) (allowing claim for damages raised for first time on appeal given Rule 54(c) and the catchall prayer for relief); ROA.244 (demand for relief).

The plaintiffs' challenge to the constitutionality of 42 U.S.C. § 300gg-13(a)(1) necessarily encompasses a challenge to agency actions taken to implement the statutory command. When a court declares a statute unconstitutional, it enjoins enforcement of not only the statute but also agency rules and actions that implement the disapproved statutory provision. *See Hellerstedt*, 136 S. Ct. at 2319-20. The defendants note that the plaintiffs abandoned a claim that had attacked the Task Force recommendations for failure to use notice-and-comment procedures,[28] but that is irrelevant to whether the plaintiffs can obtain a *remedy* under section 706 in response to the claims on which they have prevailed.

---

28.  Appellants' Br. at 45.

The defendants complain that the district court's judgment sweeps too far by vacating "any and all agency actions" taken to implement or enforce 42 U.S.C. § 300gg-13(a)(1) in response to "A" or "B" Task Force recommendations that post-date the enactment of the ACA. ROA.2131. And they insist that the judgment should have carved out non-final agency actions, which are not subject to judicial review under 5 U.S.C. § 704, as well as agency actions that occurred outside the six-year statute of limitations. *See* Appellants' Br. at 46. But the Task Force's website shows that there were *no* "A" or "B" recommendations issued between March 23, 2010 (the date on which the ACA became law), and March 29, 2014 (six years before March 29, 2020, the date on which the plaintiffs filed suit). *See* bit.ly/45kOsfI [https://perma.cc/BEZ2-HSFQ] (last visited on August 7, 2023). The first post-ACA Task Force recommendation to receive an "A" or "B" grade pertains to breast-cancer screenings, and it was published on January 11, 2016. So it is inconceivable that any of the vacated agency actions occurred outside the six-year limitations period. We agree with the defendants that agency actions that pre-date March 29, 2014, should not be vacated under section 706, but they cannot fault the district court's judgment when there was no possibility of a limitations defense.

We also agree with the defendants that only "final" agency action can be vacated under section 706. *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or

intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."); *Biden v. Texas*, 142 S. Ct. 2528, 2544–45 (2022). The district-court judgment vacates "any and all agency actions," which could be construed to encompass non-final action such as notices of proposed rulemaking. The Court can clarify that only "final" agency actions have been vacated, and it can instruct the district court on remand to modify section 3 of its judgment by inserting the word "final" between "any and all" and "agency action" in each of the two paragraphs. ROA.2131-2132.

The defendants also gesture toward the de facto officer doctrine and claim that courts "should avoid mass invalidation of past administrative actions based solely on a defect in appointment." Appellants' Br. at 46 (citing *Buckley*, 424 U.S. at 142). Yet recent decisions of the Supreme Court have made clear that past cases applying the de facto officer doctrine should be limited to their facts. *See Ryder*, 515 U.S at 184 ("To the extent [*Buckley* and *Connor v. Williams*, 404 U.S. 549 (1972)] may be thought to have implicitly applied a form of the *de facto* officer doctrine, we are not inclined to extend them beyond their facts."). In addition, the plaintiffs are not seeking to vacate the "A" or "B" ratings issued by the Task Force; they are merely seeking to vacate agency actions that implement or enforce preventive-care coverage mandates triggered by those ratings under 42 U.S.C. § 300gg-13(a)(1). ROA.2060-2061. All of these agency actions were undertaken by constitutionally appointed officers. But they are "not in accordance with law" be-

cause the Task Force cannot exercise significant authority pursuant to the laws of the United States, and they must be vacated under the mandatory language of 5 U.S.C. § 706(2)(A). *See* Part V.D.2, *infra*.

### 2.  5 U.S.C. § 706(2) Compels Courts To "Set Aside" (*i.e.*, Vacate) Unlawful Agency Action Regardless of The Balance Of Equities Or The Public Interest

The requirement of 5 U.S.C. § 706 is clear: The Court "shall" (not "may") "hold unlawful and set aside" agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A). Agency actions that implement the Task Force's post-ACA preventive-care recommendations under 42 U.S.C. § 300gg-13(a)(1) are "not in accordance with law" because the Task Force was unconstitutionally appointed cannot wield "significant authority pursuant to the laws of the United States."[29] So courts are obligated to "set aside" (*i.e.*, vacate) these agency actions under section 706 and Rule 54(c)—without regard to the balance of equities or public interest.

The defendants argue that vacatur under section 706 is discretionary rather than mandatory,[30] and that courts should consider the equities and public interest before vacating unlawful agency actions. *See* Appellants' Br. at 41-50. But that stance cannot be squared with the mandatory language of section 706(2)(A), nor can it be squared with this Court's precedents that equate "set aside" with vacatur. *See Data Marketing*, 45 F.4th at 859; *Francis-*

---

29.  *Buckley*, 424 U.S. at 126.

30.  Appellants' Br. at 45 n.5.

*can Alliance*, 47 F.4th at 374-75. The meaning of "set aside" in section 706 cannot mean "vacatur" only some of the time, or whenever the balance of equities or public interest favor a universal remedy. It either means vacatur (a universal remedy), or it means disregard (a case-specific remedy). This Court has already adopted the former interpretation of "set aside," and its meaning cannot fluctuate between the views of this Court and the views of Professor Harrison based on policy considerations.

Neither *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (en banc), nor *Central & South West Services, Inc. v. EPA*, 220 F.3d 683 (5th Cir. 2000), undermines the district court's decision to vacate the disputed agency actions, nor do they give courts discretion in deciding whether to vacate unlawful agency action under section 706. *Cargill* merely remanded a remedial question without deciding it, while observing that "vacatur of an agency action is the default rule in this Circuit." *Cargill*, 57 F.4th at 472 (plurality op.). *Central & South West* involved a one-off application of the controversial remand-without-vacatur maneuver,[31] a tactic that should "rare[ly]" be employed. *See Franciscan Alliance*, 47 F.4th at 375 n.29 ("'The ordinary practice is to vacate unlawful agency action. . . . In rare cases, however, we do not vacate the action but instead remand for the agency to correct its errors.'" (citation omitted)). The defendants are not requesting remand without vacatur.

---

31. *See NRDC v. EPA*, 489 F.3d 1250, 1262-64 (D.C. Cir. 2007) (one of Judge Randolph's many opinions criticizing remand without vacatur).

The defendants are also wrong to accuse the district court of issuing a universal remedy "automatically" from its "finding of an Appointments Clause violation." Appellants' Br. at 41. The district court said its universal remedy was authorized *only* by the "set aside" language in section 706. ROA.2122-2130. None of the cases in the defendants' brief that criticize universal remedies involved situations in which the APA authorized or required courts to "set aside" an agency action, and none of them considered the meaning of "set aside" in section 706(2)(A). *See* Appellants' Br. at 41-42.

We agree with the defendants that when "the constitutionality of a federal *statute* is at issue, the usual remedy is to enjoin the enforcement of the statutory provision against the plaintiffs" only. *See* Appellants' Br. at 41 (emphasis added). We also acknowledge that many district-court judges are too quick to issue universal remedies in response to constitutional violations. District-court judges sometimes act as though their pronouncements of unconstitutionality formally revoke the underlying statute—and issue "universal" remedies based on the idea that judicially disapproved statutes cease to exist and can no longer be enforced against anyone.[32] This is a manifestation of the writ-of-erasure mindset, which is reinforced by the sloppy nomenclature that is too often used when describing the judicial power. *See, e.g.*, *Pool v. City of Houston*, 978 F.3d 307, 309 (5th Cir. 2020) ("It is often said that

---

32. *See National Ass'n of Radiation Survivors v. Walters*, 589 F. Supp. 1302, 1329 (N.D. Cal. 1984); *ACLU v. Reno*, 31 F. Supp. 2d 473, 499 n.8 (E.D. Pa. 1999); *In re Abbott*, 954 F.3d 772, 786 n.19 (5th Cir. 2020).

courts 'strike down' laws when ruling them unconstitutional. That's not quite right."); *NetChoice*, 49 F.4th at 44 ("'[C]ourts have no authority to strike down statutory text'" (citation omitted)). There are only three circumstances in which a court may award relief beyond the named parties: (1) When a litigant sues in a representative capacity;[33] (2) When relief extending beyond the named litigants is necessary to fully redress the plaintiffs' injuries;[34] or (3) When a statute (such as the APA) authorizes or requires such a remedy.

Yet the district court's judgment was careful to respect these limits on universal remedies. It limited its declaratory relief to the plaintiffs, as required by 28 U.S.C. § 2201(a). ROA.2132. And it issued universal relief *only* with respect to "agency actions" taken to implement Task Force "A" or "B" recommendations made on or after March 23, 2010. ROA.2131-2132. The judgment and opinion make clear that a universal remedy could issue only to the extent that section 706 authorizes or requires such relief. ROA.2122-2130. The only way to defeat the district court's remedy is to reject the holdings of this Court that equate "set aside" with vacatur.

---

33. Fed. R. Civ. P. 23.

34. *See Professional Association of College Educators v. El Paso County Community College District*, 730 F.2d 258, 273-74 (5th Cir. 1984) ("An injunction . . . is not necessarily made overbroad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled.").

Finally, the defendants have not explained how plaintiff-specific relief could redress the injuries of the non-Braidwood plaintiffs. An injunction that merely restrains the defendants from enforcing section 300gg-13(a)(1) and its implementing agency actions against the plaintiffs does not redress the injuries of the plaintiffs seeking to purchase health insurance on the market, because it will not liberate or induce insurers to offer policies that exclude coverage of objectionable preventive care. So even if the district court had discretion to withhold a "vacatur" remedy, it was hardly an abuse of discretion to award such relief when a plaintiff-specific remedy fails to redress the asserted injuries.

## VI. THE SECRETARY'S ATTEMPTED RATIFICATION OF THE ACIP RECOMMENDATIONS AND HRSA GUIDELINES DO NOT CURE THE APPOINTMENTS CLAUSE VIOLATIONS

The district court allowed the Secretary's ratification memo to obviate any Appointments Clause problems with the ACIP recommendations and HRSA guidelines. ROA.1793-1797. The Court should reverse this holding.

The Secretary has no more authority to ratify or reject the ACIP recommendations and HRSA guidelines than it does the "A" or "B" ratings conferred by the Task Force. The district court thought the Secretary can "direct" the recommendations and guidelines of ACIP and HRSA, ROA.1779-1780, but the text of 42 U.S.C. § 300gg-13(a)(2)-(4) cannot support this idea, as it gives ACIP and HRSA alone the authority to issue the "recommendations" and "guidelines" that bind private insurers. *See Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020) ("By

its terms, the ACA leaves the Guidelines' content *to the exclusive discretion of HRSA*." (emphasis added)). The judiciary cannot re-write the statute by transferring the prerogatives of ACIP and HRSA to the Secretary, or making their decisions defeasible by a principal officer or cabinet secretary. *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 528 (2019) ("[W]e are not at liberty to rewrite the statute passed by Congress and signed by the President.").

The district court relied on 42 U.S.C. § 202, which says that the "Public Health Service ... shall be administered by the Assistant Secretary for Health under the supervision and direction of the Secretary." But this statute does not compromise the independence of ACIP, HRSA, or the Task Force, and it does not put the Secretary in charge of their preventive-care coverage decisions. It merely places the Assistant Secretary for Health under the Secretary's "supervision" and "direction," while instructing the Assistant Secretary to "administer[]" the Public Health Service. *See supra* at 17-18. The power to "administer" does not include a prerogative to override ACIP or HRSA when 42 U.S.C. § 300gg-13(a)(1)-(4) makes their "recommendations" and "guidelines" final and conclusive regarding the preventive-care that private insurers must cover. The ACA also specifically addresses the Secretary's powers vis-à-vis these entities and allows him only to postpone the effective date of ACIP and HRSA's recommendations and guidelines, not to countermand or "direct" their decisions. *See* 42 U.S.C. § 300gg-13(b).

And even if the Secretary has authority to veto or "ratify" ACIP's recommendations or HRSA's guidelines, section 300gg-13(a)(2)-(4) still violates

the Appointments Clause because it empowers ACIP and HRSA to dictate preventive care that private insurers must cover *until* the Secretary formally approves their decisions. That constitutes "significant authority pursuant to the laws of the United States," even if it remains subject to reversal, because the power to impose preventive-care mandates on private insurers—even for a limited time—amounts to "significant authority" in and of itself. *See Lucia*, 138 S. Ct. at 2049 (administrative-law judges qualify as "officers of the United States," even though their decisions are subject to review by the Commission itself). And the constitutional-avoidance canon is inapplicable when a litigant's proposed interpretation of a statute continues to present constitutional questions for the courts to resolve. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 836 (2018) ("Under the constitutional-avoidance canon, . . . a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative *that avoids those problems*." (emphasis added)).

The Secretary's ratification also cannot salvage the legality of *past* agency actions taken to implement ACIP recommendations and HRSA guidelines that were announced after March 23, 2010 (the date on which the ACA was signed). At most, the Secretary's ratification clears the way for agency actions taken after January 21, 2022; it cannot retroactively authorize agency actions that pre-date ratification. *See* 5 U.S.C. § 551(4) (agency rules have only "future effect"). So even if one accepts ratification, the judgment should still vacate agency actions taken before January 21, 2022, to implement ACIP

recommendations and HRSA guidelines issued after March 23, 2010, by unconstitutionally appointed officers.

Finally, the ratification document failed to go through notice-and-comment procedures and is arbitrary and capricious. *See* Part II.B, *supra*.

## VII. THE PLAINTIFFS ARE PRESERVING THEIR NONDELEGATION CLAIM

The nondelegation challenge to 42 U.S.C. § 300gg-13(a)(1)-(4) is foreclosed by *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436 (5th Cir. 2020). ROA.1811-1812. The plaintiffs are preserving this claim for the Supreme Court, which suggested that section 300gg-13(a)(4) lacks the required intelligible principle. *See Little Sisters*, 140 S. Ct. at 2380-82.

## CONCLUSION

The judgment should be reversed to the extent it rejected the Appointments Clause challenges to 42 U.S.C. § 300gg-13(a)(2)-(4). The judgment should otherwise be affirmed.

Respectfully submitted.

   /s/ Jonathan F. Mitchell

GENE P. HAMILTON
Vice-President and General Counsel
America First Legal Foundation
611 Pennsylvania Ave SE #231
Washington, DC 20003
(202) 964-3721
gene.hamilton@aflegal.org

JONATHAN F. MITCHELL
Mitchell Law PLLC
111 Congress Avenue, Suite 400
Austin, Texas 78701
(512) 686-3940 (phone)
(512) 686-3941 (fax)
jonathan@mitchell.law

Dated: August 7, 2023

*Counsel for Appellees/Cross-Appellants*

## CERTIFICATE OF SERVICE

I certify that on August 7, 2023, this document was electronically filed with the clerk of the court for the U.S. Court of Appeals for the Fifth Circuit and served through CM/ECF upon:

Michael S. Raab
Alisa B. Klein
Daniel Aguilar
Attorneys, Appellate Staff
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530
(202) 514-5432
michael.raab@usdoj.gov
alisa.klein@usdoj.gov
daniel.j.aguilar@usdoj.gov

*Counsel for Defendants-Appellees*

/s/ Jonathan F. Mitchell
Jonathan F. Mitchell
*Counsel for Appellees/Cross-Appellants*

# CERTIFICATE OF COMPLIANCE
with type-volume limitation, typeface requirements,
and type-style requirements

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 27(d)(2) because it contains 15,297 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface and type-style requirements of Fed. R. App. P. 27(d)(1)(E), 32(a)(5), and Fed. R. App. P. 32(a)(6) because it uses Equity Text B 14-point type face throughout, and Equity Text B is a proportionally spaced typeface that includes serifs.

 /s/ Jonathan F. Mitchell
Jonathan F. Mitchell
Dated: August 7, 2023                *Counsel for Appellees/Cross-Appellants*

## CERTIFICATE OF ELECTRONIC COMPLIANCE

Counsel also certifies that on August 7, 2023, this brief was transmitted to Mr. Lyle W. Cayce, Clerk of the United States Court of Appeals for the Fifth Circuit, through the court's CM/ECF document filing system, https://ecf.ca5.uscourts.gov/

Counsel further certifies that: (1) required privacy redactions have been made, 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document, 5th Cir. R. 25.2.1; and (3) the document has been scanned with the most recent version of VirusTotal and is free of viruses.


/s/ Jonathan F. Mitchell
JONATHAN F. MITCHELL
*Counsel for Appellees/Cross-Appellants*

# APPENDIX

# APPEDNIX PART I

U.S. Const., art. II, § 2, cl. 2.................................................................. App. 1

42 U.S.C. § 300gg-13(a)-(b) .............................................................. App. 2

42 U.S.C. § 299(a) ............................................................................... App. 3

42 U.S.C. § 299b-4(a) ......................................................................... App. 4

42 U.S.C. § 202.................................................................................... App. 6

Reorganization Plan No. 3 of 1966, 80 Stat. 1610 ............................. App. 7

# APPEDNIX PART II
## (Statutes Showing That The Power To "Convene" Excludes The Power To Appoint)

10 U.S.C. § 151(a), (g) .................................................................. App. 8–9

10 U.S.C. § 611–612 ................................................................... App. 11–14

15 U.S.C. § 634c(b)(2)(A) ............................................................. App. 16

16 U.S.C. §§ 3951(9), 3952(a)(1)–(2) ...................................... App. 20–21

18 U.S.C. § 3168(a) ...................................................................... App. 27

20 U.S.C. § 107d-2(a)–(b) ............................................................ App. 28

20 U.S.C. § 1090(f)(3)(A) ............................................................. App. 45

22 U.S.C. § 4831(a)(1)–(2) ...................................................... App. 65–66

22 U.S.C. § 7302(b)(1), (d)........................................................App. 72–73

42 U.S.C. § 290ee-5(e)(1)–(2)...................................................... App. 78

50 U.S.C. § 3022(b), (d)...........................................................App. 82–83

# APPENDIX PART III
## (Statutes That Separately Confer The Power To "Convene" And The Power To Appoint)

10 U.S.C. § 611–612 ................................................................. App. 85–88

21 U.S.C. § 379dd(d)(1)(D)(i)...................................................... App. 92

# PART I

**U.S. Const., art. II, § 2, cl. 2**

[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, anyersd which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

### 42 U.S.C. § 300gg-13. Coverage of preventive health services

**(a) In general**

A group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for—

(1) evidence-based items or services that have in effect a rating of "A" or "B" in the current recommendations of the United States Preventive Services Task Force;

(2) immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention with respect to the individual involved; and

(3) with respect to infants, children, and adolescents, evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration.

(4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph.

(5) for the purposes of this chapter, and for the purposes of any other provision of law, the current recommendations of the United States Preventive Service Task Force regarding breast cancer screening, mammography, and prevention shall be considered the most current other than those issued in or around November 2009.

Nothing in this subsection shall be construed to prohibit a plan or issuer from providing coverage for services in addition to those recommended by United States Preventive Services Task Force or to deny coverage for services that are not recommended by such Task Force.

**(b) Interval**

**(1) In general**

The Secretary shall establish a minimum interval between the date on which a recommendation described in subsection (a)(1) or (a)(2) or a guideline under subsection (a)(3) is issued and the plan year with respect to which the requirement described in subsection (a) is effective with respect to the service described in such recommendation or guideline.

**(2) Minimum**

The interval described in paragraph (1) shall not be less than 1 year.

### 42 U.S.C. § 299(a). Mission and Duties

**(a) In general**

There is established within the Public Health Service an agency to be known as the Agency for Healthcare Research and Quality, which shall be headed by a director appointed by the Secretary. The Secretary shall carry out this subchapter acting through the Director.

### 42 U.S.C. § 299b-4(a). Research supporting primary care and access in underserved areas

**(a) Preventive Services Task Force**

**(1) Establishment and purpose**

The Director shall convene an independent Preventive Services Task Force (referred to in this subsection as the "Task Force") to be composed of individuals with appropriate expertise. Such Task Force shall review the scientific evidence related to the effectiveness, appropriateness, and cost-effectiveness of clinical preventive services for the purpose of developing recommendations for the health care community, and updating previous clinical preventive recommendations, to be published in the Guide to Clinical Preventive Services (referred to in this section as the "Guide"), for individuals and organizations delivering clinical services, including primary care professionals, health care systems, professional societies, employers, community organizations, non-profit organizations, Congress and other policy-makers, governmental public health agencies, health care quality organizations, and organizations developing national health objectives. Such recommendations shall consider clinical preventive best practice recommendations from the Agency for Healthcare Research and Quality, the National Institutes of Health, the Centers for Disease Control and Prevention, the Institute of Medicine, specialty medical associations, patient groups, and scientific societies.

**(2) Duties**

The duties of the Task Force shall include—

> **(A)** the development of additional topic areas for new recommendations and interventions related to those topic areas, including those related to specific sub-populations and age groups;

> **(B)** at least once during every 5-year period, review interventions and update recommendations related to existing topic areas, including new or improved techniques to assess the health effects of interventions;

> **(C)** improved integration with Federal Government health objectives and related target setting for health improvement;

> **(D)** the enhanced dissemination of recommendations;

> **(E)** the provision of technical assistance to those health care professionals, agencies and organizations that request help in implementing the Guide recommendations; and

> **(F)** the submission of yearly reports to Congress and related agencies identifying gaps in research, such as preventive services that receive an insufficient evidence statement, and recommending priority areas that deserve further examination, including areas related to populations and age groups not adequately addressed by current recommendations.

**(3) Role of Agency**

The Agency shall provide ongoing administrative, research, and technical support for the operations of the Task Force, including coordinating and supporting the dissemination of the recommendations of the Task Force, ensuring adequate staff resources, and assistance to those organizations requesting it for implementation of the Guide's recommendations.

**(4) Coordination with Community Preventive Services Task Force**

The Task Force shall take appropriate steps to coordinate its work with the Community Preventive Services Task Force and the Advisory Committee on Immunization Practices, including the examination of how each task force's recommendations interact at the nexus of clinic and community.

**(5) Operation**

Operation. In carrying out the duties under paragraph (2), the Task Force is not subject to the provisions of chapter 10 of Title 5.

**(6) Independence**

All members of the Task Force convened under this subsection, and any recommendations made by such members, shall be independent and, to the extent practicable, not subject to political pressure.

**(7) Authorization of appropriations**

There are authorized to be appropriated such sums as may be necessary for each fiscal year to carry out the activities of the Task Force.

### 42 U.S.C. § 202. Administration and supervision of Service

The Public Health Service in the Department of Health and Human Services shall be administered by the Assistant Secretary for Health under the supervision and direction of the Secretary.

(b) The Secretary of Health, Education, and Welfare shall make such provisions as he shall deem to be necessary respecting the winding up of any outstanding affairs of the Assistant Secretary whose office is abolished by subsection (a) of this section.

---

## Reorganization Plan No. 3 of 1966

Transmitted
Apr. 25, 1966.
Effective June
25, 1966.

*Ante,* p. 394.
5 USC 901-913.

*Prepared by the President and transmitted to the Senate and the House of Representatives in Congress assembled, April 25, 1966, pursuant to the provisions of the Reorganization Act of 1949, 63 Stat. 203, as amended.*

### PUBLIC HEALTH SERVICE

SECTION 1. *Transfer of functions.* (a) Except as otherwise provided in subsection (b) of this section, there are hereby transferred to the Secretary of Health, Education, and Welfare (hereinafter referred to as the Secretary) all functions of the Public Health Service, of the Surgeon General of the Public Health Service, and of all other officers and employees of the Public Health Service, and all functions of all agencies of or in the Public Health Service.

(b) This section shall not apply to the functions vested by law in any advisory council, board, or committee of or in the Public Health Service which is established by law or is required by law to be established.

SEC. 2. *Performance of transferred functions.* The Secretary may from time to time make such provisions as he shall deem appropriate authorizing the performance of any of the functions transferred to him by the provisions of this reorganization plan by any officer, employee, or agency of the Public Health Service or of the Department of Health, Education, and Welfare.

SEC. 3. *Abolitions.* (a) The following agencies of the Public Health Service are hereby abolished:

(1) The Bureau of Medical Services, including the office of Chief of the Bureau of Medical Services.

(2) The Bureau of State Services, including the office of Chief of the Bureau of State Services.

58 Stat. 683;
62 Stat. 469.

(3) The agency designated as the National Institutes of Health (42 U.S.C. 203), including the office of Director of the National Institutes of Health (42 U.S.C. 206(b)) but excluding the several research Institutes in the agency designated as the National Institutes of Health.

(4) The agency designated as the Office of the Surgeon General (42 U.S.C. 203(1)), together with the office held by the Deputy Surgeon General (42 U.S.C. 206(a)).

(b) The Secretary shall make such provisions as he shall deem necessary respecting the winding up of any outstanding affairs of the agencies abolished by the provisions of this section.

SEC. 4. *Incidental transfers.* As he may deem necessary in order to carry out the provisions of this reorganization plan, the Secretary may from time to time effect transfers within the Department of Health, Education, and Welfare of any of the records, property, personnel and unexpended balances (available or to be made available) of appropriations, allocations, and other funds of the Department which relate to functions affected by this reorganization plan.

# PART II

United States Code Annotated
  Title 10. Armed Forces (Refs & Annos)
    Subtitle A. General Military Law (Refs & Annos)
      Part I. Organization and General Military Powers
        Chapter 5. Joint Chiefs of Staff (Refs & Annos)

10 U.S.C.A. § 151

§ 151. Joint Chiefs of Staff: composition; functions

Effective: December 20, 2020

Currentness

**(a) Composition.**--There are in the Department of Defense the Joint Chiefs of Staff, headed by the Chairman of the Joint Chiefs of Staff. The Joint Chiefs of Staff consist of the following:

**(1)** The Chairman.

**(2)** The Vice Chairman.

**(3)** The Chief of Staff of the Army.

**(4)** The Chief of Naval Operations.

**(5)** The Chief of Staff of the Air Force.

**(6)** The Commandant of the Marine Corps.

**(7)** The Chief of the National Guard Bureau.

**(8)** The Chief of Space Operations.

**(b) Function as military advisers.**--**(1)** The Chairman of the Joint Chiefs of Staff is the principal military adviser to the President, the National Security Council, the Homeland Security Council, and the Secretary of Defense.

**(2)** The other members of the Joint Chiefs of Staff are military advisers to the President, the National Security Council, the Homeland Security Council, and the Secretary of Defense as specified in subsection (d).

**App. 008**

**(c) Consultation by Chairman.--(1)** In carrying out his functions, duties, and responsibilities, the Chairman shall, as necessary, consult with and seek the advice of--

**(A)** the other members of the Joint Chiefs of Staff; and

**(B)** the commanders of the unified and specified combatant commands.

**(2)** Subject to subsection (d), in presenting advice with respect to any matter to the President, the National Security Council, the Homeland Security Council, or the Secretary of Defense, the Chairman shall, as he considers appropriate, inform the President, the National Security Council, the Homeland Security Council, or the Secretary of Defense, as the case may be, of the range of military advice and opinion with respect to that matter.

**(d) Advice and opinions of members other than Chairman.--(1)** After first informing the Secretary of Defense and the Chairman, the members of the Joint Chiefs of Staff, individually or collectively, in their capacity as military advisors, may provide advice to the President, the National Security Council, the Homeland Security Council, or the Secretary of Defense on a particular matter on the judgment of the military member.

**(2)** A member of the Joint Chiefs of Staff (other than the Chairman) may submit to the Chairman advice or an opinion in disagreement with, or advice or an opinion in addition to, the advice presented by the Chairman to the President, the National Security Council, the Homeland Security Council, or the Secretary of Defense. If a member submits such advice or opinion, the Chairman shall present the advice or opinion of such member at the same time he presents his own advice to the President, the National Security Council, the Homeland Security Council, or the Secretary of Defense, as the case may be.

**(3)** The Chairman shall establish procedures to ensure that the presentation of his own advice to the President, the National Security Council, the Homeland Security Council, or the Secretary of Defense is not unduly delayed by reason of the submission of the individual advice or opinion of another member of the Joint Chiefs of Staff.

[**(e) Repealed.** Pub.L. 114-328, Div. A, Title IX, § 921(a)(2)(C), Dec. 23, 2016, 130 Stat. 2351]

**(f) Recommendations to Congress.--**After first informing the Secretary of Defense, a member of the Joint Chiefs of Staff may make such recommendations to Congress relating to the Department of Defense as he considers appropriate.

**(g) Meetings of JCS.--(1)** The Chairman **shall convene** regular meetings of the Joint Chiefs of Staff.

**(2)** Subject to the authority, direction, and control of the President and the Secretary of Defense, the Chairman shall--

**(A)** preside over the Joint Chiefs of Staff;

**App. 009**

**(B)** provide agenda for the meetings of the Joint Chiefs of Staff (including, as the Chairman considers appropriate, any subject for the agenda recommended by any other member of the Joint Chiefs of Staff);

**(C)** assist the Joint Chiefs of Staff in carrying on their business as promptly as practicable; and

**(D)** determine when issues under consideration by the Joint Chiefs of Staff shall be decided.

## CREDIT(S)

(Added Pub.L. 99-433, Title II, § 201, Oct. 1, 1986, 100 Stat. 1005; amended Pub.L. 102-484, Div. A, Title IX, § 911(a), Oct. 23, 1992, 106 Stat. 2473; Pub.L. 109-163, Div. A, Title IX, § 908(a), Jan. 6, 2006, 119 Stat. 3403; Pub.L. 112-81, Div. A, Title V, § 512(a), Dec. 31, 2011, 125 Stat. 1393; Pub.L. 114-328, Div. A, Title IX, § 921(a), Dec. 23, 2016, 130 Stat. 2351; Pub.L. 116-92, Div. A, Title IX, § 953(c), Dec. 20, 2019, 133 Stat. 1564.)

10 U.S.C.A. § 151, 10 USCA § 151
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**App. 010**


KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

> United States Code Annotated
>     Title 10. Armed Forces (Refs & Annos)
>         Subtitle A. General Military Law (Refs & Annos)
>             Part II. Personnel (Refs & Annos)
>                 Chapter 36. Promotion, Separation, and Involuntary Retirement of
>                 Officers on the Active-Duty List (Refs & Annos)
>                     Subchapter I. Selection Boards (Refs & Annos)

10 U.S.C.A. § 611

§ 611. Convening of selection boards

Effective: December 28, 2001
Currentness

**(a)** Whenever the needs of the service require, the Secretary of the military department concerned ==shall convene selection boards== to recommend for promotion to the next higher permanent grade, under subchapter II of this chapter, officers on the active-duty list in each permanent grade from first lieutenant through brigadier general in the Army, Air Force, or Marine Corps and from lieutenant (junior grade) through rear admiral (lower half) in the Navy. The preceding sentence does not require the convening of a selection board in the case of officers in the permanent grade of first lieutenant or, in the case of the Navy, lieutenant (junior grade) when the Secretary concerned recommends for promotion to the next higher grade under section 624(a)(3) of this title all such officers whom the Secretary finds to be fully qualified for promotion.

**(b)** Whenever the needs of the service require, the Secretary of the military department concerned ==may convene selection boards== to recommend officers for continuation on active duty under section 637 of this title or for early retirement under section 638 of this title.

**App. 011**

**(c)** The convening of selection boards under subsections (a) and (b) shall be under regulations prescribed by the Secretary of Defense.

## CREDIT(S)

(Added Pub.L. 96-513, Title I, § 105, Dec. 12, 1980, 94 Stat. 2851; amended Pub.L. 97-86, Title IV, § 405(b)(1), Dec. 1, 1981, 95 Stat. 1105; Pub.L. 99-145, Title V, § 514(b)(1), Nov. 8, 1985, 99 Stat. 628; Pub.L. 107-107, Div. A, Title V, § 505(a)(3), Dec. 28, 2001, 115 Stat. 1086.)

Notes of Decisions (2)

10 U.S.C.A. § 611, 10 USCA § 611
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 10. Armed Forces (Refs & Annos)
    Subtitle A. General Military Law (Refs & Annos)
      Part II. Personnel (Refs & Annos)
        Chapter 36. Promotion, Separation, and Involuntary Retirement of Officers on the Active-Duty List (Refs & Annos)
          Subchapter I. Selection Boards (Refs & Annos)

10 U.S.C.A. § 612

§ 612. Composition of selection boards

Effective: January 1, 2021

Currentness

**(a)(1)** Members of selection boards shall be appointed by the Secretary of the military department concerned in accordance with this section. A selection board shall consist of five or more officers of the same armed force as the officers under consideration by the board. Each member of a selection board (except as provided in paragraphs (2), (3), and (4)) shall be an officer on the active-duty list. Each member of a selection board must be serving in a grade higher than the grade of the officers under consideration by the board, except that no member of a board may be serving in a grade below major or lieutenant commander. The members of a selection board shall represent the diverse population of the armed force concerned to the extent practicable.

**(2)(A)** Except as provided in subparagraph (B), a selection board shall include at least one officer from each competitive category of officers to be considered by the board.

**(B)** A selection board need not include an officer from a competitive category to be considered by the board when there are no officers of that competitive category on the active-duty list in a grade higher than the grade of the officers to be considered by the board and eligible to serve on the board. However, in such a case the Secretary of the military department concerned, in his discretion, may appoint as a member of the board an officer of that competitive category who is not on the active-duty list from among officers of the same armed force as the officers under consideration by the board who hold a higher grade than the grade of the officers under consideration and who are retired officers, reserve officers serving on active duty but not on the active-duty list, or members of the Ready Reserve.

**(3)** When reserve officers of an armed force are to be considered by a selection board, the membership of the board shall include at least one reserve officer of that armed force on active duty (whether or not on the active-duty list). The actual number of reserve officers shall be determined by the Secretary of the military department concerned, in the Secretary's discretion. Notwithstanding the first sentence of this paragraph, in the case of a board which is considering officers in the grade of colonel or brigadier general or, in the case of officers of the Navy, captain or rear admiral (lower half), no reserve officer need be included if there are no reserve officers of that armed force on active duty in the next higher grade who are eligible to serve on the board.

**(4)** Except as provided in paragraphs (2) and (3), if qualified officers on the active-duty list are not available in sufficient number to comprise a selection board, the Secretary of the military department concerned shall complete the membership of the board

App. 013

§ 612. Composition of selection boards, 10 USCA § 612

by appointing as members of the board officers who are members of the same armed force and hold a grade higher than the grade of the officers under consideration by the board and who are retired officers, reserve officers serving on active duty but not on the active-duty list, or members of the Ready Reserve.

**(5)** A retired general or flag officer who is on active duty for the purpose of serving on a selection board shall not, while so serving, be counted against any limitation on the number of general and flag officers who may be on active duty.

**(b)** No officer may be a member of two successive selection boards convened under section 611(a) of this title for the consideration of officers of the same competitive category and grade.

**(c)(1)** Each selection board convened under section 611(a) of this title that will consider an officer described in paragraph (2) shall include at least one officer designated by the Chairman of the Joint Chiefs of Staff who is a joint qualified officer.

**(2)** Paragraph (1) applies with respect to an officer who--

   **(A)** is serving on, or has served on, the Joint Staff; or

   **(B)** is a joint qualified officer.

**(3)** The Secretary of Defense may waive the requirement in paragraph (1) in the case of--

   **(A)** any selection board of the Marine Corps; or

   **(B)** any selection board that is considering officers in specialties identified in paragraph (2) or (3) of section 619a(b) of this title.

### CREDIT(S)

(Added Pub.L. 96-513, Title I, § 105, Dec. 12, 1980, 94 Stat. 2851; amended Pub.L. 97-22, § 4(a), July 10, 1981, 95 Stat. 125; Pub.L. 97-86, Title IV, § 405(b)(1), Dec. 1, 1981, 95 Stat. 1105; Pub.L. 99-145, Title V, § 514(b)(1), Nov. 8, 1985, 99 Stat. 628; Pub.L. 99-433, Title IV, § 402(a), Oct. 1, 1986, 100 Stat. 1030; Pub.L. 106-398, § 1 [Div. A, Title V, § 504(a)], Oct. 30, 2000, 114 Stat. 1654, 1654A-101; Pub.L. 111-383, Div. A, Title V, § 522(a), Jan. 7, 2011, 124 Stat. 4214; Pub.L. 116-283, Div. A, Title V, § 503(a)(1), Jan. 1, 2021, 134 Stat. 3564.)

10 U.S.C.A. § 612, 10 USCA § 612
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**App. 014**

United States Code Annotated
  Title 15. Commerce and Trade
    Chapter 14A. Aid to Small Business (Refs & Annos)

15 U.S.C.A. § 634c

§ 634c. Additional duties of Office of Advocacy

Effective: February 24, 2016

Currentness

**(a) In general**

The Office of Advocacy shall also perform the following duties on a continuing basis:

**(1)** serve as a focal point for the receipt of complaints, criticisms, and suggestions concerning the policies and activities of the Administration and any other Federal agency which affects small businesses;

**(2)** counsel small businesses on how to resolve questions and problems concerning the relationship of the small business to the Federal Government;

**(3)** develop proposals for changes in the policies and activities of any agency of the Federal Government which will better fulfill the purposes of the Small Business Act and communicate such proposals to the appropriate Federal agencies;

**(4)** represent the views and interests of small businesses before other Federal agencies whose policies and activities may affect small business;

**(5)** enlist the cooperation and assistance of public and private agencies, businesses, and other organizations in disseminating information about the programs and services provided by the Federal Government which are of benefit to small businesses, and information on how small businesses can participate in or make use of such programs and services; and

**(6)** carry out the responsibilities of the Office of Advocacy under chapter 6 of Title 5.

**(b) Outreach and input from small businesses on trade promotion authority**

**(1) Definitions**

In this subsection--

**App. 015**

**(A)** the term "agency" has the meaning given the term in section 551 of Title 5;

**(B)** the term "Chief Counsel for Advocacy" means the Chief Counsel for Advocacy of the Small Business Administration;

**(C)** the term "covered trade agreement" means a trade agreement being negotiated pursuant to section 4202(b) of Title 19; and

**(D)** the term "Working Group" means the Interagency Working Group convened under paragraph (2)(A).

**(2) Working Group**

**(A) In general**

Not later than 30 days after the date on which the President submits the notification required under section 4204(a) of Title 19, the Chief Counsel for Advocacy shall convene an Interagency Working Group, which shall consist of an employee from each of the following agencies, as selected by the head of the agency or an official delegated by the head of the agency:

**(i)** The Office of the United States Trade Representative.

**(ii)** The Department of Commerce.

**(iii)** The Department of Agriculture.

**(iv)** Any other agency that the Chief Counsel for Advocacy, in consultation with the United States Trade Representative, determines to be relevant with respect to the subject of the covered trade agreement.

**(B) Views of small businesses**

Not later than 30 days after the date on which the Chief Counsel for Advocacy convenes the Working Group under subparagraph (A), the Chief Counsel for Advocacy shall identify a diverse group of small businesses, representatives of small businesses, or a combination thereof, to provide to the Working Group the views of small businesses in the manufacturing, services, and agriculture industries on the potential economic effects of the covered trade agreement.

**(3) Report**

**(A) In general**

**App. 016**

Not later than 180 days after the date on which the Chief Counsel for Advocacy convenes the Working Group under paragraph (2)(A), the Chief Counsel for Advocacy shall submit to the Committee on Small Business and Entrepreneurship and the Committee on Finance of the Senate and the Committee on Small Business and the Committee on Ways and Means of the House of Representatives a report on the economic impacts of the covered trade agreement on small businesses, which shall--

   **(i)** identify the most important priorities, opportunities, and challenges to various industries from the covered trade agreement;

   **(ii)** assess the impact for new small businesses to start exporting, or increase their exports, to markets in countries that are parties to the covered trade agreement;

   **(iii)** analyze the competitive position of industries likely to be significantly affected by the covered trade agreement;

   **(iv)** identify--

      **(I)** any State-owned enterprises in each country participating in negotiations for the covered trade agreement that could pose a threat to small businesses; and

      **(II)** any steps to take to create a level playing field for those small businesses;

   **(v)** identify any rule of an agency that should be modified to become compliant with the covered trade agreement; and

   **(vi)** include an overview of the methodology used to develop the report, including the number of small business participants by industry, how those small businesses were selected, and any other factors that the Chief Counsel for Advocacy may determine appropriate.

**(B) Delayed submission**

To ensure that negotiations for the covered trade agreement are not disrupted, the President may require that the Chief Counsel for Advocacy delay submission of the report under subparagraph (A) until after the negotiations for the covered trade agreement are concluded, provided that the delay allows the Chief Counsel for Advocacy to submit the report to Congress not later than 45 days before the Senate or the House of Representatives acts to approve or disapprove the covered trade agreement.

**(C) Avoidance of duplication**

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

§ 634c. Additional duties of Office of Advocacy, 15 USCA § 634c

The Chief Counsel for Advocacy shall, to the extent practicable, coordinate the submission of the report under this paragraph with the United States International Trade Commission, the United States Trade Representative, other agencies, and trade advisory committees to avoid unnecessary duplication of reporting requirements.

**CREDIT(S)**

(Pub.L. 94-305, Title II, § 203, June 4, 1976, 90 Stat. 669; Pub.L. 111-240, Title I, § 1602(a), Sept. 27, 2010, 124 Stat. 2551; Pub.L. 114-125, Title V, § 502, Feb. 24, 2016, 130 Stat. 172.)

15 U.S.C.A. § 634c, 15 USCA § 634c
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**App. 018**

> United States Code Annotated
>   Title 16. Conservation
>     Chapter 59A. Wetlands (Refs & Annos)

16 U.S.C.A. § 3951

§ 3951. Definitions

Currentness

As used in this chapter, the term--

**(1)** "Secretary" means the Secretary of the Army;

**(2)** "Administrator" means the Administrator of the Environmental Protection Agency;

**(3)** "development activities" means any activity, including the discharge of dredged or fill material, which results directly in a more than de minimus [1] change in the hydrologic regime, bottom contour, or the type, distribution or diversity of hydrophytic vegetation, or which impairs the flow, reach, or circulation of surface water within wetlands or other waters;

**(4)** "State" means the State of Louisiana;

**(5)** "coastal State" means a State of the United States in, or bordering on, the Atlantic, Pacific, or Arctic Ocean, the Gulf of Mexico, Long Island Sound, or one or more of the Great Lakes; for the purposes of this chapter, the term also includes Puerto Rico, the Virgin Islands, Guam, the Commonwealth of the Northern Mariana Islands, and the Trust Territories of the Pacific Islands, and American Samoa;

**(6)** "coastal wetlands restoration project" means any technically feasible activity to create, restore, protect, or enhance coastal wetlands through sediment and freshwater diversion, water management, or other measures that the Task Force finds will significantly contribute to the long-term restoration or protection of the physical, chemical and biological integrity of coastal wetlands in the State of Louisiana, and includes any such activity authorized under this chapter or under any other provision of law, including, but not limited to, new projects, completion or expansion of existing or on-going projects, individual phases, portions, or components of projects and operation, maintenance [2] and rehabilitation of completed projects; the primary purpose of a "coastal wetlands restoration project" shall not be to provide navigation, irrigation or flood control benefits;

**(7)** "coastal wetlands conservation project" means--

**App. 019**

**(A)** the obtaining of a real property interest in coastal lands or waters, if the obtaining of such interest is subject to terms and conditions that will ensure that the real property will be administered for the long-term conservation of such lands and waters and the hydrology, water quality and fish and wildlife dependent thereon; and

**(B)** the restoration, management, or enhancement of coastal wetlands ecosystems if such restoration, management, or enhancement is conducted on coastal lands and waters that are administered for the long-term conservation of such lands and waters and the hydrology, water quality and fish and wildlife dependent thereon;

**(8)** "Governor" means the Governor of Louisiana;

**(9)** "Task Force" means the Louisiana Coastal Wetlands Conservation and Restoration Task Force which shall consist of the Secretary, who shall serve as chairman, the Administrator, the Governor, the Secretary of the Interior, the Secretary of Agriculture and the Secretary of Commerce; and

**(10)** "Director" means the Director of the United States Fish and Wildlife Service.

**CREDIT(S)**

(Pub.L. 101-646, Title III, § 302, Nov. 29, 1990, 104 Stat. 4778.)

**Footnotes**

1       So in original. Probably should be "de minimis".

2       So in original. Probably should be "maintenance".

16 U.S.C.A. § 3951, 16 USCA § 3951
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**                                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**App. 020**

§ 3952. Priority Louisiana coastal wetlands restoration projects, 16 USCA § 3952

---

United States Code Annotated
  Title 16. Conservation
    Chapter 59A. Wetlands (Refs & Annos)

16 U.S.C.A. § 3952

§ 3952. Priority Louisiana coastal wetlands restoration projects

Effective: October 12, 1996

Currentness

**(a) Priority project list**

**(1) Preparation of list**

Within forty-five days after November 29, 1990, the Secretary **shall convene** the Task Force to initiate a process to identify and prepare a list of coastal wetlands restoration projects in Louisiana to provide for the long-term conservation of such wetlands and dependent fish and wildlife populations in order of priority, based on the cost-effectiveness of such projects in creating, restoring, protecting, or enhancing coastal wetlands, taking into account the quality of such coastal wetlands, with due allowance for small-scale projects necessary to demonstrate the use of new techniques or materials for coastal wetlands restoration.

**(2) Task Force procedures**

The Secretary **shall convene** meetings of the Task Force as appropriate to ensure that the list is produced and transmitted annually to the Congress as required by this subsection. If necessary to ensure transmittal of the list on a timely basis, the Task Force shall produce the list by a majority vote of those Task Force members who are present and voting; except that no coastal wetlands restoration project shall be placed on the list without the concurrence of the lead Task Force member that the project is cost effective and sound from an engineering perspective. Those projects which potentially impact navigation or flood control on the lower Mississippi River System shall be constructed consistent with section 3953 of this title.

**(3) Transmittal of list**

No later than one year after November 29, 1990, the Secretary shall transmit to the Congress the list of priority coastal wetlands restoration projects required by paragraph (1) of this subsection. Thereafter, the list shall be updated annually by the Task Force members and transmitted by the Secretary to the Congress as part of the President's annual budget submission. Annual transmittals of the list to the Congress shall include a status report on each project and a statement from the Secretary of the Treasury indicating the amounts available for expenditure to carry out this chapter.

**(4) List of contents**

<span style="color:orange">App. 021</span>

---

**(A) Area identification; project description**

The list of priority coastal wetlands restoration projects shall include, but not be limited to--

**(i)** identification, by map or other means, of the coastal area to be covered by the coastal wetlands restoration project; and

**(ii)** a detailed description of each proposed coastal wetlands restoration project including a justification for including such project on the list, the proposed activities to be carried out pursuant to each coastal wetlands restoration project, the benefits to be realized by such project, the identification of the lead Task Force member to undertake each proposed coastal wetlands restoration project and the responsibilities of each other participating Task Force member, an estimated timetable for the completion of each coastal wetlands restoration project, and the estimated cost of each project.

**(B) Pre-plan**

Prior to the date on which the plan required by subsection (b) of this section becomes effective, such list shall include only those coastal wetlands restoration projects that can be substantially completed during a five-year period commencing on the date the project is placed on the list.

**(C)** Subsequent to the date on which the plan required by subsection (b) of this section becomes effective, such list shall include only those coastal wetlands restoration projects that have been identified in such plan.

**(5) Funding**

The Secretary shall, with the funds made available in accordance with section 3955 of this title, allocate funds among the members of the Task Force based on the need for such funds and such other factors as the Task Force deems appropriate to carry out the purposes of this subsection.

**(b) Federal and State project planning**

**(1) Plan preparation**

The Task Force shall prepare a plan to identify coastal wetlands restoration projects, in order of priority, based on the cost-effectiveness of such projects in creating, restoring, protecting, or enhancing the long-term conservation of coastal wetlands, taking into account the quality of such coastal wetlands, with due allowance for small-scale projects necessary to demonstrate the use of new techniques or materials for coastal wetlands restoration. Such restoration plan shall be completed within three years from November 29, 1990.

**(2) Purpose of the plan**

App. 022

The purpose of the restoration plan is to develop a comprehensive approach to restore and prevent the loss of, coastal wetlands in Louisiana. Such plan shall coordinate and integrate coastal wetlands restoration projects in a manner that will ensure the long-term conservation of the coastal wetlands of Louisiana.

**(3) Integration of existing plans**

In developing the restoration plan, the Task Force shall seek to integrate the "Louisiana Comprehensive Coastal Wetlands Feasibility Study" conducted by the Secretary of the Army and the "Coastal Wetlands Conservation and Restoration Plan" prepared by the State of Louisiana's Wetlands Conservation and Restoration Task Force.

**(4) Elements of the plan**

The restoration plan developed pursuant to this subsection shall include--

**(A)** identification of the entire area in the State that contains coastal wetlands;

**(B)** identification, by map or other means, of coastal areas in Louisiana in need of coastal wetlands restoration projects;

**(C)** identification of high priority coastal wetlands restoration projects in Louisiana needed to address the areas identified in subparagraph (B) and that would provide for the long-term conservation of restored wetlands and dependent fish and wildlife populations;

**(D)** a listing of such coastal wetlands restoration projects, in order of priority, to be submitted annually, incorporating any project identified previously in lists produced and submitted under subsection (a) of this section;

**(E)** a detailed description of each proposed coastal wetlands restoration project, including a justification for including such project on the list;

**(F)** the proposed activities to be carried out pursuant to each coastal wetlands restoration project;

**(G)** the benefits to be realized by each such project;

**(H)** an estimated timetable for completion of each coastal wetlands restoration project;

**(I)** an estimate of the cost of each coastal wetlands restoration project;

**(J)** identification of a lead Task Force member to undertake each proposed coastal wetlands restoration project listed in the plan;

**App. 023**

**(K)** consultation with the public and provision for public review during development of the plan; and

**(L)** evaluation of the effectiveness of each coastal wetlands restoration project in achieving long-term solutions to arresting coastal wetlands loss in Louisiana.

**(5) Plan modification**

The Task Force may modify the restoration plan from time to time as necessary to carry out the purposes of this section.

**(6) Plan submission**

Upon completion of the restoration plan, the Secretary shall submit the plan to the Congress. The restoration plan shall become effective ninety days after the date of its submission to the Congress.

**(7) Plan evaluation**

Not less than three years after the completion and submission of the restoration plan required by this subsection and at least every three years thereafter, the Task Force shall provide a report to the Congress containing a scientific evaluation of the effectiveness of the coastal wetlands restoration projects carried out under the plan in creating, restoring, protecting and enhancing coastal wetlands in Louisiana.

**(c) Coastal wetlands restoration project benefits**

Where such a determination is required under applicable law, the net ecological, aesthetic, and cultural benefits, together with the economic benefits, shall be deemed to exceed the costs of any coastal wetlands restoration project within the State which the Task Force finds to contribute significantly to wetlands restoration.

**(d) Consistency**

**(1)** In implementing, maintaining, modifying, or rehabilitating navigation, flood control or irrigation projects, other than emergency actions, under other authorities, the Secretary, in consultation with the Director and the Administrator, shall ensure that such actions are consistent with the purposes of the restoration plan submitted pursuant to this section.

**(2)** At the request of the Governor of the State of Louisiana, the Secretary of Commerce shall approve the plan as an amendment to the State's coastal zone management program approved under section 1455 of this title.

**(e) Funding of wetlands restoration projects**

<span style="color:orange">**App. 024**</span>

**§ 3952. Priority Louisiana coastal wetlands restoration projects, 16 USCA § 3952**

The Secretary shall, with the funds made available in accordance with this chapter, allocate such funds among the members of the Task Force to carry out coastal wetlands restoration projects in accordance with the priorities set forth in the list transmitted in accordance with this section. The Secretary shall not fund a coastal wetlands restoration project unless that project is subject to such terms and conditions as necessary to ensure that wetlands restored, enhanced or managed through that project will be administered for the long-term conservation of such lands and waters and dependent fish and wildlife populations.

**(f) Cost-sharing**

**(1) Federal share**

Amounts made available in accordance with section 3955 of this title to carry out coastal wetlands restoration projects under this chapter shall provide 75 percent of the cost of such projects.

**(2) Federal share upon conservation plan approval**

Notwithstanding the previous paragraph, if the State develops a Coastal Wetlands Conservation Plan pursuant to this chapter, and such conservation plan is approved pursuant to section 3953 of this title, amounts made available in accordance with section 3955 of this title for any coastal wetlands restoration project under this section shall be 85 percent of the cost of the project. In the event that the Secretary, the Director, and the Administrator jointly determine that the State is not taking reasonable steps to implement and administer a conservation plan developed and approved pursuant to this chapter, amounts made available in accordance with section 3955 of this title for any coastal wetlands restoration project shall revert to 75 percent of the cost of the project: *Provided, however,* that [1] such reversion to the lower cost share level shall not occur until the Governor has been provided notice of, and opportunity for hearing on, any such determination by the Secretary, the Director, and Administrator, and the State has been given ninety days from such notice or hearing to take corrective action.

**(3) Form of State share**

The share of the cost required of the State shall be from a non-Federal source. Such State share shall consist of a cash contribution of not less than 5 percent of the cost of the project. The balance of such State share may take the form of lands, easements, or right-of-way, or any other form of in-kind contribution determined to be appropriate by the lead Task Force member.

**(4) Existing cost-sharing agreements**

Paragraphs (1), (2), (3), and (5) of this subsection shall not affect the existing cost-sharing agreements for the following projects: Caernarvon Freshwater Diversion, Davis Pond Freshwater Diversion, and Bonnet Carre Freshwater Diversion.

**(5) Federal share in calendar years 1996 and 1997**

Notwithstanding paragraphs (1) and (2), upon approval of the conservation plan under section 3953 of this title and a determination by the Secretary that a reduction in the non-Federal share is warranted, amounts made available in accordance with section 3955 of this title to carry out coastal wetlands restoration projects under this section in calendar years 1996 and 1997 shall provide 90 percent of the cost of such projects.

**App. 025**

§ 3952. Priority Louisiana coastal wetlands restoration projects, 16 USCA § 3952

**CREDIT(S)**

(Pub.L. 101-646, Title III, § 303, Nov. 29, 1990, 104 Stat. 4779; Pub.L. 104-303, Title V, § 532, Oct. 12, 1996, 110 Stat. 3774.)

**Footnotes**

1   So in original. Probably should be capitalized.

16 U.S.C.A. § 3952, 16 USCA § 3952
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

§ 3168. Planning process, 18 USCA § 3168

---

United States Code Annotated
  Title 18. Crimes and Criminal Procedure (Refs & Annos)
    Part II. Criminal Procedure
      Chapter 208. Speedy Trial (Refs & Annos)

18 U.S.C.A. § 3168

§ 3168. Planning process

Currentness

**(a)** Within sixty days after July 1, 1975, each United States district court **shall convene** a planning group consisting at minimum of the Chief Judge, a United States magistrate judge, if any designated by the Chief Judge, the United States Attorney, the Clerk of the district court, the Federal Public Defender, if any, two private attorneys, one with substantial experience in the defense of criminal cases in the district and one with substantial experience in civil litigation in the district, the Chief United States Probation Officer for the district, and a person skilled in criminal justice research who shall act as reporter for the group. The group shall advise the district court with respect to the formulation of all district plans and shall submit its recommendations to the district court for each of the district plans required by section 3165. The group shall be responsible for the initial formulation of all district plans and of the reports required by this chapter and in aid thereof, it shall be entitled to the planning funds specified in section 3171.

**(b)** The planning group shall address itself to the need for reforms in the criminal justice system, including but not limited to changes in the grand jury system, the finality of criminal judgments, habeas corpus and collateral attacks, pretrial diversion, pretrial detention, excessive reach of Federal criminal law, simplification and improvement of pretrial and sentencing procedures, and appellate delay.

**(c)** Members of the planning group with the exception of the reporter shall receive no additional compensation for their services, but shall be reimbursed for travel, subsistence and other necessary expenses incurred by them in carrying out the duties of the advisory group in accordance with the provisions of title 5, United States Code, chapter 57. The reporter shall be compensated in accordance with section 3109 of title 5, United States Code, and notwithstanding other provisions of law he may be employed for any period of time during which his services are needed.

**CREDIT(S)**

(Added Pub.L. 93-619, Title I, § 101, Jan. 3, 1975, 88 Stat. 2083; amended Pub.L. 96-43, § 9(d), Aug. 2, 1979, 93 Stat. 330; Pub.L. 101-650, Title III, § 321, Dec. 1, 1990, 104 Stat. 5117.)

18 U.S.C.A. § 3168, 18 USCA § 3168
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

---

        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**App. 027**

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   1

United States Code Annotated
  Title 20. Education
    Chapter 6A. Vending Facilities for Blind in Federal Buildings

20 U.S.C.A. § 107d-2

§ 107d-2. Arbitration

Currentness

**(a) Notice and hearing**

Upon receipt of a complaint filed under section 107d-1 of this title, the Secretary **shall convene** an ad hoc arbitration panel as provided in subsection (b). Such panel shall, in accordance with the provisions of subchapter II of chapter 5 of Title 5, give notice, conduct a hearing, and render its decision which shall be subject to appeal and review as a final agency action for purposes of chapter 7 of such Title 5.

**(b) Composition of panel; designation of chairman; termination of violations**

**(1)** The arbitration panel convened by the Secretary to hear grievances of blind licensees shall be composed of three members appointed as follows:

  **(A)** one individual designated by the State licensing agency;

  **(B)** one individual designated by the blind licensee; and

  **(C)** one individual, not employed by the State licensing agency or, where appropriate, its parent agency, who shall serve as chairman, jointly designated by the members appointed under subparagraphs (A) and (B).

If any party fails to designate a member under subparagraph (1)(A), (B), or (C), the Secretary shall designate such member on behalf of such party.

**(2)** The arbitration panel convened by the Secretary to hear complaints filed by a State licensing agency shall be composed of three members appointed as follows:

  **(A)** one individual, designated by the State licensing agency;

  **(B)** one individual, designated by the head of the Federal department, agency, or instrumentality controlling the Federal property over which the dispute arose; and

**App. 028**

**(C)** one individual, not employed by the Federal department, agency, or instrumentality controlling the Federal property over which the dispute arose, who shall serve as chairman, jointly designated by the members appointed under subparagraphs (A) and (B).

If any party fails to designate a member under subparagraph (2)(A), (B), or (C), the Secretary shall designate such member on behalf of such party. If the panel appointed pursuant to paragraph (2) finds that the acts or practices of any such department, agency, or instrumentality are in violation of this chapter, or any regulation issued thereunder, the head of any such department, agency, or instrumentality shall cause such acts or practices to be terminated promptly and shall take such other action as may be necessary to carry out the decision of the panel.

**(c) Publication of decisions in Federal Register**

The decisions of a panel convened by the Secretary pursuant to this section shall be matters of public record and shall be published in the Federal Register.

**(d) Payment of costs by the Secretary**

The Secretary shall pay all reasonable costs of arbitration under this section in accordance with a schedule of fees and expenses he shall publish in the Federal Register.

**CREDIT(S)**

(June 20, 1936, c. 638, § 6, as added Pub.L. 93-516, Title II, § 206, Dec. 7, 1974, 88 Stat. 1626; Pub.L. 93-651, Title II, § 206, Nov. 21, 1974, 89 Stat. 2-11.)

20 U.S.C.A. § 107d-2, 20 USCA § 107d-2
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 20. Education
    Chapter 28. Higher Education Resources and Student Assistance (Refs & Annos)
      Subchapter IV. Student Assistance (Refs & Annos)
        Part G. General Provisions Relating to Student Assistance Programs (Refs & Annos)

20 U.S.C.A. § 1090

§ 1090. Forms and regulations

Effective: July 1, 2010
Currentness

**(a) Common financial aid form development and processing**

**(1) In general**

The Secretary, in cooperation with representatives of agencies and organizations involved in student financial assistance, shall produce, distribute, and process free of charge common financial reporting forms as described in this subsection to be used for application and reapplication to determine the need and eligibility of a student for financial assistance under parts A through E (other than under subpart 4 of part A). The forms shall be made available to applicants in both paper and electronic formats and shall be referred to as the "Free Application for Federal Student Aid" or the "FAFSA". The Secretary shall work to make the FAFSA consumer-friendly and to make questions on the FAFSA easy for students and families to read and understand, and shall ensure that the FAFSA is available in formats accessible to individuals with disabilities.

**(2) Paper format**

**(A) In general**

The Secretary shall develop, make available, and process--

**(i)** a paper version of EZ FAFSA, as described in subparagraph (B); and

**(ii)** a paper version of the other forms described in this subsection, in accordance with subparagraph (C), for any applicant who does not meet the requirements of or does not wish to use the process described in subparagraph (B).

**(B) EZ FAFSA**

**(i) In general**

**App. 030**

The Secretary shall develop and use, after appropriate field testing, a simplified paper form, to be known as the EZ FAFSA, to be used for applicants meeting the requirements of subsection (b) or (c) of section 1087ss of this title.

**(ii) Reduced data requirements**

The EZ FAFSA shall permit an applicant to submit, for financial assistance purposes, only the data elements required to make a determination of whether the applicant meets the requirements under subsection (b) or (c) of section 1087ss of this title.

**(iii) State data**

The Secretary shall include on the EZ FAFSA such data items as may be necessary to award State financial assistance, as provided under paragraph (5), except that the Secretary shall not include a State's data if that State does not permit the State's resident applicants to use the EZ FAFSA for State assistance.

**(iv) Free availability and processing**

The provisions of paragraph (6) shall apply to the EZ FAFSA, and the data collected by means of the EZ FAFSA shall be available to institutions of higher education, guaranty agencies, and States in accordance with paragraph (10).

**(C) Promoting the use of electronic FAFSA**

**(i) In general**

The Secretary shall make all efforts to encourage all applicants to utilize the electronic version of the forms described in paragraph (3).

**(ii) Maintenance of the FAFSA in a printable electronic file**

The Secretary shall maintain a version of the paper forms described in subparagraphs (A) and (B) in a printable electronic file that is easily portable, accessible, and downloadable to students on the same website used to provide students with the electronic version of the forms described in paragraph (3).

**(iii) Requests for printed copy**

The Secretary shall provide a printed copy of the full paper version of FAFSA upon request.

**(iv) Reporting requirement**

The Secretary shall maintain data, and periodically report to Congress, on the impact of the digital divide on students completing applications for aid under this subchapter. The Secretary shall report on the steps taken to eliminate the digital

App. 031

divide and reduce production of the paper form described in subparagraph (A). The Secretary's report shall specifically address the impact of the digital divide on the following student populations:

    **(I)** Independent students.

    **(II)** Traditionally underrepresented students.

    **(III)** Dependent students.

**(3) Electronic format**

    **(A) In general**

The Secretary shall produce, distribute, and process forms in electronic format to meet the requirements of paragraph (1). The Secretary shall develop an electronic version of the forms for applicants who do not meet the requirements of subsection (b) or (c) of section 1087ss of this title.

    **(B) Simplified applications: FAFSA on the web**

        **(i) In general**

The Secretary shall develop and use a simplified electronic version of the form to be used by applicants meeting the requirements under subsection (b) or (c) of section 1087ss of this title.

        **(ii) Reduced data requirements**

The simplified electronic version of the forms shall permit an applicant to submit, for financial assistance purposes, only the data elements required to make a determination of whether the applicant meets the requirements under subsection (b) or (c) of section 1087ss of this title.

        **(iii) Use of forms**

Nothing in this subsection shall be construed to prohibit the use of the forms developed by the Secretary pursuant to this paragraph by an eligible institution, eligible lender, guaranty agency, State grant agency, private computer software provider, a consortium thereof, or such other entities as the Secretary may designate.

    **(C) State data**

**App. 032**

The Secretary shall include on the electronic version of the forms such items as may be necessary to determine eligibility for State financial assistance, as provided under paragraph (5), except that the Secretary shall not require an applicant to enter data pursuant to this subparagraph that are required by any State other than the applicant's State of residence.

**(D) Availability and processing**

The data collected by means of the simplified electronic version of the forms shall be available to institutions of higher education, guaranty agencies, and States in accordance with paragraph (10).

**(E) Privacy**

The Secretary shall ensure that data collection under this paragraph complies with section 552a of Title 5 and that any entity using the electronic version of the forms developed by the Secretary pursuant to this paragraph shall maintain reasonable and appropriate administrative, technical, and physical safeguards to ensure the integrity and confidentiality of the information, and to protect against security threats, or unauthorized uses or disclosures of the information provided on the electronic version of the forms. Data collected by such electronic version of the forms shall be used only for the application, award, and administration of aid awarded under this subchapter, State aid, or aid awarded by eligible institutions or such entities as the Secretary may designate. No data collected by such electronic version of the forms shall be used for making final aid awards under this subchapter until such data have been processed by the Secretary or a contractor or designee of the Secretary, except as may be permitted under this subchapter.

**(F) Signature**

Notwithstanding any other provision of this chapter, the Secretary may continue to permit an electronic version of the form under this paragraph to be submitted without a signature, if a signature is subsequently submitted by the applicant or if the applicant uses a personal identification number provided by the Secretary under subparagraph (G).

**(G) Personal identification numbers authorized**

The Secretary may continue to assign to an applicant a personal identification number--

**(i)** to enable the applicant to use such number as a signature for purposes of completing an electronic version of a form developed under this paragraph; and

**(ii)** for any purpose determined by the Secretary to enable the Secretary to carry out this subchapter.

**(H) Personal identification number improvement**

The Secretary shall continue to work with the Commissioner of Social Security to minimize the time required for an applicant to obtain a personal identification number when applying for aid under this subchapter through an electronic version of a form developed under this paragraph.

**App. 033**

**(4) Streamlining**

**(A) Streamlined reapplication process**

**(i) In general**

The Secretary shall continue to streamline reapplication forms and processes for an applicant who applies for financial assistance under this subchapter in the next succeeding academic year subsequent to an academic year for which such applicant applied for financial assistance under this subchapter.

**(ii) Updating of data elements**

The Secretary shall determine, in cooperation with States, institutions of higher education, agencies, and organizations involved in student financial assistance, the data elements that may be transferred from the previous academic year's application and those data elements that shall be updated.

**(iii) Reduced data authorized**

Nothing in this subchapter shall be construed as limiting the authority of the Secretary to reduce the number of data elements required of reapplicants.

**(iv) Zero family contribution**

Applicants determined to have a zero family contribution pursuant to section 1087ss(c) of this title shall not be required to provide any financial data in a reapplication form, except data that are necessary to determine eligibility under such section.

**(B) Reduction of data elements**

**(i) Reduction encouraged**

Of the number of data elements on the FAFSA used for the 2009-2010 award year, the Secretary, in cooperation with representatives of agencies and organizations involved in student financial assistance and consistent with efforts under subsection (c), shall continue to reduce the number of such data elements required to be entered by all applicants, with the goal of reducing such number by 50 percent.

**(ii) Report**

The Secretary shall submit a report on the process of this reduction to each of the authorizing committees by June 30, 2011.

**App. 034**

**(5) State requirements**

**(A) In general**

Except as provided in paragraphs (2)(B)(iii), (3)(B), and (4)(A)(ii), the Secretary shall include on the forms developed under this subsection, such State-specific data items as the Secretary determines are necessary to meet State requirements for need-based State aid. Such items shall be selected in consultation with State agencies in order to assist in the awarding of State financial assistance in accordance with the terms of this subsection. The number of such data items shall not be less than the number included on the form for the 2008-2009 award year unless a State notifies the Secretary that the State no longer requires those data items for the distribution of State need-based aid.

**(B) Annual review**

The Secretary shall conduct an annual review to determine--

**(i)** which data items each State requires to award need-based State aid; and

**(ii)** if the State will permit an applicant to file a form described in paragraph (2)(B) or (3)(B).

**(C) Federal Register notice**

Beginning with the forms developed under paragraphs (2)(B) and (3)(B) for the award year 2010-2011, the Secretary shall publish on an annual basis a notice in the Federal Register requiring State agencies to inform the Secretary--

**(i)** if the State agency is unable to permit applicants to utilize the simplified forms described in paragraphs (2)(B) and (3)(B); and

**(ii)** of the State-specific nonfinancial data that the State agency requires for delivery of State need-based financial aid.

**(D) Use of simplified forms encouraged**

The Secretary shall encourage States to take such steps as are necessary to encourage the use of simplified forms under this subsection, including those forms described in paragraphs (2)(B) and (3)(B), for applicants who meet the requirements of subsection (b) or (c) of section 1087ss of this title.

**(E) Consequences if State does not accept simplified forms**

**App. 035**

If a State does not permit an applicant to file a form described in paragraph (2)(B) or (3)(B) for purposes of determining eligibility for State need-based financial aid, the Secretary may determine that State-specific questions for such State will not be included on a form described in paragraph (2)(B) or (3)(B). If the Secretary makes such determination, the Secretary shall advise the State of the Secretary's determination.

**(F) Lack of State response to request for information**

If a State does not respond to the Secretary's request for information under subparagraph (B), the Secretary shall--

**(i)** permit residents of that State to complete simplified forms under paragraphs (2)(B) and (3)(B); and

**(ii)** not require any resident of such State to complete any data items previously required by that State under this section.

**(G) Restriction**

The Secretary shall, to the extent practicable, not require applicants to complete any financial or nonfinancial data items that are not required--

**(i)** by the applicant's State; or

**(ii)** by the Secretary.

**(6) Charges to students and parents for use of forms prohibited**

The need and eligibility of a student for financial assistance under parts A through E (other than under subpart 4 of part A) may be determined only by using a form developed by the Secretary under this subsection. Such forms shall be produced, distributed, and processed by the Secretary, and no parent or student shall be charged a fee by the Secretary, a contractor, a third-party servicer or private software provider, or any other public or private entity for the collection, processing, or delivery of financial aid through the use of such forms. No data collected on a form for which a fee is charged shall be used to complete the form prescribed under this section, except that a Federal or State income tax form prepared by a paid income tax preparer or preparer service for the primary purpose of filing a Federal or State income tax return may be used to complete the form prescribed under this section.

**(7) Restrictions on use of PIN**

No person, commercial entity, or other entity may request, obtain, or utilize an applicant's personal identification number assigned under paragraph (3)(G) for purposes of submitting a form developed under this subsection on an applicant's behalf.

**(8) Application processing cycle**

**App. 036**

The Secretary shall enable students to submit forms developed under this subsection and initiate the processing of such forms under this subsection, as early as practicable prior to January 1 of the student's planned year of enrollment.

**(9) Early estimates**

The Secretary shall continue to--

**(A)** permit applicants to enter data in such forms as described in this subsection in the years prior to enrollment in order to obtain a non-binding estimate of the applicant's family contribution (as defined in section 1087mm of this title);

**(B)** permit applicants to update information submitted on forms described in this subsection, without needing to re-enter previously submitted information;

**(C)** develop a means to inform applicants, in the years prior to enrollment, of student aid options for individuals in similar financial situations;

**(D)** develop a means to provide a clear and conspicuous notice that the applicant's expected family contribution is subject to change and may not reflect the final expected family contribution used to determine Federal student financial aid award amounts under this subchapter; and

**(E)** consult with representatives of States, institutions of higher education, and other individuals with experience or expertise in student financial assistance application processes in making updates to forms used to provide early estimates under this paragraph.

**(10) Distribution of data**

Institutions of higher education, guaranty agencies, and States shall receive, without charge, the data collected by the Secretary using a form developed under this subsection for the purposes of processing loan applications and determining need and eligibility for institutional and State financial aid awards. Entities designated by institutions of higher education, guaranty agencies, or States to receive such data shall be subject to all the requirements of this section, unless such requirements are waived by the Secretary.

**(11) Third party servicers and private software providers**

To the extent practicable and in a timely manner, the Secretary shall provide, to private organizations and consortia that develop software used by institutions of higher education for the administration of funds under this subchapter, all the necessary specifications that the organizations and consortia must meet for the software the organizations and consortia develop, produce, and distribute (including any diskette, modem, or network communications) to be so used. The specifications shall contain record layouts for required data. The Secretary shall develop in advance of each processing cycle an annual schedule for providing such specifications. The Secretary, to the extent practicable, shall use multiple means of providing such specifications, including conferences and other meetings, outreach, and technical support mechanisms (such

App. 037

as training and printed reference materials). The Secretary shall, from time to time, solicit from such organizations and consortia means of improving the support provided by the Secretary.

**(12) Parent's social security number and birth date**

The Secretary is authorized to include space on the forms developed under this subsection for the social security number and birth date of parents of dependent students seeking financial assistance under this subchapter.

**(b) Information to committees of Congress**

Copies of all rules, regulations, guidelines, instructions, and application forms published or promulgated pursuant to this subchapter shall be provided to the authorizing committees at least 45 days prior to their effective date.

**(c) Toll-free information**

The Secretary shall contract for, or establish, and publicize a toll-free telephone service to provide timely and accurate information to the general public. The information provided shall include specific instructions on completing the application form for assistance under this subchapter. Such service shall also include a service accessible by telecommunications devices for the deaf (TDD's) and shall, in addition to the services provided for in the previous sentence, refer such students to the national clearinghouse on postsecondary education or other appropriate provider of technical assistance and information on postsecondary educational services for individuals with disabilities, including the National Technical Assistance Center under section 1140q of this title. The Secretary shall continue to implement, to the extent practicable, a toll-free telephone based system to permit applicants who meet the requirements of subsection (b) or (c) of section 1087ss of this title to submit an application over such system.

**(d) Assistance in preparation of financial aid application**

**(1) Preparation authorized**

Notwithstanding any provision of this chapter, an applicant may use a preparer for consultative or preparation services for the completion of a form developed under subsection (a) if the preparer satisfies the requirements of this subsection.

**(2) Preparer identification required**

If an applicant uses a preparer for consultative or preparation services for the completion of a form developed under subsection (a), and for which a fee is charged, the preparer shall--

**(A)** include, at the time the form is submitted to the Department, the name, address or employer's address, social security number or employer identification number, and organizational affiliation of the preparer on the applicant's form; and

**(B)** be subject to the same penalties as an applicant for purposely giving false or misleading information in the application.

**App. 038**

**(3) Additional requirements**

A preparer that provides consultative or preparation services pursuant to this subsection shall--

**(A)** clearly inform each individual upon initial contact, including contact through the Internet or by telephone, that the FAFSA and EZ FAFSA are free forms that may be completed without professional assistance via paper or electronic version of the forms that are provided by the Secretary;

**(B)** include in any advertising clear and conspicuous information that the FAFSA and EZ FAFSA are free forms that may be completed without professional assistance via paper or electronic version of the forms that are provided by the Secretary;

**(C)** if advertising or providing any information on a website, or if providing services through a website, include on the website a link to the website that provides the electronic version of the forms developed under subsection (a); and

**(D)** not produce, use, or disseminate any other form for the purpose of applying for Federal student financial aid other than the form developed by the Secretary under subsection (a).

**(4) Special rule**

Nothing in this chapter shall be construed to limit preparers of the forms required under this subchapter that meet the requirements of this subsection from collecting source information from a student or parent, including Internal Revenue Service tax forms, in providing consultative and preparation services in completing the forms.

**(e) Early application and estimated award demonstration program**

**(1) Purpose and objectives**

The purpose of the demonstration program under this subsection is to measure the benefits, in terms of student aspirations and plans to attend an institution of higher education, and any adverse effects, in terms of program costs, integrity, distribution, and delivery of aid under this subchapter, of implementing an early application system for all dependent students that allows dependent students to apply for financial aid using information from two years prior to the year of enrollment. Additional objectives associated with implementation of the demonstration program are the following:

**(A)** To measure the feasibility of enabling dependent students to apply for Federal, State, and institutional financial aid in their junior year of secondary school, using information from two years prior to the year of enrollment, by completing any of the forms under this subsection.

**App. 039**

**(B)** To identify whether receiving final financial aid award estimates not later than the fall of the senior year of secondary school provides students with additional time to compete for the limited resources available for State and institutional financial aid and positively impacts the college aspirations and plans of these students.

**(C)** To measure the impact of using income information from the years prior to enrollment on--

**(i)** eligibility for financial aid under this subchapter and for other State and institutional aid; and

**(ii)** the cost of financial aid programs under this subchapter.

**(D)** To effectively evaluate the benefits and adverse effects of the demonstration program on program costs, integrity, distribution, and delivery of financial aid.

**(2) Program authorized**

Not later than two years after August 14, 2008, the Secretary shall implement an early application demonstration program enabling dependent students who wish to participate in the program--

**(A)** to complete an application under this subsection during the academic year that is two years prior to the year such students plan to enroll in an institution of higher education; and

**(B)** based on the application described in subparagraph (A), to obtain, not later than one year prior to the year of the students' planned enrollment, information on eligibility for Federal Pell Grants, Federal student loans under this subchapter, and State and institutional financial aid for the student's first year of enrollment in the institution of higher education.

**(3) Early application and estimated award**

For all dependent students selected for participation in the demonstration program who submit a completed FAFSA, or, as appropriate, an EZ FAFSA, two years prior to the year such students plan to enroll in an institution of higher education, the Secretary shall, not later than one year prior to the year of such planned enrollment--

**(A)** provide each student who completes an early application with an estimated determination of such student's--

**(i)** expected family contribution for the first year of the student's enrollment in an institution of higher education; and

**(ii)** Federal Pell Grant award for the first such year, based on the Federal Pell Grant amount, determined under section 1070a(b)(2)(A) of this title, for which a student is eligible at the time of application; and

**App. 040**

**(B)** remind the students of the need to update the students' information during the calendar year of enrollment using the expedited reapplication process provided for in subsection (a)(4)(A).

**(4) Participants**

The Secretary shall include as participants in the demonstration program--

**(A)** States selected through the application process described in paragraph (5);

**(B)** institutions of higher education within the selected States that are interested in participating in the demonstration program, and that can make estimates or commitments of institutional student financial aid, as appropriate, to students the year before the students' planned enrollment date; and

**(C)** secondary schools within the selected States that are interested in participating in the demonstration program, and that can commit resources to--

**(i)** advertising the availability of the program;

**(ii)** identifying students who might be interested in participating in the program;

**(iii)** encouraging such students to apply; and

**(iv)** participating in the evaluation of the program.

**(5) Applications**

Each State that is interested in participating in the demonstration program shall submit an application to the Secretary at such time, in such form, and containing such information as the Secretary shall require. The application shall include--

**(A)** information on the amount of the State's need-based student financial assistance available, and the eligibility criteria for receiving such assistance;

**(B)** a commitment to make, not later than the year before the dependent students participating in the demonstration program plan to enroll in an institution of higher education, an estimate of the award of State financial aid to such dependent students;

**(C)** a plan for recruiting institutions of higher education and secondary schools with different demographic characteristics to participate in the program;

**App. 041**

**(D)** a plan for selecting institutions of higher education and secondary schools to participate in the program that--

**(i)** demonstrate a commitment to encouraging students to submit a FAFSA, or, as appropriate, an EZ FAFSA, two years before the students' planned date of enrollment in an institution of higher education;

**(ii)** serve different populations of students;

**(iii)** in the case of institutions of higher education--

**(I)** to the extent possible, are of varying types and sectors; and

**(II)** commit to making, not later than the year prior to the year that dependent students participating in the demonstration program plan to enroll in the institution--

**(aa)** estimated institutional awards to participating dependent students; and

**(bb)** estimated grants or other financial aid available under this subchapter (including supplemental grants under subpart 3 of part A of this subchapter), for all participating dependent students, along with information on State awards, as provided to the institution by the State;

**(E)** a commitment to participate in the evaluation conducted by the Secretary; and

**(F)** such other information as the Secretary may require.

**(6) Special provisions**

**(A) Discretion of student financial aid administrators**

A financial aid administrator at an institution of higher education participating in a demonstration program under this subsection may use the discretion provided under section 1087tt of this title as necessary for students participating in the demonstration program.

**(B) Waivers**

The Secretary is authorized to waive, for an institution of higher education participating in the demonstration program, any requirements under this subchapter, or regulations prescribed under this subchapter, that will make the demonstration

**App. 042**

program unworkable, except that the Secretary shall not waive any provisions with respect to the maximum award amounts for grants and loans under this subchapter.

**(7) Outreach**

The Secretary shall make appropriate efforts to notify States of the demonstration program under this subsection. Upon determination of participating States, the Secretary shall continue to make efforts to notify institutions of higher education and dependent students within participating States of the opportunity to participate in the demonstration program and of the participation requirements.

**(8) Evaluation**

The Secretary shall conduct a rigorous evaluation of the demonstration program to measure the program's benefits and adverse effects, as the benefits and effects relate to the purpose and objectives of the program described in paragraph (1). In conducting the evaluation, the Secretary shall--

**(A)** determine whether receiving financial aid estimates one year prior to the year in which the student plans to enroll in an institution of higher education, has a positive impact on the higher education aspirations and plans of such student;

**(B)** measure the extent to which using a student's income information from the year that is two years prior to the student's planned enrollment date had an impact on the ability of States and institutions of higher education to make financial aid awards and commitments;

**(C)** determine what operational changes are required to implement the program on a larger scale;

**(D)** identify any changes to Federal law that are necessary to implement the program on a permanent basis;

**(E)** identify the benefits and adverse effects of providing early estimates on program costs, program operations, program integrity, award amounts, distribution, and delivery of aid; and

**(F)** examine the extent to which estimated awards differ from actual awards made to students participating in the program.

**(9) Consultation**

The Secretary shall consult, as appropriate, with the Advisory Committee on Student Financial Assistance established under section 1098 of this title on the design, implementation, and evaluation of the demonstration program.

**(f) Reduction of income and asset information to determine eligibility for student financial aid**

**App. 043**

**(1) Continuation of current FAFSA simplification efforts**

The Secretary shall continue to examine--

**(A)** how the Internal Revenue Service can provide to the Secretary income and other data needed to compute an expected family contribution for taxpayers and dependents of taxpayers, and when in the application cycle the data can be made available;

**(B)** whether data provided by the Internal Revenue Service can be used to--

**(i)** prepopulate the electronic version of the FAFSA with student and parent taxpayer data; or

**(ii)** generate an expected family contribution without additional action on the part of the student and taxpayer; and

**(C)** whether the data elements collected on the FAFSA that are needed to determine eligibility for student aid, or to administer the Federal student financial aid programs under this subchapter, but are not needed to compute an expected family contribution, such as information regarding the student's citizenship or permanent residency status, registration for selective service, or driver's license number, can be reduced without adverse effects.

**(2) Report on FAFSA simplification efforts to date**

Not later than 90 days after August 14, 2008, the Secretary shall provide a written report to the authorizing committees on the work the Department has done with the Secretary of the Treasury regarding--

**(A)** how the expected family contribution of a student can be calculated using substantially less income and asset information than was used on March 31, 2008;

**(B)** the extent to which the reduced income and asset information will result in a redistribution of Federal grants and subsidized loans under this subchapter, State aid, or institutional aid, or in a change in the composition of the group of recipients of such aid, and the amount of such redistribution;

**(C)** how the alternative approaches for calculating the expected family contribution will--

**(i)** rely mainly, in the case of students and parents who file income tax returns, on information available on the 1040, 1040EZ, and 1040A; and

**(ii)** include formulas for adjusting income or asset information to produce similar results to the existing approach with less data;

**App. 044**

**(D)** how the Internal Revenue Service can provide to the Secretary of Education income and other data needed to compute an expected family contribution for taxpayers and dependents of taxpayers, and when in the application cycle the data can be made available;

**(E)** whether data provided by the Internal Revenue Service can be used to--

**(i)** prepopulate the electronic version of the FAFSA with student and parent taxpayer data; or

**(ii)** generate an expected family contribution without additional action on the part of the student and taxpayer;

**(F)** the extent to which the use of income data from two years prior to a student's planned enrollment date will change the expected family contribution computed in accordance with part F, and potential adjustments to the need analysis formula that will minimize the change; and

**(G)** the extent to which the data elements collected on the FAFSA on March 31, 2008, that are needed to determine eligibility for student aid or to administer the Federal student financial aid programs, but are not needed to compute an expected family contribution, such as information regarding the student's citizenship or permanent residency status, registration for selective service, or driver's license number, can be reduced without adverse effects.

**(3) Study**

**(A) Formation of study group**

Not later than 90 days after August 14, 2008, the Comptroller General shall convene a study group the membership of which shall include the Secretary of Education, the Secretary of the Treasury, the Director of the Office of Management and Budget, the Director of the Congressional Budget Office, representatives of institutions of higher education with expertise in Federal and State financial aid assistance, State chief executive officers of higher education with a demonstrated commitment to simplifying the FAFSA, and such other individuals as the Comptroller General and the Secretary of Education may designate.

**(B) Study required**

The Comptroller General, in consultation with the study group convened under subparagraph (A) shall--

**(i)** review and build on the work of the Secretary of Education and the Secretary of the Treasury, and individuals with expertise in analysis of financial need, to assess alternative approaches for calculating the expected family contribution under the statutory need analysis formula in effect on the day before August 14, 2008, and under a new calculation that will use substantially less income and asset information than was used for the 2008-2009 FAFSA;

<span style="color:#e8730c">**App. 045**</span>

**(ii)** conduct an additional analysis if necessary; and

**(iii)** make recommendations to the authorizing committees.

**(C) Objectives of study**

The objectives of the study required under subparagraph (B) are--

**(i)** to determine methods to shorten the FAFSA and make the FAFSA easier and less time-consuming to complete, thereby increasing higher education access for low-income students;

**(ii)** to identify changes to the statutory need analysis formula that will be necessary to reduce the amount of financial information students and families need to provide to receive a determination of eligibility for student financial aid without causing significant redistribution of Federal grants and subsidized loans under this subchapter; and

**(iii)** to review State and institutional needs and uses for data collected on the FAFSA, and to determine the best means of addressing such needs in the case of modification of the FAFSA as described in clause (i), or modification of the need analysis formula as described in clause (ii).

**(D) Required subjects of study**

The study required under subparagraph (B) shall examine--

**(i)** with respect to simplification of the financial aid application process using the statutory requirements for need analysis--

**(I)** additional steps that can be taken to simplify the financial aid application process for students who (or, in the case of dependent students, whose parents) are not required to file a Federal income tax return for the prior taxable year;

**(II)** information on State use of information provided on the FAFSA, including--

**(aa)** whether a State uses, as of the time of the study, or can use, a student's expected family contribution based on data from two years prior to the student's planned enrollment date;

**(bb)** the extent to which States and institutions will accept the data provided by the Internal Revenue Service to prepopulate the electronic version of the FAFSA to determine the distribution of State and institutional student financial aid funds;

**App. 046**

**(cc)** what data are used by States, as of the time of the study, to determine eligibility for State student financial aid, and whether the data are used for merit- or need-based aid;

**(dd)** whether State data are required by State law, State regulations, or policy directives; and

**(ee)** the extent to which any State-specific information requirements can be met by completion of a State application linked to the electronic version of the FAFSA; and

**(III)** information on institutional needs, including the extent to which institutions of higher education are already using supplemental forms to collect additional data from students and their families to determine eligibility for institutional funds; and

**(ii)** ways to reduce the amount of financial information students and families need to provide to receive a determination of eligibility for student financial aid, taking into account--

**(I)** the amount of redistribution of Federal grants and subsidized loans under this subchapter caused by such a reduction, and the benefits to be gained by having an application process that will be easier for students and their families;

**(II)** students and families who do not file income tax returns;

**(III)** the extent to which the full array of income and asset information collected on the FAFSA, as of the time of the study, plays an important role in the awarding of need-based State financial aid, and whether the State can use an expected family contribution generated by the FAFSA, instead of income and asset information or a calculation with reduced data elements, to support determinations of eligibility for such State aid programs and, if not, what additional information will be needed or what changes to the FAFSA will be required; and

**(IV)** information on institutional needs, including the extent to which institutions of higher education are already using supplemental forms to collect additional data from students and their families to determine eligibility for institutional funds; and

**(V)** changes to this chapter or other laws that will be required to implement a modified need analysis system.

**(4) Consultation**

The Secretary shall consult with the Advisory Committee on Student Financial Assistance established under section 1098 of this title as appropriate in carrying out this subsection.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    18

**(5) Reports**

**(A) Reports on study**

The Secretary shall prepare and submit to the authorizing committees--

**(i)** not later than one year after August 14, 2008, an interim report on the progress of the study required under paragraph (3) that includes any preliminary recommendations by the study group established under such paragraph; and

**(ii)** not later than two years after August 14, 2008, a final report on the results of the study required under paragraph (3) that includes recommendations by the study group established under such paragraph.

**(B) Reports on FAFSA simplification efforts**

The Secretary shall report to the authorizing committees, from time to time, on the progress of the simplification efforts under this subsection.

**(g) Addressing the digital divide**

The Secretary shall utilize savings accrued by moving more applicants to the electronic version of the forms described in subsection (a)(3) to improve access to the electronic version of the forms described in such subsection for applicants meeting the requirements of subsection (b) or (c) of section 1087ss of this title.

**(h) Adjustments**

The Secretary shall disclose, on the form notifying a student of the student's expected family contribution, that the student may, on a case-by-case basis, qualify for an adjustment under section 1087tt of this title to the cost of attendance or the values of the data items required to calculate the expected contribution for the student or parent. Such disclosure shall specify--

**(1)** the special circumstances under which a student or family member may qualify for such adjustment; and

**(2)** additional information regarding the steps a student or family member may take in order to seek an adjustment under section 1087tt of this title.

**CREDIT(S)**

(Pub.L. 89-329, Title IV, § 483, as added Pub.L. 99-498, Title IV, § 407(a), Oct. 17, 1986, 100 Stat. 1478; amended Pub.L. 100-50, § 15(3) to (6), June 3, 1987, 101 Stat. 356; Pub.L. 102-325, Title IV, § 483, July 23, 1992, 106 Stat. 612; Pub.L. 103-208, § 2(h)(8) to (12), Dec. 20, 1993, 107 Stat. 2476; Pub.L. 105-244, Title IV, § 482, Oct. 7, 1998, 112 Stat. 1733; Pub.L. 110-315,

**App. 048**

Title I, § 103(b)(10), Title IV, § 483(a), Aug. 14, 2008, 122 Stat. 3090, 3272; Pub.L. 111-39, Title IV, § 407(b)(3), July 1, 2009, 123 Stat. 1950; Pub.L. 111-152, Title II, § 2101(b)(4), Mar. 30, 2010, 124 Stat. 1073.)

<div align="center">

**AMENDMENT OF SECTION**

</div>

<Pub.L. 116-260, Div. FF, Title VII, §§ 701(b), 702(m)(1), Dec. 27, 2020, 134 Stat. 3137, 3168, as amended, as amended Pub.L 117-103, Div. R, § 102(b)(4), Mar. 15, 2022, 136 Stat. 819, provided that, effective July 1, 2024, and applicable with respect to award year 2024-2025 and each subsequent award year, as determined under the Higher Education Act of 1965, this section is amended to read as follows:>

<**§ 1090. Free Application for Federal Student Aid**>

<**(a) Simplified application for Federal student financial aid**>
   <**(1) In general**>

   <Each individual seeking to apply for Federal financial aid under this subchapter for award year 2024-2025 and any subsequent award year shall file a free application with the Secretary, known as the "Free Application for Federal Student Aid", to determine eligibility for such aid, as described in paragraph (2), and in accordance with section 1087ss of this title.>

   <**(2) Free application**>
      <**(A) In general**>

      <The Secretary shall make available, for the purposes of paragraph (1), a free application to determine the eligibility of a student for Federal financial aid under this subchapter.>

      <**(B) Information required by the applicant**>
         <**(i) In general**>

         <The applicant, and, if necessary, the parents or spouse of the applicant, shall provide the Secretary with the applicable information described in clause (ii) in order to be eligible for Federal financial aid under this subchapter.>

         <**(ii) Information to be provided**>

         <The information described in this clause is the following:>
            <**(I)** Name.>

            <**(II)** Contact information, including address, phone number, email address, or other electronic address.>

            <**(III)** Social security number.>

            <**(IV)** Date of birth.>

            <**(V)** Marital status.>

            <**(VI)** Citizenship status, including alien registration number, if applicable.>

<div align="right">

**App. 049**

</div>

<**(VII)** Sex.>

<**(VIII)** Race or ethnicity, using categories developed in consultation with the Bureau of the Census and the Director of the Institute of Education Sciences that, to the greatest extent practicable, separately capture the racial groups specified in the American Community Survey of the Bureau of the Census.>

<**(IX)** State of legal residence and date of residency.>

<**(X)** The following information on secondary school completion:>

<**(aa)** Name and location of the high school from which the applicant received, or will receive prior to the period of enrollment for which aid is sought, a regular high school diploma;>

<**(bb)** name and location of the entity from which the applicant received, or will receive prior to the period of enrollment for which aid is sought, a recognized equivalent of a regular high school diploma; or>

<**(cc)** if the applicant completed or will complete prior to the period of enrollment for which aid is sought, a secondary school education in a home school setting that is treated as a home school or private school under State law.>

<**(XI)** Name of each institution where the applicant intends to apply for enrollment or continue enrollment.>

<**(XII)** Year in school for period of enrollment for which aid is sought, including whether applicant will have finished first bachelor's degree prior to the period of enrollment for which aid is sought.>

<**(XIII)** Whether one or both of the applicant's parents attended college.>

<**(XIV)** Any required asset information, unless exempt under section 1087ss of this title, in which the applicant shall indicate--->

<**(aa)** the annual amount of child support received, if applicable; and>

<**(bb)** all required asset information not described in item (aa).>

<**(XV)** The number of members of the applicant's family who will also be enrolled in an eligible institution of higher education on at least a half-time basis during the same enrollment period as the applicant.>

<**(XVI)** If the applicant meets any of the following designations:>

<**(aa)** Is an unaccompanied homeless youth, or is unaccompanied, at risk of homelessness, and self-supporting.>

<**(bb)** Is an emancipated minor.>

<**(cc)** Is in legal guardianship.>

**App. 050**

<**(dd)** Has been a dependent ward of the court at any time since the applicant turned 13.>

<**(ee)** Has been in foster care at any time since the applicant turned 13.>

<**(ff)** Both parents have died since the applicant turned 13.>

<**(gg)** Is a veteran of the Armed Forces of the United States or is serving (on the date of the application) on active duty in the Armed Forces for other than training purposes.>

<**(hh)** Is under the age of 24 and has a dependent child or relative.>

<**(ii)** Does not have access to parental information due to an unusual circumstance described in section 1087vv(d)(9) of this title.>

<**(XVII)** If the applicant receives or has received any of the following means-tested Federal benefits within the last two years:>

<**(aa)** The supplemental security income program under title XVI of the Social Security Act (42 U.S.C. 1381 et seq.).>

<**(bb)** The supplemental nutrition assistance program under the Food and Nutrition Act of 2008 (7 U.S.C. 2011 et seq.), a nutrition assistance program carried out under section 19 of such Act (7 U.S.C. 2028), or a supplemental nutrition assistance program carried out under section 1841(c) of Title 48. >

<**(cc)** The free and reduced price school lunch program established under the Richard B. Russell National School Lunch Act (42 U.S.C. 1751 et seq.).>

<**(dd)** The program of block grants for States for temporary assistance for needy families established under part A of title IV of the Social Security Act (42 U.S.C. 601 et seq.).>

<**(ee)** The special supplemental nutrition program for women, infants, and children established by section 1786 of Title 42.>

<**(ff)** The Medicaid program under title XIX of the Social Security Act (42 U.S.C. 1396 et seq.).>

<**(gg)** Federal housing assistance programs, including tenant-based assistance under section 1437f(o) of Title 42, and public housing, as defined in section 1437a(b)(1) of Title 42.>

<**(hh)** Refundable credit for coverage under a qualified health plan under section 36B of Title 26.>

<**(ii)** The Earned Income Tax Credit under section 32 of Title 26.>

<**(jj)** Any other means-tested program determined by the Secretary to be appropriate.>

<**(XVIII)** If the applicant, or, if necessary, the parents or spouse of the applicant, reported receiving tax exempt payments from an individual retirement plan (as defined in section 7701 of Title 26) distribution or

**App. 051**

from pensions or annuities on a Federal tax return, information as to how much of the individual retirement plan distribution or pension or annuity disbursement was a qualified rollover.>

<**(XIX)** If the applicant, or, if necessary, the parents or spouse of the applicant, reported receiving foreign income that is exempt from Federal taxation or for which a permanent resident of the United States or United States citizen receives a foreign tax credit, information regarding the amount of such foreign income.>

<**(XX)** If the applicant, or, if applicable, the parents or spouse of the applicant, elects to report receiving college grant and scholarship aid included in gross income on a Federal tax return described in section 1087vv(e)(2) of this title, information regarding the amount of such aid [sic; probably should be followed by a period.]>

<**(iii) Prohibition against requesting information more than once**>

<Any information requested during the process of creating an account for completing the free application under this subsection, shall, to the fullest extent possible, not be required a second time for the same award year, or in a duplicative manner, when completing such free application except in the case of an unusual situation, such as a temporary inability to access an account for completing such free application.>

<**(iv) Change in family size**>

<The Secretary shall provide a process by which an applicant shall confirm the accuracy of family size or update the family size with respect to such applicant for purposes of determining the need of such applicant for financial assistance under this subchapter based on a change in family size from the tax year data used for such determination.>

<**(v) Single question for homeless status**>

<The Secretary shall ensure that-->
   <**(I)** on the form developed under this section for which the information is applicable, there is a single, easily understood screening question to identify an applicant who is an unaccompanied homeless youth or is unaccompanied, at risk of homelessness, and self-supporting; and>

   <**(II)** such question is distinct from those relating to an individual who does not have access to parental income due to an unusual circumstance.>

<**(vi) Adjustments**>

<The Secretary shall disclose on the FAFSA that the student may, on a case-by-case basis, qualify for an adjustment under section 1087tt of this title to the cost of attendance or the values of the data items required to calculate the student's eligibility for a Federal Pell Grant or the student aid index for the student or parent.>

<**(C) Notification and approval of request for tax return information**>

**App. 052**

<The Secretary shall notify students and borrowers who wish to submit an application for Federal student financial aid under this subchapter (as well as parents and spouses who must sign such an application or request or a Master Promissory Note on behalf of those students and borrowers) of the authority of the Secretary to require that such persons affirmatively approve that the Internal Revenue Service disclose their tax return information as described in section 1098h of this title.>

<**(D) Authorizations available to the applicant**>
   <**(i) Authorization to disclose FAFSA information, including a redisclosure of tax return information, to institution, State higher education agency, and designated scholarship organizations**>

   <An applicant and, if necessary, the parents or spouse of the applicant shall provide the Secretary with authorization to disclose to an institution, State higher education agency, and scholarship organizations (designated (prior to December 19, 2019) by the Secretary under subsection (a)(3)(E)) as in effect on such date, as specified by the applicant and in accordance with section 1098h of this title, in order for the applicant's eligibility for Federal financial aid programs, State financial aid programs, institutional financial aid programs, and scholarship programs at scholarship organizations (designated (prior to December 19, 2019) by the Secretary under subsection (a)(3)(E)) as in effect on such date, to be determined, the following:>
      <**(I)** Information described under section 6103(l)(13) of Title 26.>

      <**(II)** All information provided by the applicant on the application described by this subsection to determine the applicant's eligibility for Federal financial aid under this subchapter and for the application, award, and administration of such Federal financial aid, except the name of an institution to which an applicant selects to redisclose information shall not be disclosed to any other institution.>

   <**(ii) Authorization to disclose to benefits programs**>

   <An applicant and, if necessary, the parents or spouse of the applicant may provide the Secretary with authorization to disclose to applicable agencies that handle applications for means-tested Federal benefit programs, as defined in section 1087ss(b)(4)(H) of this title, all information provided by the applicant on the application described by this subsection as well as such applicant's student aid index and scheduled Federal Pell Grant award to assist in identification, outreach and application efforts for the application, award, and administration of such means-tested Federal benefits programs, except such information shall not include Federal tax information as specified in section 6103(l)(13)(C) of Title 26.>

<**(E) Action by the Secretary**>

<Upon receiving-->
   <**(i)** an application under this section, the Secretary shall, as soon as practicable, perform the necessary functions with the Commissioner of Internal Revenue to calculate the applicant's student aid index and scheduled award for a Federal Pell Grant, if applicable, assuming full-time enrollment for an academic year, and note to the applicant the assumptions relationship to the scheduled award; and>

   <**(ii)** an authorization under subparagraph (D), the Secretary shall, as soon as practicable, disclose the information described under such subparagraph, as specified by the applicant, in order for the applicant's

**App. 053**

eligibility for Federal, State, or institutional student financial aid programs or means-tested Federal benefit programs to be estimated or determined.>

**<(F) Work study wages>**

<With respect to an applicant who has received income earned from work under part C of this subchapter, the Secretary shall take the steps necessary to collect information on the amount of such income for the purposes of calculating such applicant's student aid index and scheduled award for a Federal Pell Grant, if applicable, without adding additional questions to the FAFSA, including by collecting such information from institutions of higher education participating in work-study programs under part C of this subchapter.>

**<(3) Information to be supplied by the Secretary of Education>**
  **<(A) In general>**

<Upon receiving and timely processing a free application that contains the information described in paragraph (2), the Secretary shall provide to the applicant the following information based on full-time attendance for an academic year:>
    **<(i)** The estimated dollar amount of a Federal Pell Grant scheduled award for which the applicant is eligible for such award year.>

    **<(ii)** Information on other types of Federal financial aid for which the applicant may be eligible (including situations in which the applicant could qualify for 150 percent of a scheduled Federal Pell Grant award and loans made under this subchapter) and how the applicant can find additional information regarding such aid.>

    **<(iii)** Consumer-tested information regarding each institution selected by the applicant in accordance with paragraph (2)(B)(ii)(XI), which may include the following:>
      **<(I)** The following information, as collected through the Integrated Postsecondary Education Data System or a successor Federal data system as designated by the Secretary:>

      **<(aa)** Net price by the income categories, as described under section 1015a(i)(6) of this title, and disaggregated by undergraduate and graduate programs, as applicable.>

      **<(bb)** Graduation rate.>

      **<(cc)** Retention rate.>

      **<(dd)** Transfer rate, if available.>

      **<(II)** Median debt of students upon completion.>

      **<(III)** Institutional default rate, as calculated under section 1085 of this title.>

**App. 054**

<**(iv)** If the student is eligible for a student aid index of less than or equal to zero under section 1087mm of this title, a notification of the Federal means-tested benefits that they have not already indicated they receive, but for which they may be eligible, and relevant links and information on how to apply for such benefits.>

<**(v)** Information on education tax benefits described in paragraphs (1) and (2) of section 25A(a) of Title 26 or other applicable education tax benefits determined in consultation with the Secretary of the Treasury.>

<**(vi)** If the individual identified as a veteran, or as serving (on the date of the application) on active duty in the Armed Forces for other than training purposes, information on benefits administered by the Department of Veteran Affairs or Department of Defense, respectively.>

<**(vii)** If applicable, the applicant's current outstanding balance of loans under this subchapter.>

<**(B) Information provided to the State**>
  <**(i) In general**>

<The Secretary shall redisclose, with authorization from the applicant in accordance with paragraph (2)(D)(i), to a State higher education agency administering State-based financial aid and serving the applicant's State of residence, the information described under section 6103(l)(13) of Title 26 and information described in paragraph (2)(B) for the application, award, and administration of grants and other student financial aid provided directly from the State to be determined by such State. Such information shall include the list of institutions provided by the applicant on the application.>

<**(ii) Use of information**>

<A State agency administering State-based financial aid-->
  <**(I)** shall use the information provided under clause (i) solely for the application, award, and administration of State-based financial aid for which the applicant is eligible;>

  <**(II)** may use the information, except for the information described under section 6103(l)(13) of Title 26, for State agency research that does not release any individually identifiable information on any applicant to promote college attendance, persistence, and completion;>

  <**(III)** may use identifying information provided by student applicants on the FAFSA to determine whether or not a graduating secondary student has filed the application in coordination with local educational agencies or secondary schools to encourage students to complete the application; and>

  <**(IV)** may share the application information, excluding the information described under section 6103(l)(13) of Title 26, with any other entity, only if such applicant provides explicit written consent of the applicant, except as provided in subclause (III).>

<**(iii) Limitation on consent process**>

<A State may provide a consent process whereby an applicant may elect to share the information described in clause (i), except for the information described in section 6103(l)(13) of Title 26, through explicit written

<span style="color:orange">App. 055</span>

consent to Federal, State, or local government agencies or tribal organizations to assist such applicant in applying for and receiving Federal, State, or local government assistance, or tribal assistance for any component of the applicant's cost of attendance that may include financial assistance or non-monetary assistance.>

<**(iv) Prohibition**>

<Any entity that receives applicant information under clause (iii) shall not sell, share, or otherwise use applicant information other than for the purposes outlined in clause (iii).>

<**(C) Use of information provided to the institution**>

<An institution-->
    <**(i)** shall use the information provided to it solely for the application, award, and administration of financial aid to the applicant;>

    <**(ii)** may use the information provided, excluding the information described under section 6013(l)(13) of Title 26, for research that does not release any individually identifiable information on any applicant, to promote college attendance, persistence, and completion; and>

    <**(iii)** shall not share such educational record information with any other entity without the explicit written consent of the applicant.>

<**(D) Prohibition**>

<Any entity that receives applicant information under subparagraph (C)(iii) shall not sell, share, or otherwise use applicant information other than for the purposes outlined in subparagraph (C).>

<**(E) FAFSA information that includes tax return information**>

<An applicant's FAFSA information that includes return or return information as described in section 6103(l)(13) of Title 26 may be disclosed or redisclosed (which shall include obtaining, sharing, or discussing such information) only in accordance with the procedures described in section 1098h of this title.>

<**(4) Development of form and information exchange**>

<Prior to the design of the free application under this subsection, the Secretary shall, to the maximum extent practicable, on an annual basis-->
    <**(A)** consult with stakeholders to gather information about innovations and technology available to-->
      <**(i)** ensure an efficient and effective process;>

      <**(ii)** mitigate unintended consequences; and>

**App. 056**

<(iii) determine the best practices for outreach to students and families during the transition to the streamlined process for the determination of Federal financial aid and Federal Pell Grant eligibility while reducing the data burden on applicants and families; and>

<(B) solicit public comments for the format of the free application that provides for adequate time to incorporate feedback prior to development of the application for the succeeding award year.>

<(5) No additional information requests permitted>

<In carrying out this subsection, the Secretary may not require additional information to be submitted by an applicant (or the parents or spouse of an applicant) for Federal financial aid through other requirements or reporting, except as required under a process or procedure exercised in accordance with the authority under section 1087tt of this title.>

<(6) State-run programs>
    <(A) In general>

<The Secretary shall conduct outreach to States in order to research the benefits to students of States relying solely on the student aid index, scheduled Pell Grant Award, or the financial data made available, upon authorization by the applicant, as a result of an application for aid under this subsection for determining the eligibility of the applicant for State provided financial aid.>

<(B) Secretarial review>

<If a State determines that there is a need for additional data elements beyond those provided pursuant to this subsection for determining the eligibility of an applicant for State provided financial aid, the State shall forward a list of those additional data elements determined necessary, but not provided by virtue of the application under this subsection, to the Secretary. The Secretary shall make readily available to the public through the Department's websites and other means-->
    <(i) a list of States that do not require additional financial information separate from the Free Application for Federal Student Aid and do not require asset information from students who qualify for the exemption from asset reporting under section 1087ss of this title for the purposes of awarding State scholarships and grant aid;>

    <(ii) a list of States that require asset information from students who qualify for the exemption from asset reporting under section 1087ss of this title for the purposes of awarding State scholarships and grant aid;>

    <(iii) a list of States that have indicated that they require additional financial information separate from the Free Application for Federal Student Aid for purposes of awarding State scholarships and grant aid; and>

    <(iv) with the publication of the lists under this subparagraph, information about additional resources available to applicants, including links to such State websites.>

<(7) Institution-run financial aid>

**App. 057**

<**(A) In general**>

<The Secretary shall conduct outreach to institutions of higher education to describe the benefits to students of relying solely on the student aid index, scheduled Pell Grant Award, or the financial data made available, upon authorization for release by the applicant, as a result of an application for aid under this subsection for determining the eligibility of the applicant for institutional financial aid. The Secretary shall make readily available to the public through its websites and other means-->

> <**(i)** a list of institutions that do not require additional financial information separate from the Free Application for Federal Student Aid and do not require asset information from students who qualify for the exemption from asset reporting under section 1087ss of this title for the purpose of awarding institution-run financial aid;>

> <**(ii)** a list of institutions that require asset information from students who qualify for the exemption from asset reporting under section 1087ss of this title for the purpose of awarding institution-run financial aid;>

> <**(iii)** a list of institutions that require additional financial information separate from the Free Application for Federal Student Aid for the purpose of awarding institution-run financial aid; and>

> <**(iv)** with the publication of the list in clause (iii), information about additional resources available to applicants.>

<**(8) Security of data**>

<The Secretary shall, in consultation with the Secretary of the Treasury-->

> <**(A)** take all necessary steps to safeguard the data required to be transmitted for the purpose of this section between Federal agencies and to States and institutions of higher education and secure the transmittal of such data;>

> <**(B)** provide guidance to States and institutions of higher education regarding their obligation to ensure the security of the data provided under this section and section 6103 of Title 26; and>

> <**(C)** provide guidance on the implementation of section 6103 of Title 26, including how it intersects with the provisions of section 1232g of this title (commonly known as the "Family Educational Rights and Privacy Act of 1974"), and any additional consent processes that may be available to applicants in accordance with Title 26 regarding sharing of Federal tax information.>

<**(9) Report to Congress**>
> <**(A) In general**>

<Not later than 1 year after December 27, 2020, the Secretary shall report to the authorizing committees on the progress of the Secretary in carrying out this subsection, including planning and stakeholder consultation. Such report shall include-->

> <**(i)** benchmarks for implementation;>

> <**(ii)** entities and organizations that the Secretary consulted;>

**App. 058**

<(iii) system requirements for such implementation and how they will be addressed;>

<(iv) any areas of concern and potential problem issues uncovered that may hamper such implementation; and>

<(v) solutions determined to address such issues.>

<(B) Updates>

<The Secretary shall provide updates to the authorizing committees--
    <(i) as to the progress and planning described in subparagraph (A) prior to implementation of the revisions to the Free Application for Federal Student Aid under this subsection not less often than quarterly; and>

    <(ii) at least 6 months and 1 year after implementation of the revisions to the Free Application for Federal Student Aid.>

<(b) Adjustments and improvements>
    <(1) In general>

<The Secretary shall disclose in a consumer-tested format, upon completion of the Free Application for Federal Student Aid under this section, that the student may, on a case-by-case basis, qualify for an adjustment under section 1087tt of this title to the cost of attendance or the values of the data items required to calculate the Federal Pell Grant or the need analysis for the student or parent. Such disclosure shall specify--
    <(A) examples of the special circumstances under which a student or family member may qualify for such adjustment or determination of independence; and>

    <(B) additional information regarding the steps a student or family member may take in order to seek an adjustment under section 1087tt of this title.>

<(2) Consumer testing>
    <(A) In general>

<Not later than 9 months after December 27, 2020, the Secretary shall begin consumer testing the design of the Free Application for Federal Student Aid under this section with prospective first-generation college students, representatives of students (including low-income students, English learners, first-generation college students, adult students, veterans, servicemembers, and prospective students), students' families (including low-income families, families with English learners, families with first-generation college students, and families with prospective students), institutions of higher education, secondary school and postsecondary counselors, and nonprofit consumer groups.>

<(B) Updates>

**App. 059**

<For award year 2024-2025 and at least each fourth succeeding award year thereafter, the Secretary shall update the design of the Free Application for Federal Student Aid based on additional consumer testing with the populations described in subparagraph (A) in order to improve the usability and accessibility of the application.>

**<(3) Accessibility of the FAFSA>**

<The Secretary shall-->
<**(A)** in conjunction with the Bureau of the Census, determine the most common languages spoken by English learner students and their parents in the United States;>

<**(B)** develop and make publicly available versions of the Free Application for Federal Student Aid form in not fewer than 11 of the most common languages determined under subparagraph (A) and make such versions available and accessible to applicants in paper and electronic formats; and>

<**(C)** ensure that the Free Application for Federal Student Aid is available in formats accessible to individuals with disabilities and compliant with the most recent Web Content Accessibility Guidelines, or successor guidelines.>

**<(4) Reapplication in a succeeding academic year>**

<In order to streamline an applicant's experience in applying for financial aid, the Secretary shall allow an applicant who electronically applies for financial assistance under this subchapter for an academic year subsequent to an academic year for which such applicant applied for financial assistance under this subchapter to automatically electronically import all of the applicant's (including parents', guardians', or spouses', as applicable) identifying, demographic, and school data from the previous application and to update such information to reflect any circumstances that have changed.>

**<(5) Technology accessibility>**

<The Secretary shall make the application under this section available through prevalent technology. Such technology shall, at a minimum, enable applicants to-->
<**(A)** save data; and>

<**(B)** submit the application under this subchapter to the Secretary through such technology.>

**<(6) Verification burden>**

<The Secretary shall-->
<**(A)** to the maximum extent practicable, streamline and simplify the process of verification for applicants for Federal financial aid;>

<**(B)** in establishing policies and procedures to verify applicants' eligibility for Federal financial aid, consider-->
<**(i)** the burden placed on low-income applicants;>

**App. 060**

<**(ii)** the risk to low-income applicants of failing to complete the application, enroll in college, or complete a postsecondary credential as a result of being selected for verification;>

<**(iii)** the effectiveness of the policies and procedures in preventing overpayments; and>

<**(iv)** the reasons for the source of any improper payments; and>

<**(C)** issue a public report not less often than annually that includes the number and percentage of applicants subject to verification, whether the applicants ultimately received Federal financial aid disbursements, the extent to which the student aid index changed for such applicants as a result of verification, and the extent to which such applicants' eligibility for Federal financial aid under this subchapter changed.>

<**(7) Studies**>

<The Secretary shall periodically conduct studies on-->
　<**(A)** whether the Free Application for Federal Student Aid is a barrier to college enrollment by examining-->
　　<**(i)** the effect of States requiring additional information specified in clauses (ii) and (iii) of subsection (a)(6) (B) on the determination of State financial aid awards, including-->
　　　<**(I)** how much financial aid awards would change if the additional information were not required; and>

　　　<**(II)** the number of students who started but did not finish the Free Application for Federal Student Aid, compared to the baseline year of 2021; and>

　　<**(ii)** the number of students who-->
　　　<**(I)** started a Free Application for Federal Student Aid but did not receive financial assistance under this subchapter for the applicable academic year; and>

　　　<**(II)** if available, did not enroll in an institution of higher education in the applicable academic year;>

　<**(B)** the most common barriers faced by applicants in completing the Free Application for Federal Student Aid; and>

　<**(C)** the most common reasons that students and families do not fill out the Free Applications for Federal Student Aid.>

<**(c) Data and information**>
　<**(1) In general**>

　<The Secretary shall publish data in a publicly accessible manner-->

**App. 061**

<**(A)** annually on the total number of Free Applications for Federal Student Aid submitted by application cycle, disaggregated by demographic characteristics, type of institution or institutions of higher education to which the applicant applied, the applicant's State of legal residence, and high school and public school district;>

<**(B)** quarterly on the total number of Free Applications for Federal Student Aid submitted by application cycle, disaggregated by type of institution or institutions of higher education to which the applicant applied, the applicant's State of legal residence, and high school and public school district;>

<**(C)** weekly on the total number of Free Applications for Federal Student Aid submitted, disaggregated by high school and public school district; and>

<**(D)** annually on the number of individuals who apply for federal financial aid pursuant to this section who indicated that they are-->
 <**(i)** an unaccompanied homeless youth or unaccompanied, at risk of homelessness, and self-supporting; or>

 <**(ii)** a foster care youth.>

<**(2) Contents**>

<The data described in paragraph (1)(D) with respect to homeless youth shall include, at a minimum, for each application cycle-->
 <**(A)** the total number of all applicants who were determined to be individuals described in section 1087vv(d)(8) of this title; and>

 <**(B)** the number of applicants described in subparagraph (A), disaggregated-->
 <**(i)** by State; and>

 <**(ii)** by the sources of determination as described in section 1087uu-2(b) of this title.>

<**(3) Data sharing**>

<The Secretary may enter into data sharing agreements with the appropriate Federal or State agencies to conduct outreach regarding, and connect applicants directly with, the means-tested Federal benefit programs described in subsection (a)(2)(B)(ii)(XVII) for which the applicants may be eligible.>

<**(d) Ensuring form usability**>
 <**(1) Signature**>

<Notwithstanding any other provision of this subchapter, the Secretary may permit the Free Application for Federal Student Aid to be submitted without a signature, if a signature is subsequently submitted by the applicant, or if the applicant uses an access device provided by the Secretary.>

**App. 062**

<**(2) Free preparation authorized**>

<Notwithstanding any other provision of this subchapter, an applicant may use a preparer for consultative or preparation services for the completion of the Free Application for Federal Student Aid without charging a fee to the applicant if the preparer-->

<**(A)** includes, at the time the application is submitted to the Department, the name, address or employer's address, social security number or employer identification number, and organizational affiliation of the preparer on the applicant's form;>

<**(B)** is subject to the same penalties as an applicant for purposely giving false or misleading information in the application;>

<**(C)** clearly informs each individual upon initial contact, that the Free Application for Federal Student Aid is a free form that may be completed without professional assistance; and>

<**(D)** does not produce, use, or disseminate any other form for the purpose of applying for Federal financial aid other than the Free Application for Federal Student Aid developed by the Secretary under this section.>

<**(3) Charges to students and parents for use of forms prohibited**>

<The need for and eligibility of a student for financial assistance under this subchapter may be determined only by using the Free Application for Federal Student Aid developed by the Secretary under this section. Such application shall be produced, distributed, and processed by the Secretary, and no parent or student shall be charged a fee by the Secretary, a contractor, a third-party servicer or private software provider, or any other public or private entity for the collection, processing, or delivery of Federal financial aid through the use of such application. No data collected on a form for which a fee is charged shall be used to complete the Free Application for Federal Student Aid prescribed under this section, except that a Federal or State income tax form prepared by a paid income tax preparer or preparer service for the primary purpose of filing a Federal or State income tax return may be used to complete the Free Application for Federal Student Aid prescribed under this section.>

<**(4) Application processing cycle**>

<The Secretary shall enable applicants to submit a Free Application for Federal Student Aid developed under this section and initiate the processing of such application, not later than January 1 of the applicant's planned year of enrollment, to the maximum extent practicable, on or around October 1 prior to the applicant's planned year of enrollment.>

<**(5) Early estimates**>

<The Secretary shall maintain an electronic method for applicants to enter income and family size information to calculate a non-binding estimate of the applicant's Federal financial aid available under this subchapter and shall place such calculator on a prominent location at the beginning of the Free Application for Federal Student Aid.>

<**(6) Additional forms**>

**App. 063**

**§ 1090. Forms and regulations, 20 USCA § 1090**

<Notwithstanding any other provision of this subchapter, an institution may not condition the packaging or receipt of Federal financial aid on the completion of additional requests for financial information beyond the Free Application for Federal Student Aid, unless such information is required for verification, a determination of independence, or professional judgement.>

Notes of Decisions (2)

20 U.S.C.A. § 1090, 20 USCA § 1090
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

---

**End of Document**                                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

**App. 064**

---

United States Code Annotated
  Title 22. Foreign Relations and Intercourse
    Chapter 58. Diplomatic Security
      Subchapter III. Performance and Accountability

---

22 U.S.C.A. § 4831

§ 4831. Security Review Committees

Effective: December 23, 2022
Currentness

## (a) In general

### (1) Convening the Security Review Committee

In any case of a serious security incident involving loss of life, serious injury, or significant destruction of property at, or related to, a United States Government diplomatic mission abroad (referred to in this subchapter as a "Serious Security Incident"), and in any case of a serious breach of security involving intelligence activities of a foreign government directed at a United States Government mission abroad, the Secretary of State shall convene a Security Review Committee, which shall issue a report providing a full account of what occurred, consistent with section 4834 of this title.

### (2) Committee composition

The Secretary shall designate a Chairperson and may designate additional personnel of commensurate seniority to serve on the Security Review Committee, which shall include--

(A) the Director of the Office of Management Strategy and Solutions;

**App. 065**

**(B)** the Assistant Secretary responsible for the region where the incident occurred;

**(C)** the Assistant Secretary of State for Diplomatic Security;

**(D)** the Assistant Secretary of State for Intelligence and Research;

**(E)** an Assistant Secretary-level representative from any involved United States Government department or agency; and

**(F)** other personnel determined to be necessary or appropriate.

**(3) Exceptions to convening a Security Review Committee**

**(A) In general**

The Secretary of State is not required to convene a Security Review Committee--

**(i)** if the Secretary determines that the incident involves only causes unrelated to security, such as when the security at issue is outside of the scope of the Secretary of State's security responsibilities under section 4802 of this title;

**(ii)** if operational control of overseas security functions has been delegated to another agency in accordance with section 4805 of this title;

**(iii)** if the incident is a cybersecurity incident and is covered by other review mechanisms; or

**(iv)** in the case of an incident described in paragraph (1) that involves any facility, installation, or personnel of the Department of Defense with respect to which

the Secretary has delegated operational control of overseas security functions to the Secretary of Defense pursuant to section 4805 of this title.

**(B) Department of Defense investigations**

In the case of an incident described in subparagraph (A)(iv), the Secretary of Defense shall conduct an appropriate inquiry. The Secretary of Defense shall report the findings and recommendations of such inquiry, and the action taken with respect to such recommendations, to the Secretary of State and Congress.

**(4) Facilities in Afghanistan, Yemen, Syria, and Iraq**

**(A) Limited exemptions from requirement to convene Board**

The Secretary of State is not required to convene a Board in the case of an incident that--

**(i)** involves serious injury, loss of life, or significant destruction of property at, or related to, a United States Government mission in Afghanistan, Yemen, Syria, or Iraq; and

**(ii)** occurs during the period beginning on October 1, 2020, and ending on September 30, 2022.

**(B) Reporting requirements**

In the case of an incident described in subparagraph (A), the Secretary shall--

**(i)** promptly notify the Committee on International Relations of the House of Representatives and the Committee on Foreign Relations of the Senate of the incident;

<span style="color:orange">**App. 067**</span>

**(ii)** conduct an inquiry of the incident; and

**(iii)** upon completion of the inquiry required by clause (ii), submit to each such Committee a report on the findings and recommendations related to such inquiry and the actions taken with respect to such recommendations.

**(5) Rulemaking**

The Secretary of State shall promulgate regulations defining the membership and operating procedures for the Security Review Committee and provide such guidance to the Chair and ranking members of the Committee on Foreign Relations of the Senate and the Committee on Foreign Affairs of the House of Representatives.

**(b) Deadlines for convening Security Review Committees**

**(1) In general**

The Secretary of State shall convene a Security Review Committee not later than 60 days after the occurrence of an incident described in subsection (a)(1), or 60 days after the Department first becomes aware of such an incident, whichever is earlier, except that the 60-day period for convening a Security Review Committee may be extended for one additional 60-day period if the Secretary determines that the additional period is necessary.

**(2) Delay in cases involving intelligence activities**

With respect to breaches of security involving intelligence activities, the Secretary of State may delay the establishment of a Board if, after consultation with the chairman of the Select Committee on Intelligence of the Senate and the chairman of the Permanent Select Committee on Intelligence of the House of Representatives, the Secretary determines that the establishment of a Board would compromise intelligence sources or methods. The Secretary shall promptly advise the chairmen of such committees of each determination pursuant to this paragraph to delay the establishment of a Board.

**App. 068**

**(c) Congressional notification**

Whenever the Secretary of State convenes a Security Review Committee, the Secretary shall promptly inform the chair and ranking member of--

**(1)** the Committee on Foreign Relations of the Senate;

**(2)** the Select Committee on Intelligence of the Senate;

**(3)** the Committee on Appropriations of the Senate;

**(4)** the Committee on Foreign Affairs of the House of Representatives;

**(5)** the Permanent Select Committee on Intelligence of the House of Representatives; and

**(6)** the Committee on Appropriations of the House of Representatives.

## CREDIT(S)

(Pub.L. 99-399, Title III, § 301, Aug. 27, 1986, 100 Stat. 859; Pub.L. 100-204, Title I, § 156(a), Dec. 22, 1987, 101 Stat. 1354; Pub.L. 106-113, Div. B, § 1000(a)(7) [Div. A, Title VI, § 608], Nov. 29, 1999, 113 Stat. 1536, 1501A-458; Pub.L. 109-140, § 3, Dec. 22, 2005, 119 Stat. 2650; Pub.L. 117-81, Div. E, Title LIII, § 5316, Dec. 27, 2021, 135 Stat. 2366; Pub.L. 117-263, Div. I, Title XCIII, § 9302(d), Dec. 23, 2022, 136 Stat. 3884.)

22 U.S.C.A. § 4831, 22 USCA § 4831
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**App. 069**

**§ 4831. Security Review Committees, 22 USCA § 4831**

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

**App. 070**

United States Code Annotated
  Title 22. Foreign Relations and Intercourse
    Chapter 80. Diplomatic Telecommunications Service Program Office (Dts-PO)

22 U.S.C.A. § 7302

§ 7302. Establishment of the Diplomatic Telecommunications Service Governance Board

Effective: October 7, 2010
Currentness

**(a) Governance Board**

**(1) Establishment**

There is established the Diplomatic Telecommunications Service Governance Board to direct and oversee the activities and performance of the DTS-PO.

**(2) Executive Agent**

**(A) Designation**

The Director of the Office of Management and Budget shall designate, from among the departments and agencies of the United States Government that use the DTS Network, a department or agency as the DTS-PO Executive Agent.

**(B) Duties**

The Executive Agent designated under subparagraph (A) shall--

**(i)** nominate a Director of the DTS-PO for approval by the Governance Board in accordance with subsection (e); and

**(ii)** perform such other duties as established by the Governance Board in the determination of written implementing arrangements and other relevant and appropriate governance processes and procedures under paragraph (3).

**(3) Requirement for implementing arrangements**

Subject to the requirements of this chapter, the Governance Board shall determine the written implementing arrangements and other relevant and appropriate governance processes and procedures to manage, oversee, resource, or otherwise administer the DTS-PO.

**App. 071**

§ 7302. Establishment of the Diplomatic Telecommunications..., 22 USCA § 7302

**(b) Membership**

**(1) Selection**

The Director of the Office of Management and Budget shall designate from among the departments and agencies that use the DTS Network--

**(A)** four departments and agencies to each appoint one voting member of the Governance Board from the personnel of such departments and agencies; and

**(B)** any other departments and agencies that the Director considers appropriate to each appoint one nonvoting member of the Governance Board from the personnel of such departments and agencies.

**(2) Voting and nonvoting members**

The Governance Board shall consist of voting members and nonvoting members as follows:

**(A) Voting members**

The voting members shall consist of a Chair, who shall be designated by the Director of the Office of Management and Budget, and the four members appointed by departments and agencies designated under paragraph (1)(A).

**(B) Nonvoting members**

The nonvoting members shall consist of the members appointed by departments and agencies designated under paragraph (1)(B) and shall act in an advisory capacity.

**(c) Chair duties and authorities**

The Chair of the Governance Board shall--

**(1)** preside over all meetings and deliberations of the Governance Board;

**(2)** provide the Secretariat functions of the Governance Board; and

**(3)** propose bylaws governing the operation of the Governance Board.

**(d) Quorum, decisions, meetings**

**App. 072**

A quorum of the Governance Board shall consist of the presence of the Chair and four voting members. The decisions of the Governance Board shall require a majority of the voting membership. The Chair **shall convene** a meeting of the Governance Board not less than four times each year to carry out the functions of the Governance Board. The Chair or any voting member may convene a meeting of the Governance Board.

**(e) Governance Board duties**

The Governance Board shall have the following duties with respect to the DTS-PO:

**(1)** To approve and monitor the plans, services, priorities, policies, and pricing methodology of the DTS-PO for bandwidth costs and projects carried out at the request of a department or agency that uses the DTS Network.

**(2)** To provide to the DTS-PO Executive Agent the recommendation of the Governance Board with respect to the approval, disapproval, or modification of each annual budget request for the DTS-PO, prior to the submission of any such request by the Executive Agent.

**(3)** To review the performance of the DTS-PO against plans approved under paragraph (1) and the management activities and internal controls of the DTS-PO.

**(4)** To require from the DTS-PO any plans, reports, documents, and records the Governance Board considers necessary to perform its oversight responsibilities.

**(5)** To conduct and evaluate independent audits of the DTS-PO.

**(6)** To approve or disapprove the nomination of the Director of the DTS-PO by the Executive Agent with a majority vote of the Governance Board.

**(7)** To recommend to the Executive Agent the replacement of the Director of the DTS-PO with a majority vote of the Governance Board.

**(f) National security interests**

The Governance Board shall ensure that those enhancements of, and the provision of service for, telecommunication capabilities that involve the national security interests of the United States receive the highest prioritization.

**CREDIT(S)**

(Pub.L. 106-567, Title III, § 322, as added Pub.L. 111-259, Title V, § 501(a)(1), Oct. 7, 2010, 124 Stat. 2735.)

**App. 073**

**§ 7302. Establishment of the Diplomatic Telecommunications..., 22 USCA § 7302**

22 U.S.C.A. § 7302, 22 USCA § 7302
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**App. 074**

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   4

United States Code Annotated
  Title 42. The Public Health and Welfare
    Chapter 6A. Public Health Service (Refs & Annos)
      Subchapter III-A. Substance Abuse and Mental Health Services Administration (Refs & Annos)
        Part D. Miscellaneous Provisions Relating to Substance Abuse and Mental Health (Refs & Annos)

42 U.S.C.A. § 290ee-5

§ 290ee-5. Funding

Effective: December 29, 2022

Currentness

**(a) Best practices for operating recovery housing**

**(1) In general**

The Secretary, in consultation with the individuals and entities specified in paragraph (2), shall continue activities to identify, facilitate the development of, and periodically update consensus-based best practices, which may include model laws for implementing suggested minimum standards for operating, and promoting the availability of, high-quality recovery housing.

**(2) Consultation**

In carrying out the activities described in paragraph (1), the Secretary shall consult with, as appropriate--

**(A)** officials representing the agencies described in subsection (e)(2);

**(B)** directors or commissioners, as applicable, of State health departments, Tribal health departments, State Medicaid programs, and State insurance agencies;

**(C)** representatives of health insurance issuers;

**(D)** national accrediting entities and reputable providers of, and analysts of, recovery housing services, including Indian Tribes, Tribal organizations, and Tribally designated housing entities that provide recovery housing services, as applicable;

**(E)** individuals with a history of substance use disorder; and

**(F)** other stakeholders identified by the Secretary.

**App. 075**

**(G)** Redesignated (F)

**(3) Availability**

The best practices referred to in paragraph (1) shall be--

**(A)** made publicly available; and

**(B)** published on the public website of the Substance Abuse and Mental Health Services Administration.

**(4) Exclusion of guideline on treatment services**

In facilitating the development of best practices under paragraph (1), the Secretary may not include any best practices with respect to substance use disorder treatment services.

**(b) Identification of fraudulent recovery housing operators**

**(1) In general**

The Secretary, in consultation with the individuals and entities described in paragraph (2), shall identify or facilitate the development of common indicators that could be used to identify potentially fraudulent recovery housing operators.

**(2) Consultation**

In carrying out the activities described in paragraph (1), the Secretary shall consult with, as appropriate, the individuals and entities specified in subsection (a)(2) and the Attorney General of the United States.

**(3) Requirements**

**(A) Practices for identification and reporting**

In carrying out the activities described in paragraph (1), the Secretary shall consider how law enforcement, public and private payers, and the public can best identify and report fraudulent recovery housing operators.

**(B) Factors to be considered**

In carrying out the activities described in paragraph (1), the Secretary shall identify or develop indicators, which may include indicators related to--

**App. 076**

**(i)** unusual billing practices;

**(ii)** average lengths of stays;

**(iii)** excessive levels of drug testing (in terms of cost or frequency); and

**(iv)** unusually high levels of recidivism.

**(c) Dissemination**

The Secretary shall, as appropriate, disseminate the best practices identified or developed under subsection (a) and the common indicators identified or developed under subsection (b) to--

**(1)** State agencies, which may include the provision of technical assistance to State agencies seeking to adopt or implement such best practices;

**(2)** Indian Tribes, Tribal organizations, and tribally designated housing entities;

**(3)** the Attorney General of the United States;

**(4)** the Secretary of Labor;

**(5)** the Secretary of Housing and Urban Development;

**(6)** State and local law enforcement agencies;

**(7)** health insurance issuers;

**(8)** recovery housing entities; and

**(9)** the public.

**(d) Requirements**

In carrying out the activities described in subsections (a) and (b), the Secretary, in consultation with appropriate individuals and entities described in subsections (a)(2) and (b)(2), shall consider how recovery housing is able to support recovery and

**App. 077**

§ 290ee-5. Funding, 42 USCA § 290ee-5

prevent relapse, recidivism, or overdose (including overdose death), including by improving access and adherence to treatment, including medication-assisted treatment.

**(e) Coordination of Federal activities to promote the availability of housing for individuals experiencing homelessness, individuals with a mental illness, and individuals with a substance use disorder**

**(1) In general**

The Secretary, acting through the Assistant Secretary, and the Secretary of Housing and Urban Development **shall convene an interagency working group** for the following purposes:

**(A)** To increase collaboration, cooperation, and consultation among the Department of Health and Human Services, the Department of Housing and Urban Development, and the Federal agencies listed in paragraph (2)(B), with respect to promoting the availability of housing, including high-quality recovery housing, for individuals experiencing homelessness, individuals with mental illnesses, and individuals with substance use disorder.

**(B)** To align the efforts of such agencies and avoid duplication of such efforts by such agencies.

**(C)** To develop objectives, priorities, and a long-term plan for supporting State, Tribal, and local efforts with respect to the operation of high-quality recovery housing that is consistent with the best practices developed under this section.

**(D)** To improve information on the quality of recovery housing.

**(2) Composition**

The interagency working group under paragraph (1) shall be composed of--

**(A)** the Secretary, acting through the Assistant Secretary, and the Secretary of Housing and Urban Development, who shall serve as the co-chairs; and

**(B)** representatives of each of the following Federal agencies:

**(i)** The Centers for Medicare & Medicaid Services.

**(ii)** The Substance Abuse and Mental Health Services Administration.

**(iii)** The Health Resources and Services Administration.

**App. 078**

**(iv)** The Office of the Inspector General of the Department of Health and Human Services.

**(v)** The Indian Health Service.

**(vi)** The Department of Agriculture.

**(vii)** The Department of Justice.

**(viii)** The Office of National Drug Control Policy.

**(ix)** The Bureau of Indian Affairs.

**(x)** The Department of Labor.

**(xi)** The Department of Veterans Affairs.

**(xii)** Any other Federal agency as the co-chairs determine appropriate.

**(3) Meetings**

The working group shall meet on a quarterly basis.

**(4) Reports to Congress**

Not later than 4 years after December 29, 2022, the working group shall submit to the Committee on Health, Education, Labor, and Pensions, the Committee on Agriculture, Nutrition, and Forestry, and the Committee on Finance of the Senate and the Committee on Energy and Commerce, the Committee on Ways and Means, the Committee on Agriculture, and the Committee on Financial Services of the House of Representatives a report describing the work of the working group and any recommendations of the working group to improve Federal, State, and local coordination with respect to recovery housing and other housing resources and operations for individuals experiencing homelessness, individuals with a mental illness, and individuals with a substance use disorder.

**(f) Grants for implementing national recovery housing best practices**

**(1) In general**

The Secretary shall award grants to States (and political subdivisions thereof), Indian Tribes, and territories--

<span style="color:orange">**App. 079**</span>

**(A)** for the provision of technical assistance to implement the guidelines and recommendations developed under subsection (a); and

**(B)** to promote--

**(i)** the availability of recovery housing for individuals with a substance use disorder; and

**(ii)** the maintenance of recovery housing in accordance with best practices developed under this section.

**(2) State promotion plans**

Not later than 90 days after receipt of a grant under paragraph (1), and every 2 years thereafter, each State (or political subdivisions thereof,) Indian Tribe, or territory receiving a grant under paragraph (1) shall submit to the Secretary, and publish on a publicly accessible internet website of the State (or political subdivisions thereof), Indian Tribe, or territory--

**(A)** the plan of the State (or political subdivisions thereof), Indian Tribe, or territory, with respect to the promotion of recovery housing for individuals with a substance use disorder located within the jurisdiction of such State (or political subdivisions thereof), Indian Tribe, or territory; and

**(B)** a description of how such plan is consistent with the best practices developed under this section.

**(g) Rule of construction**

Nothing in this section shall be construed to provide the Secretary with the authority to require States to adhere to minimum standards in the State oversight of recovery housing.

**(h) Definitions**

In this section:

**(1)** The term "recovery housing" means a shared living environment free from alcohol and illicit drug use and centered on peer support and connection to services that promote sustained recovery from substance use disorders.

**(2)** The terms "Indian Tribe" and "Tribal organization" have the meanings given those terms in section 5304 of Title 25.

**(3)** The term "tribally designated housing entity" has the meaning given that term in section 4103 of Title 25.

**App. 080**

§ 290ee-5. Funding, 42 USCA § 290ee-5

**(i) Authorization of appropriations**

To carry out this section, there is authorized to be appropriated $5,000,000 for the period of fiscal years 2023 through 2027.

**CREDIT(S)**

(July 1, 1944, c. 373, Title V, § 550, as added Pub.L. 115-271, Title VII, § 7031, Oct. 24, 2018, 132 Stat. 4014; amended Pub.L. 117-328, Div. FF, Title I, §§ 1232, 1233, 1235, 1236, Dec. 29, 2022, 136 Stat. 5674, 5676.)

42 U.S.C.A. § 290ee-5, 42 USCA § 290ee-5
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
  Title 50. War and National Defense (Refs & Annos)
    Chapter 44. National Security (Refs & Annos)
      Subchapter I. Coordination for National Security

50 U.S.C.A. § 3022
Formerly cited as 50 USCA § 402-1

§ 3022. Joint Intelligence Community Council

Effective: December 20, 2019
Currentness

**(a) Joint Intelligence Community Council**

There is a Joint Intelligence Community Council.

**(b) Membership**

The Joint Intelligence Community Council shall consist of the following:

**(1)** The Director of National Intelligence, who shall chair the Council.

**(2)** The Secretary of State.

**(3)** The Secretary of the Treasury.

**(4)** The Secretary of Defense.

**(5)** The Attorney General.

**App. 082**

**(6)** The Secretary of Energy.

**(7)** The Secretary of Homeland Security.

**(8)** Such other officers of the United States Government as the President may designate from time to time.

## (c) Functions

The Joint Intelligence Community Council shall assist the Director of National Intelligence in developing and implementing a joint, unified national intelligence effort to protect national security by--

**(1)** advising the Director on establishing requirements, developing budgets, financial management, and monitoring and evaluating the performance of the intelligence community, and on such other matters as the Director may request; and

**(2)** ensuring the timely execution of programs, policies, and directives established or developed by the Director.

## (d) Meetings

The Director of National Intelligence shall convene meetings of the Joint Intelligence Community Council as the Director considers appropriate.

## (e) Advice and opinions of members other than Chairman

**(1)** A member of the Joint Intelligence Community Council (other than the Chairman) may submit to the Chairman advice or an opinion in disagreement with, or advice or an opinion in addition to, the advice presented by the Director of National Intelligence to the President or the National Security Council, in the role of the Chairman as Chairman

**App. 083**

of the Joint Intelligence Community Council. If a member submits such advice or opinion, the Chairman shall present the advice or opinion of such member at the same time the Chairman presents the advice of the Chairman to the President or the National Security Council, as the case may be.

**(2)** The Chairman shall establish procedures to ensure that the presentation of the advice of the Chairman to the President or the National Security Council is not unduly delayed by reason of the submission of the individual advice or opinion of another member of the Council.

## (f) Recommendations to Congress

Any member of the Joint Intelligence Community Council may make such recommendations to Congress relating to the intelligence community as such member considers appropriate.

## CREDIT(S)

(July 26, 1947, c. 343, Title I, § 101A, as added Pub.L. 108-458, Title I, § 1031, Dec. 17, 2004, 118 Stat. 3677; amended Pub.L. 116-92, Div. E, Title LXIII, § 6311(a), Dec. 20, 2019, 133 Stat. 2191.)

50 U.S.C.A. § 3022, 50 USCA § 3022
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# PART III


KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

> United States Code Annotated
>     Title 10. Armed Forces (Refs & Annos)
>         Subtitle A. General Military Law (Refs & Annos)
>             Part II. Personnel (Refs & Annos)
>                 Chapter 36. Promotion, Separation, and Involuntary Retirement of
>                 Officers on the Active-Duty List (Refs & Annos)
>                     Subchapter I. Selection Boards (Refs & Annos)

10 U.S.C.A. § 611

§ 611. Convening of selection boards

Effective: December 28, 2001
Currentness

**(a)** Whenever the needs of the service require, the Secretary of the military department concerned shall convene selection boards to recommend for promotion to the next higher permanent grade, under subchapter II of this chapter, officers on the active-duty list in each permanent grade from first lieutenant through brigadier general in the Army, Air Force, or Marine Corps and from lieutenant (junior grade) through rear admiral (lower half) in the Navy. The preceding sentence does not require the convening of a selection board in the case of officers in the permanent grade of first lieutenant or, in the case of the Navy, lieutenant (junior grade) when the Secretary concerned recommends for promotion to the next higher grade under section 624(a)(3) of this title all such officers whom the Secretary finds to be fully qualified for promotion.

**(b)** Whenever the needs of the service require, the Secretary of the military department concerned may convene selection boards to recommend officers for continuation on active duty under section 637 of this title or for early retirement under section 638 of this title.

**App. 085**

**(c)** The convening of selection boards under subsections (a) and (b) shall be under regulations prescribed by the Secretary of Defense.

## CREDIT(S)

(Added Pub.L. 96-513, Title I, § 105, Dec. 12, 1980, 94 Stat. 2851; amended Pub.L. 97-86, Title IV, § 405(b)(1), Dec. 1, 1981, 95 Stat. 1105; Pub.L. 99-145, Title V, § 514(b)(1), Nov. 8, 1985, 99 Stat. 628; Pub.L. 107-107, Div. A, Title V, § 505(a)(3), Dec. 28, 2001, 115 Stat. 1086.)

Notes of Decisions (2)

10 U.S.C.A. § 611, 10 USCA § 611
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                    2

United States Code Annotated
  Title 10. Armed Forces (Refs & Annos)
    Subtitle A. General Military Law (Refs & Annos)
      Part II. Personnel (Refs & Annos)
        Chapter 36. Promotion, Separation, and Involuntary Retirement of Officers on the Active-Duty List (Refs & Annos)
          Subchapter I. Selection Boards (Refs & Annos)

10 U.S.C.A. § 612

§ 612. Composition of selection boards

Effective: January 1, 2021

Currentness

**(a)(1)** Members of selection boards shall be appointed by the Secretary of the military department concerned in accordance with this section. A selection board shall consist of five or more officers of the same armed force as the officers under consideration by the board. Each member of a selection board (except as provided in paragraphs (2), (3), and (4)) shall be an officer on the active-duty list. Each member of a selection board must be serving in a grade higher than the grade of the officers under consideration by the board, except that no member of a board may be serving in a grade below major or lieutenant commander. The members of a selection board shall represent the diverse population of the armed force concerned to the extent practicable.

**(2)(A)** Except as provided in subparagraph (B), a selection board shall include at least one officer from each competitive category of officers to be considered by the board.

**(B)** A selection board need not include an officer from a competitive category to be considered by the board when there are no officers of that competitive category on the active-duty list in a grade higher than the grade of the officers to be considered by the board and eligible to serve on the board. However, in such a case the Secretary of the military department concerned, in his discretion, may appoint as a member of the board an officer of that competitive category who is not on the active-duty list from among officers of the same armed force as the officers under consideration by the board who hold a higher grade than the grade of the officers under consideration and who are retired officers, reserve officers serving on active duty but not on the active-duty list, or members of the Ready Reserve.

**(3)** When reserve officers of an armed force are to be considered by a selection board, the membership of the board shall include at least one reserve officer of that armed force on active duty (whether or not on the active-duty list). The actual number of reserve officers shall be determined by the Secretary of the military department concerned, in the Secretary's discretion. Notwithstanding the first sentence of this paragraph, in the case of a board which is considering officers in the grade of colonel or brigadier general or, in the case of officers of the Navy, captain or rear admiral (lower half), no reserve officer need be included if there are no reserve officers of that armed force on active duty in the next higher grade who are eligible to serve on the board.

**(4)** Except as provided in paragraphs (2) and (3), if qualified officers on the active-duty list are not available in sufficient number to comprise a selection board, the Secretary of the military department concerned shall complete the membership of the board

App. 087

by appointing as members of the board officers who are members of the same armed force and hold a grade higher than the grade of the officers under consideration by the board and who are retired officers, reserve officers serving on active duty but not on the active-duty list, or members of the Ready Reserve.

**(5)** A retired general or flag officer who is on active duty for the purpose of serving on a selection board shall not, while so serving, be counted against any limitation on the number of general and flag officers who may be on active duty.

**(b)** No officer may be a member of two successive selection boards convened under section 611(a) of this title for the consideration of officers of the same competitive category and grade.

**(c)(1)** Each selection board convened under section 611(a) of this title that will consider an officer described in paragraph (2) shall include at least one officer designated by the Chairman of the Joint Chiefs of Staff who is a joint qualified officer.

**(2)** Paragraph (1) applies with respect to an officer who--

    **(A)** is serving on, or has served on, the Joint Staff; or

    **(B)** is a joint qualified officer.

**(3)** The Secretary of Defense may waive the requirement in paragraph (1) in the case of--

    **(A)** any selection board of the Marine Corps; or

    **(B)** any selection board that is considering officers in specialties identified in paragraph (2) or (3) of section 619a(b) of this title.

<div align="center">

**CREDIT(S)**

</div>

(Added Pub.L. 96-513, Title I, § 105, Dec. 12, 1980, 94 Stat. 2851; amended Pub.L. 97-22, § 4(a), July 10, 1981, 95 Stat. 125; Pub.L. 97-86, Title IV, § 405(b)(1), Dec. 1, 1981, 95 Stat. 1105; Pub.L. 99-145, Title V, § 514(b)(1), Nov. 8, 1985, 99 Stat. 628; Pub.L. 99-433, Title IV, § 402(a), Oct. 1, 1986, 100 Stat. 1030; Pub.L. 106-398, § 1 [Div. A, Title V, § 504(a)], Oct. 30, 2000, 114 Stat. 1654, 1654A-101; Pub.L. 111-383, Div. A, Title V, § 522(a), Jan. 7, 2011, 124 Stat. 4214; Pub.L. 116-283, Div. A, Title V, § 503(a)(1), Jan. 1, 2021, 134 Stat. 3564.)

10 U.S.C.A. § 612, 10 USCA § 612
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 21. Food and Drugs (Refs & Annos)
        Chapter 9. Federal Food, Drug, and Cosmetic Act (Refs & Annos)
            Subchapter VII. General Authority
                Part I. Reagan-Udall Foundation for the Food and Drug Administration

21 U.S.C.A. § 379dd

§ 379dd. Establishment and functions of the Foundation

Effective: March 15, 2022
Currentness

**(a) In general**

A nonprofit corporation to be known as the Reagan-Udall Foundation for the Food and Drug Administration (referred to in this part as the "Foundation") shall be established in accordance with this section. The Foundation shall be headed by an Executive Director, appointed by the members of the Board of Directors under subsection (e) [1]. The Foundation shall not be an agency or instrumentality of the United States Government.

**(b) Purpose of Foundation**

The purpose of the Foundation is to advance the mission of the Food and Drug Administration to modernize medical, veterinary, food, food ingredient, and cosmetic product development, accelerate innovation, and enhance product safety.

**(c) Duties of the Foundation**

The Foundation shall--

**(1)** taking into consideration the Critical Path reports and priorities published by the Food and Drug Administration, identify unmet needs in the development, manufacture, and evaluation of the safety and effectiveness, including postapproval, of devices, including diagnostics, biologics, and drugs, and the safety of food, food ingredients, and cosmetics, and including the incorporation of more sensitive and predictive tools and devices to measure safety;

**(2)** establish goals and priorities in order to meet the unmet needs identified in paragraph (1);

**(3)** in consultation with the Secretary, identify existing and proposed Federal intramural and extramural research and development programs relating to the goals and priorities established under paragraph (2), coordinate Foundation activities with such programs, and minimize Foundation duplication of existing efforts;

**App. 089**

**(4)** award grants to, or enter into contracts, memoranda of understanding, or cooperative agreements with, scientists and entities, which may include the Food and Drug Administration, university consortia, public-private partnerships, institutions of higher education, entities described in section 501(c)(3) of Title 26 (and exempt from tax under section 501(a) of such title), and industry, to efficiently and effectively advance the goals and priorities established under paragraph (2);

**(5)** recruit meeting participants and hold or sponsor (in whole or in part) meetings as appropriate to further the goals and priorities established under paragraph (2);

**(6)** release and publish information and data and, to the extent practicable, license, distribute, and release material, reagents, and techniques to maximize, promote, and coordinate the availability of such material, reagents, and techniques for use by the Food and Drug Administration, nonprofit organizations, and academic and industrial researchers to further the goals and priorities established under paragraph (2);

**(7)** ensure that--

**(A)** action is taken as necessary to obtain patents for inventions developed by the Foundation or with funds from the Foundation;

**(B)** action is taken as necessary to enable the licensing of inventions developed by the Foundation or with funds from the Foundation; and

**(C)** executed licenses, memoranda of understanding, material transfer agreements, contracts, and other such instruments, promote, to the maximum extent practicable, the broadest conversion to commercial and noncommercial applications of licensed and patented inventions of the Foundation to further the goals and priorities established under paragraph (2);

**(8)** provide objective clinical and scientific information to the Food and Drug Administration and, upon request, to other Federal agencies to assist in agency determinations of how to ensure that regulatory policy accommodates scientific advances and meets the agency's public health mission;

**(9)** conduct annual assessments of the unmet needs identified in paragraph (1); and

**(10)** carry out such other activities consistent with the purposes of the Foundation as the Board determines appropriate.

**(d) Board of Directors**

**(1) Establishment**

**App. 090**

**(A) In general**

The Foundation shall have a Board of Directors (referred to in this part as the "Board"), which shall be composed of ex officio and appointed members in accordance with this subsection. All appointed members of the Board shall be voting members.

**(B) Ex officio members**

The ex officio members of the Board shall be the following individuals or their designees:

**(i)** The Commissioner.

**(ii)** The Director of the National Institutes of Health.

**(iii)** The Director of the Centers for Disease Control and Prevention.

**(iv)** The Director of the Agency for Healthcare Research and Quality.

**(C) Appointed members**

**(i) In general**

The ex officio members of the Board under subparagraph (B) shall, by majority vote, appoint to the Board 14 individuals, of which 9 shall be from a list of candidates to be provided by the National Academy of Sciences and 5 shall be from lists of candidates provided by patient and consumer advocacy groups, professional scientific and medical societies, and industry trade organizations. Of such appointed members--

**(I)** 4 shall be representatives of the general pharmaceutical, device, food, cosmetic, and biotechnology industries;

**(II)** 3 shall be representatives of academic research organizations;

**(III)** 2 shall be representatives of patient or consumer advocacy organizations;

**(IV)** 1 shall be a representative of health care providers; and

**(V)** 4 shall be at-large members with expertise or experience relevant to the purpose of the Foundation.

**App. 091**

**(ii) Additional members**

The Board, through amendments to the bylaws of the Foundation, may provide that the number of voting members of the Board shall be a number (to be specified in such amendment) greater than 14. Any Board positions that are established by any such amendment shall be appointed (by majority vote) by the individuals who, as of the date of such amendment, are voting members of the Board and persons so appointed may represent any of the categories specified in subclauses (I) through (V) of clause (i), so long as no more than 30 percent of the total voting members of the Board (including members whose positions are established by such amendment) are representatives of the general pharmaceutical, device, food, cosmetic, and biotechnology industries.

**(iii) Requirements**

**(I) Expertise**

The ex officio members, acting pursuant to clause (i), and the Board, acting pursuant to clause (ii), shall ensure the Board membership includes individuals with expertise in areas including the sciences of developing, manufacturing, and evaluating the safety and effectiveness of devices, including diagnostics, biologics, and drugs, and the safety of food, food ingredients, and cosmetics.

**(II) Federal employees**

No employee of the Federal Government shall be appointed as a member of the Board under this subparagraph or under paragraph (3)(B). For purposes of this section, the term "employee of the Federal Government" does not include a special Government employee, as that term is defined in section 202(a) of Title 18.

**(D) Initial meeting**

**(i) In general**

Not later than 30 days after September 27, 2007, the Secretary shall convene a meeting of the ex officio members of the Board to--

**(I)** incorporate the Foundation; and

**(II)** appoint the members of the Board in accordance with subparagraph (C).

**(ii) Service of ex officio members**

Upon the appointment of the members of the Board under clause (i)(II)--

<span style="color:orange">**App. 092**</span>

**(I)** the terms of service of the Director of the Centers for Disease Control and Prevention and of the Director of the Agency for Healthcare Research and Quality as ex officio members of the Board shall terminate; and

**(II)** the Commissioner and the Director of the National Institutes of Health shall continue to serve as ex officio members of the Board, but shall be nonvoting members.

**(iii) Chair**

The ex officio members of the Board under subparagraph (B) shall designate an appointed member of the Board to serve as the Chair of the Board.

**(2) Duties of Board**

The Board shall--

**(A)** establish bylaws for the Foundation that--

**(i)** are published in the Federal Register and available for public comment;

**(ii)** establish policies for the selection of the officers, employees, agents, and contractors of the Foundation;

**(iii)** establish policies, including ethical standards, for the acceptance, solicitation, and disposition of donations and grants to the Foundation and for the disposition of the assets of the Foundation, including appropriate limits on the ability of donors to designate, by stipulation or restriction, the use or recipient of donated funds;

**(iv)** establish policies that would subject all employees, fellows, and trainees of the Foundation to the conflict of interest standards under section 208 of Title 18;

**(v)** establish licensing, distribution, and publication policies that support the widest and least restrictive use by the public of information and inventions developed by the Foundation or with Foundation funds to carry out the duties described in paragraphs (6) and (7) of subsection (c), and may include charging cost-based fees for published material produced by the Foundation;

**(vi)** specify principles for the review of proposals and awarding of grants and contracts that include peer review and that are consistent with those of the Foundation for the National Institutes of Health, to the extent determined practicable and appropriate by the Board;

**App. 093**

**(vii)** specify a cap on administrative expenses for recipients of a grant, contract, or cooperative agreement from the Foundation;

**(viii)** establish policies for the execution of memoranda of understanding and cooperative agreements between the Foundation and other entities, including the Food and Drug Administration;

**(ix)** establish policies for funding training fellowships, whether at the Foundation, academic or scientific institutions, or the Food and Drug Administration, for scientists, doctors, and other professionals who are not employees of regulated industry, to foster greater understanding of and expertise in new scientific tools, diagnostics, manufacturing techniques, and potential barriers to translating basic research into clinical and regulatory practice;

**(x)** specify a process for annual Board review of the operations of the Foundation; and

**(xi)** establish specific duties of the Executive Director;

**(B)** prioritize and provide overall direction to the activities of the Foundation;

**(C)** evaluate the performance of the Executive Director; and

**(D)** carry out any other necessary activities regarding the functioning of the Foundation.

**(3) Terms and vacancies**

**(A) Term**

The term of office of each member of the Board appointed under paragraph (1)(C)(i), and the term of office of any member of the Board whose position is established pursuant to paragraph (1)(C)(ii), shall be 4 years, except that--

**(i)** the terms of offices for the members of the Board initially appointed under paragraph (1)(C)(i) shall expire on a staggered basis as determined by the ex officio members; and

**(ii)** the terms of office for the persons initially appointed to positions established pursuant to paragraph (1)(C)(ii) may be made to expire on a staggered basis, as determined by the individuals who, as of the date of the amendment establishing such positions, are members of the Board.

**(B) Vacancy**

**App. 094**

Any vacancy in the membership of the Board--

**(i)** shall not affect the power of the remaining members to execute the duties of the Board; and

**(ii)** shall be filled by appointment by the appointed members described in paragraph (1)(C) by majority vote.

**(C) Partial term**

If a member of the Board does not serve the full term applicable under subparagraph (A), the individual appointed under subparagraph (B) to fill the resulting vacancy shall be appointed for the remainder of the term of the predecessor of the individual.

**(D) Serving past term**

A member of the Board may continue to serve after the expiration of the term of the member until a successor is appointed.

**(4) Compensation**

Members of the Board may not receive compensation for service on the Board. Such members may be reimbursed for travel, subsistence, and other necessary expenses incurred in carrying out the duties of the Board, as set forth in the bylaws issued by the Board.

**(e) Incorporation**

The ex officio members of the Board shall serve as incorporators and shall take whatever actions necessary to incorporate the Foundation.

**(f) Nonprofit status**

In carrying out subsection (b), the Board shall establish such policies and bylaws under subsection (d), and the Executive Director shall carry out such activities under subsection (g), as may be necessary to ensure that the Foundation maintains status as an organization that--

**(1)** is described in subsection (c)(3) of section 501 of Title 26; and

**(2)** is, under subsection (a) of such section, exempt from taxation.

**(g) Executive Director**

**App. 095**

**(1) In general**

The Board shall appoint an Executive Director who shall serve at the pleasure of the Board. The Executive Director shall be responsible for the day-to-day operations of the Foundation and shall have such specific duties and responsibilities as the Board shall prescribe.

**(2) Compensation**

The compensation of the Executive Director shall be fixed by the Board.

**(h) Administrative powers**

In carrying out this part, the Board, acting through the Executive Director, may--

**(1)** adopt, alter, and use a corporate seal, which shall be judicially noticed;

**(2)** hire, promote, compensate, and discharge 1 or more officers, employees, and agents, as may be necessary, and define their duties;

**(3)** prescribe the manner in which--

    **(A)** real or personal property of the Foundation is acquired, held, and transferred;

    **(B)** general operations of the Foundation are to be conducted; and

    **(C)** the privileges granted to the Board by law are exercised and enjoyed;

**(4)** with the consent of the applicable executive department or independent agency, use the information, services, and facilities of such department or agencies in carrying out this section;

**(5)** enter into contracts with public and private organizations for the writing, editing, printing, and publishing of books and other material;

**(6)** hold, administer, invest, and spend any gift, devise, or bequest of real or personal property made to the Foundation under subsection (i);

**App. 096**

**(7)** enter into such other contracts, leases, cooperative agreements, and other transactions as the Board considers appropriate to conduct the activities of the Foundation;

**(8)** modify or consent to the modification of any contract or agreement to which it is a party or in which it has an interest under this part;

**(9)** take such action as may be necessary to obtain patents and licenses for devices and procedures developed by the Foundation and its employees;

**(10)** sue and be sued in its corporate name, and complain and defend in courts of competent jurisdiction;

**(11)** appoint other groups of advisors as may be determined necessary to carry out the functions of the Foundation; and

**(12)** exercise other powers as set forth in this section, and such other incidental powers as are necessary to carry out its powers, duties, and functions in accordance with this part.

**(i) Acceptance of funds from other sources**

The Executive Director may solicit and accept on behalf of the Foundation, any funds, gifts, grants, devises, or bequests of real or personal property made to the Foundation, including from private entities, for the purposes of carrying out the duties of the Foundation.

**(j) Service of Federal employees**

Federal Government employees may serve on committees advisory to the Foundation and otherwise cooperate with and assist the Foundation in carrying out its functions, so long as such employees do not direct or control Foundation activities.

**(k) Detail of Government employees; fellowships**

**(1) Detail from Federal agencies**

Federal Government employees may be detailed from Federal agencies with or without reimbursement to those agencies to the Foundation at any time, and such detail shall be without interruption or loss of civil service status or privilege. Each such employee shall abide by the statutory, regulatory, ethical, and procedural standards applicable to the employees of the agency from which such employee is detailed and those of the Foundation.

**(2) Voluntary service; acceptance of Federal employees**

**App. 097**

**(A) Foundation**

The Executive Director of the Foundation may accept the services of employees detailed from Federal agencies with or without reimbursement to those agencies.

**(B) Food and Drug Administration**

The Commissioner may accept the uncompensated services of Foundation fellows or trainees. Such services shall be considered to be undertaking an activity under contract with the Secretary as described in section 379 of this title.

**(l) Annual reports**

**(1) Reports to Foundation**

Any recipient of a grant, contract, fellowship, memorandum of understanding, or cooperative agreement from the Foundation under this section shall submit to the Foundation a report on an annual basis for the duration of such grant, contract, fellowship, memorandum of understanding, or cooperative agreement, that describes the activities carried out under such grant, contract, fellowship, memorandum of understanding, or cooperative agreement.

**(2) Report to Congress and the FDA**

Beginning with fiscal year 2009, the Executive Director shall submit to Congress and the Commissioner an annual report that--

**(A)** describes the activities of the Foundation and the progress of the Foundation in furthering the goals and priorities established under subsection (c)(2), including the practical impact of the Foundation on regulated product development;

**(B)** provides a specific accounting of the source and use of all funds used by the Foundation to carry out such activities; and

**(C)** provides information on how the results of Foundation activities could be incorporated into the regulatory and product review activities of the Food and Drug Administration.

**(m) Separation of funds**

The Executive Director shall ensure that the funds received from the Treasury are managed as individual programmatic funds under subsection (i), according to best accounting practices.

**(n) Funding**

WESTLAW     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

§ 379dd. Establishment and functions of the Foundation, 21 USCA § 379dd

From amounts appropriated to the Food and Drug Administration for each fiscal year, the Commissioner shall transfer not less than $1,250,000 and not more than $5,000,000, to the Foundation to carry out subsections (a), (b), and (d) through (m).

**CREDIT(S)**

(June 25, 1938, c. 675, § 770, as added Pub.L. 110-85, Title VI, § 601(a), Sept. 27, 2007, 121 Stat. 890; amended Pub.L. 114-255, Div. A, Title III, § 3076, Dec. 13, 2016, 130 Stat. 1139; Pub.L. 117-101, § 2(a), Mar. 15, 2022, 136 Stat. 47.)

**Footnotes**

1        So in original. Probably should be "subsection (g)".

21 U.S.C.A. § 379dd, 21 USCA § 379dd
Current through P.L.118-10. Some statute sections may be more current, see credits for details.

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.