No. 23-10326

United States Court of Appeals
for the Fifth Circuit

◆

BRAIDWOOD MANAGEMENT, INC., et al.,
*Plaintiffs-Appellees/Cross-Appellants*,
v.
XAVIER BECERRA, in his official capacity as
Secretary of Health and Human Services, et al.
*Defendants-Appellants/Cross-Appellees.*

◆

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth

◆

**BRIEF OF AMICUS THE BUCKEYE INSTITUTE
IN SUPPORT OF APPELLEES/CROSS APPELLANTS**

◆

Jay R. Carson (0068526)
David C. Tryon (Ohio 0028954)
The Buckeye Institute
88 East Broad Street, Ste. 1300
Columbus, Ohio 43215
(614) 224-4422
j.carson@buckeyeinstitute.org
d.tryon@buckeyeinstitute.org
*Attorneys for Amicus Curiae The Buckeye
Institute*

**CERTIFICATE OF INTERESTED PARTIES**
Case No. 23-10326

The undersigned counsel of record for *amicus* The Buckeye Institute certifies

that The Buckeye Institute is an Ohio nonprofit organization.[1]  Counsel is not aware

of any person or entity as described in the fourth sentence of Rule 28.2.1 that have

an interest in the outcome of this case other than those listed in the parties'

certificates.  These representations are made in order that the judges of this court

may evaluate possible disqualification or recusal.

*/s/ Jay R. Carson*
Jay R. Carson
*Counsel of Record*

---

[1] Pursuant to Fed. R. App. 29(a)(4)(E), The Buckeye Institute has authored this brief in whole.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ........................................................ i

TABLE OF AUTHORITIES ................................................................. iii

INTERESTS OF THE *AMICUS CURIAE* ............................................. 1

SUMMARY OF ARGUMENT .......................................................... 2

ARGUMENT ........................................................................ 4

   I.   The Expanding Regulatory State and the Threat of Unaccountable Agencies 4

   II.   Canons of Statutory Construction Do Not Support the Government's Reading of 42 U.S.C. § 299b-4(a)(6) ................................................. 10

CERTIFICATE OF COMPLIANCE .................................................... 16

CERTIFICATE OF SERVICE ......................................................... 17

# TABLE OF AUTHORITIES

## Cases

*Bowsher v. Synar*, 478 U.S. 714 (1986) ...................................................11

*City of Arlington, Tex. v. FCC*, 569 U.S. 290 (2013).............................. 7

*Dept. of Transp. v. Assn. of Am. Railroads*, 575 U.S. 43 (2015)............................ 8

*Free Enterprise Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010) ................................................................. 8

*Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49 (1987)10

*Heaven v. Gonzales,* 473 F.3d 167 (5th Cir. 2006)..................................11

*In re Aiken Cnty.*, 645 F.3d 428 (D.C. Cir. 2011)................................. 8

*Oceana, Inc. v. Locke,* 670 F.3d 1238 (D.C. Cir. 2011).........................13

*PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018) ............................... 7

*Sackett v. EPA*, 566 U.S. 120 (2012)....................................................... 7

*Sierra Club v. Train*, 557 F.2d 485 (5th Cir. 1977) .............................13

*Trade Commission v. Ruberoid Co.*, 343 U.S. 470 (1952)..................... 4

*W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587 (2022) ..................10

## Statutes

42 U.S.C. § 299b-4(a)(6) ......................................................................10

42 U.S.C. §299b–4(a) ............................................................................. 3

## Other Authorities

David Casazza, *Liberty Requires Accountability: Checking Delegations to Indep. Agencies*, 38 Harv. J.L. & Pub. Pol'y 729 (2015)...........................6, 7

C.W. Crews Jr., *Ten Thousand Commandments: An Annual Snapshot of the Federal Regulatory State*, Competitive Enterprise Institute (May 8, 2015), https://cei.org/studies/ten-thousand-commandments-2015/ ................................ 6

Stephen Dinan, *Feds Shut Down Amish Farm for Selling Fresh Milk*, Wash. Times (Feb. 13, 2012) ...................................................................... 7

Peter Kastor, *The Early Federal Workforce*, Brookings (May 2018), https://tinyurl.com/3rpv55s2 .............................................................. 5

Peter Onuf, *Thomas Jefferson: Domestic Affairs,* U. Va. Miller Ctr., (Mar. 25, 2021), https://tinyurl.com/6jmm4nze ................................................ 5

*Procedure Manual*, Preventative Services Task Force (Dec. 2015), www.uspreventiveservicestaskforce.org/uspstf/sites/default/files/inline-files/procedure-manual-2020_3.pdf .....................................................12

*Public Trust in Government: 1958-2022*, Pew Research Ctr. (June 6, 2022),
     https://www.pewresearch.org/politics/2022/06/06/public-trust-in-government-
     1958-2022/.................................................................................................. 8

Lee Raine and Andrew Perrin, *Key Findings about Americans' Declining Trust in
     Government and Each Other,* Pew Research Ctr. (Jul. 22, 2019),
     https://www.pewresearch.org/fact-tank/2019/07/22/key-findings-about-
     americans-declining-trust-in-government-and-each-other/ ................................ 9

C. Sands, *Statutes and Statutory Construction* § 25.04 (4th ed. 1973)...................13

The Federalist No. 11 (A. Hamilton) (C. Rossiter ed. 1961) ................................10

The Federalist No. 51 (James Madison)........................................................5, 8

Susan Webb Yackee, *The Politics of Rulemaking in the United States*, 22 Annu.
     Rev. Political Sci. 37 (2019) ............................................................ 6

## Rules

Fed. R. App. P. 32...............................................................................16
Fed. R. App. P. 29(a)(2)........................................................................16

## Regulations

606 Mass. Code Regs. § 7.11(11)(d) ..................................................... 7

## Constitutional Provisions

U.S. Const. art. I, § 1, cl. 1 ................................................................ 5

## INTERESTS OF THE *AMICUS CURIAE*

*Amicus curiae* The Buckeye Institute[2] was founded in 1989 as an independent research and educational institution—a think tank—whose mission is to advance free-market public policy.   The staff at The Buckeye Institute accomplishes the organization's mission by performing timely and reliable research on key issues, compiling and synthesizing data, formulating free-market policy solutions, and marketing those policy solutions for implementation in Ohio and replication throughout the country.   The Buckeye Institute is a nonpartisan, non-profit, tax-exempt organization as defined by I.R.C. section 501(c)(3).   The Buckeye Institute's Legal Center files and joins amicus briefs that are consistent with its mission.

The Buckeye Institute is dedicated to promoting free-market policy solutions and protecting individual liberties, especially those liberties guaranteed by the Constitution of the United States, against government overreach.   Often government overreach comes in the form of agency rules and regulations imposed by unelected bureaucrats.   The result is not just government overreach, but the insulation of

---

[2] Pursuant to Rule 29(a), The Buckeye Institute states that all parties have given consent to file this amicus brief. Further, no counsel for any party has authored this brief in whole or in part and no person other than the amicus has made any monetary contribution to this brief's preparation or submission. The Buckeye Institute has no parent corporation and no publicly held corporation owns 10% or more of its stock.

important public policy decisions from any political or judicial accountability.  This is incompatible with the representative democracy guaranteed by the Constitution.

The Buckeye Institute has advocated for government accountability in rulemaking.  "Independent" entities like the U.S. Preventative Services Task Force—and the arguments made by the government in this case—highlight the danger of unelected and unaccountable bodies making policy while hiding behind the skirts of the regulatory state.

## SUMMARY OF ARGUMENT

In enacting the Affordable Care Act ("ACA"), Congress left many of the details to administrative agencies.  This practice of making grand pronouncements and leaving executive agencies to work out the fine print is—unfortunately—far from unusual, particularly in legislation that seeks to regulate complex systems like insurance markets.

Proponents of this style of governance by delegation and deference to regulatory bodies often point to the twin rationales of access to technical expertise and independence from politics.  They claim that allowing apolitical experts guided by data to create those policies will benefit society (whether the public likes it or not).

In this case, however, Congress took the delegation to administrative agencies even further, ostensibly in the hope of giving difficult decision-making about

required insurance coverage to independent experts, protected—"to the extent practicable"—from "political pressure." Congress created the Preventative Services Task Force ("PSTF" or "the Task Force") in 1984 as an advisory body with no authority to mandate its recommendations. 42 U.S.C. §299b–4(a). However, Sec. 2713 of the Affordable Care Act requires private insurers to cover preventive services recommended by the PSTF with a grade of A or B. And the ACA requires insurers to cover these services at no cost to the end-user. Thus, the PSTF went from a governmental advisor, issuing recommendations, to a governmental agency issuing enforceable edicts.

Regardless of whether one views this congressional delegation regarding insurance coverage law-making to an outside group as wise policy, the elevation of an independent *advisory* body to an independent agency with law-making power requires Congress to make a choice of what kind of agency the PSTF is. If the Task Force is truly independent, then its members are subject to the requirement of the Appointments Clause. If the Task Force members are instead merely inferior officers that give non-binding recommendations, controlled by the Secretary of Health and Human Services, then constitutional appointment is not necessary. But, the government cannot have it both ways.

The expansion of the regulatory state necessarily raises questions of accountability. The government's attempt to create an independent agency without

complying with the Appointments Clause strikes directly at the constitutional principle that liberty requires accountability.

Further, in trying to justify the PSTF's alleged exemption from accountability that flows from the Appointments clause, the government urges a tortured reading of the statute that would in essence ignore the statute's mandatory language. The district court correctly interpreted the statute to hold that the PSTF cannot be simultaneously "independent" yet also subject to political control by the Secretary. This brief urges that—in light of the damage that the government's interpretation could do to the cause of constitutional accountability—this Court affirm the district court's reading of the statute.

## ARGUMENT

### I.     The Expanding Regulatory State and the Threat of Unaccountable Agencies

The Constitution makes no mention of administrative agencies. Yet, as Justice Jackson lamented over half a century ago, "[t]hey have become a veritable fourth branch of the Government, which has deranged our three-branch legal theories much as the concept of a fourth dimension unsettles our three-dimensional thinking." *Fed. Trade Commission v. Ruberoid Co.,* 343 U.S. 470, 487 (1952) (Jackson, J., dissenting). Simply put, the executive agency paradigm is always—to some extent—at odds with the Constitution's directive that "All legislative Powers

herein granted shall be vested in a Congress of the United States . . . ." U.S. Const. art. I, § 1, cl. 1. The practice of delegating legislative powers to executive agencies and more recently—independent agencies insulated from political pressure from the executive branch—thus implicates the U.S. Constitution's fundamental promise of self-governance. Madison described the challenge aptly in Federalist 51:

> "In framing a government which is to be administered by men over men, the great difficulty lies in this: you must first enable the government to control the governed; and in the next place oblige it to control itself."

The Federalist No. 51 (James Madison). Judging by the system of checks and balances he championed in the Constitution, Madison appreciated that the second task was more difficult than the first. But for a republican form of government to survive, it was also the more important one.

The government's need for self-control is even more apparent now. In 1802, the United States government had 3,905 employees. Peter Kastor, *The Early Federal Workforce*, Brookings (May 2018), https://tinyurl.com/3rpv55s2. Roughly 700 of those employees were clerks in the federal government; the rest were postal workers. By contrast, today, the federal government employs 2.3 million civilians. Peter Onuf, *Thomas Jefferson: Domestic Affairs,* U. Va. Miller Ctr., (Mar. 25, 2021), https://tinyurl.com/6jmm4nze. More significant than the number of employees, however, is the influence that this unelected branch of government has over national

policy. In 2015, Federal agencies issue 3,410 new rules, which equates to 30 rules for every piece of congressionally passed legislation in that same year. C.W. Crews Jr., *Ten Thousand Commandments: An Annual Snapshot of the Federal Regulatory State*, Competitive Enterprise Institute (May 8, 2015), https://cei.org/studies/ten-thousand-commandments-2015/.

The expanding regulatory state is nothing new. Indeed, the New Deal, with its faith in "expert" bureaucrats ushered in the heyday of independent agencies.

By the 1970s, however, critics had raised concerns of congressional "delegation as abdication," arguing that "an unaccountable and headless fourth branch of government—the bureaucrats—had come to run American politics." Susan Webb Yackee, *The Politics of Rulemaking in the United States*, 22 Annu. Rev. Political Sci. 37, 39 (2019) (citations omitted). In the mid-1980s, commentators observed that "[a]dministrative agencies today have enormous power to make fundamental policy decisions that the Constitution assigns to Congress as the branch of government most representative of the majority's views." *Id.* Indeed, "[m]ore and more legislation has been originating with the executive branch of government." *Id.* And today commentators have noted that "[e]very year, the growth of Statutes at Large is dwarfed by the expansion of the Federal Register." David Casazza, *Liberty Requires Accountability: Checking Delegations to Indep. Agencies*, 38 Harv. J.L. & Pub. Pol'y 729, 731 (2015).

Yet, despite these concerns, legislative delegation of regulatory authority to agencies continues unabated, with the result that modern governance relies heavily on the public policy decisions of the unelected.  The result is "a nation governed largely by the duly appointed administrators of the people rather than the duly elected representatives of the people." *Id.*

Administrative law "constrain[s] Americans in all aspects of their lives, political, economic, social, and personal," having become "the government's primary mode of controlling Americans."  Philip Hamburger, *Is Administrative Law Unlawful?* 1 (2014).  Administrative processes intrude upon many facets of American life that may well have been thought the proper province of private life and business, including brushing one's teeth, 606 Mass. Code Regs. § 7.11(11)(d); selling fresh milk, Stephen Dinan, *Feds Shut Down Amish Farm for Selling Fresh Milk*, Wash. Times (Feb. 13, 2012); or filling holes on one's land, *see Sackett v. EPA*, 566 U.S. 120, 124–25 (2012).  Add to that "independent agencies" like the PSTF that "hold enormous power over the economic and social life of the United States." *See PHH Corp. v. CFPB*, 881 F.3d 75, 165 (D.C. Cir. 2018) (Kavanaugh, J., dissenting).  With literally "hundreds of federal agencies poking into every nook and cranny of daily life," "the danger posed by the growing power of the administrative state cannot be dismissed." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 315 (2013) (Roberts, C.J., dissenting).

7

Even if government by unelected experts proved more efficient, more rational, or even more just, the Supreme Court has time and again held that those purported benefits must yield to the "vital constitutional principle" that "[l]iberty requires accountability." *Dept. of Transp. v. Assn. of Am. Railroads*, 575 U.S. 43, 57 (2015) (Alito, J., concurring). "The Framers created a structure in which 'a dependence on the people' would be the 'primary control on the government.'" *In re Aiken Cnty.*, 645 F.3d 428, 440 (D.C. Cir. 2011) (Kavanaugh, J., concurring) (quoting *Free Enterprise Fund v. Public Co. Accounting Oversight Bd.,* 561 U.S. 477, 501 (2010) (quoting The Federalist No. 51 (Madison)). Indeed, "[p]romoting political accountability is a central feature of American political thought dating back to the Founding period, finding expression in the Declaration of Independence, *The Federalist Papers*, and the works that influenced the Founders. Casazza, *supra*, at 729–30.

Not surprisingly, the increase in government by administrative fiat has coincided with a decrease in trust in the federal government. Pew research polling shows that from 1958 to 2022, the percentage of Americans who say they trust the federal government "to do what is right always or most of the time" has declined from 73% to 20%. *Public Trust in Government: 1958-2022*, Pew Research Ctr. (June 6, 2022), https://www.pewresearch.org/politics/2022/06/06/public-trust-in-government-1958-2022/. In 2019, nearly two-thirds of Americans "surveyed said

that this lack of trust in the federal government made it harder to solve many of the country's problems. Lee Raine and Andrew Perrin, *Key Findings about Americans' Declining Trust in Government and Each Other,* Pew Research Ctr. (Jul. 22, 2019), https://www.pewresearch.org/fact-tank/2019/07/22/key-findings-about-americans-declining-trust-in-government-and-each-other/.

This case brings the dangers of unaccountable administrative governance into clear relief because the PSTF is not merely lending technical expertise, it is instead making moral value judgments that it forces upon insurers and private employers. While citizens might accept government experts' findings on morally neutral issues, such as how many parts per million of soot particulates emitted from a smokestack present a health risk or what constitutes a safe dosage of a drug, they understandably resist or reject administrative fiats that may require them to violate their consciences. Government "experts" have no more expertise on moral issues than do every-day citizens.  In other words, when it comes to matters affecting or impacting individual moral choices, rather than simple technical expertise, the decision makers must be accountable to the citizenry.  Law givers must be accountable to—not shielded from—those that they govern by using the shibboleth of "independence."  Indeed, "[w]hen citizens cannot readily identify the source of legislation or regulation that affects their lives, Government officials can wield power without owning up to the consequences." *Assn. of Am. Railroads*, 575 U.S. at 57 (Alito, J., concurring).  This

accountability "is vital because the framers believed that a republic—a thing of the people—would be more likely to enact just laws than a regime administered by a ruling class of largely unaccountable 'ministers.'" *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2617 (2022) (quoting The Federalist No. 11, at 85 (A. Hamilton) (C. Rossiter ed. 1961)).

## II.    Canons of Statutory Construction Do Not Support the Government's Reading of 42 U.S.C. § 299b-4(a)(6)

The "starting point for interpreting a statute is the language of the statute itself." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 56 (1987). The statute at issue here states that "[a]ll members of the Task Force convened under this subsection, and any recommendations made by such members, shall be independent and, to the extent practicable, not subject to political pressure." 42 U.S.C. § 299b-4(a)(6).

The government argues that the phrase "to the extent practicable" refers to not only the clause following those words, but also to the independence of the Task Force. Therefore, it argues, the phrase "to the extent practicable" implicitly gives the Secretary of Health and Human Services wide authority over the PSTF, including the authority to ratify its decisions and to appoint, remove, or reconstitute the Task Force. *See, e.g.*, Appellants' Br. at 25. Thus, the Task Force is not really independent and so there is no Appointments Clause problem. As the district court

10

correctly held, however, reading the phrase "to the extent practicable" to swallow the rest of the statute cannot be squared with common sense and well-established canons of statutory construction.

The well-established canons of statutory interpretation require that a court must "give effect to all words and phrases, if possible." *Heaven v. Gonzales,* 473 F.3d 167, 176 (5th Cir. 2006). Applying that rule, the conjunction "and" indicates that Congress set two related—but distinct—requirements for the PTSF. First, the Task Force members and their recommendations must be "independent." And second, "to the extent practicable," it shall "not be subject to political influence." The first question is thus whether it is possible for the Court to give meaning to both requirements. Plainly, it is.

"Independent," as used in the statute, means not reliant on any outside source or authority. The statute fully authorizes Task Force members to make up their own minds on Task Force "recommendations"—which, in this situation—are binding. They are not required, by statute or otherwise, to consult with any other person, agency, or other governmental body in reaching their decisions. Nor are they required to defer to any other person or entity. And their decisions are not subject to appeal or review. Indeed, courts have developed a set of objective factors to determine when an agency is "independent." *See Bowsher v. Synar*, 478 U.S. 714, 725 n. 4 (1986).

In contrast, the requirement that members and their decisions be "not subject to political pressure" is more aspirational or hortatory. The term "political pressure" is not defined and could include many varieties of influence ranging from industry lobbying, media campaigns, or overt pressure from the administration. Perhaps most obviously, the Task Force extensively uses outside resources in reaching its recommendations. It has an entire procedures manual explaining the process. See *Procedure Manual*, Preventative Services Task Force (Dec. 2015), www.uspreventiveservicestaskforce.org/uspstf/sites/default/files/inline-files/procedure-manual-2020_3.pdf. The statute does not provide for any penalty for applying political pressure to a Task Force member. Indeed, such a prohibition would almost certainly run afoul of the First Amendment.

By including the phrase "to the extent practicable," the drafters acknowledged that they could no more outlaw political influence than they could repeal the law of gravity. Political pressure would always exist, for example, to the extent that Congress could always repeal the statute and abolish the Task Force. Interest groups like the American Cancer Society and others who have filed amicus briefs in support of the government's position could quite appropriately advocate for the PSTF to include certain services in its recommendations. The press could editorialize on the wisdom of requiring that certain preventative services be covered.

More importantly, though, applying standard rules of grammar, the phrase "to the extent practicable" modifies only the clause "not subject to political pressure." While the government's reading would conflate the two provisions, there is no qualification that the members are independent only "to the extent practicable." Courts have held that when a statute qualifies one provision but not another, the non-qualified provision is mandatory. *See Oceana, Inc. v. Locke,* 670 F.3d 1238, 1242–43 (D.C. Cir. 2011) (reading statutory provision as mandatory where, in contrast to a neighboring provision, duty imposed was not modified by phrase "to the extent practicable").

The use of the mandatory "shall" further supports this reading. "Shall" appears immediately before the independence requirements and without modification. Indeed, the "[u]se of the word 'shall' generally indicates a mandatory intent unless a convincing argument to the contrary is made." *Sierra Club v. Train*, 557 F.2d 485, 489 (5th Cir. 1977) (citing C. Sands, *Statutes and Statutory Construction* § 25.04 (4th ed. 1973)). The independence provision is thus mandatory, while the second, qualified provision is merely directory.

Assuming that both provisions may be given meaning, the second inquiry is whether the meaning that the government assigns to the second clause can be reconciled with the first. It cannot. The government argues that although the members of the PSTF are independent, because they are protected from political

influence only to the extent practicable, they are also subordinate to the Secretary of Health and Human Services. As the district court correctly decided, this reading would allow the exception to swallow the rule. More importantly, it would remove all meaning from the requirement that the PSTF be "independent." Simply put, because the PSTF cannot be both independent and also subject to absolute political control by the Secretary, the government's reading must be rejected.

The bottom line is that Congress has effectively elevated the previously only advisory PSTF into an independent agency with binding lawmaking authority, at least with respect to required insurance coverage issues. Accordingly, the PSTF members must be appointed consistent with the Appointments Clause. They were not. Therefore, the PSTF is unconstitutional in its present form and operation and any of its binding "recommendations" must fall.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's decision on the issue of the applicability of the Appointments Clause to the members of the PSTF.

Respectfully submitted,

*/s/ Jay R. Carson*
Jay R. Carson
  *Counsel of Record*
David Tryon
THE BUCKEYE INSTITUTE

14

88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
j.carson@buckeyeinstitute.org
d.tryon@buckeyeinstitute.org

## CERTIFICATE OF COMPLIANCE
Federal Rules of Appellate Procedure
Appendix 6

1. This document complies with the word limit of Fed. R. App. P. 29(a)(2) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

    X      this document contains 2,990 words, or

    ☐      this brief uses a monospaced typeface and contains [state the number of] lines of text.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

    X      this document has been prepared in a proportionally spaced typeface using Microsoft Word for the most current version of Office 365 in 14-point type, Times New Roman, or

    ☐      this document has been prepared in a monospaced typeface using [state name and version of word-processing program] with [state number of characters per inch and name of type style].

*/s/ Jay R. Carson*          
Jay R. Carson
  *Counsel of Record*
David Tryon
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
(614) 224-4422
j.carson@buckeyeinstitute.org
d.tryon@buckeyeinstitute.org

*Counsel for Amicus Curiae,*
*The Buckeye Institute*

August 14, 2023

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Amicus Brief was served on all counsel of record via the Court's electronic filing system this 14th day of August 2023.

*/s/ Jay R. Carson*
Jay R. Carson
*Counsel of Record for The Buckeye Institute*