No. 23-10326

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

BRAIDWOOD MANAGEMENT, INCORPORATED; JOHN SCOTT KELLEY; KELLEY ORTHODONTICS; ASHLEY MAXWELL; ZACH MAXWELL; JOEL STARNES,

Plaintiffs-Appellees/Cross-Appellants,

JOEL MILLER; GREGORY SCHEIDEMAN,

Plaintiffs–Cross-Appellants

v.

XAVIER BECERRA, SECRETARY, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, in his official capacity as Secretary of Health and Human Services; UNITED STATES OF AMERICA; JANET YELLEN, SECRETARY, U.S. DEPARTMENT OF TREASURY, in her official capacity as Secretary of the Treasury; JULIE A. SU, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR, in her official capacity as Secretary of Labor,

Defendants-Appellants/Cross-Appellees.

---

On Appeal from the United States District Court
for the Northern District of Texas, No. 20-cv-283, Hon. Reed O'Connor

---

## FEDERAL DEFENDANTS' RESPONSE AND REPLY BRIEF

---

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*
LEIGHA SIMONTON
  *United States Attorney*
MICHAEL S. RAAB
ALISA B. KLEIN
DANIEL AGUILAR
(202) 514-5432
  Attorneys, Appellate Staff
  Civil Division
  U.S. Department of Justice
  950 Pennsylvania Avenue, NW
  Washington, DC  20530

**CERTIFICATE OF INTERESTED PERSONS**

A certificate of interested persons is not required, as appellants are the United States and federal officials sued in their official capacities. Fifth Cir. R. 28.2.1.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................... iv

INTRODUCTION AND SUMMARY OF ARGUMENT ...................................1

ARGUMENT.................................................................................... 5

I.   TASK FORCE MEMBERS ARE INFERIOR OFFICERS ..................................... 5

    A.   The Secretary Has Authority To Appoint Task Force
       Members...................................................................... 5

        1.   HHS's Reorganization Plan................................. 6

        2.   42 U.S.C. §§ 299 and 299b-4............................. 9

    B.   Task Force Members Are Constitutionally Subordinate
       To The Secretary....................................................... 14

        1.   The Secretary May Remove Task Force Members
             At Will ...................................................... 14

        2.   If Constitutionally Necessary, The Secretary May
             Decline To Give Task Force Recommendations
             Legally Binding Effect ..................................... 20

        3.   The Secretary Properly Ratified The Task Force's
             Recommendations .......................................... 25

II.  IF THE SECRETARY CANNOT ADEQUATELY SUPERVISE TASK FORCE
    MEMBERS, THE STATUTORY RESTRICTIONS ON SECRETARIAL
    SUPERVISION SHOULD BE DECLARED SEVERABLE................................... 28

III. AT A MINIMUM, THIS COURT SHOULD REVERSE THE NATIONWIDE
    INJUNCTION AND UNIVERSAL VACATUR OF AGENCY ACTIONS ................ 34

    A.   The Balance Of Equities And The Public Interest
       Preclude The District Court's Universal Remedies ................. 34

B.    The APA Does Not Allow A District Court To Ignore
The Balance Of The Equities ....................................................38

IV.    PLAINTIFFS' CROSS-APPEAL ................................................... 47

A.    The District Court Correctly Rejected Plaintiffs'
Challenges To The CDC And HRSA Recommendations........... 47

B.    The District Court Correctly Dismissed Plaintiffs'
Nondelegation Challenge ........................................................ 50

CONCLUSION............................................................................51

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Advanced Disposal Services East, Inc. v. NLRB,*
  820 F.3d 592 (3d Cir. 2016) ...................................................... 50

*Alabama Association of Realtors v. HHS,*
  141 S. Ct. 2485 (2021) (per curiam) ........................................ 42

*Alliance for Hippocratic Medicine v. FDA,*
  78 F.4th 210 (5th Cir. 2023) .................................................... 45

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission,*
  988 F.2d 146 (D.C. Cir. 1993) .................................................. 45

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ............................................... 41, 42

*Armstrong v. Exceptional Child Center, Inc.,*
  575 U.S. 320 (2015) .................................................................. 40

*Arthrex, Inc. v. Smith & Nephew, Inc.,*
  941 F.3d 1320 (Fed. Cir. 2019) ................................................ 18

*Ayotte v. Planned Parenthood of Northern New England,*
  546 U.S. 320 (2006) .................................................................. 31

*Big Time Vapes, Inc. v. FDA,*
  963 F.3d 436 (5th Cir. 2020) ................................................ 4, 50

*Bowsher v. Synar,*
  478 U.S. 714 (1986) .................................................................. 15

*Butz v. Economou,*
  438 U.S. 478 (1978) .................................................................. 22

*Califano v. Yamasaki,*
  442 U.S. 682 (1979) ............................................................... 3, 44

*California Communities Against Toxics v. EPA,*
  688 F.3d 989 (9th Cir. 2012) (per curiam) .............................. 46

*Central & South West Services, Inc. v. EPA,*
    220 F.3d 683 (5th Cir. 2000) ........................................................... 45, 46

*Cargill v. Garland,*
    57 F.4th 447 (5th Cir. 2023) (en banc) .................................................... 45

*Duenas v. Garland,*
    78 F.4th 1069 (9th Cir. 2023) ...................................................... 12, 13, 22

*Edmond v. United States,*
    520 U.S. 651 (1997) ........................................................ 5, 7, 8, 15, 18, 28

*Electronic Privacy Information Center v. DHS,*
    653 F.3d 1 (D.C. Cir. 2011) ...................................................................... 46

*Exela Enterprise Solutions, Inc. v. NLRB,*
    32 F.4th 436 (5th Cir. 2022) ...................................................................... 7

*Financial Oversight & Management Board for Puerto Rico v.*
    *Aurelius Investment, LLC,*
    140 S. Ct. 1649 (2020) ....................................................................... 12-13

*Free Enterprise Fund v. Public Company Accounting Oversight Board,*
    537 F.3d 667 (D.C. Cir. 2008) ................................................................. 17
    561 U.S. 477 (2010) .................................................. 16, 17, 29, 30, 31, 40

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) ............................................................................... 3

*Hecht Co. v. Bowles,*
    321 U.S. 321 (1944) ................................................................................. 41

*Huntington Ingalls, Inc. v. Director, Office of Workers'*
    *Compensation Programs,*
    70 F.4th 245 (5th Cir. 2023) .................................................................... 19

*Intercollegiate Broadcasting System, Inc. v. Copyright Royalty Board,*
    684 F.3d 1332 (D.C. Cir. 2012) ............................................................... 31

*Kalaris v. Donovan,*
    697 F.2d 376 (D.C. Cir. 1983) .......................................................... 15, 21

*Keim v. United States,*
    177 U.S. 290 (1900) .................................................................. 14

*Kennedy v. United States,*
    146 F.2d 26 (5th Cir. 1944) ................................................. 1, 10

*Lewis v. Casey,*
    518 U.S. 343 (1996) ................................................................. 43

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*
    140 S. Ct. 2367 (2020) .......................................................... 49

*Louisiana v. United States,*
    948 F.3d 317 (5th Cir. 2020) ................................................ 39

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ..................................................... 35, 36, 37

*Lujan v. National Wildlife Federation,*
    497 U.S. 871 (1990) .......................................................... 38, 39

*McManaway v. KBR, Inc.,*
    852 F.3d 444 (5th Cir. 2017) ................................................ 27

*Medical Center Pharmacy v. Mukasey,*
    536 F.3d 383 (5th Cir. 2008) ................................................ 31

*Morrison v. Olson,*
    487 U.S. 654 (1988) ............................................. 16, 24, 24-25

*Myers v. United States,*
    272 U.S. 52 (1926) ................................................................. 23

*Nash v. Califano,*
    613 F.2d 10 (2d Cir. 1980) ................................................... 22

*NLRB v. SW General, Inc.,*
    580 U.S. 288 (2017) ............................................................... 11

*Noel Canning v. NLRB,*
    823 F.3d 76 (D.C. Cir. 2016) ................................................ 28

*Lebron v. Rumsfeld*,
   670 F.3d 540 (4th Cir. 2012) ................................................................. 44

*Reagan v. United States*,
   182 U.S. 419 (1901) ................................................................. 14, 15

*Rush v. Kijakazi*,
   65 F.4th 114 (4th Cir. 2023) ................................................................. 22

*Seila Law LLC v. CFPB*,
   140 S. Ct. 2183 (2020) ................................................................. 29

*Snead v. Barnhart*,
   360 F.3d 834 (8th Cir. 2004) ................................................................. 22

*Staley v. Harris County*,
   485 F.3d 305 (5th Cir. 2007) ................................................................. 44

*Texas Association of Manufacturers v. U.S. Consumer Product
   Safety Commission*,
   989 F.3d 368 (5th Cir. 2021) ................................................................. 45

*Texas Medical Providers Performing Abortion Services v. Lakey*,
   667 F.3d 570 (5th Cir. 2012) ................................................................. 23

*Thomas v. Ameritas Life Insurance Corp.*,
   34 F.4th 395 (5th Cir. 2022) ................................................................. 28

*Trump v. International Refugee Assistance Project*,
   582 U.S. 571 (2017) (per curiam) ................................................................. 40

*United States ex rel. Accardi v. Shaughnessy*,
   347 U.S. 260 (1954) ................................................................. 2, 21

*United States v. Arthrex, Inc.*,
   141 S. Ct. 1970 (2021) ................................................... 3, 17-18, 19, 20, 29, 30

*United States v. Bonilla-Romero*,
   984 F.3d 414 (5th Cir. 2020) ................................................... 3, 29, 31, 33

*United States v. Hartwell*,
   73 U.S. 385 (1867) ................................................................. 10, 13, 14

*United States v. Texas*,
   143 S. Ct. 1964 (2023)................................................................... 42, 43, 44

*Varnadore v. Secretary of Labor*,
   141 F.3d 625 (6th Cir. 1998) ...................................................... 9

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) .............................................................. 42

*Willy v. Administrative Review Board*,
   423 F.3d 483 (5th Cir. 2005) ................................................ 1, 6, 7, 8, 9, 11

*Wong Yang Sung v. McGrath*,
   339 U.S. 33 (1950) .................................................................... 21

## U.S. Constitution and Statutes:

U.S. Const. art. II, § 2, cl. 2 ....................................................... 5, 7

Act of July 23, 1866, ch. 208,
   14 Stat. 191 ............................................................................. 13

Consolidated Appropriations Act, 2023,
   Pub. L. No. 117-328, Div. FF, Title II, § 2101(a)-(b),
   136 Stat. 4459 (2022) ............................................................. 48

Healthcare Research and Quality Act of 1999,
   Pub L. No. 106-129, 113 Stat. 1653 ........................................ 13

Military Appropriation Act, 1943, ch. 477,
   Pub. L. No. 77-649, 56 Stat. 611 (1942) .................................. 10

Military Appropriation Act, 1944, ch. 185,
   Pub. L. No. 78-108, 57 Stat. 347 (1943) .................................. 11

Reorganization Plan No. 3 of 1966,
   80 Stat. 1610 ......................................................................... 6, 13

5 U.S.C. app. (1994) ................................................................. 9

5 U.S.C. § 301 ................................................................................. 6

5 U.S.C. § 702(1) ........................................................................... 41

5 U.S.C. § 703 ............................................................................... 41

5 U.S.C. § 704 ............................................................................... 38

5 U.S.C. § 706 ................................................................... 38, 41, 42

6 U.S.C. § 521 ............................................................................... 12

12 U.S.C. § 263(a) ......................................................................... 19

28 U.S.C. § 2201(a) ....................................................................... 33

30 U.S.C. § 932(a) ......................................................................... 19

33 U.S.C. § 921(b)(1) ..................................................................... 19

33 U.S.C. § 921(b)-(c) ................................................................... 19

42 U.S.C. § 202 ................................................... 4, 20, 25, 47, 48

42 U.S.C. § 299(a) ........................................................................... 9

42 U.S.C. §§ 299(a), 299b-4(a) ............................................... 13, 20

42 U.S.C. § 299b-4(a)(1) ........................................... 7, 8, 9, 13, 24

42 U.S.C. § 299b-4(a)(6) ................................. 2, 20, 23, 28, 31, 51

42 U.S.C. § 300gg-13(a) ............................................................... 32

42 U.S.C. § 300gg-13(a)(1) ................................ 3, 5, 17, 22, 24, 32, 37, 51

42 U.S.C. § 300gg-13(a)(2)-(4) ................................................... 48

42 U.S.C. § 300gg-13(b)(1)-(2) ................................................... 20

**Rules and Regulations:**

20 C.F.R. §§ 404.902-.907, 404.1805 ....................................................... 33

45 C.F.R. § 147.130 ................................................................................... 49

47 Fed. Reg. 38409 (Aug. 31, 1982) ......................................................... 48

82 Fed. Reg. 47792 (Oct. 13, 2017) ........................................................... 49

**Filings on Appeal:**

American Public Health Association and Public Health Deans and Scholars
   Amicus Br.,
   Dkt. 187 (5th Cir. June 27, 2023) .......................................................... 34

Pls. Resp. to Mot. for a Partial Stay of Final Judgment Pending Appeal,
   Dkt. 66 (5th Cir. May 5, 2023) ............................................................... 35

**Other:**

*Appointment and Removal of Federal Reserve Bank Members
   of the Federal Open Market Committee,*
   43 Op. O.L.C. ___, 2019 WL 11594453 (Oct. 23, 2019) ........... 12, 15, 18, 19

Nicholas Bagley, *Remedial Restraint in Administrative Law,*
   117 Colum. L. Rev. 253, 309 (2017) ....................................................... 43

HHS, *Ratification of Prior Appointment and Prospective Appointment,*
   https://perma.cc/8TAA-7AMN ................................................................. 1

1 Floyd R. Mechem, *Treatise on the Law of Public Offices and Officers*
   (1890) ................................................................................... 49-50, 50

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy,*
   104 Va. L. Rev. 933, 941 (2018) ....................................................... 39, 41

**INTRODUCTION AND SUMMARY OF ARGUMENT**

**I.** Our opening brief explained that the Secretary of Health and Human Services (HHS) has statutory authority to appoint members of the U.S. Preventive Services Task Force (Task Force) and was in the process of doing so. The Secretary formally made those appointments on June 28, 2023. HHS, *Ratification of Prior Appointment and Prospective Appointment*, https://perma.cc/8TAA-7AMN. The Secretary thus accepted the political accountability that the Appointments Clause is designed to promote. The district court correctly recognized that no statute limits the Secretary's authority to remove Task Force members. ROA.1807-1809. And as our opening brief explained, the Secretary ratified the Task Force's past recommendations.

Plaintiffs strain to read statutory text in ways that would create Appointments Clause or other separation-of-powers problems. But as plaintiffs themselves emphasized, "federal statutes must be interpreted in a manner that will avoid serious constitutional questions." ROA.235, ¶ 79. Plaintiffs all but concede that this Court's precedents in *Willy v. Administrative Review Board*, 423 F.3d 483, 491-92 (5th Cir. 2005) and *Kennedy v. United States*, 146 F.2d 26, 28 (5th Cir. 1944), establish that the Secretary has broad authority to appoint inferior officers under multiple

statutes.  And plaintiffs identify no precedent to support their theory that an officer appointed by and removable at will by a Department Head must nevertheless be considered a principal officer.

Plaintiffs insist that the Task Force must be composed of principal officers because Congress described them as "independent" and "to the extent practicable, not subject to political pressure."  42 U.S.C. § 299b-4(a)(6).  But many inferior officers within the Executive Branch are expected to make independent decisions detached from politics.  It would be deeply concerning if, for instance, an immigration judge's removal decision were subject to political pressure or not independently made.  The fact that such inferior officers are "required * * * to exercise [their] own judgment," *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954), does not render them *principal* officers outside the Attorney General's control.  And as our opening brief explained, if constitutionally necessary, the statutory scheme can be construed to allow the Secretary to reject Task Force recommendations before they result in any coverage requirement.  Because the Task Force is subordinate to the Secretary, the Secretary may properly ratify its recommendations.

**II.**  Assuming that the "independent" provision is constitutionally problematic, however, the remedy is to sever the portion of the statute

2

necessary to eliminate the problem, as the Supreme Court did in *United States v. Arthrex, Inc.*, 141 S. Ct. 1970 (2021).  Plaintiffs' assertion that the Supreme Court alone has the power to declare a provision severable, *see* Pls. Br. 44-45, rests on a basic misunderstanding of the Declaratory Judgment Act, which allows any court to declare that a challenged provision is severable.  And this Court has employed severance when appropriate.  *See, e.g.*, *United States v. Bonilla-Romero*, 984 F.3d 414, 418-19 (5th Cir. 2020).

**III.**  At a minimum, the district court's universal remedies must be reversed.  The Supreme Court has repeatedly instructed that relief "must be 'limited to the inadequacy that produced [the] injury in fact,'" *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018), and may not be "more burdensome than necessary to redress the complaining parties," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  The equities weigh decisively in favor of permitting the 150 million Americans who are not parties to this suit to continue receiving coverage of preventive services without cost-sharing under 42 U.S.C. § 300gg-13(a)(1), as Congress directed.  As leading public health organizations and scholars have explained in their amicus briefs, these preventive services are crucial and often life-saving.  Plaintiffs' insistence that the Administrative Procedure Act (APA) gave the district

court no choice but to enter a universal remedy, *see* Pls. Br. 53-54, is foreclosed by this Court's precedents and ignores bedrock considerations of equity. In any event, plaintiffs concede that they abandoned in district court the sole APA claim that they had originally pled below. *See* Pls. Br. 50.

**IV.** In their cross-appeal, plaintiffs mistakenly argue that the Secretary lacked authority to ratify the preventive services recommendations made by the Centers for Disease Control and Prevention (CDC) and the Health Resources and Services Administration (HRSA). As the district court correctly explained, those subagencies act "under the supervision and direction of the Secretary," 42 U.S.C. § 202, and the Secretary may appropriately ratify their actions, ROA.1793-1797. Plaintiffs raise no separate challenge to the appointments of the CDC Director or the HRSA Administrator, both of whom properly serve as inferior officers appointed by the Secretary. The district court also correctly rejected plaintiffs' nondelegation claim, ROA.1810-1815, and plaintiffs concede that their nondelegation claim is "foreclosed by *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436 (5th Cir. 2020)." Pls. Br. 60. Accordingly, plaintiffs' cross-appeal provides no basis to overturn those challenged aspects of the district court's judgment.

## ARGUMENT

### I.   TASK FORCE MEMBERS ARE INFERIOR OFFICERS

Task Force members hold positions established by federal law and they "exercis[e] significant authority on behalf of the United States," *Edmond v. United States*, 520 U.S. 651, 662 (1997), to the extent that their recommendations are given binding legal effect under 42 U.S.C. § 300gg-13(a)(1).  Thus, as the district court held, they are officers for purposes of the Appointments Clause.  U.S. Const. art. II, § 2, cl. 2.  And under that Clause, they are inferior officers:  Congress has permitted their appointment by the Secretary as the Head of a Department, and the Secretary may supervise the Task Force's exercise of constitutionally significant authority through removal.  That is sufficient to correct the error identified by the district court; if more supervision were constitutionally necessary, the statutory scheme can also allow for the Secretary's substantive review of whether the Task Force's recommendations should be given binding legal effect under federal law.

#### A.   The Secretary Has Statutory Authority To Appoint Task Force Members

As explained in our opening brief (at 30-35) the Secretary is authorized by multiple statutes to appoint the Task Force members.

5

### 1.    HHS's Reorganization Plan

Under HHS's Reorganization Plan No. 3 of 1966, the Secretary "may from time to time make such provisions as he shall deem appropriate authorizing the performance of any of the functions transferred to him," including "all functions of the Public Health Service," "by any officer, employee, or agency of the Public Health Service or" HHS.  80 Stat. 1610, 1610 (1966).  This Court held that materially identical language in the Department of Labor's reorganization plan "vests the Secretary with ample authority" to both create offices and appoint inferior officers.  *Willy v. Administrative Review Board*, 423 F.3d 483, 491-92 (5th Cir. 2005) (citing the Secretary's authority to "from time to time make such provisions as he shall deem appropriate authorizing the performance by any other officer, or by any agency or employee, of the Department of Labor of any function of the Secretary").  *Willy* held that under the Reorganization Plan (as well as the general rulemaking and delegation authority common to all federal agencies in 5 U.S.C. § 301), "the Secretary possesses the requisite congressional authority to appoint" inferior officers who may "issue final agency decisions."  *Willy*, 423 F.3d at 491.

Plaintiffs urge this Court to read *Willy* "as narrowly as possible."  Pls. Br. 34.  But this Court does not read its precedents regarding appointment

and removal as "limited to [their] facts," but rather applies their principles as appropriate to similar statutory provisions. *Exela Enterprise Solutions, Inc. v. NLRB*, 32 F.4th 436, 442-43 (5th Cir. 2022) (rejecting a similar argument to unjustifiably restrict applicable precedent). And, in any event, plaintiffs' proffered grounds for distinguishing *Willy* are without merit.

First, plaintiffs mistakenly contend (at 36) that *Willy* does not apply because 42 U.S.C. § 299b-4(a)(1) directs that the Task Force should be solely appointed by another inferior officer within HHS (the Director of the Agency for Healthcare Research and Quality). In other words, plaintiffs contend that the Secretary lacks authority to appoint the Task Force because § 299b-4(a)(1) should be read to vest *unconstitutional* appointment authority in someone who is not the Head of a Department. *Cf.* U.S. Const. art. II, § 2, cl. 2. The Supreme Court rejected exactly this kind of backwards argument in *Edmond*, 520 U.S. at 655-58. Although the Secretary in *Edmond* had general authority to appoint officers, *id.* at 656, the petitioners argued that a statute vested in an inferior officer the exclusive authority to appoint military judges for the Coast Guard, *id.* at 656-57. The Supreme Court declined to read the statute that way, as "Congress could not give the" inferior officer appointment power, which "can be conferred only upon the President, department heads, and courts of

law." *Id.* at 658.  So too here, there is no reason to interpret § 299b-4(a)(1) "in a manner that would render it clearly unconstitutional," when the Secretary would otherwise have constitutional appointment authority. *Edmond*, 520 U.S. at 658.

Plaintiffs next argue (at 36) that the Reorganization Plan is inapplicable because the Secretary had not previously appointed the Task Force.  But the Secretary in *Edmond* had also previously failed to personally appoint the civilians who served as the Coast Guard's military judges.  It was only after Appointments Clause challenges had arisen in litigation that the Secretary "issued a memorandum 'adopting'" the previous unconstitutional appointments "as judicial appointments of my own." *Edmond*, 520 U.S. at 654.  The Supreme Court held those appointments valid and did not suggest that the Secretary's appointment authority was somehow lacking because the judges had not been appointed sooner.

Plaintiffs' final assertion is that the Reorganization Plan only authorizes Secretarial appointments to positions which already existed, and since the Task Force did not exist at the time of the Plan, the Secretary lacks appointment authority.  Pls. Br. 37.  But plaintiffs' theory would have caused *Willy* to come out the other way.  In *Willy*, the Secretary of Labor relied on a Reorganization Plan from 1950 for his authority to both create

8

the Administrative Review Board and appoint its members in 1996. 423
F.3d at 491. Under plaintiffs' theory, since the Board "did not exist at the
time" of the Reorganization Plan, this Court should have held that the
Secretary of Labor "cannot claim that" the Plan "'vests' the Secretary with
powers over the [Board] in any way." Pls. Br. 37. But this Court held to the
contrary, readily determining "that the Secretary possesses the requisite
congressional authority to appoint members to the" Board. *Willy*, 423 F.3d
at 491; *accord Varnadore v. Secretary of Labor*, 141 F.3d 625, 631 (6th Cir.
1998) (holding that the Reorganization Plan, 5 U.S.C. app. at 1496 (1994),
grants the Secretary "authority to appoint inferior officers").

### 2.   42 U.S.C. §§ 299 and 299b-4

Congress's statutory placement of the Task Force within the Public
Health Service also authorizes the Secretary to appoint its members. The
Secretary "shall carry out" various statutory duties in the Public Health
Service through the Director of the Agency for Healthcare Research and
Quality, whom the Secretary appoints. 42 U.S.C. § 299(a). Those duties
include the authority to "convene" the Task Force, which shall be
"composed of individuals with appropriate expertise." *Id.* § 299b-4(a)(1).
Thus, the Director may initially select members for the Task Force and they
may be appointed with the Secretary's approval. That is the same system of

constitutional appointment that the Supreme Court approved in *United States v. Hartwell*, 73 U.S. 385, 393-94 (1867), which permitted an assistant treasurer to appoint a clerk as an inferior officer with the Secretary's approval.

And this Court in *Kennedy v. United States*, 146 F.2d 26 (5th Cir. 1944), held that the plaintiff was an "officer[] of the United States," *id.* at 27, by applying the Appointments Clause framework from *Hartwell* and other cases. Thus, the plaintiff was "appointed by a subordinate executive officer * * * with the approval of the Secretary of the War Department, acting pursuant to Acts of Congress," in the same manner that other officers had been appointed "within the constitutional meaning of that term." *Id.* at 28 (footnote omitted). Plaintiffs do not meaningfully attempt to distinguish *Kennedy*, Br. 33 n.12, and do not engage with this Court's lengthy analysis of the Appointments Clause and the proper method of appointment under a number of statutes—including the statutes cited by the Court as providing the Secretary of War with appointment authority even though neither statute explicitly authorizes the Secretary to "appoint" anyone. *Kennedy*, 146 F.2d at 28 & n.2 (first citing Military Appropriation Act, 1943, ch. 477, Pub. L. No. 77-649, 56 Stat. 611, 619 (1942), and then

citing Military Appropriation Act, 1944, ch. 185, Pub. L. No. 78-108, 57 Stat. 347, 356 (1943)).

Plaintiffs mistakenly contend (at 27) that a statute must use the word "appoint" to comport with the Appointments Clause.  But "the Constitution affords Congress substantial discretion to fashion appointments within the specified constraints," and "Article II does not require that a law specifically provide for the appointment of a particular inferior officer."  *Willy*, 423 F.3d at 491 (quotation marks omitted).  Indeed, plaintiffs do not assert that any of the statutes in *Willy* or *Kennedy* used the term "appoint," yet through those statutes Congress was able to constitutionally convey appointment authority to a Department Head.  Nor is the term "appoint" an indispensable incantation.  At the Founding, the term "appoint" was synonymous with the terms "allot, assign, or designate," *NLRB v. SW General, Inc.*, 580 U.S. 288, 312 (2017) (Thomas, J., concurring), demonstrating the broad nature of the word and that different terms can convey identical authority.  All that is constitutionally required is ultimate approval by the Department Head as Congress may permit.  The Secretary may thus "administer[] the statute to require and make such approvals," which "would satisfy the constitutional requirement that a competent appointing official retain ultimate authority to approve" all appointments to

and removals from the Task Force.  *Appointment and Removal of Federal Reserve Bank Members of the Federal Open Market Committee*, 43 Op. O.L.C. ___, 2019 WL 11594453, at *14 (Oct. 23, 2019) (*Federal Reserve OLC Opinion*).

Plaintiffs' theory of strict construction would also have broad and unwarranted ramifications.  For example, there is "[n]o statute" that "governs the appointment of" officers within the Board of Immigration Appeals, who adjudicate administrative appeals in removal cases.  *Duenas v. Garland*, 78 F.4th 1069, 1073 n.2 (9th Cir. 2023).  But the absence of an explicit directive to "appoint" such inferior officers does not mean that their appointments are unconstitutional.  To the contrary, Congress's general instruction that the Executive Office for Immigration Review (which contains the Board of Immigration Appeals) "shall be subject to the direction and regulation of the Attorney General," 6 U.S.C. § 521, is sufficient authority to "vest[] the power to appoint the BIA's members in the Attorney General." *Duenas*, 78 F.4th at 1073 n.2 (citing 6 U.S.C. § 521).  So too, the Reorganization Plan and other statutes here vest the Secretary with authority to appoint the Task Force members.  And the Task Force's appointment "helps to 'ensure'" that both the Secretary and the Task Force are "accountable to political force and the will of the people." *Financial*

*Oversight & Management Board for Puerto Rico v. Aurelius Investment, LLC*, 140 S. Ct. 1649, 1657 (2020); *accord Duenas*, 78 F.4th at 1071 (appointments "mak[e] clear to the people who is responsible for good—and bad—appointees").

Plaintiffs suggest (at 31) that the Secretary cannot have appointment authority under 42 U.S.C. §§ 299 and 299b-4 because they are different sections of the U.S. Code. But Congress enacted both provisions simultaneously in passing the Healthcare Research and Quality Act of 1999, Pub L. No. 106-129, 113 Stat. 1653, 1653, 1659, and with the understanding that the Secretary is vested with authority to perform "all functions of the Public Health Service," 80 Stat. at 1610. Nothing about the statutory text, context, and history indicates that Congress intended to diminish the Secretary's authority or to withhold something from it.

Plaintiffs also argue that to the extent § 299b-4(a)(1) prescribes for the Task Force's appointment, it is unconstitutional because it vests the appointment in an inferior officer. Pls. Br. 29-30. But so too did the statute the Supreme Court approved in *Hartwell*, 73 U.S. at 393-94. That statute authorized the "assistant treasurer of the United States at Boston * * * to appoint" a clerk. Act of July 23, 1866, ch. 208, 14 Stat. 191, 202. Under plaintiffs' theory, that would have been an unconstitutional

appointment.  But because Congress also allowed the Secretary to approve of that appointment, *id.*, Congress thus provided for the clerk to be "appointed by the head of a department," *Hartwell*, 73 U.S. at 393-94.

### B. Task Force Members Are Constitutionally Subordinate To The Secretary, Who May Ratify Their Recommendations

#### 1. The Secretary May Remove Task Force Members At Will

The district court correctly held that Task Force members are removable at will and "do not have statutory tenure."  ROA.1809.  As the Supreme Court has long recognized, unless there is a "specific provision to the contrary, the power of removal from office is incident to the power of appointment."  *Keim v. United States*, 177 U.S. 290, 293 (1900).  Here, there are no provisions limiting the Secretary's authority to remove the Task Force members he has appointed.  Plaintiffs wrongly claim that the government must "identify [a] statute that gives the Secretary at-will removal power over the Task Force."  Pls. Br. 10.  At-will removal is the background rule—if Congress has not provided for a for-cause removal limitation, then "the appointing power could remove at pleasure or for such cause as it deemed sufficient."  *Reagan v. United States*, 182 U.S. 419, 425 (1901) (upholding the removal of an inferior officer without cause).  And contrary to plaintiffs' suggestions, at-will removal is not just a presumption

for presidentially appointed officers.  Instead, "the long-standing rule [is] that in the face of congressional silence all inferior officers of the United States serve at the discretion of their appointing officer." *Kalaris v. Donovan*, 697 F.2d 376, 381 (D.C. Cir. 1983) (at-will removal for officers appointed by the Secretary of Labor as the Head of a Department); *see also Reagan*, 182 U.S. at 243-24 (at-will removal for officer appointed by a Court of Law).

The Secretary's at-will removal authority is sufficient to render the Task Force members constitutionally subordinate.  At-will removal is "a powerful tool for control" and grants the principal officer "administrative oversight over" inferior officers.  *Edmond*, 520 U.S. at 664.  "When it comes to the supervision of an officer within the Executive Branch, the removal power is perhaps even more significant than the appointment authority." *Federal Reserve OLC Opinion*, 2019 WL 11594453, at *13.  Indeed, after "an officer is appointed, it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey." *Bowsher v. Synar*, 478 U.S. 714, 726 (1986). Accordingly, just as the power to remove flows from the power to appoint, "the power to supervise and direct is incident to the power to remove." *Federal Reserve OLC Opinion*, 2019 WL 11594453, at *8.

Department Heads may have other means to exercise control over inferior officers, such as altering a subordinate's resources, promulgating new rules, amending the subordinate's actions, or taking enforcement measures themselves. *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 504 (2010). But these tools can also be "a problematic way to control an inferior office." *Id.* at 504. Thus, in *Free Enterprise*, the Supreme Court severed the removal restrictions for the Board and made its members removable at will by the Securities and Exchange Commission. *Id.* at 510. That at-will removal rendered Board members inferior officers, even though they could "take significant enforcement actions * * * largely independently of the Commission," and the Commission lacked authority to pre-approve or direct the Board's "priorities and interven[tion] in the affairs of regulated firms (and the lives of their associated persons)." *Id.* at 504-05.

Thus, as Justice Scalia explained in his *Morrison v. Olson* dissent, that case would have been far more straightforward had the independent counsel lacked removal restrictions. Because "[i]f she were removable at will by the Attorney General, then she would be subordinate to him and thus properly designated as inferior." *Morrison v. Olson*, 487 U.S. 654, 716 (1988) (Scalia, J., dissenting). Then-Judge Kavanaugh echoed the same

point in his opinion in *Free Enterprise*, which anticipated the position ultimately adopted by Supreme Court. As he explained, "the basic principles underlying Article II teach that the key initial question" of inferior officer status "is whether the officer is removable at will," because such removal "carries with it the inherent power to direct and supervise." *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 537 F.3d 667, 707 (D.C. Cir. 2008) (Kavanaugh, J., dissenting), *rev'd in relevant part*, 561 U.S. 477. Thus, officers who are removable at will by Department Heads "may properly be considered inferior officers" because they are subject to control by "other superior officers in the Executive Branch chain of command." *Id.* at 707 n.15.

Plaintiffs contend that the Secretary must have authority to direct and reject Task Force recommendations for Task Force members to be inferior officers. Pls. Br. 12-15. As explained in our opening brief (at 24-27), and below (at 20-25), if it is constitutionally necessary for the Secretary to have additional supervisory authority, nothing in the statutory scheme prevents the Secretary from declining to give a Task Force recommendation with an "A" or "B" rating legally binding effect under 42 U.S.C. § 300gg-13(a)(1). And plaintiffs' proposition—that at-will removal cannot render an officer inferior—is unsupported by their citations to *Edmond* and *United States v.*

*Arthrex, Inc.*, 141 S. Ct. 1970 (2021).  Neither of those cases held that officers removable at will by a Department Head could not serve as inferior officers.  Indeed, *Edmond* had no occasion to address at-will removal— instead, the Supreme Court held it sufficient that the judges could be freely removed from a "judicial assignment without cause," and that their decisions could receive further review.  520 U.S. at 664-65.  And in *Arthrex*, the Federal Circuit held that the administrative patent judges at issue improperly exercised too much power for their station as inferior officers and corrected that defect by rendering them removable at will.  *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320, 1337-38 (Fed. Cir. 2019).  The Supreme Court cast no doubt on that solution to the problem, but instead held that allowing for principal officer review of the judges' decisions "better reflects the structure of supervision within the [agency] and the nature of [the judges'] duties."  *Arthrex*, 141 S. Ct. at 1987.

Indeed, there are a number of inferior officers for which the Department Head's control comes almost solely through removal.  For example, the Federal Open Market Committee is composed in significant part by inferior officers appointed by a Department Head—the Federal Reserve System's Board of Governors.  *Federal Reserve OLC Opinion*, 2019 WL 11594453, at *9-11.  The Committee members are in charge of

"expand[ing] or contract[ing] the supply of money in the United States," primarily "by setting the target for the federal funds rate." *Id.* at *3. As the Office of Legal Counsel explained in its thorough opinion, the committee members appointed by the Board of Governors properly serve as inferior officers. Although committee members have "final authority over open-market operations," *id.* at *7 (citing 12 U.S.C. § 263(a)), they are "'directed and supervised' * * * by the Board of Governors, which has the authority to remove them at will," *id.*

The same is true for the Benefits Review Board in the Department of Labor. The Board is composed of officers appointed by the Secretary of Labor. 33 U.S.C. § 921(b)(1). By statute, it is the Board, not the Secretary, which issues final orders under the Black Lung Benefits Act, 30 U.S.C. § 932(a), and the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 921(b)-(c). The Board's orders are directly reviewable in the courts of appeals without further review by any Executive Branch officer. *See, e.g.*, *Huntington Ingalls, Inc. v. Director, Office of Workers' Compensation Programs*, 70 F.4th 245, 248 (5th Cir. 2023). Yet *Arthrex* did not suggest that the Board members must be principal officers—to the contrary, *Arthrex* identified and distinguished these Board members, explaining that they "appear to serve at the pleasure of the appointing department head,"

and thus *Arthrex*'s framework did not prohibit the Board members from properly serving as inferior officers.  141 S. Ct. at 1984.

### 2.    If Constitutionally Necessary, The Secretary May Decline To Give Task Force Recommendations Legally Binding Effect

As our opening brief explained (at 24-27), if more control by the Secretary were constitutionally necessary, the statutory scheme permits it. The Task Force, convened under the authority of the Public Health Service, 42 U.S.C. §§ 299(a), 299b-4(a), is "under the supervision and direction of the Secretary," *id.* § 202.  And Task Force recommendations with an "A" or "B" rating do not carry self-executing legal force—instead, those recommended items and services must be covered only after an appropriate minimum interval (not less than one year) established by the Secretary.  *Id.* § 300gg-13(b)(1)-(2).  Given that general and specific oversight, if it were constitutionally necessary for the Secretary to refuse to give binding legal effect to a Task Force recommendation with an "A" or "B" rating, nothing in the statutory scheme would prohibit that exercise of "supervision and direction."  *Id.* § 202.

Plaintiffs resist this construction by emphasizing that the Task Force is "independent and, to the extent practicable, not subject to political pressure," 42 U.S.C. § 299b-4(a)(6), and therefore, plaintiffs assert, the

Task Force cannot be "subject to the 'direction' and 'supervision' of the Secretary," Pls. Br. 17.  But a direction that a subordinate make "independent" decisions, by itself, does not connote anything lacking in terms of supervision.  Other constitutional officers similarly are entrusted to make "unbiased, independent judgments," even while subject to removal and supervision by principal officers.  *Kalaris*, 697 F.2d at 393-94.  Their independence arises from their duties in "dispassionate decisionmaking," *id.* at 400-01, which is not unique to any particular officer but is instead common to many.  "When the Constitution requires a hearing, it requires a fair one, one before a tribunal which meets at least currently prevailing standards of impartiality."  *Wong Yang Sung v. McGrath*, 339 U.S. 33, 50 (1950).

Accordingly, when an immigration judge or the Board of Immigration Appeals issues a decision in a removal case, they are "required * * * to exercise [their] own judgment" and "must exercise [their] authority according to [their] own understanding and conscience."  *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266-67 (1954).  In exercising that independent judgment, immigration judges and Board members do not transform into principal officers—instead, they continue to properly

serve as inferior officers appointed and overseen by the Attorney General. *Duenas*, 78 F.4th at 1071-72.

The same rule applies in hearings at the Social Security Administration.  There, administrative law judges (ALJs) adjudicate claims for benefits and in doing so "must act neutrally," *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004), and with "complete individual independence of action and decision," *Nash v. Califano*, 613 F.2d 10, 15 (2d Cir. 1980). Social Security ALJs thus exercise "independent judgment on the evidence * * * free from pressures by the parties or other officials within the agency." *Butz v. Economou*, 438 U.S. 478, 513 (1978).  Even so, the ALJs properly serve as inferior officers, *Rush v. Kijakazi*, 65 F.4th 114, 117 (4th Cir. 2023), because they are supervised and directed by their Department Head.

The Task Force members—like these officers and many others—make "independent" determinations when they act as neutral examiners of the evidence and issue a disinterested decision on the merits of the health benefits and efficacy of any given preventive item or service.  And as explained above, if it were constitutionally necessary, the statute can be construed to allow the Secretary to refuse to give particular Task Force recommendations legally binding effect for purposes of coverage under 42 U.S.C. § 300gg-13(a)(1).  The Task Force's decisional independence does

not render them principal officers unsupervised by anyone else—it works to ensure that the inferior officers render a neutral judgment from which a superior can make an informed and considered decision.

As plaintiffs recognize (at 17), the statutory provision that the Task Force shall not be "subject to political pressure" is expressly subject to the limiting principle that it applies only "to the extent practicable." 42 U.S.C. § 299b-4(a)(6). That qualifier entails limitations that are necessary to comport with constitutional requirements. *See Texas Medical Providers Performing Abortion Services v. Lakey*, 667 F.3d 570, 581 (5th Cir. 2012) (citing the "elementary rule that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality"). In some instances, the Constitution may require that a superior not direct the outcome of certain matters properly before a subordinate. *Cf. Myers v. United States*, 272 U.S. 52, 135 (1926) (recognizing this possibility). But even so, the superior "may consider the decision after its rendition" and choose to take appropriate action. *Id.* [1]

_____

[1] Plaintiffs mistakenly assert that the statute cannot bear this interpretation, citing a government filing at the summary judgment stage. Pls. Br. 14 n.4 (citing ROA.1746). But at summary judgment, the government did not contend that the Task Force members were constitutional officers or that they might require additional supervision by the Secretary to comport with separation-of-powers concerns. There was thus no occasion to consider the doctrine of constitutional avoidance.

Moreover, as our opening brief explained, the Task Force would in any event remain independent and free of political pressure in developing and making recommendations.[2]  For separation-of-powers purposes, the only relevant constitutional control comes *after* the Task Force makes a recommendation with and "A" or "B" rating.  If necessary to retain constitutional control over the Task Force, the Secretary could at that point direct that the recommendation not become legally binding for coverage purposes under § 300gg-13(a)(1).

This level of supervision would definitively render the Task Force members inferior to the Secretary, as confirmed by *Morrison v. Olson*. There, the statute authorizing the independent counsel granted her "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice."  487 U.S. at 662.  Despite that "independent" authority—and even though the independent counsel could only be removed for good cause—the Supreme Court held that the Attorney General had "sufficient control over the independent counsel" such that she validly served as an inferior officer.  *Id.*

---

[2] The Task Force must "consider clinical preventive best practice recommendations from" agencies within HHS and subject to the Secretary's direction, 42 U.S.C. § 299b-4(a)(1).

at 696.  The Secretary's *greater* control here plainly alleviates any constitutional difficulties.

Plaintiffs also assert (at 17-18) that under 42 U.S.C. § 202, the Secretary cannot personally direct and supervise the Public Health Service—which includes the National Institutes of Health, the Food and Drug Administration, the CDC, and HRSA—but instead must only act through an Assistant Secretary.[3]  That is plainly incorrect.  As the note to § 202 explains, "all functions of the Public Health Service" and its officers and employees are vested in the Secretary.  42 U.S.C. § 202 note, at 608 (2018) (citing the Reorganization Plan).

### 3.  The Secretary Properly Ratified The Task Force's Recommendations

The premise of the district court's adverse ratification ruling was that the Secretary cannot adequately supervise the Task Force's functions. ROA.1797.  That concern has been addressed by the Secretary's appointment of the Task Force members.  As properly appointed inferior officers who are subject to the Secretary's constitutional oversight, their recommendations are subject to ratification by the Secretary.

---

[3] *See* Congressional Research Service, R43304, *Public Health Service Agencies: Overview and Funding (FY2010-FY2016)* (2015), https://perma.cc/C69V-FLPX (listing HHS subagencies within the Public Health Service).

Plaintiffs contend that the Secretary's ratification based on his "independent and considered review," ROA.1094, is insufficient because the Secretary must have authority to "override the Task Force's recommendations and decide the preventive care that private insurers must cover," Pls. Br. 21.  But as explained above, the statute is susceptible of that construction and can permit the Secretary to decline to give a Task Force recommendation legally binding effect.  Here, moreover, the Secretary affirmatively chose to "affirm and ratify" the existing Task Force recommendations and adopt them as his own.  ROA.1094.

Plaintiffs' contention that the Secretary lacks the authority to ratify the Task Force's recommendations reiterates the arguments that they unsuccessfully made in district court with respect to the Secretary's ratification of the recommendations of the CDC and HRSA.  *See* ROA.559-561.  The district court rightly rejected those arguments.  ROA.1793-1797.  They are equally unavailing with respect to the Task Force now that its members have been appointed by the Secretary and are properly understood to be constitutionally subordinate to his direction and supervision.

Plaintiffs mistakenly suggest that the Secretary could not have ratified the Task Force's recommendations without engaging in notice-and-

comment rulemaking.  Pls. Br. 24-25.  Plaintiffs never made this argument in district court when they contested the Secretary's ratification, *see* ROA.533, ROA.559-561 (plaintiffs' summary judgment brief), ROA.1626, ROA.1644-1650 (plaintiffs' summary judgment response and reply), and the district court had no occasion to consider it.  That is notable because plaintiffs raised a notice-and-comment challenge to the Task Force's recommendations in their original complaint.  ROA.35, ROA.57-58, ¶¶ 98-102.  But after the government explained why that claim failed on the merits, ROA.197-203, plaintiffs amended their complaint, ROA.219-245, and elected to "abandon[]" their notice-and-comment claim, Pls. Br. 50.

After jettisoning a notice-and-comment challenge to the Task Force recommendations from their complaint and contesting the Secretary's ratification of those recommendations on other grounds, plaintiffs cannot now— for the first time on appeal—assert a notice-and-comment challenge to the Secretary's ratification.  This Court "will generally not countenance arguments not raised before the district court," and instead deems those "arguments[s] forfeited."  *McManaway v. KBR, Inc.*, 852 F.3d 444, 455 (5th Cir. 2017).  "This rule exists for a simple reason: It is 'an efficient approach that allows a full consideration of all the parties' arguments in the district court.  * * * A thorough ruling might avoid an appeal by making

27

clearer the unlikelihood of appellate success based on the strengths of the district court decision.'" *Thomas v. Ameritas Life Insurance Corp.*, 34 F.4th 395, 402 (5th Cir. 2022).

Plaintiffs alternatively suggest that the Task Force's past recommendations can never be implemented "because its members were unconstitutionally appointed when those recommendations were made." Pls. Br. 16.  But defective appointments are cured by proper appointments, *Edmond*, 520 U.S. at 653-55, 666, and nothing prevents a properly appointed official from ratifying or re-promulgating a decision made by a previous officer holder if the decision is otherwise proper.  *See Noel Canning v. NLRB*, 823 F.3d 76, 78 (D.C. Cir. 2016) (affirming decisions made by properly appointed officers that "essentially adopt[ed]" a previous decision made by improperly appointed officers because the decision "was supported by substantial evidence"); *see also* Opening Br. 28-29 (collecting cases).

## II.     IF THE SECRETARY CANNOT ADEQUATELY SUPERVISE TASK FORCE MEMBERS, THE STATUTORY RESTRICTIONS ON SECRETARIAL SUPERVISION SHOULD BE DECLARED SEVERABLE

If this Court concludes that Task Force members are not subject to constitutionally sufficient supervision by the Secretary, the correct course would be to declare severable the portions of 42 U.S.C. § 299b-4(a)(6) that

the Court determines unconstitutionally impede the Secretary's authority.

Plaintiffs insist that the Court lacks this authority, but severance is the

exact response adopted by the Supreme Court in *Free Enterprise*, 561 U.S.

at 508-10, and *Arthrex*, 141 S. Ct. at 1986-88, and by this Court in other

cases. "[W]hen a portion of a statute is unconstitutional, 'the traditional

rule is that the unconstitutional provision must be severed unless the

statute created in its absence is legislation that Congress would not have

enacted.'" *United States v. Bonilla-Romero*, 984 F.3d 414, 418 (5th Cir.

2020) (quoting *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2209 (2020)).

Applying that rule, the Court upholds the portions of the statute "that are

(1) constitutionally valid, (2) capable of functioning independently, and

(3) consistent with Congress' basic objectives in enacting the statute."

*Bonilla-Romero*, 984 F.3d at 418.

  As the Supreme Court has explained, when an officer wields authority

"incompatible with their appointment by the Secretary to an inferior

office," there is no requirement for them to be appointed as principal

officers. *Arthrex*, 141 S. Ct. at 1985. To the contrary, "the appropriate way

to resolve this dispute given [a] violation of the Appointments Clause" is to

"disregard[] the problematic portions" of the statute "while leaving the

remainder intact." *Id.* at 1986 (quotation marks omitted). Thus, by

severing any portions that unconstitutionally limit the Secretary's supervisory authority, the Task Force "would properly function as inferior officers." *Id.* at 1987. That is why in *Arthrex*, the Supreme Court severed the statutory restrictions on a principal officer's authority to review the decisions of administrative patent judges, thus rendering those judges properly serving inferior officers. *Id.* Earlier in the case, the Federal Circuit had employed a similar severance, holding invalid the removal restrictions for those judges to ensure they could properly serve as inferior officers. *Id.* While the Supreme Court chose to sever a different part of the statute, both courts provided a remedy that made the officers appropriately subordinate to a principal officer.

The Supreme Court's decision in *Free Enterprise* is to the same effect. There the Court identified a separation-of-powers violation in that the Board members wielded "executive power without the Executive's oversight," making them insufficiently accountable to the President. *Free Enterprise*, 561 U.S. at 498. The Court redressed that problem by severing the Board members' removal restrictions, thus preserving the "clear and effective chain of command," which allows the public to "determine on whom the blame or the punishment of a pernicious measure * * * ought really to fall." *Id.* So accountable, the Board members properly served as

30

inferior officers and the Court had no trouble rejecting the petitioners'
argument that they must be "principal officers requiring Presidential
appointment with the Senate's advice and consent." *Id.* at 510. Applying
the same logic, the D.C. Circuit likewise severed removal restrictions to
ensure that officers properly serve as inferior officers. *Intercollegiate
Broadcasting System, Inc. v. Copyright Royalty Board*, 684 F.3d 1332,
1341 (D.C. Cir. 2012) ("Once the [removal] limitations * * * are nullified,
they would become validly appointed inferior officers.").

Thus, for severance, the question is whether "Congress, faced with the
limitations imposed by the Constitution," *Free Enterprise*, 561 U.S. at 509,
would "have preferred what is left of its statute to no statute at all," *Ayotte
v. Planned Parenthood of Northern New England*, 546 U.S. 320, 330
(2006). Here, of course, the Affordable Care Act is "fully operative as a law"
if the offending portions of § 299b-4(a)(6) were declared severed, and so
"the invalid part may be dropped." *Medical Center Pharmacy v. Mukasey*,
536 F.3d 383, 401 (5th Cir. 2008). That presumption of severance and its
application here "may be overcome only by 'strong evidence,'" *id.* at 402,
which plaintiffs fail to produce. Accordingly, "it is appropriate to sever as
necessary." *Bonilla-Romero*, 984 F.3d at 418.

31

At bottom, plaintiffs contest severance because they "would remain subject to the unwanted coverage mandates." Pls. Br. 4; *see also id.* at 45. But the sole basis for the district court's holding was that the preventive services requirements were promulgated by officers who had not received a constitutional appointment. Once that Appointments Clause claim is resolved—with the Task Force members appropriately subject to Secretarial appointment and oversight, and their recommendations properly ratified by the Secretary—there is no other basis to invalidate the government's actions pursuant to 42 U.S.C. § 300gg-13(a), or to hold that third-party health plans and issuers need not comply with those statutory requirements. The mere fact that plaintiffs wish other health plans were available is not a distinct Article III injury. *See* ROA.2115-2118 (dismissing such claims for lack of standing).

Plaintiffs note that severance does not address the Task Force's "failure to recommend coverage of items or services," Pls. Br. 38, but they do not explain why this point would be constitutionally significant. If the Task Force determines that an item or service should not receive an "A" or "B" rating, then no health plan is required to cover it under § 300gg-13(a)(1) and there is no exercise of federal authority on any entity or individual. Indeed, it is common throughout government that officers and

employees may take actions that lack any adverse coercive effect and are generally not subject to further review. For example, Social Security claimants who present a qualifying claim begin receiving benefits after an initial determination without further review by another government official—it is only determinations adverse to claimants that are immediately subject to further review within the agency. *See* 20 C.F.R. §§ 404.902-.907, 404.1805.

Plaintiffs' assertion that the Supreme Court alone has the power to declare a statutory provision severable, *see* Pls. Br. 44-45, rests on a basic misunderstanding of the Declaratory Judgment Act. That statute allows "any court of the United States" to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Thus, a district court can declare that a statute is constitutionally infirm and that the offending portion of the statute must be severed. Likewise, this Court can and has declared severable unconstitutional portions of a statute to resolve constitutional concerns, even though a party might have wished for greater relief. *Bonilla-Romero*, 984 F.3d at 417-19 (severing unconstitutional portion of a criminal sentencing statute and affirming the sentence imposed).

### III. AT A MINIMUM, THIS COURT SHOULD REVERSE THE DISTRICT COURT'S UNIVERSAL REMEDIES

#### A. The Balance Of Equities And The Public Interest Preclude The District Court's Universal Remedies

The district court's judgment extinguished the rights of 150 million Americans—not parties to this case—who are otherwise protected by the statutory requirement that group health plans and insurers governed by § 300gg-13 must cover without cost-sharing preventive services with an "A" or "B" rating in the current Task Force recommendations.  Unsurprisingly, the leading public health organizations and over 100 public health deans and scholars have urged this Court to reverse the district court's universal remedies.  As amici explain, the final judgment encompasses dozens of vital services, including, for example, statins to prevent cardiovascular; screenings for lung and colon cancer; and aspirin to prevent preeclampsia deaths in pregnant women and pre-term births.  *See, e.g.*, American Public Health Association and Public Health Deans and Scholars Amicus Br. 7-15, Dkt. 187 (5th Cir. June 27, 2023).  The balance of equities and public interest preclude the district court's universal remedies.

The government has not appealed the plaintiff-specific relief entered by the district court: a declaration of the parties' rights and a plaintiff-specific injunction.  ROA.2132.  And plaintiffs previously conceded that this

plaintiff-specific relief fully redressed the injuries of Braidwood Management, which has a self-insured plan. Pls. Resp. to Mot. for a Partial Stay of Final Judgment Pending Appeal 2, Dkt. 66 (5th Cir. May 5, 2023). "[T]hat is because Braidwood's injuries arose from its inability to determine the coverage in its self-insured plan"—"an injury that was fully redressed by declaratory and injunctive relief that restrains the defendants from enforcing the unlawful preventive-care coverage mandates *against Braidwood*." *Id.* (emphasis added).

Plaintiffs assert (at 57) that universal remedies are necessary to "induce insurers to offer" the *individual plaintiffs*—a handful of uninsured Texas residents who object for religious reasons to buying a plan that covers certain services—the plans that these plaintiffs would prefer. At most, that argument might support a tailored injunction that prevents the federal government from enforcing the statute's coverage requirement against a Texas insurer that furnished *these plaintiffs* with such health coverage. But the individual plaintiffs failed even to demonstrate standing to seek such a tailored injunction.

Standing is "'substantially more difficult' to establish" when the plaintiff "is not himself the object of the government action or inaction he challenges." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992). And

at the final judgment stage, the plaintiff must substantiate standing allegations with evidence. *Id.* at 561-62. Here, the plaintiffs' declarations showed that it is speculative whether they would buy insurance even if plans without the objected-to coverage were offered. Mr. Starnes and Mr. Kelley stopped buying insurance in 2016 in part "because the premiums had become too expensive," and they stated only that they would "seriously consider" buying insurance if plans without objectionable coverage were offered. ROA.2066-2067, ¶¶ 5-7; ROA.2068-2069, ¶¶ 5, 7-8. Mr. Kelley stopped buying insurance for Kelley Orthodontics in part because "the premiums had become too expensive" and "several of [his] employees asked [him] to drop coverage because they were unable to enroll in their husbands' much better plans as long as [he] was offering coverage to them as part of their job." ROA.2068-2069, ¶ 6. Mr. Maxwell and his wife have not had insurance since he left a job in 2021 and "cannot guarantee that [he] would once again purchase health insurance in the absence of the preventive-care coverage mandates." ROA.2070-2071, ¶¶ 5-7. Mr. Starnes and Mr. Kelley likewise acknowledged that they "cannot guarantee" that they would buy an insurance plan even if the district court ruled in their favor. ROA.2067, ¶ 7 (Starnes); ROA.2069, ¶ 8 (Kelley).

"Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury" that the Supreme Court's "cases require." *Lujan*, 504 U.S. at 564. Furthermore, plaintiffs submitted no evidence showing that any Texas insurer is willing to sell them the bespoke plans that they would prefer.[4]

In any event, the individual plaintiffs' claims certainly provide no basis to uphold the district court's nationwide injunction and vacatur of all relevant agency actions since 2010. At the very least, then, the district court should have confined any injunction to barring defendants from enforcing § 300gg-13(a)(1) against Texas insurers that provide insurance without the objected-to coverage to the individual plaintiffs. Such an injunction would have remedied their asserted injuries without jeopardizing coverage under federal law of all other Task Force recommended preventive services for millions of other Americans.

---

[4] The record shows that all qualified health plans in Texas were already covering preexposure prophylaxis drugs as of 2019, *see* ROA.1544-1545, before the Task Force's "A" rating took effect in 2021, *see* ROA.40-41, ¶ 25.

## B.    The APA Does Not Allow A District Court To Ignore The Balance Of The Equities

The district court erred in failing to consider the substantial harms to 150 million Americans when it issued a universal vacatur of all agency action to implement and enforce coverage of preventive items and services recommended by the Task Force with an "A" and "B" rating, and further issued a nationwide injunction of any action to implement and enforce those coverage requirements.  *See* ROA.2121-2129.  Plaintiffs make no attempt to defend these universal remedies as equitable or fair to absent parties; instead, plaintiffs contend that universal vacatur is compelled "regardless of the balance of equities or the public interest."  Pls. Br. 53 (capitalization altered).  Plaintiffs identify no authority for that extraordinary proposition, which is contrary to precedent and bedrock principles of equity.

Plaintiffs insist (at 53-54) that the "set aside" language in § 706 of the APA compelled the district court to issue a universal remedy.  As an initial matter, that issue is not before the Court because plaintiffs chose to abandon their lone APA claim when they amended their complaint, *see supra* pp. 27-28.  APA claims must challenge "final agency action," 5 U.S.C. § 704, meaning "an *identifiable* 'agency action,'" *Lujan v. National Wildlife Federation*, 497 U.S. 871, 890 (1990) (emphasis added).  Broadside

challenges to a conglomeration of varied government actions are not permissible because they are "not an identifiable 'final agency action,'" and plaintiffs seeking relief under the APA must challenge "some specific order or regulation." *Id.* at 890 n.2.

Plaintiffs' complaint made no attempt to challenge "circumscribed [and] discrete" agency actions as required by the APA. *Louisiana v. United States*, 948 F.3d 317, 321 (5th Cir. 2020) (affirming dismissal on this basis because "*Lujan* 'announced a prohibition on programmatic challenges'"). Instead, the complaint alleged that the Task Force violated the Constitution in various ways and urged that unspecified agency actions must be vacated. ROA.231-243. The operative complaint's constitutional challenges were aimed at the statute—not particular agency action. As plaintiffs' counsel has explained, when the constitutionality of a statute is challenged, "[a]ll that a court can do is announce its opinion that the statute violates the Constitution, decline to enforce the statute in cases before the court, and instruct executive officers not to initiate enforcement proceedings." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 941 (2018) (footnotes omitted). To the extent a plaintiff seeks to prevent a defendant from relying on agency actions implementing a purportedly unconstitutional statute, any ancillary relief applicable to those actions

must likewise be limited to preventing enforcement with respect to the relevant plaintiffs.[5]

Plaintiffs chose not to bring an APA claim and instead proceeded with claims directly under the Constitution. When that is permissible, it does not compel plaintiffs to follow the APA's pathways. *See Free Enterprise*, 561 U.S. at 489-91 (allowing plaintiffs to bring freestanding constitutional claims in district court). But claims under the Constitution seek "equitable relief." *Id.* at 491 n.2; *see also Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015) (explaining that suits directly under the Constitution are "the creation of courts of equity" consistent with "a long history of judicial review"). And equitable claims require a court to "explore the relative harms" and consider "the interests of the public." *Trump v. International Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam). The district court failed to do so here, and its order of universal vacatur must be vacated for that reason alone.

Furthermore, even if APA-specific remedies were available to plaintiffs, the APA preserves "the power or duty of the court to * * * deny

---

[5] The only discrete agency action identified by plaintiffs was limited to their claim under the Religious Freedom Restoration Act, ROA.243, and the government has not appealed the district court's plaintiff-specific relief on that claim, ROA.2132.

relief on any * * * equitable ground." 5 U.S.C. § 702(1).  Congress enacted the APA against a background rule that statutory remedies should be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).  Indeed, the relief available in an action under the APA, governed by 5 U.S.C. § 703, provides for traditional forms of equitable actions and relief, such as "declaratory judgments or writs of prohibitory or mandatory injunction."  There is no sound reason to conclude that Congress "meant to upset the bedrock practice of case-by-case judgments with respect to the parties in each case" by adopting the "unremarkable" "set aside" language in 5 U.S.C. § 706.  *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring).  Indeed, confining any equitable relief to no more than what is necessary to remedy the plaintiff's actual or imminently threatened injury is required by both equitable principles and Article III.  Accordingly, plaintiffs' counsel has acknowledged that "[t]he authority to 'set aside' an agency's action * * * does not resolve whether courts should extend relief beyond the named litigants."  Mitchell, *supra*, at 1014.

The Supreme Court has cautioned that when interpreting a statute vesting authority in an Executive Branch agency, "both separation of powers principles and a practical understanding of legislative intent make

[the Court] 'reluctant to read into ambiguous statutory text'" an extravagant delegation of power. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). Such caution is equally appropriate when interpreting a statute that vests authority to review agency action in district courts, which by constitutional design are insulated from political accountability. The litany of extraordinary consequences that flow from universal remedies is well catalogued. *See, e.g.*, *Arizona*, 40 F.4th at 395-98 (Sutton, C.J., concurring). The language in § 706 authorizing a district court to set aside agency action is "a wafer-thin reed on which to rest such sweeping power." *Alabama Association of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (per curiam).[6]

As three Justices explained shortly after our opening brief was filed, courts traditionally provide "party-specific relief, directing the defendant to take or not take some action relative to the plaintiff. If the court's remedial order affects nonparties, it does so only incidentally." *United States v. Texas*, 143 S. Ct. 1964, 1980 (2023) (Gorsuch, J., concurring in the

---

[6] As noted in our opening brief (at 45 n.5), we recognize that this Court's precedents hold that the APA permits vacatur of agency action, and the government continues to "dispute[] this premise." *United States v. Texas*, 143 S. Ct. 1964, 1980 (2023) (Gorsuch, J., concurring in the judgment) (explaining that the reasons for the government's position "are plenty and serious enough to warrant careful consideration").

judgment, joined by Thomas and Barrett, JJ.). Plaintiffs' theory is founded on a faulty premise that Congress enacted the APA to "overthrow the bedrock practice of case-by-case judgments with respect to the parties in each case and vest courts with a new and far-reaching remedial power" of compelled vacatur, without any consideration for the equities or whether such a remedy is warranted. *Id.* at 1981 (quotation marks omitted).[7]

But plaintiffs' argument is incompatible with the Supreme Court's repeated instructions that remedies "must of course be limited to the inadequacy that produced the injury in fact." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Any court-ordered remedy "must not be 'more burdensome [to the defendant] than necessary to redress the complaining parties.'" *Texas*, 143 S. Ct. at 1985 (Gorsuch, J., concurring) (quoting *Califano v. Yamasaki*, 442 U. S. 682, 702 (1979)). An order of vacatur without consideration for the equities can improperly "sweep up nonparties who may not wish to receive the benefit of the court's decision," *id.*, in addition to the other detriments that attend to vacatur. *See id.* (explaining that vacatur "can

---

[7] The article that plaintiffs cite (at 47 n.26) explained that "the APA's embrace of the appellate model reflected the contemporaneous fact that agencies overwhelmingly operated through adjudication, not rulemaking," and found "nothing to the argument that the APA, by its terms, strips courts of the authority to leave procedurally defective agency rules intact." Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 Colum. L. Rev. 253, 258, 309 (2017).

stymie the orderly review of important questions, lead to forum shopping, render meaningless rules about joinder and class actions, and facilitate efforts to evade the APA's normal rulemaking processes").  In sum, when considering an APA claim, as in all other contexts, "an appellate court should not hesitate to hold that broader relief is an abuse of discretion" where "party-specific relief can adequately protect the plaintiff's interests." *Id.* at 1986.[8]

In the context of vacating court judgments, the "Supreme Court made clear and emphasized that vacatur is an 'extraordinary' and equitable remedy * * * to be determined on a case-by-case basis, governed by facts and not inflexible rules." *Staley v. Harris County*, 485 F.3d 305, 310 (5th Cir. 2007).  Those same considerations apply to the wholesale vacatur of the Executive's actions to fulfill Congress's directives, which "suggest[s] some measure of caution on the Third Branch." *Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012).

---

[8] This case's caption illustrates one of the many problems with universal vacatur.  Joel Miller and Gregory Scheideman are listed as "Plaintiffs–Cross-Appellants" because the district court dismissed their claims for lack of standing.  ROA.2117-2118, ROA.2131.  Although both Miller and Scheideman are among the appellants, ROA.2141, plaintiffs' principal brief makes no argument that these two plaintiffs have standing.  By entering orders of universal vacatur and a nationwide injunction, the district court gave Miller and Scheideman relief on claims that the district court recognized they could not bring themselves.

This Court's precedents thus treat vacatur of an agency action as an equitable remedy.  For example, while "vacatur of an agency action is the default rule in this Circuit," *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality op.), remand without vacatur is appropriate if "there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so," *Alliance for Hippocratic Medicine v. FDA*, 78 F.4th 210, 255 (5th Cir. 2023).  A decision to vacate does not occur as a matter of course, but instead "depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'" *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146, 150-51 (D.C. Cir. 1993).

Consistent with *Allied-Signal*, this Court held in similar cases that universal vacatur was unwarranted where the agency could likely take the same substantive action.  *Texas Association of Manufacturers v. U.S. Consumer Product Safety Commission*, 989 F.3d 368, 389 (5th Cir. 2021) (declining to vacate agency action, citing *Allied Signal*); *Central & South West Services, Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (same).  Indeed, plaintiffs acknowledge (at 54) that this Court found it appropriate to "remand, without vacatur," a final rule when "vacating would be

'disruptive.'" *Central & South West Services*, 220 F.3d at 692.[9]  That

principle forecloses plaintiffs' contention that the APA leaves a district

court with no choice but to vacate any agency action that it finds unlawful.

      In their appellate briefs, plaintiffs do not take issue with the

substance of the Task Force's recommendations.  They do not, for example,

dispute that the Task Force rightly assigned an "A" or "B" rating to dozens

of vital items and services, such as statins to prevent deadly cardiovascular

disease, screenings for cancer, and aspirin to prevent preeclampsia deaths

in pregnant women and pre-term births.  The only error identified by the

district court was the Task Force's method of appointment.  As explained

above, the Secretary has now appointed the Task Force members and

ratified their past "A" and "B" recommendations.  And going forward, the

Secretary may (if constitutionally necessary) take any steps needed to

ensure that the Task Force recommendations do not have legally binding

effect over his objection.  Thus, there is no conceivable basis to extinguish

---

[9] Other courts of appeals likewise have declined to issue vacatur
orders where doing so would have deprived many people of electricity,
*California Communities Against Toxics v. EPA*, 688 F.3d 989, 993-94 (9th
Cir. 2012) (per curiam), or when vacatur might have endangered the
"obvious need for the TSA to continue its airport security operations
without interruption," *Electronic Privacy Information Center v. DHS*, 653
F.3d 1, 11 (D.C. Cir. 2011).

the rights of 150 million Americans to continue receiving coverage of vital preventive services under federal law as Congress mandated.

## IV.   PLAINTIFFS' CROSS-APPEAL

### A.   The District Court Correctly Rejected Plaintiffs' Challenges To The CDC And HRSA Recommendations

The district court correctly rejected plaintiffs' Appointments Clause challenge recommendations made by the CDC HRSA.  ROA.1793-1797. Although plaintiffs alleged that these recommendations had been issued by improperly appointed officers, ROA.1793, the district court found it unnecessary to address the method of appointment because the Secretary had ratified those recommendations as his own, ROA.1094.  Consistent with the decisions of many courts of appeals, plaintiffs' claims failed because "a properly appointed official's ratification of an allegedly improper official's prior action * * * resolves the claim on the merits by 'remedying the defect' (if any) from the initial appointment."  ROA.1793-1794 (quotation marks omitted).  Because the Secretary may "supervis[e] and direct[]," 42 U.S.C. § 202, the CDC and HRSA to issue or reject recommendations, the Secretary could properly ratify recommendations made under that delegated authority, ROA. 1794-1795.

On appeal, plaintiffs have not raised an Appointments Clause challenge to the CDC Director or to the HRSA Administrator. *See* Pls.

Br. 57-60.  It is thus immaterial that those officers exercise "significant authority pursuant to the laws of the United States," *id.* at 59, because those individuals properly serve as inferior officers subject to the Secretary's plenary supervision and at-will removal.[10]

Even if there were a defect in their appointment, the district court correctly explained that the Secretary took appropriate remedial action by ratifying their preventive service recommendations.  ROA.1795.  That ratification was proper because both the CDC and HRSA are "part of the Public Health Service" and therefore "'under the supervision and direction of the Secretary.'"  ROA.1794 (quoting 42 U.S.C. § 202).  Neither the CDC nor HRSA have any statutory limitations on Secretarial review, and, as the district court held, the Secretary may direct the CDC or HRSA to issue specific recommendations that will be covered by the preventive services provision in 42 U.S.C. § 300gg-13(a)(2)-(4).  ROA.1794-95.  That is because the HRSA Administrator exercises only "[d]elegations of [a]uthority" from the Secretary, 47 Fed. Reg. 38409, 38424 (Aug. 31, 1982), and the Administrator is thus "answerable to the Secretary," ROA.1795 (citing 47

---

[10] Congress recently amended the method of appointment for future Directors of the CDC, and beginning in 2025 the Director will be appointed by the President with Senate confirmation.  Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, Div. FF, Title II, § 2101(a)-(b), 136 Stat. 4459, 5706-09 (2022).

Fed. Reg. at 38410).  Likewise, the CDC Director "exercises delegated authority from the Secretary," ROA.1794 (citing 42 U.S.C. §§ 243, 247b), and a CDC recommendation only takes effect "after it has been adopted by the Director" under that delegated authority, ROA.1794-1795 (citing 45 C.F.R. § 147.130).  There is thus no doubt that the Secretary's ratification satisfies the prerequisites that plaintiffs urge, that in order to ratify the Secretary must "have lawfully delegated authority to undertake the act he is seeking to ratify."  Pls. Br. 23.[11]

Plaintiffs contend (at 59) that ratification cannot validate previous actions, but that is precisely how ratification works.  Ratification "extends to the whole of the act—it goes back to its inception and continues to its legitimate end" and is therefore "retroactive and equivalent to a prior authority."  1 Floyd R. Mechem, *Treatise on the Law of Public Offices and*

---

[11] Plaintiffs' assertion that the statute "gives [the CDC] and HRSA alone the authority to issue the 'recommendations' and 'guidelines' that bind private insurers," Pls. Br. 57, rests on a misunderstanding of *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020), which used "HRSA" as a shorthand but recognized that the statutory authority at issue was exercised by Department Heads.  *See id.* at 2372 (explaining that "the Departments of Health and Human Services, Labor, and the Treasury (Departments)—which jointly administer the relevant [statutory] provision—exempted certain employers who have religious and conscientious objections from this agency-created mandate") (footnote omitted); *see also, e.g., id.* at 2377 (discussing 82 Fed. Reg. 47792, 47812 (Oct. 13, 2017), which was signed by Department officials exercising authority delegated by the Secretaries).

*Officers* § 557, at 361 (1890); *see also Advanced Disposal Services East, Inc. v. NLRB*, 820 F.3d 592, 602, 606 (3d Cir. 2016) (affirming ratification "*nunc pro tunc*").  In doing so, ratification does not prejudice the rights of third parties, *see* Mechem, *supra*, at 361, and the government makes no argument that any party must or will incur any liability based on a retroactive application of the ratified recommendations.

## B.    The District Court Correctly Dismissed Plaintiffs' Nondelegation Challenge

Plaintiffs concede that their nondelegation challenge "is foreclosed by *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436 (5th Cir. 2020)," Pls. Br. 60, and the district court correctly dismissed that claim, ROA.1810-1815.

## CONCLUSION

The Court should reverse the district court's judgment insofar as it held that the statutory provision concerning preventive services covered under 42 U.S.C. § 300gg-13(a)(1) suffered from an Appointments Clause defect.  If the Court concludes that there was an Appointments Clause defect, then it should sever the restrictions in 42 U.S.C. § 299b-4(a)(6) with respect to the HHS's Secretary's review over Task Force recommendations that may be given binding effect under 42 U.S.C. § 300gg-13(a)(1) and (b). At a minimum, the Court should reverse the district court's universal remedies.

As to plaintiffs' cross-appeal, the Court should affirm paragraphs 2 and 4 of the district court's judgment.

Respectfully submitted,

BRIAN M. BOYNTON
  *Principal Deputy Assistant*
  *Attorney General*

LEIGHA SIMONTON
  *United States Attorney*

MICHAEL S. RAAB
ALISA B. KLEIN
 */s/ Daniel Aguilar*

DANIEL AGUILAR
(202) 514-5432
Attorneys, Appellate Staff
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-5432

September 2023

## CERTIFICATE OF SERVICE

I certify that on September 29, 2023, I filed a copy of this brief with the Clerk of Court for the Fifth Circuit Court of Appeals through the Court's CM/ECF system, which will serve counsel for all parties.

*/s/ Daniel Aguilar*
Daniel Aguilar

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(e)(2)(A)(i) because it contains 10,760 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Georgia 14-point font, a proportionally spaced typeface.

*/s/ Daniel Aguilar*
Daniel Aguilar