# No. 23-10326

## IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

BRAIDWOOD MANAGEMENT, INCORPORATED *et al.*,

*Plaintiffs-Appellees/Cross-Appellants*,

v.

XAVIER BECERRA, *et al.*,

*Defendants-Appellants/Cross-Appellees.*

**On Appeal from the United States District Court for the Northern District of Texas**

Case No. 20-cv-283

**BRIEF OF *AMICUS CURIAE* THE NATIONAL WOMEN'S LAW CENTER IN SUPPORT OF DEFENDANTS-APPELLANTS/CROSS-APPELLEES**

Alison Tanner
    *Counsel of Record*
Dorianne Mason
Mara Gandal-Powers
Michelle Banker
K.M. Bell
NATIONAL WOMEN'S LAW CENTER
1350 I Street NW, Suite 700
Washington, DC 20005
(202) 588-5180
atanner@nwlc.org

*Counsel for Amicus Curiae*
*National Women's Law Center*

**SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES**

Pursuant to Fifth Circuit Rule 29.2, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1, in addition to those already listed in the parties' briefs, have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

National Women's Law Center

Alison Tanner
Dorianne Mason
Mara Gandal-Powers
Michelle Banker
K.M. Bell
Gabrielle Feliciani

Under Federal Rule of Appellate Procedure 26.1, National Women's Law Center certifies that it is a non-stock, nonprofit corporation. It has no parent corporation, and no publicly held corporation owns it or any part of it.

Dated: October 6, 2023

*/s/ Alison Tanner*
Alison Tanner
*Counsel for Amicus Curiae*
*National Women's Law Center*

i

# TABLE OF CONTENTS

Supplemental Statement of Interested Parties ............................................i

Table of Authorities ........................................................................ iii

Statement of *Amicus Curiae* ...............................................................1

Summary of the Argument..................................................................2

Argument.......................................................................................4

    I.   The ACA Ensured Access to Women's Preventive Care Without Cost-Sharing to Remedy Discrimination, Promote Economic Security, and Reduce Disparities. ...........................................................................4

    II. Reinstating Out-of-Pocket Costs Will Reduce Utilization of Women's Preventive Care and Harm the Health and Economic Security of Women and Families, Especially Women of Color, Low-Income Women, and LGBTQI+ Individuals. ...............................................................................10

        A. Even marginal costs will effectively block many women from accessing preventive care..........................................................................10

        B. Reimposing barriers to women's preventive care will reverse the critical progress that has been made in improving health and wellbeing.............13

        C. Reimposing costs on women's preventive services will exacerbate health disparities.................................................................................20

        D. Reimposing costs on women's preventive care threatens the economic prosperity of individuals, their families and communities at large.........22

Conclusion ...................................................................................25

Certificate of Service ......................................................................26

Certificate of Compliance .................................................................27

# TABLE OF AUTHORITIES

**Administrative & Legislative Materials, Regulations, Rules, and Statutes,**

155 Cong. Rec. S11,979 (daily ed. Nov. 30, 2009) ...................................................6

155 Cong. Rec. S12,019 (daily ed. Dec. 1, 2009) ......................................5, 6, 7, 12

155 Cong. Rec. S12,261 (daily ed. Dec. 3, 2009) ...................................................6

42 U.S.C. § 300gg-13 .....................................................................................*passim*

H.R. 3590, 111th Cong. (as of Nov. 19, 2009)........................................................5

H. Comm. on Educ. & Lab., *No Right to Deny Care: The Importance of Preserving Preventive Care in the Affordable Care Act* (2022).......................................7, 20

Health Res. & Servs. Admin., *Women's Preventive Services Guidelines*, https://www.hrsa.gov/womens-guidelines.........................................3, 13, 14, 15

Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* (2011)...............................................................................................16, 17, 18

Patient Protection and Affordable Care Act; Standards Related to Essential Health Benefits, Actuarial Value, and Accreditation, 78 Fed. Reg. 12,834 (Feb. 25, 2023).......................................................................................4

Medicaid & CHIP Access Comm'n, *Report to Congress on Medicaid and CHIP* (2022), https://bit.ly/3tqgpFy...........................................................................22

President Barack Obama, Remarks on Signing the Patient Protection and Affordable Care Act (Mar. 23, 2010) ....................................................7

Emily A. Shrider et al., U.S. Census Bureau, P60-273, *Income and Poverty in the United States: 2020* (2021) ................................................................11

U.S. Dep't of Health & Hum. Servs., Off. of the Assistant Sec'y for Planning & Evaluation, Issue Brief, HP-2022-01, *Access to Preventive Services Without Cost-Sharing: Evidence from the Affordable Care Act* (2022) ...............8, 21, 22

U.S. Preventive Servs. Task Force, *A & B Recommendations*, https://bit.ly/45qnxyF.......................................................................22–23

**Other Authorities**

Rajender Agarwal et al., *High-Deductible Health Plans Reduce Health Care Cost and Utilization, Including Use of Needed Preventive Services*, 36 Health Affs. 1762 (2017)..................................................................................................10

Am. Cancer Soc'y, *Breast Cancer Facts & Figures 2022–2024* (2022) ...............13

Am. Cancer Soc'y, *Cancer Prevention & Early Detection Facts & Figures 2023– 2024* (2023)........................................................................................................13

Emma Anderson, *Survey: OBGYNs Report That the Affordable Care Act Has Increased Use of Contraceptives Among Patients but the Cost of Reproductive Health Care Still a Burden for Their Low-Income Patients*, Kaiser Fam. Found. (Feb. 25, 2021), https://bit.ly/3S07wgb .............................................................19

Carolina Aragão, *Gender Pay Gap in the U.S. Hasn't Changed Much in Two Decades*, Pew Rsch. Ctr. (Mar. 1, 2023), https://pewrsr.ch/46viP3M ..............11

Kellan Baker et al., *The Medicaid Program and LGBT Communities: Overview and Policy Recommendations*, Ctr. for Am. Progress (Aug. 9, 2016), https://ampr.gs/3ZIuYjB .....................................................................................21

Nora V. Becker et al., *ACA Mandate Led to Substantial Increase in Contraceptive Use Among Women Enrolled in High-Deductible Health Plans*, 40 Health Affs. 579 (2021)...............................................................................................19

Black Mamas Matter All., *Black Mamas Matter Toolkit Advancing the Right to Safe and Respectful Maternal Health Care* (2018) ...........................................16

Julie K. Bower et al., *Racial/Ethnic Differences in Diabetes Screening and Hyperglycemia with US Women After Gestational Diabetes*, 16 Preventing Chronic Disease 1 (2019) ...................................................................................15

Ctrs. for Disease Control, *Gestational Diabetes*, https://www.cdc.gov/diabetes/basics/gestational.html ......................................14

Ctrs. For Disease Control & Prevention, *Diabetes and Pregnancy*, https://bit.ly/3ph43O8 ........................................................................................17

Ctrs. for Disease Control & Prevention, *Health and Economic Costs of Chronic Diseases*, https://bit.ly/3thWkBb ...................................................................24

Samantha Artiga et al., Kaiser Fam. Found., *The Effects of Premiums & Cost Sharing on Low-Income Population*s: *Updated Review of Research Findings* (2017) ...............................................................................................................11

Nicole Fusco et al., *Cost-Sharing and Adherence, Clinical Outcomes, Health Care Utilization, and Costs: A Systematic Literature Review*, 29 J. of Managed Care & Specialty Pharm. 4 (2023) ..............................................................................11

Catherine J. Golics et al., *The Impact of Patient's Chronic Disease on Family Quality of Life: An Experience from 26 Specialties*, 6 Int'l J. of General Med. 787 (2013).....................................................................................................23

Ivette Gomez et al., *Medicaid Coverage for Women*, Kaiser Fam. Found. (Feb. 17, 2022), https://bit.ly/3RLYzXt................................................................................21

Tami Gurley-Calvez et al., *Effect of the Affordable Care Act on Breastfeeding Outcomes*, 108 Am. J. of Public Health 277 (2018).....................................15–16

Madeline Guth et al., *Medicaid and Racial Health Equity*, Kaiser Fam. Found. (June 2, 2023), https://bit.ly/3RPqyW6 .............................................................21

Summer S. Hawkins et al., *Breastfeeding and the Affordable Care Act*, 62 Pediatric Clinic N. Am. 1071 (2015) .....................................................................................15

Latoya Hill et al., *Key Data on Health and Health Care by Race and Ethnicity*, Kaiser Fam. Found. (Mar. 15, 2023), https://bit.ly/3PW0o2J .............................20

In Our Own Voice, *The State of Black Women & Reproductive Justice* (2017), https://bit.ly/3CGNQok................................................................................18

Intersections of Our Lives, *Reproductive Justice for Women of Colo*r (2017) .......16

Katherine M. Jones et al., *Racial and Ethnic Disparities in Breastfeeding*, 10 Breastfeeding Medicine 186 (2015) ....................................................................15

Zura Kakushadze et al., *Estimating Cost Savings from Early Cancer Diagnosis*, 2 Data 30 (2017), https://bit.ly/46surWa ...............................................................8

Gary Kopycinski, *Senator Mikulski Puts Women First in Health Care Reform Debate*, eNews Park Forest (Dec. 1, 2009), https://bit.ly/3rFT4Pl ........................5–6

Maggi LeDuc, *How Birth Control Can Help with Gender Dysphoria*, Power to Decide (Aug. 10, 2020), https://bit.ly/46sIlY1 ...................................................17

Lois K. Lee et al., *Women's Affordability, Access and Preventive Care After the Affordable Care Act*, 56 Am. J. Preventive Med. 631 (2019) .............................9

Lois K. Lee et al., *Women's Coverage, Utilization, Affordability, and Health After the ACA: A Review of the Literature*, 39 Health Affs. 387 (2020).......................9

Lisa L. Lindley & Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 Am. J. Pub. Health 1379 (2015) ....................................................................................16

Zhen-Qiang Ma & Lisa C. Richardson, *Cancer Screening Prevalence and Associated Factors Among US Adults*, 19 Prev. Chronic Disease 1 (2022) ........7

Marian F. MacDorman et al., *Racial and Ethnic Disparities in Maternal Mortality in the United States Using Enhanced Vital Records, 2016–2017*, 111 Am. J. Pub. Health 1673 (2021) ....................................................................................18

Page Minemyer, *Patients Are Likely to Avoid Preventive Care Should ACA Coverage Ruling Stand, Survey Finds*, Fierce Healthcare (Mar. 8, 2023), https://bit.ly/3ZGQ5D9 ....................................................................................12

Moody's Analytics, *Healthy People, Healthy Economies* (2016)...........................24

Moody's Analytics, *The Economic Consequences of Millennial Health* (2019) ....24

Nat'l Acads. of Scis., Eng'g, & Med., *Communities in Action: Pathways to Health Equity* (James N. Weinstein et al. eds., 2017) ....................................................20

Hope C. Norris et al., *Utilization Impact of Cost-Sharing Elimination for Preventive Care Services: A Rapid Review* (2021) ...........................................14

NPR & Harv. T.H. Chan Sch. Pub. Health, *Discrimination in America: Experiences and Views of American Women* (2017), https://bit.ly/3p4EKPn ................................................................................17–18

Okechukwu Osuebi, *Maternal-Fetal Health in African American Women*, Mayo Clinic Health Sys. (Mar. 16, 2023), https://mayocl.in/3RGOQla ............ 14

Morning Consult, *National Tracking Poll #2301147* (Jan. 28, 2023), https://bit.ly/3PICWEO ..................................................................................... 12

Usha Ranji et al., Kaiser Fam. Found., *Women's Health Care Chartbook: Key Findings from the Kaiser Women's Health Survey* (2011), https://bit.ly/45n2AoE ........................................................................................ 9

Cory Reinert, *Rates of Diabetes Screening in Kentucky Before and After Implementation of the Affordable Care Act (ACA)* (2021) ................................. 15

Lisa C. Richardson et al., *Patterns and Trends in Age-Specific Black-White Differences in Breast Cancer Incidence and Mortality—United States, 1999–2014*, 65 Morbidity & Mortality Wkly. Rep. 1093 (2016) ................................. 14

Caroline Rosenzweig et al., *Women's Sexual and Reproductive Health Services: Key Findings from the 2017 Kaiser Women's Health Survey* (2018), https://bit.ly/341zw7Z .................................................................................... 17

Alina Salganicoff, Kaiser Fam. Found., *Women and Health Care: A National Profile* (2005), https://bit.ly/3Q1nTrp .............................................................. 9

Susan Silberman., *Cost of Chronic Disease: Why It Matters for Older Adults*, Nat'l Council on Aging (Apr. 21, 2022), https://bit.ly/3PIkV9T ...................... 23

Kenneth E. Thorpe, *Racial Trends in Clinical Preventive Services Use, Chronic Disease Prevalence, and Lack of Insurance Before and After the Affordable Care Ac*t, 28 Am. J. of Managed Care 126 (2022) ...................................... 20, 21

James Trussell et al*., Cost Effectiveness of Contraceptives in the United States*, 79 Contraception 5 (2009), https://bit.ly/3Pohgza ............................................. 8

Hugh Waters & Marlon Graf, Milken Inst., *The Costs of Chronic Disease in the U.S.* (2018) .............................................................................................. 23, 24

*Women's Health Insurance Coverage*, Kaiser Fam. Found. (Dec. 21, 2022), https://bit.ly/46yNWvj ..................................................................................... 10

Mitchell Wong et al., *Effects of Cost Sharing on Care Seeking and Health Status: Results from the Medical Outcomes Study*, 91 Am. J. Pub. Health 1889 (2001) ................................................................................10–11

## STATEMENT OF AMICUS CURIAE[1]

The National Women's Law Center ("NWLC") is a nonprofit legal advocacy organization that fights for gender justice in the courts, in public policy, and in our society. NWLC works across issues that are central to the lives of women, girls, and all who face sex discrimination—especially women of color, LGBTQI+ people, and low-income women and families. NWLC is committed to ensuring that all individuals have access to preventive care without cost-sharing, as guaranteed by the Patient Protection and Affordable Care Act ("ACA"), and NWLC has participated as *amicus curiae* in multiple cases before this Court, the U.S. Supreme Court, and others in defense of the ACA. NWLC submits this brief to demonstrate the substantial harm that will result, particularly to those who face multiple and intersecting forms of discrimination, if the Court reverses the decision below with respect to HRSA-supported preventive services for women.

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(2)*, Amicus Curiae* National Women's Law Center states that all parties consent to the filing of this brief. No party's counsel authored this brief in whole or in part, no party or party's counsel contributed money intended to fund this brief, and no person other than *amicus* and its counsel contributed money to fund this brief.

## SUMMARY OF THE ARGUMENT

The Patient Protection and Affordable Care Act ("ACA") requires that group health plans and health insurance issuers offering group or individual health insurance coverage provide recommended preventive care without cost-sharing. 42 U.S.C. § 300gg-13(a). This includes four sets of preventive services: those that have a rating of "A" or "B" by the U.S. Preventive Services Task Force ("USPSTF"), *id.* § 300gg-13(a)(1); immunizations recommended by the Advisory Committee on Immunization Practices ("ACIP"), *id.* § 300gg-13(a)(2); services for children and adolescents set forth in guidelines supported by the Health Resources and Services Administration ("HRSA"), a component of the U.S. Department of Health and Human Services, *id.* § 300gg-13(a)(3); and services for women in HRSA-supported guidelines, *id.* § 300gg-13(a)(4).

With respect to the fourth category—preventive services for women[2]—HRSA has adopted comprehensive guidelines that require group health plans and health insurance issuers to provide coverage without cost-sharing for services such as breast and cervical cancer screenings, pregnancy and postpartum diabetes

---

[2] This brief uses the term "women" given that one important purpose of the ACA was to ensure that women's health care needs are met. As *amicus* discusses, women's preventive services apply to people who are indicated for the service regardless of gender identity or sex assigned at birth, and the ACA's preventive services benefit, like all ACA provisions designed to protect against sex discrimination, applies regardless of gender identity.

screenings, "well-woman" visits, contraceptives, screenings for anxiety, and breastfeeding services and supplies. Health Res. & Servs. Admin., *Women's Preventive Services Guidelines*, https://www.hrsa.gov/womens-guidelines (last visited Oct. 2, 2023). As described herein, providing these services without cost-sharing has helped to remedy discrimination in women's health care and coverage and increased overall uptake of these services, improving women's health and economic security and reducing racial disparities in both the use of these services and in health outcomes for populations facing multiple and intersecting forms of discrimination.

In this cross-appeal, Appellees/Cross-Appellants seek to reverse the District Court's rejection of their nondelegation and Appointments Clause challenges to the HRSA-supported women's preventive services requirement set forth in § 300gg-13(a)(4). But as set forth in the District Court's decision, nothing in § 300gg-13(a)(4) runs afoul of the Constitution. *Amicus* writes to explain the substantial and irreparable harm that would result—particularly to women of color, low-income women, and LGBTQI+ individuals—if this Court were to reverse that decision and allow the District Court to impose the same overreaching interpretation it issued with respect to the USPSTF recommended services. Part I explains the intent of the ACA's requirement to provide women's preventive health services without cost-sharing and its impact on women's access to care. Part II shows that reimposing

costs for preventive care will reduce women's utilization rates—particularly among women who already experience significant health disparities and discrimination, outlines how the ACA's preventive services requirement has helped meet women's unique health needs, and describes the detrimental health and economic effects of cost-sharing on individuals and communities. Because the HRSA-supported women's preventive services requirement is both lawful and critical to the health and wellbeing of individuals nationwide, the decision regarding § 300gg-13(a)(4) should be affirmed.

## ARGUMENT

### I. The ACA Ensured Access to Women's Preventive Care Without Cost-Sharing to Remedy Discrimination, Promote Economic Security, and Reduce Disparities.

The ACA requires coverage of preventive care, including preventive services for women, with no consumer cost-sharing by group health plans and health insurance insurers and in Medicaid coverage of the expansion population. *See* 42 U.S.C. § 300gg-13(a); Patient Protection and Affordable Care Act; Standards Related to Essential Health Benefits, Actuarial Value, and Accreditation, 78 Fed. Reg. 12,834, 12,834, 12,866 (Feb. 25, 2023) (to be codified at 45 C.F.R. pts. 147, 155, 156) (requiring that "Medicaid benchmark and benchmark-equivalent plans . . . cover essential health benefits," including "[p]reventive and wellness services and chronic disease management"). Specifically, the Women's Preventive Services

Initiative conducts rigorous reviews of scientific evidence and recommends which types of women's preventive care must be provided without cost-sharing, and HRSA reviews the recommendations to determine which to adopt as part of the Women's Preventive Services Guidelines. 42 U.S.C. § 300gg-13(a)(1)–(4). Plaintiffs have challenged the constitutionality of HRSA's Women's Preventive Services Guidelines.

As originally introduced in the Senate, the ACA provided coverage for: (1) items or services recommended by the USPSTF; (2) immunizations recommended by ACIP; and (3) with respect to children, preventive care and screenings recommended by HRSA. *See* H.R. 3590, § 2713(a), 111th Cong. (as of Nov. 19, 2009). The USPSTF recommendations, however, "d[id] not include certain recommendations that many women's health advocates and medical professionals believe are critically important." 155 Cong. Rec. S12,019, S12,025 (daily ed. Dec. 1, 2009) (statement of Sen. Boxer). Recognizing this limitation for what it was—a significant gap in coverage that threatened women's health and discriminated against women—Senator Mikulski sponsored the Women's Health Amendment, codified at § 300gg-13(a)(4), to ensure "essential protection for women's access to preventive health care not currently covered in other prevention sections of the [ACA]." Gary Kopycinski, *Senator Mikulski Puts Women First in Health Care Reform Debate*,

eNews Park Forest (Dec. 1, 2009), https://bit.ly/3rFT4Pl (quoting Sen. Mikulski's prepared remarks).

In relevant part, the Amendment proposed a fourth category of preventive coverage: "(4) with respect to women, such additional preventive care and screenings not described in paragraph (1) as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph." 155 Cong. Rec. S11,979, S11,987 (daily ed. Nov. 30, 2009) (Women's Health Amendment). The Amendment "require[d] coverage of women's preventive services developed by women's health experts to meet the unique needs of women." 155 Cong. Rec. S12,261, S12,273 (daily ed. Dec. 3, 2009) (statement of Sen. Stabenow).

Congress intended the Amendment to help alleviate the "punitive practices of insurance companies that charge women more and give [them] less in a benefit" and to "end the punitive practices of the private insurance companies in their gender discrimination." 155 Cong. Rec. S12,019, S12,026 (daily ed. Dec. 1, 2009) (statement of Sen. Mikulski); *see also id.* at S12,030 (statement of Sen. Dodd) ("I support the effort by Senator Mikulski on her efforts to see to it that women are treated equally, and particularly in preventive care."). In enacting the Women's Health Amendment, Congress recognized that the failure to cover women's preventive health services meant that women paid more in out-of-pocket costs than

men for basic and necessary preventive care and in some instances were unable to

obtain this care at all because of cost barriers:

> Women must shoulder the worst of the health care crisis, including outrageous discriminatory practices in care and coverage. Not only do we pay more for the coverage we seek . . . but in general women of childbearing age spend 68 percent more in out-of-pocket health care costs than men. . . . In America today, too many women are delaying or skipping preventive care because of the costs of copays and limited access. In fact, more than half of women delay or avoid preventive care because of its cost. This fundamental inequity in the current system is dangerous and discriminatory and we must act.

155 Cong. Rec. S12,019, S12,027 (daily ed. Dec. 1, 2009) (statement of Sen.

Gillibrand).

   One of the intents of the ACA was to remove cost barriers to preventive care

in order to improve long-term health and reduce overall health care spending, *see*

President Barack Obama, Remarks on Signing the Patient Protection and Affordable

Care Act (Mar. 23, 2010), and the Women's Health Amendment does just that.

Preventive care reduces the risk of chronic conditions through early detection,

reduces transmission of illnesses, and improves survival rates for serious illnesses

such as cancer. *See, e.g.*, H. Comm. on Educ. & Lab., *No Right to Deny Care: The*

*Importance of Preserving Preventive Care in the Affordable Care Act* 6 (2022)

(reporting an increase in vaccinations and screenings); Zhen-Qiang Ma & Lisa C.

Richardson, *Cancer Screening Prevalence and Associated Factors Among US*

*Adults*, 19 Prev. Chronic Disease 1, 2 (2022) ("10,179 deaths from breast cancer,

27,166 from cervical cancer, and 74,740 from colorectal cancer could be prevented

if current screening levels [are] maintained."). Studies have estimated that early cancer diagnoses from preventive screenings result in $26 billion in annual cost savings, Zura Kakushadze et al., *Estimating Cost Savings from Early Cancer Diagnosis*, 2 Data 30, 43 (2017), https://bit.ly/46surWa, and that contraception results in $19 billion in direct cost savings annually, James Trussell et al., *Cost Effectiveness of Contraceptives in the United States*, 79 Contraception 5, 5 (2009), https://bit.ly/3Pohgza.

Enacted in 2010, the Women's Health Amendment now reaches over fifty-eight million women, including those who are currently eligible to receive the thirteen recommended women's preventive services without cost-sharing through their private insurance coverage. U.S. Dep't of Health & Hum. Servs., Off. of the Assistant Sec'y for Planning & Evaluation, Issue Brief, HP-2022-01, *Access to Preventive Services Without Cost-Sharing: Evidence from the Affordable Care Act* 1 (2022). The Women's Health Amendment has made tremendous impact towards its goals of increasing utilization of preventive care and remedying discrimination in health coverage and care and addressing existing health disparities. With respect to utilization of preventive care, there has been a dramatic increase since passage of the ACA, which is due in significant part to the elimination of cost-sharing. Women's health surveys conducted prior to the ACA, in 2004 and 2008, found a "limited reach of [women's] preventive care" and that "use of [women's] preventive

counseling and screening services still fall far below recommended levels." Alina Salganicoff, Kaiser Fam. Found., *Women and Health Care: A National Profile* 3 (2005), https://bit.ly/3Q1nTrp; Usha Ranji et al., Kaiser Fam. Found., *Women's Health Care Chartbook: Key Findings from the Kaiser Women's Health Survey* 3 (2011), https://bit.ly/45n2AoE. In the years following the ACA's passage, more women in all income groups have received preventive care. *See* Lois K. Lee et al., *Women's Affordability, Access and Preventive Care After the Affordable Care Act*, 56 Am. J. Preventive Med. 631, 636 (2019) (showing increased utilization from 2010 to 2017). Women report receiving more cancer screenings and early-stage diagnoses, improvements in mental health symptoms from higher depression screening rates, and increased use and adherence to contraception. Lois K. Lee et al., *Women's Coverage, Utilization, Affordability, and Health After the ACA: A Review of the Literature*, 39 Health Affs. 387, 390–91 (2020). The HRSA-supported women's preventive services requirement has had just as significant an effect in remedying discrimination and addressing disparities, as detailed further below.

Cross-Appellant's challenge to the HRSA-supported women's preventive services requirement threatens this progress. If this Court were to reverse the District Court's decision to uphold the HRSA-supported women's preventive services requirement, it will directly contradict Congress's intent for the ACA. Further, the health and well-being of the millions of women who rely on the ACA's no-cost-

sharing coverage to access preventive care and who benefit from the resulting improvements to their health and economic security will be harmed.

## II. Reinstating Out-of-Pocket Costs Will Reduce Utilization of Women's Preventive Care and Harm the Health and Economic Security of Women and Families, Especially Women of Color, Low-Income Women, and LGBTQI+ Individuals.

### A. Even marginal costs will effectively block many women from accessing preventive care.

Invalidating the HRSA-supported women's preventive services requirement risks returning to a system that prevents many from accessing preventive care, leading to adverse health outcomes and financial repercussions. Cost significantly affects health care utilization rates among women. *See Women's Health Insurance Coverage*, Kaiser Fam. Found. (Dec. 21, 2022), https://bit.ly/46yNWvj. In turn, out-of-pocket costs for women's preventive services will decrease utilization and discourage many women from seeking the services they need to maintain and improve their health and wellbeing.

The imposition of costs for preventive care leads to significant reductions in use. Rajender Agarwal et al., *High-Deductible Health Plans Reduce Health Care Cost and Utilization, Including Use of Needed Preventive Services*, 36 Health Affs. 1762, 1765 (2017) (comparing traditional to high-deductible health care plans). Unlike some health care costs, out-of-pocket costs have a direct, negative impact on individual demand for services. *See* Mitchell Wong et al., *Effects of Cost Sharing on*

10

*Care Seeking and Health Status: Results from the Medical Outcomes Study*, 91 Am. J. Pub. Health 1889, 1892 (2001) (finding 34% sought care for minor symptoms with no copays compared to 18% with high copays). When even marginal costs[3] are imposed, utilization of outpatient services decreases. Nicole Fusco et al., *Cost-Sharing and Adherence, Clinical Outcomes, Health Care Utilization, and Costs: A Systematic Literature Review*, 29 J. of Managed Care & Specialty Pharm. 4, 8 fig.2 (2023).

Lower-income individuals are more likely to reduce care than higher-income individuals, even when cost impositions are as low as $1. Artga et al., *supra*, at 4. Women earn less on average than men, Carolina Aragão, *Gender Pay Gap in the U.S. Hasn't Changed Much in Two Decades*, Pew Rsch. Ctr. (Mar. 1, 2023), https://pewrsr.ch/46viP3M (finding women earn 82% as much as men in median hourly wages), and women and minority populations experience higher rates of poverty, Emily A. Shrider et al., U.S. Census Bureau, P60-273, *Income and Poverty in the United States: 2020* 53 tbl.B-1 (2021) (reporting 12.6% of women overall, 19.5% of Black individuals, and 17% of Hispanic individuals experience poverty). This means women and women of color in particular are more likely to be burdened

---

[3] "[E]ven relatively small levels of cost sharing in the range of $1 to $5 are associated with reduced use of care, including necessary services." Samantha Artiga et al., Kaiser Fam. Found., *The Effects of Premiums & Cost Sharing on Low-Income Population*s: *Updated Review of Research Findings* 4 (2017).

by reimposing cost barriers to preventive care. For them, losing preventive care without cost-sharing would create cost impositions that will serve as a barrier to preventive care, reducing utilization.

Current consumer attitudes support the research showing that individuals will forego preventive care due to cost barriers. Page Minemyer, *Patients Are Likely to Avoid Preventive Care Should ACA Coverage Ruling Stand, Survey Find*s, Fierce Healthcare (Mar. 8, 2023), https://bit.ly/3ZGQ5D9. In a 2023 survey, 53% of women reported avoiding seeking care due to cost concerns, compared to 47% of men. Morning Consult, *National Tracking Poll #2301147* 78 (Jan. 28, 2023), https://bit.ly/3PICWEO. Further, fewer than 40% of women participants said they would pay out of pocket for eleven of twelve covered preventive care services included in the survey. *Id.* at 82–126.[4]

The ACA required the provision of women's preventive care without cost-sharing so that fewer women would delay or skip recommended preventive services due to cost concerns. 155 Cong. Rec. at S12,027. Reversing the District Court's decision to uphold the HRSA-recommended women's preventive services

---

[4] Survey questions covered cancer screenings, STI screening, HIV screening, prediabetes screening, tobacco smoking cessation, depression screening, unhealthy drug use screening, cardiovascular disease prevention, weight loss measures, Hepatitis B/C screening, and mental and physical health screenings for children. Morning Consult, *supra*, at 3–4.

requirement would allow group health plans and health insurance issuers to reinstate those cost barriers to women's access to critical health services.

## B. Reimposing cost barriers to women's preventive care will reverse the critical progress that has been made in improving health and wellbeing.

Women have unique health needs that the ACA was designed to meet, and the women's preventive services benefit has increased access to a range of services that were not historically covered by plans without cost-sharing—or at all—including women-specific cancer and diabetes screenings, breastfeeding services and supplies, and contraception.

Breast cancer and cervical cancer screenings are currently covered without cost-sharing under the ACA's women's preventive services requirement. Health Res. & Servs. Admin., *supra*. This encourages more and earlier screening, which can lead to earlier detection and save lives, because mortality rates from breast and cervical cancer decrease with early detection and screening. Am. Cancer Soc'y, *Breast Cancer Facts & Figures 2022–2024* 5 (2022) (breast cancer); Am. Cancer Soc'y, *Cancer Prevention & Early Detection Facts & Figures 2023–2024* 54 (2023) (cervical cancer). This is important for all women—almost 300,000 women will be diagnosed with breast cancer and 14,000 with cervical cancer each year. Am. Cancer Soc'y, *Cancer Prevention & Early Detection Facts & Figures 2023–2024* 54–55 (2023). It is especially important for minority populations, like Black women, who

have historically faced higher rates of breast cancer. Lisa C. Richardson et al., *Patterns and Trends in Age-Specific Black-White Differences in Breast Cancer Incidence and Mortality—United States, 1999–2014*, 65 Morbidity & Mortality Wkly. Rep. 1093, 1093 (2016). Since the passage of the ACA, "African Americans maintained a statistically significant increase in [screening mammography] utilization . . . helping close the racial gap." Hope C. Norris et al., *Utilization Impact of Cost-Sharing Elimination for Preventive Care Services: A Rapid Review* 9 (2021).

Another of the HRSA-supported women's preventive services guidelines recommends that women at risk of developing gestational diabetes and type-2 diabetes postpartum receive screenings and repeat testing without cost-sharing. Health Res. & Servs. Admin., *supra*. Approximately 2–10% of women develop gestational diabetes during pregnancy, and half of those women will develop type-2 diabetes after giving birth. Ctrs. for Disease Control, *Gestational Diabetes*, https://www.cdc.gov/diabetes/basics/gestational.html (last updated Dec. 30, 2022). Women of color have a higher risk of developing gestational diabetes and more than half develop type-2 diabetes within nineteen years after giving birth. Okechukwu Osuebi, *Maternal-Fetal Health in African American Women*, Mayo Clinic Health Sys. (Mar. 16, 2023), https://mayocl.in/3RGOQla. Repeated postpartum screenings help to prevent progression from gestational diabetes to type-two diabetes. More non-Hispanic Black women have received screenings since the passage of the ACA.

Julie K. Bower et al., *Racial/Ethnic Differences in Diabetes Screening and Hyperglycemia with US Women After Gestational Diabetes*, 16 Preventing Chronic Disease 1, 2, 4 (2019); *see also* Cory Reinert, *Rates of Diabetes Screening in Kentucky Before and After Implementation of the Affordable Care Act (ACA)* 14 tbl.3 (2021) (finding higher rates of type-2 diabetes screenings among women and Black individuals in Kentucky).

The HRSA-supported women's preventive services requirement also specifies that plans must cover comprehensive breastfeeding support services, breast pump rental and purchase, pre- and postnatal breastfeeding counseling by providers, and lactation support and counseling without cost-sharing. Health Res. & Servs. Admin., *supra*. Breastfeeding provides proven health benefits for infants and mothers, but there are significant socioeconomic disparities in breastfeeding rates. *See* Summer S. Hawkins et al., *Breastfeeding and the Affordable Care Act*, 62 Pediatric Clinic N. Am. 1071 (2015). Education, community and family support, and access to free or reduced breastfeeding supplies can increase the rates of breastfeeding. Katherine M. Jones et al., *Racial and Ethnic Disparities in Breastfeeding*, 10 Breastfeeding Medicine 186, 193 (2015). Since the HRSA women's preventive services recommendations were implemented, the percentage of women who have ever breastfed increased from 78% to 84%. Tami Gurley-Calvez et al., *Effect of the Affordable Care Act on Breastfeeding Outcomes*, 108 Am.

J. of Public Health 277, 280 tbl.1 (2018). Women have also increased the number of months they spend breastfeeding from 5.61 to 6.51 months and the number of months they breastfeed exclusively from 3.42 months to 3.95 months. *Id.*

The HRSA-supported women's preventive services guidelines further require plans to cover contraception without cost-sharing. Contraception is a vital component of preventive health care, preventing unintended pregnancy and its attendant risks, which, due to systemic barriers, are already higher for women of color and young people, including LGBTQI+ youth.[5] The risks of unintended pregnancy include maternal mortality; Black women in the United States are between three and four times more likely to die from pregnancy-related causes than white women, and the maternal mortality ratio for Black women is now higher than in many developing countries. Black Mamas Matter All., *Black Mamas Matter Toolkit Advancing the Right to Safe and Respectful Maternal Health Care* 21 (2018). Women with unintended pregnancies are also at higher risk for maternal morbidity,

---

[5] "Women aged 18 to 24 years, unmarried women, women with low incomes, women who are not high school graduates, and women who are members of a racial or ethnic minority group" are more likely to experience unintended pregnancy. Inst. of Med., *Clinical Preventive Services for Women: Closing the Gaps* 103–04 (2011). Further, "female and male sexual-minority high-school students in New York City who had ever engaged in vaginal intercourse were at greater risk for pregnancy than their heterosexual counterparts." Intersections of Our Lives, *Reproductive Justice for Women of Colo*r 2 (2017); Lisa L. Lindley & Katrina M. Walsemann, *Sexual Orientation and Risk of Pregnancy Among New York City High-School Students*, 105 Am. J. Pub. Health 1379, 1383 (2015).

maternal depression, and physical violence during pregnancy. Inst. of Med., *supra*, at 103. Pregnancy can also dangerously exacerbate pre-existing health conditions, like diabetes and gender dysphoria. *See* Ctrs. For Disease Control & Prevention, *Diabetes and Pregnancy*, https://bit.ly/3ph43O8 (last updated July 14, 2022); Maggi LeDuc, *How Birth Control Can Help with Gender Dysphoria*, Power to Decide (Aug. 10, 2020), https://bit.ly/46sIlY1.

Further, while most women aged 18-44 use contraception to prevent pregnancy (59%), many also use it to manage medical conditions (22%). Caroline Rosenzweig et al., *Women's Sexual and Reproductive Health Services: Key Findings from the 2017 Kaiser Women's Health Survey* 1, 3 (2018), https://bit.ly/341zw7Z. It treats menstrual disorders and helps protect against pelvic inflammatory disease, among other conditions. Inst. of Med., *supra*, at 107. It also reduces the overall risk of cancer and specifically reduces the risk of ovarian cancer. *Id.* at 107. Reinstating barriers to contraception will aggravate medical conditions and undermine necessary health benefits, particularly among Black women, who experience systemic barriers to care and have a higher prevalence of conditions that can be complicated by pregnancy.[6]

---

[6] Women—particularly Black women—are still far more likely to be harassed by a provider and have reported that doctors failed to inform them of the full range of reproductive health options regarding labor or delivery. NPR & Harv. T.H. Chan Sch. Pub. Health, *Discrimination in America: Experiences and Views of American*

While reinstating cost barriers to contraception may not prevent people from obtaining *a* method of contraception, it will greatly influence their choice of contraceptive method and lead to women using less effective methods or methods that are not compatible with their needs. For example, before the ACA, high out-of-pocket costs prevented many women, particularly women of color, from accessing and obtaining the contraceptive method of their choice. Inst. Of Med., *supra*, at 125. This made it harder for them to control their reproductive and sexual health and, by extension, many other aspects of their lives.

Eliminating cost-sharing for contraception was meant to remedy the cost barrier that kept people from using contraception at all or from using less desired methods, and indeed it has. The women's preventive services requirement for contraceptive coverage without cost-sharing has resulted in greatly improved access to contraception and its preventive benefits. One survey found that since implementation of the ACA's contraceptive coverage requirement, nearly two-thirds of OBGYNs (63%) reported an increase in contraceptive use by their patients and 69% reported an increase in their patients' use of their desired contraceptive method.

---

*Women* 15 (2017), https://bit.ly/3p4EKPn*;* In Our Own Voice, *The State of Black Women & Reproductive Justice* 52 (2017), https://bit.ly/3CGNQok. Black women experience higher rates of preeclampsia and eclampsia than white women and are more likely to die from this complication. Marian F. MacDorman et al., *Racial and Ethnic Disparities in Maternal Mortality in the United States Using Enhanced Vital Records, 2016–2017*, 111 Am. J. Pub. Health 1673, 1676–77 (2021).

Emma Anderson, *Survey: OBGYNs Report That the Affordable Care Act Has Increased Use of Contraceptives Among Patients but the Cost of Reproductive Health Care Still a Burden for Their Low-Income Patients*, Kaiser Fam. Found. (Feb. 25, 2021), https://bit.ly/3S07wgb. The ACA is also credited with an increased use of long-acting reversible contraceptive methods, which are the most effective but have high upfront costs without insurance coverage. *See* Nora V. Becker et al., *ACA Mandate Led to Substantial Increase in Contraceptive Use Among Women Enrolled in High-Deductible Health Plans*, 40 Health Affs. 579, 584 (2021) (finding 35% increase in long-acting reversible contraceptive initiation after implementation of the ACA among women with high deductible plans).

The ACA's women's preventive services requirement was designed precisely to remedy long-standing insurance practices that ignored women's needs and to facilitate access to preventive services, thereby reducing health disparities and preventing the development or worsening of conditions that can be addressed with early, consistent, and proper care. By reimposing cost barriers for women's preventive services, the relief requested by Cross-Appellants, if fully granted, would jeopardize the health of millions of women receiving preventive care services without cost-sharing.

**C. Reimposing costs on women's preventive services will exacerbate health disparities.**

Preventive care is key to achieving health equity. Rates of preventable disease are higher among women of color, low-income women, and LGBTQI+ individuals. Nat'l Acads. of Scis., Eng'g, & Med., *Communities in Action: Pathways to Health Equity* 59 (James N. Weinstein et al. eds., 2017). These health disparities arise from various social determinants of health, including "socioeconomic status, education, immigration status, neighborhood and physical environment, employment, social support networks, and access to health care," Latoya Hill et al., *Key Data on Health and Health Care by Race and Ethnicity*, Kaiser Fam. Found. (Mar. 15, 2023), https://bit.ly/3PW0o2J, and are fueled by decades-long inequities, structural racism, and bias in the health care system. Access to preventive care without cost-sharing can help reduce these disparities by incentivizing early screenings and treatment plans.

Indeed, data show that there have been larger increases in preventive services uptake among women of color compared to white women since the ACA's passage, Kenneth E. Thorpe, *Racial Trends in Clinical Preventive Services Use, Chronic Disease Prevalence, and Lack of Insurance Before and After the Affordable Care Ac*t, 28 Am. J. of Managed Care 126, 131 (2022), and racial and ethnic health disparities have narrowed due to the ACA's requirement to provide preventive care without cost-sharing, H. Comm. on Educ. & Lab, *supra*, at 5. For

example, among Hispanic and Black women, rates of hypertension and coronary heart disease lowered, and mental health improved. Thorpe, *supra*, at 130.

Concerns about health equity are especially pertinent to Medicaid expansion beneficiaries who currently receive HRSA-supported women's preventive services and whose health and economic security is threatened by Cross-Appellant's challenge. In states that have expanded Medicaid, the ACA has secured coverage of preventive care without cost-sharing for over twenty million adults. U.S. Dep't of Health & Hum. Servs., *supra*, at 6. The Medicaid expansion population includes many low-income women, disabled women, women of color, and LGBTQI+ individuals. Ivette Gomez et al., *Medicaid Coverage for Women*, Kaiser Fam. Found. (Feb. 17, 2022), https://bit.ly/3RLYzXt (women); Madeline Guth et al., *Medicaid and Racial Health Equity*, Kaiser Fam. Found. (June 2, 2023), https://bit.ly/3RPqyW6 (people of color); Kellan Baker et al., *The Medicaid Program and LGBT Communities: Overview and Policy Recommendations*, Ctr. for Am. Progress (Aug. 9, 2016), https://ampr.gs/3ZIuYjB (LGBTQI+ individuals). These individuals are particularly vulnerable to cost barriers to care, and to health disparities.

Health disparities continue to exist in the Medicaid program for enrollees of color, including among the conditions the HRSA-supported women's preventive services requirement was designed to address. For example, Black women enrolled

in Medicaid are 79% more likely to experience severe maternal morbidity and mortality than their white counterparts, and Medicaid enrollees who identify as Asian American, Black, or Hispanic were less likely to receive a cervical cancer screening test in the last three years. Medicaid & CHIP Access Comm'n, *Report to Congress on Medicaid and CHIP* 139 (2022), https://bit.ly/3tqgpFy. These health disparities will not go away without a variety of intentional strategies, including access to women's preventive services without cost-sharing. And this must remain a requirement; in traditional Medicaid states, where state Medicaid agencies are encouraged—but not required—to provide coverage without cost-sharing, only half of the states covered all USPSTF services. U.S. Dep't of Health & Hum. Servs., *supra*, at 6.

The HRSA-supported women's preventive services requirement was designed to—and has made great strides in—promoting health equity. This Court must dismiss Cross-Appellant's challenge or risk changing course and exacerbating health disparities.

### D. Reimposing costs on women's preventive care threatens the economic prosperity of individuals, their families, and society at large.

There are grave economic consequences when individuals cannot utilize preventive care. Covered preventive care prevents serious and chronic diseases, including cancer, diabetes, heart disease, sexually transmitted infections, HIV, mental health conditions, and substance use disorder. *See* U.S. Preventive Servs.

Task Force, *A & B Recommendations*, https://bit.ly/45qnxyF (last visited Oct. 6, 2023). These diseases are a significant burden on individuals, families, and society.

The economic burden of chronic disease can be devastating for individuals and their families. The cost of treating chronic diseases creates long-term economic harm in the form of medical bills from treatment and medication and loss of income. Hugh Waters & Marlon Graf, Milken Inst., *The Costs of Chronic Disease in the U.S.* 9–10 (2018). For example, when accounting for treatment and lost wages, cancer costs a person over $30,000 per year and diabetes over $20,000 per year. Susan Silberman., *Cost of Chronic Disease: Why It Matters for Older Adults*, Nat'l Council on Aging (Apr. 21, 2022), https://bit.ly/3PIkV9T. The economic burden of chronic diseases is highest among women, people of color, and low-income people. *Id.*

The economic burden extends to family members as well. One study of the impact of patients' chronic diseases on family quality of life found that the majority of family members said the financial impact of disease on their family was great, and a majority also reported their own work or study was affected because they "had to take time off work to look after the patient or attend their medical appointments." Catherine J. Golics et al., *The Impact of Patient's Chronic Disease on Family Quality of Life: An Experience from 26 Specialties*, 6 Int'l J. of General Med. 787, 794 (2013). In 9% of cases, the family member gave up their job completely. *Id.* at 794.

The harm reaches beyond the individual or family unit. According to the CDC, 90% of all health care expenditures are for people with chronic and mental health conditions. Ctrs. for Disease Control & Prevention, *Health and Economic Costs of Chronic Diseases*, https://bit.ly/3thWkBb (last updated Mar. 23, 2023). The total costs for treating chronic conditions in 2016 totaled $1.1 trillion. Waters & Graf, *supra*, at 1. Adding in the indirect costs of lost economic productivity, the total costs increase to $3.7 trillion, or nearly one-fifth of the U.S. economy. *Id.*

On the other hand, studies have shown that healthier populations contribute to a stronger local economy. *See* Moody's Analytics, *Healthy People, Healthy Economies*, 3 chart2 (2016) (finding positive correlation between community health indices and GDP per capita growth, employment growth, and pay growth); Moody's Analytics, *The Economic Consequences of Millennial Health* 7 (2019) ("[T]here is a strong correlation between overall health and several important economic measures, . . . some of the areas that may see the largest economic drag from lower millennial health are areas with already below average economic outcomes."). This is largely because healthier people have higher rates of workforce participation, tend to be more productive, and earn more. Moody's Analytics, *Healthy People, Healthy Economies*, *supra*, at 2.

Removing the ACA's requirement to provide women's preventive care without cost-sharing would place the economic security of millions of women and

their families at risk and burden society with additional costs. This Court must reject Cross-Appellants' challenge to coverage of women's preventive care without cost-sharing.

## CONCLUSION

Appellees/Cross-Appellants' efforts to reverse the District Court's decision to uphold HRSA-supported women's preventive services recommendations would cause substantial harm to women nationwide and particularly to those facing multiple and intersecting forms of discrimination. Accordingly, the Court should uphold the District Court's decision regarding § 300gg-13(a)(4).

October 6, 2023                                    Respectfully submitted,

                                                   */s/ Alison Tanner*
                                                   Alison Tanner
                                                       *Counsel of Record*
                                                   Dorianne Mason
                                                   Mara Gandal-Powers
                                                   Michelle Banker
                                                   K.M. Bell
                                                   NATIONAL WOMEN'S LAW CENTER*
                                                   1350 I Street NW, Suite 700
                                                   Washington, DC 20005
                                                   (202) 238-3311
                                                   atanner@nwlc.org
                                                   *Counsel for Amicus Curiae*
                                                   *National Women's Law Center*

* Gabrielle Feliciani, a 2023 law-school graduate who is awaiting admission to the bar, substantially contributed to the preparation of this brief.

25

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed this Brief of *Amicus Curiae* with the Clerk of the Court for the U.S. Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on October 6, 2023. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Alison Tanner*
Alison Tanner

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 29(b)(4) because it contains 5,507 words, including footnotes and excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface and typestyle requirements of Rule 32(a) and Fifth Circuit Rule 32.1 because it has been prepared using Microsoft Office Word and is set in 14-point Times New Roman font.

October 6, 2023

*/s/ Alison Tanner*
Alison Tanner