# United States Court of Appeals for the Fifth Circuit

---

No. 23-10326

---

United States Court of Appeals
Fifth Circuit

**FILED**

June 21, 2024

Lyle W. Cayce
Clerk

BRAIDWOOD MANAGEMENT, INCORPORATED; JOHN SCOTT
KELLEY; KELLEY ORTHODONTICS; ASHLEY MAXWELL; ZACH
MAXWELL; JOEL STARNES,

*Plaintiffs—Appellees/Cross-Appellants*,

JOEL MILLER; GREGORY SCHEIDEMAN,

*Plaintiffs—Cross-Appellants*,

*versus*

XAVIER BECERRA, *Secretary, U.S. Department of Health and Human Services, in his official capacity as Secretary of Health and Human Services*; UNITED STATES OF AMERICA; JANET YELLEN, *Secretary, U.S. Department of Treasury, in her official capacity as Secretary of the Treasury*; JULIE A. SU, *Acting Secretary, U.S. Department of Labor, in her official capacity as Secretary of Labor*,

*Defendants—Appellants/Cross-Appellees*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:20-CV-283

---

Before WILLETT, WILSON, and RAMIREZ, *Circuit Judges*.

DON R. WILLETT, *Circuit Judge*:

No. 23-10326

The Affordable Care Act requires private insurers to cover certain kinds of "preventive care," including contraception, HPV vaccines, and drugs preventing the transmission of HIV. The plaintiffs are a group of individuals and businesses who have religious objections to these preventive-care mandates and challenged them on multiple grounds. They contend, among other things, that the preventive-care mandates are unlawful because the agencies that issued them violate Article II of the Constitution, insofar as their members are principal officers of the United States who have not been validly appointed under the Appointments Clause. In a series of summary-judgment rulings, the district court mostly agreed, vacating all agency actions taken to enforce the mandates under the Administrative Procedure Act and issuing both party-specific and universal injunctive relief.

Our decision today is something of a mixed bag. With respect to one of the challenged administrative bodies, the United States Preventive Services Task Force, we agree that the unreviewable power it wields—the power to issue preventive-care recommendations that insurers must cover by law—renders its members principal officers of the United States who have not been validly appointed under Article II of the United States Constitution. And because Xavier Becerra, in his capacity as the Secretary of the Department of Health and Human Services, has not validly cured the Task Force's constitutional problems, the district court properly enjoined the defendants from enforcing the preventive-care mandates to the extent they came at the recommendation of the Task Force. We think it was error, however, for the district court to have also vacated all agency actions taken to enforce the preventive-care mandates and to universally enjoin the defendants from enforcing them.

With respect to the plaintiffs' cross-appeal and their Appointments Clause challenges against the other two administrative bodies at issue in this case, the Advisory Committee on Immunization Practices and the Health

No. 23-10326

Resources and Services Administration, we agree with the Government that Secretary Becerra has the authority to ratify their recommendations and guidelines, but we reserve judgment on whether he has effectively done so. The district court had no opportunity to consider the plaintiffs' arguments that the Secretary's ratification memo suffers from multiple defects under the Administrative Procedure Act, and we decline to consider these arguments in the first instance.

Accordingly, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings consistent with this opinion.

I

A

In 2010, Congress passed, and President Obama signed into law, the Patient Protection and Affordable Care Act (ACA).[1] As part of its stated goal of broadening health insurance coverage, the ACA requires private insurers to cover certain preventive-care services without "cost sharing"—that is, without requiring the insured to pay deductibles, copayments, or other out-of-pocket expenses.[2] The ACA does not define "preventive care," nor does it provide a list or examples of which preventive-care services must be covered.[3] Instead, it empowers three agencies, all affiliated with the

---

[1] Pub. L. No. 111-148, 124 Stat. 119 (2010).

[2] 42 U.S.C. § 300gg-13(a) ("A group health plan and a health insurance issuer offering group or individual health insurance shall, at a minimum provide coverage for and shall not impose any cost sharing requirements for" four different categories of preventive care).

[3] *See generally id.*; *see also Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 664 (2020) ("The statute itself does not define 'preventive care and screenings,' nor does it include an exhaustive or illustrative list of such services. Thus, the statute does not explicitly require coverage for any specific form of 'preventive care.'").

No. 23-10326

Department of Health and Human Services (HHS), to determine what services are required under four different categories of care.

The first and most important category of mandated coverage for purposes of this appeal includes "evidence-based items or services that have in effect a rating of 'A' or 'B' in the current recommendations of the United States Preventive Services Task Force."[4] The Task Force is a body of sixteen volunteers "with appropriate expertise"[5] who serve four-year terms and "periodically convene" to make recommendations on covered preventive-care services.[6] Members of the Task Force are "convened" by the Director of the Agency for Healthcare Research and Quality[7] (a subagency within the Public Health Service, which in turn is a subagency within HHS). There is, however, no removal restriction on Task Force members before the expiration of their terms. The ACA instead provides that "[a]ll members of the Task Force . . . and any recommendations made by such members, shall be independent and, to the extent practicable, not subject to political pressure."[8]

The second category of mandated coverage includes "immunizations that have in effect a recommendation from the Advisory Committee on Immunization Practices of the Centers for Disease Control and Prevention

---

[4] *Id.* § 300gg-13(a)(1).

[5] 42 U.S.C. § 299b-4(a)(1).

[6] Act of Dec. 6, 1999, Pub. L. No. 106–129, 113 Stat. 1659, § 915(a)(1). The district court found that, in practice, Task Force members' work entailed meeting "three times a year for two days in Washington, D.C. (paid for by taxpayers)," "frequent" emailing, "multiple conference calls each month," and "interaction with stakeholders." In all, "members devote approximately 200 hours a year outside of in-person meetings."

[7] 42 U.S.C. § 299b-4(a)(1).

[8] *Id.* § 299b-4(a)(6).

with respect to the individual involved."[9] The Advisory Committee on Immunization Practices, or ACIP, is part of the Public Health Service and is thus "administered by the Assistant Secretary for Health under the supervision and direction of the [HHS] Secretary."[10] According to its charter, ACIP consists of fifteen members who serve four-year terms and are selected by the HHS Secretary. ACIP is also one of several advisory committees that report to the CDC Director, who in turn exercises authority delegated to him by the HHS Secretary.[11]

The third and fourth categories of mandated coverage include "evidence-informed preventive care and screenings provided for in the comprehensive guidelines supported by the Health Resources and Services Administration [HRSA]" for infants, children, and adolescents,[12] and "such additional preventive care and screenings" for women not already provided for by the Task Force.[13] Like ACIP, HRSA is part of the Public Health Service and is "administered by the Assistant Secretary for Health under the supervision and direction of the [HHS] Secretary,"[14] but it does not consist of "members," so to speak. Rather, it consists of offices and bureaus that report to the Office of the Administrator, who in turn reports to the HHS Secretary.[15]

---

[9] *Id.* § 300gg-13(a)(2).

[10] *Id.* § 202.

[11] *See* 80 Stat. 1610, Reorganization Plan No. 3 of 1966, § 1; *see also* 42 U.S.C. §§ 243, 247b.

[12] 42 U.S.C. § 300gg-13(a)(3).

[13] *Id.* § 300gg-13(a)(4).

[14] *Id.* § 202.

[15] *See id.*

Together, the Task Force, ACIP, and HRSA issue recommendations and guidelines for preventive-care services that most private insurers must cover by law.[16] These recommendations span a number of different healthcare services, ranging from cancer-detection procedures to physical therapy for older adults. The many amici in this case attest to the breadth and importance of these preventive-care services.

This is not to say, however, that all have gone without objection. As relevant here, in 2007, ACIP recommended the HPV vaccine for females ages eleven to twelve. Several years later, in 2011, HRSA issued guidelines recommending "contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."[17] And most recently, in 2019, the Task Force issued an "A" recommendation for pre-exposure prophylaxis drugs (what the parties refer to as "PrEP" drugs), which prevent the transmission of HIV.

## B

The plaintiffs in this case, four individuals and two businesses, take issue with the specific recommendations detailed above. The individual plaintiffs are Texas residents who provide health insurance coverage for themselves and their families, and the businesses are Christian-based for-profit companies that provide health insurance for their employees.[18]

---

[16] *Id.* § 300gg-13(a).

[17] Some of these guidelines, codified in various parts of the Code of Federal Regulations, became known as the "contraceptive mandate." *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 692 (2014).

[18] The district court found that four of the ten plaintiffs who objected to the preventive-care mandates for purely economic reasons—namely, Donovan Riddle, Karla Riddle, Joel Miller, and Gregory Scheideman—did not have standing. Although these plaintiffs are listed as cross-appellants in this appeal, they present no argument on appeal that the district court erred in its standing analysis. We will thus leave the district court's

No. 23-10326

Collectively, they object to the preventive-care mandates on religious grounds and specifically allege that compulsory coverage of these services requires them to violate their religious beliefs "by making them complicit in facilitating homosexual behavior, drug use, and sexual activity outside of marriage between one man and one woman." For those reasons, the plaintiffs all wish "to obtain or provide health insurance that excludes or limits coverage currently required by the preventive-care mandates."

To that end, they filed suit in the summer of 2020 and named as defendants the federal government and the Secretaries of the Department of Health and Human Services, the Department of the Treasury, and the Department of Labor in their official capacities.[19] Their operative complaint contains five claims, only one of which is now relevant on appeal. They contend that the structures of the Task Force, ACIP, and HRSA all violate the Appointments Clause of the U.S. Constitution, insofar as the members of each are acting as principal officers of the United States who have not been nominated by the President and confirmed by the Senate.[20] In their prayer

---

judgment in this respect undisturbed. *See Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 542 (5th Cir. 2019) ("Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived.").

[19] Some of the plaintiffs in this case had initially filed suit several years ago in what they say was a "response" to the nationwide injunction issued in *Pennsylvania v. Trump*, 351 F. Supp. 3d 791 (E.D. Penn. 2019). In that prior litigation, also in the Northern District of Texas, the plaintiffs obtained a permanent injunction prohibiting federal officials from enforcing the contraceptive mandate, thus essentially putting back in place the conscience-based exemptions issued during the Trump administration. *See DeOtte v. Azar*, 393 F. Supp. 3d 490, 514–15 (N.D. Tex. 2019). A panel of this court, however, later vacated that injunction as moot in light of *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020). *See DeOtte v. Nevada*, 20 F.4th 1055, 1060 (5th Cir. 2021).

[20] *See* U.S. Const. art. II, § 2, cl. 2.

for relief, the plaintiffs sought an injunction prohibiting the Government from enforcing the preventive-care mandates against them.

In its second of three summary-judgment rulings,[21] the district court rejected the plaintiffs' Appointments Clause challenges against ACIP and HRSA but granted the motion with respect to the Task Force. In light of the latter ruling, the district court instructed the parties to file supplemental briefing on, among other things, the scope of relief that should be given with respect to the Task Force's recommendations. The parties obliged, and in its third and final summary-judgment order, the district court concluded that the plaintiffs were entitled to a universal injunction and vacatur under § 706 of the Administrative Procedure Act (APA). The district court specifically vacated all agency action taken to enforce the preventive-care mandates in response to the Task Force's recommendations and enjoined the Government from enforcing the preventive-care mandates against anyone.[22]

---

[21] In its first, the district court ruled that, (1) in light of *DeOtte*, the plaintiffs' challenge to the contraceptive mandate was barred by *res judicata*, and (2) the plaintiffs' suggested construction of § 300gg-13(a) under the canon of constitutional avoidance—that it be read to encompass only those recommendations in effect at the time of the ACA's enactment—was unsupportable by the statute's plain text.

[22] In addition to the universal remedies, the district court also provided party-specific relief, declaring that some of the plaintiffs "need not comply with the preventive care coverage recommendations of [the Task Force] issued on or after March 23, 2010, because the members of the Task Force have not been appointed in a manner consistent with Article II's Appointments Clause." For good measure, the district court also enjoined the Government defendants "from implementing or enforcing the [recommendations] against" these plaintiffs.

No. 23-10326

## C

The parties timely cross-appealed. The plaintiffs maintain that the structure of both ACIP and HRSA violate the Appointments Clause,[23] while the Government continues to defend the constitutionality of the Task Force and its recommendations.[24] The Government, moreover, sought a partial stay of the district court's judgment pending appeal. A separate panel of this court carried the motion and administratively stayed the district court's ruling to the extent it vacated and enjoined all agency actions taken to enforce the Task Force's recommendations.

After briefing and oral argument on the motion, the parties filed a joint stipulation agreeing to a partial stay. The plaintiffs specifically acknowledged that the district court's injunction was incapable of immunizing them from statutory penalties in the event the district court's judgment was later vacated or reversed,[25] so they agreed to withdraw their opposition to the

---

[23] The plaintiffs also continue to press on appeal their argument that 42 U.S.C. § 300gg-13(a)(1)–(4) lacks an intelligible principle and therefore violates the non-delegation doctrine. They acknowledge, however, that their argument is foreclosed by our decision in *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436 (5th Cir. 2020).

[24] Notably, the Government does not contest the district court's determination that at least six of the plaintiffs have Article III standing. Standing, of course, implicates our subject-matter jurisdiction, so we cannot assume that the plaintiffs have it merely because the Government does not argue otherwise. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999). Based on an independent review of the record and the plaintiffs' allegations, we are satisfied that they have alleged an injury in fact that is traceable to the defendants' conduct and redressable by a favorable judicial decision. *See Allen v. Wright*, 468 U.S. 737, 751 (1984).

[25] We take no position on whether the plaintiffs' position on this point is in fact correct. It appears to be an open question and one that we have no reason to answer today. *Compare Edgar v. MITE Corp.*, 457 U.S. 624, 648–49 (1982) (Stevens, J., concurring in part and concurring in the judgment) ("Neither the terms of the preliminary injunction nor prior equity practice provides any support for an interpretation of the District Court's order as a grant of total immunity from future prosecution."), *with id.* at 656 (Marshall,

No. 23-10326

motion in exchange for the Government's promise not to take any enforcement action against them for their refusal to cover the mandated preventive care between the date of the stipulation and the issuance of the mandate in this appeal. Part of the district court's judgment thus remains stayed before this court, and we now review its legal rulings de novo.[26]

## II

The primary point of contention between the parties, and the subject of much of the district court's thorough analysis, is the constitutionality of the Task Force. The Government argued below that Task Force members were merely "private citizens" and did not qualify as officers under Article II. It has now abandoned that argument on appeal and concedes that Task Force members are indeed officers who, by dint of their power to issue legally binding recommendations on preventive care, exercise "significant authority pursuant to the laws of the United States."[27] The parties now dispute only whether Task Force members are "principal" or "inferior" officers and, depending on which, whether Secretary Becerra has effectively cured the constitutional problems that inhere in their recommendations.

---

J., dissenting) (concluding that a federal court has "the power to issue a preliminary injunction that offers permanent protection from penalties for violations of the statute that occurred during the period the injunction was in effect."). This issue also seems to be contested in the academic literature as well. *Compare* Douglas Laycock, *Federal Interference with State Prosecutions: The Need for Prospective Relief*, 1977 Sup. Ct. Rev. 193, 209 (1977) ("If the final judgment holds the statute valid, dissolves the interlocutory injunction, and denies permanent relief, state officials would be free to prosecute any violation within the limitations period."), *with* Michael T. Morley, *Erroneous Injunctions*, 71 Emory L. J. 1137, 1183 (2022) ("To achieve its goal of preventing irreparable harm to a plaintiff's rights, a court must have authority to bar enforcement of a legal provision for actions the plaintiff performs while an injunction is in effect, even if that injunction is later reversed or vacated.").

[26] *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 208 (5th Cir. 2011).

[27] *Buckley v. Valeo*, 424 U.S. 1, 126 (1976).

No. 23-10326

A

We begin with the major premise of the plaintiffs' Appointments Clause challenge: that the sixteen members of the Task Force are "principal officers" of the United States who must be nominated by the President and confirmed by the Senate.

Article II, section 2, clause 2 of the Constitution, more familiarly known as the Appointments Clause, empowers the President to "nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law."[28] The Appointments Clause also empowers Congress to "vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."[29] The Appointments Clause thus establishes two tiers of officers—principal and inferior—and provides different appointment processes for each. Principal officers must be appointed by the President and confirmed by the Senate, whereas the appointment of inferior officers may, by law, be vested in the President, judiciary, or department heads.[30]

The process for appointing officers of the United States, as outlined above, was by no means preordained. Perhaps owing to their experience under the English Crown and its unilateral appointments of royal governors, as well as the unsatisfactory solution provided by some early state constitutions to vest the appointment power exclusively with the legislature,

---

[28] U.S. Const. art. II, § 2, cl. 2.

[29] *Id.*

[30] *Buckley*, 424 U.S. at 132 ("Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary.").

the Framers fiercely debated the niceties of the appointments process.[31] "The framers came to Philadelphia mindful of the colonial legacy of monarchical appointment abuses," one scholar recounts, "yet equally fearful of legislative tyranny."[32] Understandably hesitant about concentrating the appointment power in either the President or Congress, the Framers "did what they did best—they compromised."[33] Hence the interbranch approach we have today.

"[T]he debate on the Appointments Clause was," to be sure, "brief," and the record we have on it from the convention is, alas, "sparse."[34] Sparser still is the record on the Founding generation's understanding of what, exactly, distinguished principal officers from inferior ones.[35] In their limited debates on the Appointments Clause, the Framers were "primarily concerned with whether Congress or the President would have the power *to appoint*, rather than *whom* they would appoint."[36] Justice Story, in his Commentaries on the Constitution, would later lament that the Framers

---

[31] *See Freytag v. Comm'r*, 501 U.S. 868, 883 (1991) ("The manipulation of official appointments had long been one of the American revolutionary generation's greatest grievances against executive power because the power of appointment to offices was deemed the most insidious and powerful weapon of eighteenth-century despotism." (internal quotations and citations omitted)).

[32] Theodore Y. Blumhoff, *Separation of Powers and the Origins of the Appointment Clause*, 37 Syracuse L. Rev. 1037, 1069 (1987).

[33] *Id.* at 1070.

[34] *Freytag*, 501 U.S. at 883.

[35] There has, however, been helpful and in-depth research on the original meaning of the phrase "Officers of the United States." *See, e.g.*, Jennifer L. Mascott, *Who Are "Officers of the United States"?*, 70 Stan. L. Rev. 443 (2018).

[36] Edward Susolik, Note, *Separation of Powers and Liberty: The Appointments Clause*, Morrison v. Olson, *and the Rule of Law*, 63 S. Cal. L. Rev. 1515, 1544 (1990) (emphasis added).

No. 23-10326

failed to distinguish between "who are and who are not to be deemed *inferior* officers."[37]

Unfortunately, the knowledge gap has not improved with time. In one of its first modern[38] Appointments Clause cases, *Morrison v. Olson*,[39] the Supreme Court echoed Justice Story's lamentation. "The line between 'inferior' and 'principal' officers is one that is far from clear," the Court observed, "and the Framers provided little guidance into where it should be drawn."[40] Unsurprisingly, then, in determining the status of the independent counsel in that case, the *Morrison* Court declined "to decide exactly where the line falls between the two types of officers."[41] Nevertheless, over a solo yet enduring dissent from Justice Scalia, the Court attempted to provide "[s]everal factors" guiding its decision, asking whether the officer (1) is

---

[37] 1 Joseph Story, Commentaries on the Constitution of the United States 397 (3d ed. 1858).

[38] Like the ratification history, early cases interpreting the Appointments Clause's distinction between principal and inferior officers are also of limited utility. "In fact," one court has commented, "the earliest Appointments Clause cases often employed circular logic, granting officer status to an official based in part upon his appointment by the head of a department." *Landry v. FDIC*, 204 F.3d 1125, 1132–33 (D.C. Cir. 2000) (citing, *e.g.*, *United States v. Mouat*, 124 U.S. 303, 307 (1888)). The reasoning resonating from most Appointments Clause cases from the nineteenth and twentieth centuries can generally be characterized as a mixture of deference and pragmatism, looking to what Congress had done and the function of the office being evaluated. *See, e.g.*, *Ex parte Hennen*, 38 U.S. (13 Pet.) 230, 258 (1839); *United States v. Germaine*, 99 U.S. 508, 510 (1878); *United States v. Eaton*, 169 U.S. 331, 336 (1898); *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 352 (1931). Justice Scalia, for his part, called some these cases "sketchy precedent." *Morrison v. Olson*, 487 U.S. 654, 721 (1988) (Scalia, J., dissenting).

[39] 487 U.S. 654 (1988).

[40] *Id.* at 671 (citing 2 Story, *supra* note 37, § 1536, at 397–98).

[41] *Id.*

removable by a higher official, (2) has only certain, limited duties, (3) has limited jurisdiction, and (4) has limited tenure.[42]

The functional "balancing test"[43] employed in *Morrison*, however, would not survive long. Writing for a nearly unanimous Court in *Edmond v. United States*[44] a decade later, and borrowing from his dissent in *Morrison*, Justice Scalia placed greater if not sole emphasis on subordination and supervisory responsibility. "Generally speaking," he wrote for the Court, "the term 'inferior officer' connotes a relationship with some higher ranking officer or officers below the President."[45] So "we think it evident," he continued, "that 'inferior officers' are officers whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate."[46]

The Court has twice since "reaffirm[ed] and appl[ied] the rule from *Edmond* that the exercise of executive power by inferior officers must at some level be subject to the direction and supervision of an officer nominated by the President and confirmed by the Senate."[47] First, in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, the Court held that, without statutory removal restrictions, members of the Accounting Oversight Board were inferior officers because the Securities and Exchange Commission could "remove Board members at will" and exercise "other oversight authority" over the Board, like approve its issuance of rules and sanctions.[48]

---

[42] *Id.* at 671–72.

[43] *Id.* at 711 (Scalia, J., dissenting).

[44] 520 U.S. 651 (1997).

[45] *Id.* at 662.

[46] *Id.* at 663.

[47] *United States v. Arthrex, Inc.*, 594 U.S. 1, 27 (2021).

[48] *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 510 (2010).

No. 23-10326

Then, in *United States v. Arthrex*, the Court held that members of the Patent Trial and Appeal Board were, effectively, principal officers because they had the "power to render a final decision on behalf of the United States" on the validity of existing patents without any "review by a superior executive officer."[49]

The general import of these Appointments Clause cases and others is that inferiority entails being controlled and supervised by a superior. At a high level, then, the inquiry can be a bit circular.[50] Yet there are some discernable hallmarks of inferiority from the precedent, perhaps the most important of which is an officer's removability.[51] As the plaintiffs acknowledge in their brief on cross-appeal, "at-will removal is the *sine qua non* of a dependent relationship." Indeed, removing an officer at will is, as the Court in *Edmond* put it, "a powerful tool for control."[52]

And on that score, we agree with the Government that the HHS Secretary may remove members of the Task Force at will. At-will removal is

---

[49] *Arthrex*, 594 U.S. at 14 (quoting *Edmond*, 520 U.S. 651 at 655). We use the word "effectively" because we recognize that there was a disagreement between the majority and one of the dissents as to whether the majority had in fact held that PTAB members were principal officers. *Compare id.* at 23 ("The principal dissent repeatedly charges that we never say whether APJs are principal officers who were not appointed in the manner required by the Appointments Clause . . . ."), *with id.* at 46 (THOMAS, J., dissenting) ("Although [the majority] cannot quite bring itself to say so expressly, it too appears to hold that administrative patent judges are principal officers under the current statutory scheme.").

[50] *Compare Principal Officer*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An officer with the most authority of the officers being considered for some purpose."), *with Inferior Officer*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("An officer who is subordinate to another officer.").

[51] *See Seila L. LLC v. CFPB*, 140 S. Ct. 2183, 2191–92 (2020) ("The President's power to remove—and thus supervise—those who wield executive power on his behalf follows from the text of Article II . . . .").

[52] *Edmond*, 520 U.S. at 664.

the background rule unless Congress clearly and expressly says otherwise,[53] and neither we nor the plaintiffs can identify anything in the ACA or elsewhere that displaces that background rule. Granted, the plaintiffs are quick to point out that 42 U.S.C. § 299b-4(a)(6) requires Task Force members to "be independent and, to the extent practicable, not subject to political pressure." And we agree that, on its face, this particular provision provides a level of protection to the Task Force members and their work. But we cannot go as far as to say that it is a clear and express restriction on their removal. The provision does not resemble other provisions that more plainly restrict removal,[54] and if there were any doubt about the meaning of § 299b-4(a)(6), we are not predisposed to resolve it in the plaintiffs' favor. We generally construe statutes in a way that avoids, rather than invites, constitutional infirmity.[55] So we agree with the Government that, whatever

---

[53] *See Collins v. Yellen*, 141 S. Ct. 1761, 1782 (2021) ("When a statute does not limit the President's power to remove an agency head, we generally presume that the officer serves at the President's pleasure."); *see also Shurtleff v. United States*, 189 U.S. 311, 315 (1903) (requiring "very clear and explicit language" in the statute to establish removal limitations). The plaintiffs contend that these cases merely stand for the proposition that there must be "clear statutory language before courts will enforce limits on the *President's* removal powers," not other executive officers', like the HHS Secretary. We see no reason, however, why the presumption would be limited to the President. If anything, such an artificial limitation would further disrupt the efficiency of the executive power that Article II contemplates, *see Seila L.*, 140 S. Ct. at 2197, and we are not in the business of thinking up limitations ourselves.

[54] *E.g.*, 29 U.S.C. § 153(a) ("Any member of the [National Relations] Board may be removed by the President, upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause."); 15 U.S.C. § 2053(a) ("Any member of the Commission may be removed by the President for neglect of duty or malfeasance in office but for no other cause.").

[55] *See United States ex rel. Att'y Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909) ("[W]here a statute is susceptible to two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.").

No. 23-10326

else § 299b-4(a)(6) means, it does not inhibit the HHS Secretary from removing the Task Force members at his will.

We part ways with the Government, however, in its submission that our analysis should stop there. More specifically, we disagree that "the Secretary's at-will removal authority is," as the Government submits, "sufficient to render the Task Force members constitutionally subordinate." The case the Government cites for that proposition, *Free Enterprise Fund*, does not stand for it. To the contrary, it was the SEC's removal power, *along with* its oversight authority, that rendered members of the Accounting Oversight Board inferior officers.[56] The Supreme Court's decisions in *Edmond* and *Arthrex* likewise demonstrate that removability is not the sole criterion by which to judge inferiority.[57] Indeed, another important consideration, if not equally so, is the extent to which the Task Force's work can be supervised by a higher-ranking executive official, like Secretary Becerra.

On that front, we cannot say that any such supervision exists—as a matter of law or reality. The statutory scheme, insofar as it concerns recommendations from the Task Force, contemplates complete autonomy. Indeed, we need look no further than the statutory provision we just addressed, 42 U.S.C. § 299b-4(a)(6), which again provides that "[a]ll

---

[56] *See Free Enter. Fund*, 561 U.S. at 510 ("Given that the Commission is properly viewed, under the Constitution, as possessing the power to remove Board members at will, *and* given the Commission's oversight authority, we have no hesitation in concluding that under *Edmond* the Board members are inferior officers whose appointment Congress may permissibly vest in a 'Hea[d] of Departmen[t].'" (alterations in original) (emphasis added)).

[57] *See Edmond*, 520 U.S. at 663 ("'[I]nferior officers' are officers whose work is directed and supervised at some level by others . . . ."); *Arthrex*, 594 U.S. at 17–18 ("[I]t certainly is the norm for principal officers to have the capacity to review decisions made by inferior adjudicative officers." (internal quotations omitted)).

members of the Task Force . . . , and any recommendations made by such members, shall be independent and, to the extent practicable, not subject to political pressure." While § 299b-4(a)(6) is not a clear and express removal restriction, as we concluded above, it is a clear and express directive from Congress that the Task Force be free from any supervision. In our view, the Task Force cannot be "independent" and free from "political pressure" on the one hand, and at the same time be supervised by the HHS Secretary, a political appointee, on the other.

Invoking the constitutional-doubt canon again, the Government resists this conclusion by emphasizing the qualifying language in § 299b-4(a)(6). By its terms, the provision says that the Task Force shall be free from political pressure only "*to the extent practicable*," and this qualifier, according to the Government, signals flexibility in our ability to construe the provision in a way to make the broader scheme constitutional. The Government, in other words, urges us to read "to the extent practicable" as "to the extent *constitutional*."

We decline to do so. The first flaw with the Government's argument is a textual one. Assuming "practicable" and "constitutional" are synonymous (a doubtful semantic proposition to start), the phrase "to the extent practicable" modifies only freedom from "political pressure," not "independent."[58] So even if we thought that § 299b-4(a)(6) provided some interpretive flexibility with respect to the amount of political pressure that the HHS Secretary could place on the Task Force, the terms of the provision prevent us from using that same flexibility with respect to the Task Force's

---

[58] *See* 42 U.S.C. § 299b-4(a)(6) ("All members of the Task Force convened under this subsection, and any recommendations made by such members, shall be independent and, to the extent practicable, not subject to political pressure.").

No. 23-10326

statutorily required independence.[59] More fundamentally, though, even if we read § 299b-4(a)(6) to permit a level of review by the HHS Secretary "necessary to ensure conformity with constitutional requirements," as the Government invites us to do, it is unclear how much review that should be. If we were to read § 299b-4(a)(6) to allow the Secretary to review *all* the Task Force's recommendations, then the Task Force would have no political independence at all, contrary to the terms of the provision. And if we were to read § 299b-4(a)(6) to allow the Secretary to review only *some* of the recommendations (how many, we do not know), then that would invite an obvious line-drawing problem for which the provision provides no readily discernable solution. For understandable reasons, the Government does not offer any textually plausible way to draw the line,[60] and we decline to contort the provision in an effort to essentially guess what the constitutionally optimal amount of "political pressure" ought to be.[61]

---

[59] The Government makes the point that "independence" in this context does not necessarily mean decisionmaking without supervision, but simply "unbiased" or "dispassionate" decisionmaking. This is a creative but unpersuasive argument. The most natural reading of "independent" in § 299b-4(a)(6), given its juxtaposition to the additional requirement that the Task Force not be "subject to political pressure," is one that connotes freedom from outside control.

[60] One could read the Government's brief to suggest that we ought to draw the line between recommendations that have "A" and "B" ratings and those that do not; or, more finely, between those recommendations that have "A" and "B" ratings that specifically qualify under § 300gg-13(a)(1) and those that do not. Whichever way the Government might suggest such a line, we decline to draw it. Section 299b-4(a)(6) makes no distinction between types of recommendations, as § 300gg-13(a)(1) does, and our modest interpretive authority gives us no basis to begin picking and choosing how and when the HHS Secretary must exercise a power of review that is not otherwise contemplated by the statutory text.

[61] *See Seila L.*, 140 S. Ct. at 2211 ("Constitutional avoidance is not a license to rewrite Congress's work to say whatever the Constitution needs it to say in a given situation.").

No. 23-10326

We are also mindful that, however willing we may be to accept the Government's invitation to be "flexible," we cannot read § 299b-4(a)(6) in a way that is inconsistent with other parts of the statutory scheme. For example, under § 300gg-13(a)(1), insurers "shall" provide coverage for preventive-care services recommended by the Task Force, and under § 300gg-13(b)(1), the HHS Secretary "shall establish a minimum interval between the date on which a recommendation . . . is issued and the plan year with respect to which [the coverage requirement] is effective with respect to the service described in such recommendation or guideline." In other words, the HHS Secretary has no power over the content of the Task Force's recommendations; his authority extends to only *when* those recommendations become binding.[62] In short, the statutory scheme outlining the process by which the preventive-care recommendations are issued and made effective envisions no supervisory role for the Secretary, and that is especially clear in light of the express congressional preference that the Task Force be independent and not subject to political pressure.

Our conclusions regarding the various statutory provisions governing the respective roles of the Task Force and the HHS Secretary in issuing the preventive-care mandates are, thus far, twofold: (1) Task Force members are subject to at-will removal by the HHS Secretary; and (2) the Task Force's "recommendations" on legally mandated coverage of preventive care go unreviewed—and are unreviewable—by a higher-ranking officer. The Task Force members thus have attributes of both inferior and principal officers,

---

[62] *See* 42 U.S.C. § 300gg-13(b). The Government seems to suggest that the Secretary could fix the constitutional problem by refusing to give binding legal effect to the Task Force's recommendations under this provision. Assuming we were to embrace the Secretary's abdication of his statutory role as an ersatz solution to the broader structural problem, it is unclear to us how this proposal would change anything about the recommendations and guidelines that have already taken effect under § 300gg-13(b) and currently give rise to the plaintiffs' alleged injuries.

No. 23-10326

and we now have the uneasy but necessary task of determining how to resolve the competing considerations.

In our view, the Supreme Court's decision in *Arthrex*, as informed by *Edmond*, requires us to resolve those considerations in favor of holding that the Task Force members are principal officers. As we have already briefly recounted above, the question presented in *Arthrex* was whether members of the Patent Trial and Appeal Board, or PTAB, were constitutionally appointed officers in light of their power to give the "final word" on the validity of challenged patents.[63] The Court answered that question in the negative, holding that the appointment of PTAB members as inferior officers was inconsistent with the "nature of their responsibilities"—specifically, their "power to render a final decision on behalf of the United States" on patent claims "without any . . . review by their nominal superior or any other principal officer in the Executive Branch."[64]

The similarities between the PTAB in *Arthrex* and the Task Force in this case are close, if not dispositive, of the issue before us. Like the PTAB, the Task Force can, and does, issue legally binding decisions without any review by a higher-ranking officer. Private insurers are legally required to cover its preventive-care recommendations,[65] and there is no way for the HHS Secretary (or anyone else) to review, revise, or otherwise reject those recommendations.[66] It is no answer, as the Government argues, that the HHS Secretary can exercise indirect control over the Task Force's recommendations through his removal power, because *post hoc* removal, as in *Arthrex*, does not change the fact that there is still "no means of

---

[63] *Arthrex*, 594 U.S. at 6.

[64] *Id.* at 13–14.

[65] 42 U.S.C. § 300gg-13(a)(1).

[66] *See id.* §§ 300gg-13(b), 299b-4(a)(6).

countermanding the final decision [of the Task Force] already on the books."[67] The scheme the Supreme Court rejected in *Arthrex* thus mimics the scheme in this case in many material respects.

And yet we arguably have even more compelling reasons to be skeptical of the scheme's constitutionality here, because there was at least the prospect of Article III review of the PTAB's decisions in *Arthrex*[68] (which no one suggests we have of the Task Force's recommendations), and the unreviewable power the Task Force wields—promulgating preventive-care coverage mandated for private insurers—is indisputably significant.[69] Put simply, the Task Force exercises substantial power, and the absence of any supervision over this power "goes a long way," if not all the way, "toward resolving this dispute" about whether to classify members of the Task Force as principal officers.[70]

Accordingly, we hold that members of the Task Force are principal officers under Article II of the Constitution who must be—yet have not been—nominated by the President and confirmed by the Senate.[71]

## B

Because we have concluded that members of the Task Force are principal officers of the United States, we need not address the effect of

---

[67] *Arthrex*, 594 U.S. at 16.

[68] *See id.* at 17 ("Review outside Article II—here, an appeal to the Federal Circuit—cannot provide the necessary supervision.").

[69] *See id.* ("*Edmond* calls [for] an appraisal of how much power an officer exercises free from control by a superior" to distinguish between inferior and principal officers.). As the Government has already conceded, the Task Force exercises "significant authority pursuant to the laws of the United States." *Buckley*, 424 U.S. at 126.

[70] *Id.* at 14.

[71] U.S. CONST. art. II, § 2, cl. 2.

No. 23-10326

Secretary Becerra's affidavit, dated June 23, 2023, purporting to appoint the members as inferior officers.[72] Apart from that makeshift solution, however, the Secretary has also attempted to cure the constitutional defects in the Task Force's recommendations through ratification. The Government points us to a memo issued by Secretary Becerra dated January 21, 2022, purporting to ratify all the recommendations issued thus far by the Task Force. According to the Government, the Secretary's memo cures whatever defects afflict the Task Force's recommendations because they now have the imprimatur of a principal officer.

To our knowledge, neither we nor the Supreme Court[73] has embraced ratification as a remedy for an Appointments Clause issue. The remedial theory seems to be well established, however, in a few of our sister circuits. The D.C. Circuit, for example, has "repeatedly held that a properly appointed official's ratification of an allegedly improper official's prior action, rather than mooting [the] claim, resolves the claim on the merits by 'remedy[ing] [the] defect' (if any) from the initial appointment."[74] The Government represents that other circuits, such as the Second, Third, and Ninth, have followed suit.[75] Based on our reading of these cases, they rest on

---

[72] *See* U.S. Department of Health and Human Services, Ratification of Prior Appointment and Prospective Appointment Affidavit (2023), https://perma.cc/8TAA-7AMN.

[73] As best we can tell, the Supreme Court has alluded to the notion of ratification at least once in an Appointments Clause case. In *Edmond*, the Court mentioned in passing that the Secretary of Transportation had, in anticipation of a potential Appointments Clause problem, "issued a memorandum 'adopting'" a lower-level officer's assignments to inferior officers. 520 U.S. at 654.

[74] *Guedes v. Bur. of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 13 (D.C. Cir. 2019) (second and third alteration in original) (citation omitted).

[75] *See NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 160–63 (2d Cir. 2021); *Kajmowicz v. Whitaker*, 42 F.4th 138, 152 (3d Cir. 2022); *CFPB v. Gordon*, 819 F.3d 1179, 1191–92 (9th Cir. 2016).

basic principles of agency, to the extent that ratification can retroactively effect actual authority for the improper official's disputed action.[76]

Assuming we were to also adopt the proposition that ratification can cure an improperly appointed official's prior actions, however, we would still be unconvinced that Secretary Becerra's purported ratification of the Task Force's recommendations cures the constitutional problem in this case. That is principally because, as we have already discussed, the Secretary does not have the statutory authority to either review, revise, or issue the preventive-care recommendations himself. That fact alone is fatal to the Government's ratification theory. "[I]t is essential," the Supreme Court has held, "that the party ratifying should be able not merely to do the act ratified at the time the act was done, but also at the time the ratification was made."[77] In another one of its Appointments Clause cases, the D.C. Circuit has similarly adhered to the principle that "ratification can remedy a defect arising from the decision of an improperly appointed official . . . when . . . a properly appointed official has the power to conduct an independent evaluation of the merits and does so."[78] So even if we were to go along with the Government's ratification theory, the argument would fail on its own terms, because no agency relationship exists when the purported "principal" cannot do what his agent does. Nor, in the same vein, is an agent's relationship to his principal

---

[76] *See* Restatement (Third) of Agency § 4.02; *see also Williams v. Thrasher*, 62 F.2d 944, 946 (5th Cir. 1933).

[77] *FEC v. NRA Pol. Victory Fund*, 513 U.S. 88, 98 (1994) (quoting *Cook v. Tullis*, 85 U.S. (18 Wall.) 332, 338 (1874) (emphasis omitted)).

[78] *Wilkes-Barre Hosp. Co., LLC v. NLRB*, 857 F.3d 364, 371 (D.C. Cir. 2017) (internal quotation marks and citations omitted).

No. 23-10326

typically characterized by independence, as the Task Force's is with the HHS Secretary by statute.[79]

With respect to whether the HHS Secretary has principal-like authority over the Task Force, the Government mostly reasserts the same arguments it made on the principal-versus-inferior officer issue. For the same reasons we have already rejected those arguments, we can also reject them here. For the sake of completeness, though, we address one more, because it too is equally applicable to the Government's theory of ratification. According to the Government, Secretary Becerra can supervise the Task Force by virtue of statutory hierarchy. The Task Force, the Government explains, is convened by a subagency within the Public Health Service, which in turn "is administered by the Assistant Secretary for Health under the supervision and direction of the [HHS] Secretary."[80] Based on this structure, the Government contends, the Task Force is effectively "under the supervision and direction of the Secretary."

We are not persuaded. The inference the Government asks us to draw is a plausible one, and statutory structure is indeed a key ingredient in the interpretive enterprise.[81] But relying on § 202 to show that the HHS Secretary plays a particular role in the statutory scheme, as the Government attempts to do, can in some sense beg the question. The Assistant Secretary is charged under § 202 to "administer" the Public Health Service, and he must do so as that body is currently constituted—with its various subagencies and their own statutory schemes. The Assistant Secretary, in other words,

---

[79] *See* 42 U.S.C. § 299b-4(a)(6) ("All members of the Task Force convened under this subsection, and any recommendations made by such members, shall be independent and, to the extent practicable, not subject to political pressure.").

[80] *Id.* § 202.

[81] *See, e.g.*, *United States v. Granderson*, 511 U.S. 39, 54 (1994) (using "text, structure, and history" to determine statutory meaning).

has no authority to reconfigure a legislative design by virtue of his duty to "administer" the Public Health Service, and the HHS Secretary, by the same token, has no more authority to do so just because he "supervis[es] and direct[s]" the Assistant Secretary's administration.[82] At most, they could "convene" and support the Task Force, as those tasks have been delegated to the Director of the Agency for Healthcare Research and Quality,[83] but they cannot use the general pronouncement of § 202 to override the specific statutory provisions providing the Task Force independence and autonomy in the preventive-care process.[84]

Accordingly, we hold that Secretary Becerra's attempt to cure the constitutional defect in the Task Force's recommendations through ratification, as memorialized in his memo of January 21, 2022, is ineffective.

## C

Recognizing the constitutional problems that inhere in the Task Force's statutorily required independence and distance from political pressure, the Government asks that we "sever the limitations on secretarial oversight in 42 U.S.C. § 299b-4(a)(6)." By this request, we understand the Government to ask that we essentially interpret the statutory scheme in a way that allows Secretary Becerra to disregard the limitations set forth in § 299b-4(a)(6).[85] Without those limitations, the Government argues, the

---

[82] 42 U.S.C. § 202.

[83] *Id.* § 299b-4(a)(1), (3).

[84] *See id.* §§ 299b-4(a)(6), 300gg-13(a)–(b); *see also Preiser v. Rodriguez*, 411 U.S. 475, 489–90 (1973).

[85] *See Arthrex*, 594 U.S. at 23 ("In general, 'when confronting a constitutional flaw in a statute, we try to limit the solution to the problem' by disregarding the 'problematic portions while leaving the remainder intact.'" (quoting *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328–29 (2006))); *see also Massachusetts v. Mellon*, 262 U.S. 447,

No. 23-10326

constitutional problem can be avoided: the Task Force need no longer be "independent" and "subject to political pressure,"[86] and Secretary Becerra can begin "to review and reject Task Force 'A' and 'B' recommendations before they would become effective under § 300gg-13."

The Government is half-right. If we were to "sever" § 299b-4(a)(6), we would indeed have no reason to ensure that the Task Force remained "independent" and not "subject to political pressure," as that provision requires. We can agree with the Government on that much. It is far from clear, however, how our decision to disregard § 299b-4(a)(6) would also thereby *empower* the Secretary to begin reviewing, and possibly rejecting,[87] the Task Force's recommendations. Such secretarial review would not conflict with any other applicable statutory provision, to be sure, but the Government does not explain from where the Secretary's power to review the recommendations would derive once we decide to disregard the command of § 299b-4(a)(6). As we have already observed, Congress contemplated a limited, ministerial role for the Secretary with respect to the preventive-care recommendations, as the mechanics of § 300gg-13(a)–(b) bear out, and the HHS Reorganization Plan No. 3 of 1996 further makes clear that any "functions vested by law in any advisory council, board, or committee of the Public Health Service"—such as the Task Force—would

---

488 (1923) (describing a court's "negative power to disregard an unconstitutional enactment"). *Compare* Kevin C. Walsh, *Partial Unconstitutionality*, 85 N.Y.U. L. Rev. 738, 778 (2010) ("[J]udicial review is an exercise in determining the extent to which superior law displaces inferior law."), *with* William Baude, *Severability First Principles*, 109 Va. L. Rev. 1, 5–6 (2023) ("The severability question tries to answer what the law is— what *is* the law, in light of what the law *is not*?").

[86] 42 U.S.C. § 299b-4(a)(6).

[87] We note that it is only a possibility, and certainly not an inevitability, because of the Secretary's unexplained memo ratifying all the Task Force's recommendations *en masse*.

not be transferred to the HHS Secretary.[88] It is thus apparent that the Secretary could not exercise the supervisory power that the Government hypothesizes he would exercise in the absence of § 299b-4(a)(6).

For many of these reasons, we are unable to track the Supreme Court's severability analysis in *Arthrex*, as the Government urges us to do. The Court in *Arthrex*, of course, concluded that the offending provision— § 6(c) of the America Invents Act—"cannot constitutionally be enforced to the extent that its requirements prevent the Director from reviewing final decisions rendered by the APJs."[89] By declining to enforce that provision, the Court allowed the Director to exercise the "powers and duties" vested in him by Congress and to accordingly "review[] PTAB decisions" and even "issue decisions himself on behalf of the Board."[90] In this case, by contrast, Congress bestowed no such power upon the HHS Secretary. There are no fallback provisions on which he can rely to exercise a supervisory power (or any other), and no injunction, declaration, or judgment of ours can change that statutory reality.[91]

"[W]e try," when we can, "to limit the solution to the problem."[92] But with or without § 299b-4(a)(6), the constitutional problem persists. We

---

[88] 80 Stat. 1610, § 1(b).

[89] *Arthrex*, 549 U.S. at 25.

[90] *Id.* at 24, 25; *see also* 35 U.S.C. § 3(a)(1) ("The powers and duties of the United States Patent and Trademark Office shall be vested in . . . [a] Director of the United States Patent and Trademark Office . . . , who shall be a citizen of the United States and who shall be appointed by the President, by and with the advice and consent of the Senate."); *id.* § 3(2)(A) ("The Director shall be responsible for providing policy direction and management supervision for the Office and for the issuance of patents and the registration of trademarks.").

[91] *Cf. NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 448 (5th Cir. 2022) ("[T]he judicial power vested in us by Article III does not include the power to veto statutes.").

[92] *Ayotte*, 546 U.S. at 328.

No. 23-10326

therefore decline the Government's invitation "to sever the limitations on secretarial oversight" over the Task Force.[93]

## III

Because we agree with the plaintiffs on the merits of their Appointment Clause challenge against the Task Force, we must now determine whether they were given the appropriate relief.

The district court determined that the plaintiffs were entitled to not only party-specific injunctive relief but also vacatur under § 706(2) of the APA and a concomitant universal injunction. The district court specifically vacated "any and all agency actions taken to implement or enforce the preventive care coverage requirements in response to an 'A' or 'B' recommendation by the [Task Force] on or after March 23, 2010," and enjoined the Government "from implementing or enforcing 42 U.S.C. § 300gg-13(a)(1)'s compulsory coverage requirements in response to an 'A' or 'B' rating from [the Task Force] in the future."

The Government, along with the many amici in this case, vigorously object to these remedies. The Government, for its part, contends that the district court failed to consider the equities when it granted this broad relief—and if it had, the Government posits, the district court would have concluded that vacatur was unwarranted. The amici, for their part, echo the Government and vouch for the equities at stake. They generally attest to the importance of the various preventive-care services that are now covered by

---

[93] By extension, we also decline the Government's alternative invitation to sever § 299b-4(a)(6)'s application "to the Task Force's 'A' and 'B' recommendations to the extent those recommendations are given effect to require coverage under 42 U.S.C. § 300gg-13." If the Government's broader proposed solution cannot fix the constitutional problem, neither can its narrower one.

No. 23-10326

operation of § 300gg-13(a), and many of them express concern about the collateral effects the universal remedies would have if implemented.

Although we disagree with the Government's primary contention that the district court was required to consider the various equities at stake, we nevertheless agree with its secondary contention that there was no basis for the district court to grant relief under the APA. It follows, in our view, that there was also no basis for the universal injunction.

## A

Our caselaw, notwithstanding notable skepticism,[94] has understood vacatur under § 706(2) to be a remedy that affects individuals beyond those who are parties to the immediate dispute. "Under prevailing precedent," we have observed, "§ 706 extends beyond the mere non-enforcement remedies available to courts that review the constitutionality of legislation, as it empowers courts to set aside—*i.e.*, formally nullify and revoke—an unlawful agency action."[95] As we put it in a couple of recent cases, setting aside agency action under § 706 has "nationwide effect,"[96] is "not party-restricted,"[97] and "affects persons in all judicial districts equally."[98] That is because, unlike

---

[94] *E.g.*, *United States v. Texas*, 599 U.S. 670, 695 (2023) (GORSUCH, J., concurring) (doubting that the "power to 'vacate' agency action" means to render it "null and void"); John Harrison, *Vacatur of Rules Under the Administrative Procedure Act*, 40 YALE J. ON REG. 119, 131 (2023) ("Vacatur of rules, under section 706(2) or as a generally applicable non-statutory remedy, was not familiar when the APA was adopted.").

[95] *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022) (internal quotations marks omitted).

[96] *In re Clarke*, 94 F.4th 502, 512 (5th Cir. 2024).

[97] *Career Colls. and Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024).

[98] *Clarke*, 94 F.4th at 512.

No. 23-10326

an injunction, which operates *in personam*,[99] vacatur operates on the status of agency action in the abstract.[100]

In addition to its potency and peculiarly broad nature, vacatur under § 706 is, as we have repeatedly described it, the "default" remedy for unlawful agency action.[101] Thus, contrary to what the Government and the amici represent, we do not read our precedent to require consideration of the various equities at stake before determining whether a party is entitled to vacatur.[102] Section 706, after all, provides that a "reviewing court *shall*" set

---

[99] *See* Joseph Story, Commentaries on Equity Pleadings § 72, at 74 (2d ed. 1840).

[100] *See Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) ("Consistent with historical practice, a federal court exercising its equitable authority may enjoin named defendants from taking specified unlawful actions."); *see also Texas v. Biden*, 20 F.4th 928, 957 (2021) (*rev'd on other grounds*) ("That statutory empowerment [in § 706(2)] means that, unlike a court's decision to hold a statute unconstitutional, the district court's vacatur rendered the June 1 Termination Decision void."); Harrison, *supra* note 94, at 119 (2023) ("Vacatur of rules, as [some] courts understood it, is a universal remedy distinct from universal injunctions. Vacatur operates on the legal status of a rule, causing the rule to lose binding force.").

[101] *E.g.*, *Data Mktg.*, 45 F.4th at 859 ("The default rule is that vacatur is the appropriate remedy); *Texas v. Biden*, 20 F.4th at 993 ("[B]y default, remand *with* vacatur is the appropriate remedy."); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation.").

[102] The one decision the Government cites in support of its contention, *Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023), is not to the contrary. In *Cargill*, we confronted what we concluded to be an unlawful agency regulation, and a plurality of our en banc court opted to remand the vacatur issue to the district court so that it could consider whether "a more limited remedy [was] appropriate [under the] circumstances." *Id.* at 472. The plurality did so, it stated, because "the parties ha[d] not briefed the remedial-scope question." *Id.* That is obviously not the case here. What the Government's short parenthetical citation to *Cargill* fails to capture is that just before the plurality decided that remand was appropriate given the lack of briefing, it recited plainly the proposition that is at odds with its argument: "vacatur of an agency action is the default rule in this Circuit." *Id.*

No. 23-10326

aside unlawful agency action,[103] and we do not understand vacatur to be a remedy familiar to courts sitting in equity, at least as this court currently conceptualizes it.[104]

We do read our precedent, however, to say that one of the minimal requirements to be entitled to this "default" APA remedy is, perhaps unsurprisingly, an APA claim. As the Government dutifully apprised us via a Rule 28(j) letter, a panel of this court recently said as much. In *Deanda v. Becerra*, a plaintiff belatedly requested vacatur of an allegedly unlawful regulation in a proposed final judgment following his successful constitutional challenge to the administration of a federal statute.[105] Over an objection by the Government that the plaintiff had failed to plead an APA claim, the district court adopted the proposed judgment and vacated the regulation.[106] We reversed, observing, "We know of no authority . . . authorizing a court to vacate a regulation under § 706(2) in the absence of an APA claim."[107]

We can say the same today. The plaintiffs' response to the Government's Rule 28(j) letter does not raise to our attention any newer,

---

[103] 5 U.S.C. § 706(2) (emphasis added).

[104] *See Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) ("[T]he English system of equity did not authorize injunctions against the king. And as a general rule, American courts of equity did not provide relief to parties beyond the case." (internal quotations and citations omitted)). *But cf.* 2 The Records of the Federal Convention of 1787, at 27 (Max Farrand ed., 1911) (Madison describing the judiciary's powers to "set aside" unconstitutional laws).

[105] 96 F.4th 750, 755 (5th Cir. 2024).

[106] *Id.*

[107] *Id.* at 767–68.

No. 23-10326

contrary authority. Nevertheless, they offer two counterpoints. Abiding by our rule of orderliness,[108] we must reject them both.

The plaintiffs first contend that Rule 54(c) of the Federal Rules of Civil Procedure does not confine the available remedies to what they requested in their complaint. Under Rule 54(c), "final judgment[s] should grant relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."[109] We agree that Rule 54(c) does indeed dispel the formalism that relief is limited to only what is specifically demanded, and we further agree that, unlike the defendant in *Deanda*, the Government in this case had comparatively more time to rebut the plaintiffs' claim of entitlement to vacatur. Even so, the plaintiffs' vacatur demand undeniably came "at a . . . later stage of the proceedings,"[110] and it was of "substantially different character from that requested" in their operative complaint.[111] Specifically, the demand came during the third round of summary-judgment briefing, just before the notice of appeal was filed, and the remedy had the effect of invalidating many agency actions, none of which the plaintiffs challenged in their live complaint. In fact, the one APA claim the plaintiffs asserted in their original complaint—which took aim at the many preventive-care recommendations that they now assert are unlawful—was abandoned in their amended complaint. We continue to adhere to the view that Rule 54(c)

---

[108] *See Gahagan v. U.S. Citizenship & Immigr. Servs.*, 911 F.3d 298, 302 (5th Cir. 2018) ("Three-judge panels . . . abide by a prior Fifth Circuit decision until the decision is overruled, expressly or implicitly, by either the United States Supreme Court or by the Fifth Circuit sitting en banc." (quoting *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 (5th Cir. 2001))).

[109] Fed. R. Civ. P. 54(c).

[110] *Engel v. Teleprompter Corp.*, 732 F.2d 1238, 1242 (5th Cir. 1984).

[111] *Portillo v. Cunningham*, 872 F.3d 728, 735 (5th Cir. 2017).

offers "remedial latitude,"[112] insofar as judgments need not be limited to the kind or amount of relief pleaded,[113] but we think it a step too far for the district court to award relief never pleaded (indeed, abandoned), and to do so at the last stage of proceedings and for particular agency actions never expressly challenged.

Apart from their procedural-flexibility argument, the plaintiffs also contend that even if they did not expressly challenge the agency actions encompassed by the district court's vacatur order, their constitutional challenge implicitly did. In the plaintiffs' view, vacatur under the APA is appropriate here because their successful constitutional challenge to the preventive-care coverage mandates under 42 U.S.C. § 300gg-13 necessarily implicates the lawfulness of the regulations and agency actions taken under them. This argument, we think, has sound logic,[114] but it is one that is also foreclosed by *Deanda*. As the panel in that case recognized, the "substantive rulings were incompatible with the regulation's lawfulness," but it was still "not the same as adjudicating an APA challenge to a regulation."[115] We must, therefore, also reject this theory of upholding the district court's vacatur remedy.

## B

Because we do not find any support for the district court's decision to vacate all agency actions taken to enforce the Task Force's recommendations, we also cannot find any support for the district court's

---

[112] *Deanda*, 96 F.4th at 768.

[113] Charles Allen Wright & Mary Kay Kane, Law of Federal Courts 631 (8th ed. 2017).

[114] *Cf. Franciscan All.*, 47 F.4th at 378 ("[A] challenge to an agency regulation is necessarily a challenge to the underlying statute as well.").

[115] *Deanda*, 96 F.4th at 768.

No. 23-10326

universal (or nationwide) injunction. The parties recognize that such injunctions are not "required or even the norm,"[116] and several justices on the Supreme Court have viewed them with conspicuous skepticism.[117] Scholars and judges from our sister circuits have done the same.[118]

Likely for those reasons, the plaintiffs do not defend the universal injunction on its own terms. They instead justify it on the ground that it is no broader, and thus no more harmful, than the vacatur remedy that the district court already awarded. "Because this injunction is concomitant to the APA remedy," the plaintiffs explain, "there is no cause for angst over the issuance of a universal injunction." We can agree with the sentiment[119] but not with

---

[116] *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021).

[117] *Compare Labrador v. Poe*, 144 S. Ct. 921, 928 (2024) (Gorsuch, J., concurring) ("Lower courts would be wise to take heed" that "any equitable remedy they issue must not be 'more burdensome to the defendant than necessary to redress' the plaintiff's injuries.") (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)), *with id.* at 938 (Jackson, J., dissenting) ("I share the concern that courts heed the limits of their power."); *see also Trump v. Hawaii*, 585 U.S. 667, 713 (2018) (Thomas, J., concurring) ("I am skeptical that district courts have the authority to enter universal injunctions."); *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 1 (Mem.) (statement of Kavanaugh, J.) ("No federal statute expressly grants district courts the power to enter injunctions prohibiting Government enforcement against non-parties in the circumstances presented in this case.").

[118] *E.g.*, *Arizona v. Biden*, 40 F.4th 375, 394–98 (Sutton, C.J., concurring). The scholarship on nationwide injunctions is prolific, and we are generally familiar—and appreciative—of all the academics who have weighed in on this important issue. But for analysis from one leading commentator, see generally Samuel L. Bray, *Multiple Chancellors: Reforming the National Injunction*, 131 Harv. L. Rev. 417, 421 (2017).

[119] *Cf. Labrador*, 144 S. Ct. at 931–32 (Kavanaugh, J., concurring) ("[A] rule prohibiting nationwide or statewide injunctions would not eliminate the need for this Court to assess the merits of some emergency applications involving new laws. For one, there is an ongoing debate about whether any such rule would apply to Administrative Procedure Act cases involving new regulations, given the text of the APA."); *Earth Island Inst. v. Ruthenbeck*, 490 F.3d 687, 699 (9th Cir. 2006) (upholding a nationwide injunction and concluding that it was "compelled by the text of [§ 706] of the Administrative Procedure

No. 23-10326

the premise. As we have already explained, the district court erred in vacating all agency actions[120] taken to enforce the preventive-care mandates, so we have no reason to uphold relief broader than what is necessary to redress the plaintiffs' injuries.[121] Though this case concerns federal law and necessarily implicates concerns of nationwide uniformity, it does not fall into one of the narrow categories that we have previously identified as particularly appropriate for universal injunctive relief.[122] Nor would party-specific

---

Act"); Ronald M. Levin, *Vacatur, Nationwide Injunctions, and the Evolving APA*, 98 NOTRE DAME L. REV. 1997, 2027 (2023) ("The [Solicitor General's] solution of allowing a court to provide injunctive relief only to the individual litigant would seem to mean that a regulation could never be vacated or 'set aside' as a whole, no matter how many courts have spoken to its validity, until the Supreme Court has reviewed it.").

[120] We additionally note, and the plaintiffs agree, that the district court's vacatur remedy was overbroad insofar as it purported to vacate non-final agency actions. *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in court are subject to judicial review.").

[121] *See Califano*, 442 U.S. at 702 ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.").

[122] *E.g.*, *Texas v. United States*, 809 F.3d 134, 187–88 (5th Cir. 2015) (upholding a universal injunction in an immigration case because of the interest in keeping immigration laws "uniform" and because "a geographically-limited injunction would be ineffective"); *Texas v. United States*, 50 F.4th 498, 531 (5th Cir. 2022) ("In the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement.") (quoting *Texas v. United States*, 40 F.4th 205, 229 n.18 (5th Cir. 2022)); *see also Feds for Med. Freedom*, 63 F.4th at 388 (explaining that the Government's opposition toward the district court's universal injunction "s[at] awkwardly" with its position that it wanted "consistency across the Government in enforcement of this Government-wide vaccine policy"). It is worth noting that the fact we are reviewing the constitutionality of federal law can also cut *against* universal relief, because unlike a universal injunction against the enforcement of state law, one against the enforcement of federal law presents more practical percolation problems. *See Trump*, 585 U.S. at 713 (THOMAS, J., concurring) ("These [universal] injunctions are beginning to take a toll on the federal court system— preventing legal questions from percolating through the federal courts . . . ."). There is also, not to mention, the issue of nonmutual offensive collateral estoppel and the Supreme Court's holding in *United States v. Mendoza* that it does not apply to the federal government. 464 U.S. 154, 164 (1984).

No. 23-10326

injunctive relief in this case prove "unwieldy" or "cause more confusion" for geographic reasons, for all the plaintiffs in this case reside in two neighboring Texas counties.[123]

Thus, without any basis to seek universal vacatur of final agency actions taken to enforce the preventive-care mandates, the plaintiffs lack any basis for an injunction of the same breadth.[124] The district court likewise did not explain why, apart from vacatur under the APA, the universal injunction was necessary. We must therefore conclude that it was an abuse of discretion to enter universal injunctive relief after already providing complete relief to the plaintiffs.

## IV

We now address, lastly, the subject of the plaintiffs' cross-appeal. For reasons that echo their constitutional challenge against the Task Force, the plaintiffs maintain that the other two administrative bodies behind the preventive-care mandates, ACIP and HRSA, violate the Appointments Clause.

As far as the statutory scheme in § 300gg-13 is concerned, both ACIP and HRSA have roles similar to that of the Task Force. For example, like the

---

[123] *Feds for Med. Freedom*, 63 F.4th at 388 (upholding a universal injunction because, among other reasons, the thousands of plaintiffs were "spread across every State in the Nation" and the district court "fear[ed] that limiting the relief to only those before it would prove unwieldy and would only cause more confusion").

[124] We recognize, of course, that even ordinary, party-specific injunctions can incidentally benefit nonparties. *See, e.g.*, *Texas*, 599 U.S. at 693 (GORSUCH, J., concurring) ("Traditionally, when a federal court finds a remedy merited, it provides party-specific relief, directing the defendant to take or not take some action relative to the plaintiff. If the court's remedial order affects nonparties, it does so only incidentally."); *see also Feds for Med. Freedom*, 63 F.4th at 387 (noting that injunctions "*could* benefit non-parties as long as that benefit was merely incidental" (internal quotation omitted)). But we think it indicative of its overbreadth that the district court's universal injunction in this case would ultimately benefit some of the parties in this lawsuit whom it found lacked standing.

No. 23-10326

Task Force, both ACIP and HRSA appear to have the unilateral authority to issue legally binding recommendations for preventive care under § 300gg-13(a), and their power to do so is subject only to the HHS Secretary's "interval" determination under subsection (b).[125]

The similarities, however, disappear once our review extends past that cabined preventive-care scheme. With respect to ACIP, its preventive-care recommendations must first be approved by the CDC Director before they can take effect.[126] The CDC Director, in turn, derives his authority from the HHS Secretary, who can countermand the CDC Director's decisions to approve ACIP's vaccine recommendations.[127] Similarly, with respect to HRSA, Secretary Becerra can exercise control over the guidelines it publishes by virtue of the transfer of power in HHS's Reorganization Plan No. 3 of 1966. There, Congress authorized the Secretary to perform "all functions of the Public Health Service . . . and all functions of all agencies of or in the Public Health Service."[128] Thus, unlike his power vis-à-vis the Task Force, Secretary Becerra has fallback powers on which he can exercise

---

[125] *See* 42 U.S.C. § 300gg-13(b) ("The [HHS] Secretary shall establish a minimum interval between the date on which a recommendation described in subsection (a)(1) and (a)(2) or a guideline under subsection (a)(3) is issued and the plan year with respect to which the requirement described in subsection (a) is effective with respect to the service described in such recommendation or guideline.").

[126] *See* 45 C.F.R. § 147.130(a)(1)(ii) ("[A] recommendation from [ACIP] is considered in effect after it has been adopted by the Director of the [CDC].").

[127] *See* 42 U.S.C. § 243; *see also id.* § 242c.

[128] 80 Stat. 1610 (1966). The plaintiffs contend that HRSA did not exist until 1982, so the Reorganization Plan No. 3 of 1966 could not have transferred its powers and functions to the HHS Secretary. The plaintiffs recognize, however, that this argument is all but foreclosed by *Willy v. Administrative Review Board*, 423 F.3d 483, 491–92 (5th Cir. 2005), in which we held that the Reorganization Plan No. 6 of 1950, which predated the creation of the Administrative Review Board within the Department of Labor, transferred to the Secretary of Labor the power to appoint members of the Administrative Review Board.

supervisory authority over ACIP and HRSA—authority, in our view, that encompasses the prerogative to ratify their preventive-care recommendations and guidelines made pursuant to § 300gg-13(a).[129]

According to the Government, the Secretary has exercised this statutory prerogative and has effectively cured whatever Appointments Clause issues afflict ACIP and HRSA. Like it did with the Task Force, the Government points to Secretary Becerra's memo of January 21, 2022, in which he purported to ratify all the recommendations and guidelines thus far issued by ACIP and HRSA.

Even if we were prepared to accept ratification as a valid means of curing Appointments Clause defects, however, we cannot accept the Secretary's attempt to do so here—at least at this juncture. That is because the plaintiffs put forward compelling and essentially unrebutted arguments that there are serious APA problems with the Secretary's ratification memo. They specifically contend that the Secretary's memo (1) failed to go through notice-and-comment rulemaking,[130] (2) is arbitrary and capricious because it does not explain its reasoning,[131] and (3) is improperly retroactive.[132] The district court, to be sure, determined that the Secretary had properly ratified ACIP's and HRSA's recommendations and guidelines, but it had no

---

[129] *See Free Enter. Fund*, 561 U.S. at 510 ("Given that the Commission is properly viewed, under the Constitution, as possessing the power to remove Board members at will, *and* given the Commission's oversight authority, we have no hesitation in concluding that under *Edmond* the Board members are inferior officers whose appointment Congress may permissibly vest in a 'Hea[d] of Departmen[t].'" (emphasis added) (alterations in original)).

[130] *See* 5 U.S.C. § 553(b)–(c) (outlining notice-and-comment procedure).

[131] *See id.* § 706(2)(A) (empowering reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be—arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").

[132] *See id.* § 551(4).

No. 23-10326

opportunity to consider the above three contentions that the plaintiffs now advance on appeal—likely because the Secretary issued his ratification memo on January 21, 2022, years after the plaintiffs filed their amended complaint and months after they filed their initial brief in support of summary judgment.

In our estimation, these arguments present pure questions of law and, if left unconsidered, could lead to an incorrect result with respect to the plaintiffs' constitutional challenges. For those reasons, we could exercise our discretion to consider them for the first time on appeal.[133] At the same time, however, we are disinclined to decide questions without sufficient briefing, particularly ones of high stakes and of constitutional import. We also generally prefer to adhere to our policy of being "a court of review, not first view."[134] So rather than decide these heady questions ourselves without the benefit of any considered judgment below or any meaningful response from the Government on appeal, we think it prudent for the district court to consider these arguments in the first instance. Once it does, we will be better positioned to weigh in on issues that affect not only the parties to this case, but evidently so many of the interested stakeholders in this circuit that the many amici represent.[135]

---

[133] *See Murray v. Anthony J. Bertucci Constr. Co.*, 958 F.2d 127, 128 (1992) ("This court has recognized, however, that 'when a question is of pure law, and when refusal to consider it will lead to an incorrect result or a miscarriage of justice, appellate courts are inclined to consider questions first raised on appeal.'" (quoting *Nilsen v. City of Moss Point, Mississippi*, 674 F.2d 379, 387 n.13 (5th Cir. 1982), *rev'd en banc on other grounds*, 701 F.2d 556 (5th Cir. 1983))).

[134] *Deanda*, 96 F.4th at 767 (quoting *Rest L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023)).

[135] *Cf. Maslenjak v. United States*, 582 U.S. 335, 354 (2017) (Gorsuch, J., concurring in part and concurring in the judgment) ("[T]he crucible of adversarial testing on which we usually depend, along with the experience of our thoughtful colleagues on the district and circuit benches, could yield insights (or reveal pitfalls) we cannot muster guided

No. 23-10326

## V

In sum, we:

- AFFIRM the district court's judgment insofar as it enjoined the defendants from enforcing the preventive-care mandates against the plaintiffs it found had standing;

- REVERSE its judgment insofar as it entered universal remedial relief; and

- REMAND for further proceedings to consider those arguments we have identified as presented for the first time on appeal.

---

only by our own lights."). Granted, the many amici in this case may have less interest in this litigation now that we have determined the district court erred in granting universal relief. But barring a contrary decision from our en banc court or the Supreme Court, our decision today will of course have stare decisis effect for the litigants in this circuit. *See Labrador*, 144 S. Ct. at 932 (KAVANAUGH, J., concurring).